**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ALARIC STONE**, **ERIC JACKSON**, and **MICHAEL MARCENELLE**, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) | Case No. |
| v. | ) ) | |
| **ALEJANDRO N. MAYORKAS**, in his official capacity as Secretary of Homeland Security, **LLOYD J. AUSTIN**, **III**, in his official capacity as Secretary of Defense, **LINDA L. FAGAN**, in her official capacity as Commandant of the Coast Guard, and **BRIAN K. PENOYER**, in his official capacity as Assistant Commandant for Human Resources of the Coast Guard, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT – CLASS ACTION

Plaintiffs Lieutenant Junior Grade (LTJG) Alaric Stone, Boatswain's Mate 1st Class (BM1) Eric Jackson, and LTJG Michael Marcenelle, on behalf of themselves and all others similarly situated (the "Class"), for their Class Action Complaint against the Defendants in their official capacities, hereby state as follows:

## INTRODUCTION

1.      Defendants are trying to force Plaintiffs and more than 1,200 other Coast Guard members to submit to being injected with a COVID-19 vaccine against their sincerely held religious beliefs.

1

2.      In this lawsuit, Plaintiffs challenge Defendants' policy of categorically denying virtually all religious accommodation requests from the Coast Guard COVID-19 vaccine mandate, which violates their sincerely held religious beliefs.

3.      Chaplains attested to the sincerity of Plaintiffs' religious objections to being vaccinated, and Defendants did not contest the sincerity of Plaintiffs' religious objections to being vaccinated.

4.      Plaintiffs contracted COVID-19 and obtained natural immunity, and Plaintiffs have been willing and able and remain willing and able to wear a mask and test periodically.

5.      On May 4, 2022, the Coast Guard issued a purported final denial of LTJG Stone's September 22, 2021, request for religious accommodation. On May 3, 2022, the Coast Guard issued a purported final denial of BM1 Jackson's November 7, 2021, request for religious accommodation. On May 16, 2022, the Coast Guard issued a purported final denial of LTJG Marcenelle's September 9, 2021, request for religious accommodation.

6.      The Coast Guard has denied virtually all of the 1,200+ religious accommodation requests filed by Coast Guard service members.

7.      Any approved religious accommodation requests were for service members already slated for retirement or separation.

8.      The Coast Guard is experiencing a significant recruiting and retention shortfall due in part to the Coast Guard's systematic mistreatment of religious service members.

9.      This action is based upon the Religious Freedom Restoration Act of 1993 (RFRA) and the First Amendment to the United States Constitution, both of which protect Plaintiffs' and each Class member's fundamental right to the free exercise of their religion.

10.     This action is also based on the Administrative Procedure Act (APA), which protects Plaintiffs and the Class from arbitrary and capricious agency action by Defendants.

11.     Plaintiffs and the Class challenge Defendants' orders, policies, and actions detailed below, facially for lack of exception for any religious exercise, and as applied to Plaintiffs and the Class in denying their particular requests for religious accommodation.

12.     Plaintiffs and the Class challenge Defendants' orders, policies, and actions detailed below, as applied to Plaintiffs and the Class in refusing to consider or grant medical exemptions based on natural immunity and in failing to provide an appellate review as required by mandatory Coast Guard instructions.

13.     Defendants' orders, policies, and actions deprived and will continue to deprive Plaintiffs and other Class members of their paramount rights and guarantees under federal law, including under RFRA, the United States Constitution, and the APA.

14.     Defendants committed each and every act alleged herein under the color of law and authority—and in blatant violation of the U.S. Constitution and federal law.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and federal law.

16.     The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the United States.

17.     The Court also has jurisdiction under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs and Class.

18.     The Court also has jurisdiction pursuant to 42 U.S.C. § 2000bb-1(c) because Plaintiffs' religious exercise and that of other service members have been burdened by Defendants.

19.     The Court also has jurisdiction to review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action.

20.     This Court has authority to award the requested relief pursuant to 42 U.S.C. § 2000bb-1; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 2202; and costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b), 28 U.S.C. § 2412, and 28 U.S.C. § 1920.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, including § 1391(e)(1)(C) because at least one of the Plaintiffs (BM1 Jackson) resides in this district.

## PARTIES

22.     LTJG Stone is an officer in the United States Coast Guard.

23.     BM1 Jackson is a non-commissioned officer in the United States Coast Guard. He is a resident of the Northern District of Texas, within the Fort Worth Division.

24.     LTJG Marcenelle is an officer in the United States Coast Guard.

25.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security. Secretary Mayorkas is sued in his official capacity.

26.     Defendant Lloyd J. Austin, III, is the Secretary of the United States Department of Defense. Secretary Austin is sued in his official capacity.

27.     Defendant Admiral Linda Fagan is the Commandant of the United States Coast Guard. Admiral Fagan is sued in her official capacity.

4

28.     Defendant Rear Admiral Brian K. Penoyer is the Assistant Commandant for Human Resources (CG-1). Rear Admiral Penoyer is sued in his official capacity.

## FACTUAL BACKGROUND

### The COVID-19 Vaccine Mandates at Issue

29.     On August 24, 2021, the Secretary of Defense Lloyd Austin issued a mandate for all service members of the Armed Forces under Department of Defense authority on active duty or in the Ready Reserve to receive a COVID-19 vaccine ("DoD Mandate").

30.     During peacetime, the Coast Guard is subordinate to the Secretary of Homeland Security and is a part of the Department of Homeland Security. The Coast Guard is subordinate to the Department of Defense only in wartime, and only if Congress so directs.

31.     On August 26, 2021, then-Commandant of the Coast Guard, Admiral K. L. Shultz, issued a service-wide announcement designated ALCOAST 305/21. ALCOAST 305/21 directed all Coast Guard active duty and ready reserve members to receive the Pfizer-BioNTech COVID-19 vaccine "[c]onsistent with the Secretary of Defense's direction."

32.     ALCOAST 305/21 added that Commanding Officers "shall ensure that all Service members are aware of this message and made available and scheduled for vaccination in coordination with servicing medical personnel. Commanding Officers and leaders shall not commence administrative or disciplinary action based solely on a Service member's decision to decline vaccination until such implementing guidance is promulgated."

33.     ALCOAST 305/21 did not state that the direction was a lawful general order.

34.     At the time of ALCOAST 305/21, the Coast Guard already had at least a 71.5% vaccination rate.

35.     On September 7, 2021, the Deputy Commandant for Mission Support, Vice Admiral Paul F. Thomas, issued ALCOAST 315/21 instructing commanders, commanding officers, and officers in charge to direct unvaccinated Coast Guard members to begin vaccination immediately. The message described itself as a lawful general order ("Coast Guard Mandate").

36.     The DoD Mandate, Coast Guard Mandate, and any and all other related vaccine mandate orders are herein referred to, collectively, as "the Mandates" and sometimes referred to interchangeably as applicable.

37.     LTJG Stone was reprimanded on July 21, 2022, for not complying with the Coast Guard Mandate.

38.     ALCOAST 089/21, dated September 13, 2021 and titled "COVID-19: Permanent and Temporary Medical Exemptions to COVID-19 Immunization Requirement," states that ALCOAST 315/21 mandates COVID-19 vaccination. ALCOAST 089/21 does not cite ALCOAST 305/21 in any capacity.

39.     The issuing authority of ALCOAST 315/21, the Deputy Commandant for Mission Support, is subordinate to the Commandant of the Coast Guard.

40.     Multiple Coast Guard offices are also subordinate to the Commandant of the Coast Guard, including the Deputy Commandant for Operations, Commander Atlantic Area, and Commander Pacific Area. These offices are *not* subordinate to the Deputy Commandant for Mission Support.

41.     The Deputy Commandant for Mission Support is outside of the chain of command for personnel under the Deputy Commandant for Operations, Commander Atlantic Area, and Commander Pacific Area.

42.     The Mandates do not apply to the approximately 30,000 members of the Coast Guard Auxiliary. The Coast Guard Auxiliary "provide[s] trained crews and facilities to augment the Coast Guard" and often work alongside active duty and reserve Coast Guard service members. Coast Guard Auxiliary members are permitted to shop in Coast Guard Exchanges on Coast Guard installations. The Coast Guard continues to permit and even sponsor off-station unit morale events, where Coast Guard service members gather in local communities in close proximity with civilians of uncertain vaccination statuses, such as at restaurants, sporting events, public parks, movie theaters, or theme parks.

43.     The Mandates do not apply to Coast Guard Reserve members on the Inactive Status List (ISL). Members on the ISL are still members of the Coast Guard, carry Coast Guard identification cards, and maintain access to Coast Guard and DoD installations, including housing, gyms, commissaries, food courts, chapels, libraries, theaters, and morale, welfare, and recreation (MWR) facilities and events.

44.     The Mandates do not apply to Coast Guard dependents. Unvaccinated Coast Guard dependents continue to live in base housing alongside Coast Guard members, and enjoy unrestricted access to housing, gyms, commissaries, food courts, chapels, libraries, theaters, and MWR facilities and events. The Department of Defense also has an express policy for retaining non-worldwide deployable members on a case-by-case basis. *See* DoD Instruction 1332.45.[1] Moreover, LTJG Stone is personally aware that the other two officers that work in his District 5 Intelligence Branch office are non-worldwide deployable (for reasons not related to the COVID-19 vaccine) but yet are allowed to remain in the Coast Guard.

---

[1]https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133245p.pdf?ver=2018-08-01-143025-053.

**The Coast Guard's Religious Accommodation Regulations**

45.     At the time of issuance of the Coast Guard Mandate, Commandant Instruction (COMDTINST) M6230.4G, *Immunizations and Chemoprophylaxis for the Prevention of Infectious Disease*, dated February 16, 2018, was an existing policy and procedure of the Coast Guard and remains a policy and procedure of the Coast Guard.

46.     COMDTINST M6230.4G is mandatory.

47.     Other branches of the military have policies and procedures identical to COMDTINST M6230.4G: Army 40-562; Navy BUMEDINST 6230.15B; and Air Force AFI 48-110.

48.     COMDTINST M6230.4G provides an accommodation program for service members seeking an accommodation (also referred to as an exemption) from a vaccination requirement. The accommodation program includes administrative exemptions and medical exemptions.

49.     COMDTINST M6230.4G states in part that administrative exemptions include exemptions for religious reasons.

50.     According to COMDTINST M6230.4G, to obtain a religious exemption from an immunization requirement, a Coast Guard service member must be counseled by a military physician and his or her commander.

51.     On August 30, 2021, the Coast Guard issued COMDTINST 1000.15, titled "Military Religious Accommodations." This was the first time the Coast Guard issued this regulation providing detailed instructions on granting religious accommodations to service members.

52.     COMDTINST 1000.15 is mandatory.

8

53.    COMDTINST 1000.15 states in part that "the Armed Forces must accommodate the beliefs of a member of the armed forces reflecting the conscience, moral principles, or religious beliefs of the member and, in so far as practicable, may not use such beliefs as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training or assignment."

54.    According to ALCOAST 270/22 dated July 25, 2022, "all [Coast Guard Mandate] non-compliant service members will be processed for separation."

55.    According to the Coast Guard document titled "Command Toolkit – Mandatory COVID-19 Vaccinations Version 2.0 (25 July 2022)," enlisted and officers who are not compliant with the Coast Guard Mandate are not eligible to be selected for promotion. If service member has already been selected for promotion, the promotion will be revoked.

56.    ALCOAST 315/21 threatened to restrict official travel, schooling, and leave for unvaccinated service members, including service members seeking a religious accommodation.

57.    LTJG Marcenelle requested leave to travel from South Carolina to North Carolina on March 5, 2022, to run in the Coast Guard Marathon after months of training. LTJG Marcenelle's supervisor and commander both disapproved the request due to his vaccination status.

58.    COMDTINST 1001.15 further states in part that the Coast Guard will "normally accommodate" religious practices of a service member.

59.    The Coast Guard has "granted" at most approximately 1% of all religious accommodation requests from the Mandates. Any approved religious accommodation requests were for service members already slated for separation or retirement.

60. The Coast Guard has granted at least 53 exemptions, including at least eight permanent exemptions, from the Coast Guard Mandate for reasons other than religion.

61. According to COMDTINST 1000.15, the approval authority for a religious accommodation from immunization is Commandant (CG-133). CG-133 is the Coast Guard Office of Military Personnel Policy.

62. The Office Chief of the Office of Military Personnel Policy (CG-133) is Captain Anthony Williams.

63. Captain Anthony Williams denied BM1 Jackson's initial religious accommodation request on December 14, 2021.

64. Captain Anthony Williams denied LTJG Stone's initial religious accommodation request on January 19, 2022.

65. Captain Anthony Williams denied LTJG Marcenelle's initial religious accommodation request on February 8, 2022.

66. According to COMDTINST 1000.15, the official in the chain of command or chain of supervision one level above the officer or official who denied the request must review an appeal of a denied religious accommodation request. This appellate authority is required by COMDTINST 1000.15 to either overturn or uphold the contested accommodation decision.

67. CG-133 is under CG-13, the Coast Guard Director of Military Personnel Policy.

68. The Chief of Military Personnel Policy for the Coast Guard (CG-13) is Dr. Donna Mischell Navarro.

69. Dr. Navarro did not overturn or uphold the denial of Plaintiffs' respective religious accommodation requests on appeal in her role as CG-13.

70. CG-13 is under CG-1, the Coast Guard Office of Human Resources.

71.     Letters sent to Plaintiffs denying their initial religious accommodation requests recognize and confirm that the appeal authority for their requests was the Assistant Commandant for Human Resources (CG-1).

72.     Rear Admiral Eric Jones was the Assistant Commandant for Human Resources until April 2022.

73.     Rear Admiral Eric Jones did not overturn or uphold the denial of multiple Plaintiffs' respective accommodation requests on appeal.

74.     Dr. Navarro was the acting Assistant Commandant for Human Resources during May 2022 until at least July 2022.

75.     Dr. Navarro did not overturn or uphold the denial of Plaintiffs' respective accommodation requests on appeal.

76.     Defendant Penoyer became the current Assistant Commandant for Human Resources as of July 2022.

77.     Defendant Penoyer did not overturn or uphold the denial of Plaintiffs' accommodation requests on appeal.

78.     James Knight, a member of the Senior Executive Service and the Deputy Assistant Commandant for Acquisition and Director of Acquisition Services under CG-9 (Acquisition Directorate), purportedly denied the appeal of LTJG Alaric Stone on May 4, 2022.

79.     Rear Admiral Miriam Lafferty, Assistant Commandant for Reserve (CG-R), purportedly denied the appeal of BM1 Jackson on May 3, 2022.

80.     Rear Admiral Jones purportedly denied the appeal of LTJG Marcenelle on May 16, 2022. At the time of signature, Rear Admiral Jones had already departed CG-1.

81.    No one who issued the purported denials of Plaintiffs' appeals had authority to issue the purported denials

82.    The respective purported appeal authority for each Plaintiff stated: "My decision in your case came only after extensive consideration. I personally reviewed your appeals package and consulted with a Judge Advocate to ensure I accurately applied the law and policy to your specific circumstance."

83.    The purported final denial memoranda for each Plaintiff are virtually identical aside from name changes and dates.

84.    None of the Plaintiffs' appeal denial memoranda mention the plaintiffs' respective duties, individual health risks, natural immunity, compliance with mitigation protocols, availability of less restrictive means, additional facts and arguments submitted in plaintiffs' respective appeal memoranda, or a statement of the Coast Guard's alleged compelling interest in denying an accommodation to the respective plaintiffs.

85.    Based on information and belief, the Coast Guard informed service members of their "personally reviewed," "extensive[ly] consider[ed]," and inevitably denied appeals at a rate of roughly 200 per week between May 4, 2022, and May 25, 2022.

86.    The Department of Defense Inspector General investigated and as of June 2, 2022 "found a trend of generalized assessments rather than the individualized assessment that is required by Federal law and DoD and Military Service policies." He also concluded that, at most, "the average review period" by appeal authorities "was about 12 minutes for each package," which is likely "insufficient to process each request in an individualized manner."

87.     On September 2, 2022, Defendant Austin forwarded the Inspector General's June 2, 2022 memorandum to his Under Secretary and military branch leaders for unspecified "appropriate action… as necessary and appropriate."

88.     Defendants have taken no action to remedy the unlawful activity the Inspector General found.

**Natural Immunity as a Basis for Medical Exemption and a Lesser Restrictive Means than Vaccination**

89.     COMDTINST M6230.4G states in part: "Health care providers will determine a medical exemption based on the health of the vaccine candidate and the nature of the immunization under consideration. . . . General examples of medical exemptions [from a vaccination requirement] include the following . . . (b) Evidence of immunity based on serologic tests, documented infection, or similar circumstances."

90.     COMDTINST M6230.4G requires health care providers to record "exemption codes denoting evidence of immunity," in addition to requiring health care providers to record any "severe adverse event after immunization."

91.     COMDTINST M6230.4G further requires that service members with "[e]vidence of immunity (for example, by serologic *antibody test*); documented previous infection . . . ; [or] natural infection presumed" (emphasis added) should be provided a medical exemption code "MI."

92.     The Centers for Disease Control and Prevention (CDC) defines immunity as "protection against a disease."

93.     According to the CDC, immunity "can be acquired in two ways, either by contracting the disease or through vaccination." The CDC adds that such immunity "is usually permanent, meaning an individual is protected from the disease for the duration of their lives."

94.     Consistent with COMDINST M6230.4G, the CDC's definition of immunity states that "[i]mmunity is indicated by the presence of antibodies in the blood."

95.     Immunity acquired by contracting the disease is also referred to as "natural immunity."

96.     Natural immunity to COVID-19 is gained from previous infection of COVID-19.

97.     Natural immunity to COVID-19 gained from previous infection of COVID-19 has helped to protect people from medically significant disease, hospitalization, and death from COVID-19.

98.     Existence of COVID-19 antibodies in the body indicates natural immunity to COVID-19.

99.     Individuals with positive serological tests for antibodies for SARS-CoV-2 (the virus that causes COVID-19) are excluded from clinical trials of COVID-19 vaccine candidates because natural immunity, indicated by the presence of antibodies in the blood, provides protection which could interfere with an analysis of vaccine effectiveness.

100.    The federal Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS) issued a COVID-19 regulation recognizing that the vaccinated and those who "have recovered from infection . . . are no longer sources of future infections." 86 Fed. Reg. at 61,604.

101.    The CDC has recognized that natural immunity has helped to substantially reduce the risk for medically significant COVID-19 illness, hospitalization, and death.

14

102.    The CDC's COVID-19 prevention recommendations "no longer differentiate based on a person's vaccination status because" a) breakthrough infections occur in vaccinated persons, and b) natural immunity provides adequate protection against reinfection, transmission, and serious illness.[2]

103.    ALCOAST 305/21 states in part, "Those with previous COVID-19 infection are not considered fully vaccinated."

104.    ALCOAST 089/21 states in part, "Permanent medical exemptions will be granted only when an individual has a medical contraindication to the required COVID-19 vaccine(s). . . previous COVID-19 infection is not considered proof of immunity."

105.    The Coast Guard recorded more COVID-19 cases in vaccinated personnel than in unvaccinated personnel beginning on or about September 7, 2021 (the date of ALCOAST 315/21) and continuing through at least the end of 2021. The Coast Guard's infection statistics do not differentiate between infection rates among unvaccinated personnel with natural immunity and unvaccinated personnel without natural immunity.

106.    Coast Guard officers, including Captain John Iskander, the Chief of Preventative Medicine and Population Health for the Coast Guard, published research in August 2021 studying COVID-19 vaccine effectiveness among Coast Guard members. The research showed that vaccine effectiveness among the Coast Guard declined twenty percentage points in the three months leading up to the Coast Guard Mandate.

107.    A study published in the New England Journal of Medicine found that the effectiveness of the Pfizer-BioNtech COVID-19 vaccine "was negligible" just six months after vaccination. The researchers concluded that their findings were explained "by the short-lived

---

[2] https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm

protection of primary-series vaccination against omicron infections and the more durable protection from natural infection."[3]

108.    A Coast Guard Atlantic Area briefing dated March 4, 2022, illustrated COVID-19 cases between May 2020 and March 2022.

109.    According to this briefing, in January 2022, the Coast Guard Atlantic Area experienced a peak of 662 cases in January 2022. In August 2021 when the Coast Guard Mandate issued, the Coast Guard Atlantic Area only had approximately 150 cases. In December 2020, the Coast Guard Atlantic area experienced a peak of 215 cases. The December 2020 peak was only exceeded by the January 2022 peak.

110.    As of May 2022, the Coast Guard had a vaccination rate of approximately 98%. In January 2022, the Coast Guard had at least a 95.2% vaccination rate. In August 2021, the Coast Guard had at least a 69.2% vaccination rate. In December 2020, the Coast Guard had below a 50% vaccination rate.

111.    The Coast Guard observed roughly ten times as many cases of COVID-19 in vaccinated personnel than in unvaccinated personnel during a period covering November and December 2021.

112.    The Coast Guard observed an increase of over 70% in the number of COVID cases in vaccinated personnel during a period covering November and December 2021. During the same period, cases among unvaccinated personnel (including those with and without natural immunity) nearly halved.

---

[3] https://www.nejm.org/doi/full/10.1056/NEJMoa2203965

113.    Nearly 90% of the man-days lost due to COVID-19 quarantines during a period covering November and December 2021 were due to quarantines among vaccinated personnel, as opposed to unvaccinated personnel.

114.    The Coast Guard has granted permanent medical exemptions from the Coast Guard Mandate for medical reasons other than evidence of immunity based on serologic testing.[4]

115.    The Coast Guard has rejected medical exemption requests for service members with immunity based on serologic tests or previous infection in accordance with COMDTINST M6230.4G.

116.    ALCOAST 305/21 further states in part that although service members are required to receive the Pfizer-BioNtech COVID-19 vaccine, service members who sought protection from COVID-19 by non-FDA approved methods would nonetheless be considered "fully vaccinated."

117.    ALCOAST 315/21 further states in part that members may receive vaccination outside of a Coast Guard clinic. Such members need only provide evidence of vaccination to a Coast Guard clinic to be recorded as "vaccinated."

118.    ALCOAST 089/21 states in part that "[t]he only acceptable proof of immunity is completion of a COVID-19 vaccination series."

119.    ALCOAST 315/21 warns service members that "[p]roviding false vaccination information is a violation of Article 107, UCMJ and may also result in administrative and/or disciplinary action."

120.    In February 2022, a Marine was charged with providing over 300 falsified vaccination cards to unvaccinated persons, including members of the military. The Marine

---

[4] https://www.nejm.org/doi/full/10.1056/NEJMoa2203965

allegedly arranged for unvaccinated persons to receive an authentic vaccination document while destroying, rather than administering, vaccine doses. As a result, service members had proof of vaccination, which could be confirmed against vaccine databases recording exhausted doses, without actually having been vaccinated.

121.    These unvaccinated service members could be recorded as "vaccinated" by their service and freed from any threatened or actual adverse action merely by presenting their falsified vaccination cards.

122.    Based on information and belief, the Coast Guard does not inspect vaccine cards submitted as proof of vaccination to ensure validity.

123.    Because no medical tests exist that can determine whether a person with SARS-CoV-2 antibodies received a vaccine or recovered from a prior infection, the Coast Guard cannot conduct tests to determine whether a person claiming to be vaccinated was, in fact, vaccinated.[5]

124.    ALCOAST 305/21 further states in part that COMDTINST M6230.4 "will be updated to reflect the Secretary of Defense's direction."

125.    COMDTINST M6230.4 has not been updated since February 16, 2018.

126.    ALCOAST 305/21 further states in part, "Service members who are actively participating in COVID-19 clinical trials are exempted from mandatory vaccination against COVID-19 until the trial is complete in order to avoid invalidating such clinical trial results."

**Plaintiffs Have been Ordered to Comply With the Coast Guard Mandate**

127.    On May 11, 2022, a Commanding Officer of the Coast Guard issued an order to Plaintiff Eric Jackson stating in part, "You are hereby ordered to report to Base Los Angeles-

---

[5] https://www.fda.gov/medical-devices/safety-communications/antibody-testing-not-currently-recommended-assess-immunity-after-covid-19-vaccination-fda-safety

Long Beach Clinic at 1330 on 24 May 2022 to receive the first dose of a fully FDA-approved COVID-19 vaccine." ("Coast Guard Order to BM1 Jackson").

128.    On July 21, 2022, a Deputy Commander of the Coast Guard issued an order to LTJG Stone stating in part, "You are hereby ordered to report to the Vaccination Clinic of your choice by 1500 on Friday, 29 July 2022, to receive the first dose of a fully FDA-approved COVID-19 vaccine." ("Coast Guard Order to LTJG Stone").

129.    On May 27, 2022, a Deputy Commander of the Coast Guard issued an order to LTJG Marcenelle stating in part, "You are hereby ordered to receive your first dose of a fully FDA-approved COVID-19 vaccine no later than Tuesday, 03 June 2022. You will email proof of your vaccine to medical." ("Coast Guard Order to LTJG Marcenelle").

**LTJG Stone's Career**

130.    LTJG Stone graduated first in his class from the United State Coast Guard Academy in 2020 (the Distinguished Honor Graduate of that class), achieving the highest overall performance in the academic, military, and physical components of the entire Coast Guard Academy program.

131.    LTJG Stone's family has a long tradition of service in the Coast Guard, beginning with Commander Elmer Stone, the Coast Guard's first aviator and namesake of the Coast Guard ship, the USCGC Stone.

132.    LTJG Stone's father served as Lieutenant in the Coast Guard.

133.    When the military in 2020 began imposing COVID-19 restrictions on personnel— including masking, social distancing, and working remotely—LTJG Stone followed and led others to follow these policies.

134.    LTJG Stone has conducted four worldwide afloat tours, each lasting at least three months, since commissioning.

135.    LTJG Stone has since transferred to the shore-based District 5 Intelligence Branch under a "needs of the service" exception to Coast Guard's general prohibition on transfers by unvaccinated service members.

9.    LTJG Stone's July 2022 evaluation recommended him for "in-zone reorder," i.e., for an extremely rare accelerated promotion. His comments stated that he is: "performing well above paygrade"; an "[e]xemplary officer that embodies critical leadership skills, work ethic, technical acumen, & commitment to core values"; "[i]intrinsically motivated . . . w/ limitless potential"; and his reporting officer gave him the "[h]ighest recommendation for future afloat tours," and said he "will no-doubt excel & compete for O3 Command positions." It further stated that he is a "Must-select for Cyber, Cryptology billets"—consistent with his current position at the District 5 Intelligence Branch—and observed that he has "[d]rive & passion w/ [an] impeccable academic record underscor[ing] highest rec[ommendation] for Public Admin, Law & Intel PG programs." Finally, it recommended that he be "Prime select[ed]" for "high vis[ibility] assignments incl[uding]" the "White House," the Coast Guard Liaison Office, Congress, and Flag aide.

136.    LTJG Stone has consistently and fully supported and sustained Defendants' interests in military readiness, unit cohesion, good order, discipline, health, and safety.

**BM1 Jackson's Career**

137.    For more than 18 years, BM1 Jackson has served his country in the United States Coast Guard.

138.    The military has rewarded Jackson with numerous medals for his service, including the Coast Guard Special Operations Service Ribbon in 2022. He earned this award with a rapid-response interdiction team uniquely trained to intercept human smugglers off the coast of California, having helped halt many smuggling boats and apprehended numerous captains while transferring migrants to Customs and Border Patrol.

139.    In July 2022, the Coast Guard transferred him from California to South Padre Island, Texas, despite the Coast Guard's policy forbidding transfers for unvaccinated Coast Guard service members. He was told his transfer was pursuant to a "needs of the Service" exception and was forced to move his family from California to Texas on short notice.

140.    Since his transfer occurred pursuant to the Coast Guard's needs, he was led to believe that he could continue serving in the Coast Guard until his current enlistment expired.

141.    BM1 Jackson has consistently and fully supported and sustained Defendants' interests in military readiness, unit cohesion, good order, discipline, health, and safety.

### LTJG Marcenelle's Career

142.    LTJG Marcenelle began his service to the United States in 2011 when he commissioned as an officer in the United States Marine Corps.

143.    LTJG Marcenelle served as an Air Intelligence Officer, Weapons and Tactics Intelligence Instructor, and Recruiting Management Officer in the Marine Corps.

144.    While in the Marine Corps, LTJG Marcenelle deployed multiple times, including to Afghanistan, Kuwait, and throughout the Mediterranean.

145.    LTJG Marcenelle transferred to the United States Coast Guard in 2019, with no break in service. LTJG Marcenelle has over a decade of commissioned service in the United States Military.

146.     LTJG Marcenelle currently serves as an instructor at the International Maritime Officers School with Training Center Yorktown, Virginia.

147.     Since early 2020, LTJG Marcenelle has followed all COVID-19 related precautions required by the Coast Guard, including masking, social distancing, and working remotely when possible.

148.     In this role, LTJG Marcenelle teaches international officers, including by transporting international officers to historic sites in the United States.

149.     At present, the Coast Guard does not require personnel to mask, test, or socially distance due to the consistently low risk of COVID-19.

150.     The Coast Guard is aware that LTJG Marcenelle is not vaccinated. The Coast Guard still does not ask or require LTJG Marcenelle to take the mitigation protocols LTJG Marcenelle has in the past.

151.     The military has awarded LTJG Marcenelle numerous medals throughout his career in both the Marine Corps and the Coast Guard.

152.     On May 25, 2022, the Coast Guard finalized a Coast Guard Achievement Medal for LTJG Marcenelle.

153.     The citation for LTJG Marcenelle's medal covered his superior performance while assigned to Coast Guard Sector Charleston from April 2019 to June 2022.

154.     By the Achievement Medal, the Coast Guard praised LTJG Marcenelle for his meritorious service including supporting prosecution of 60 multi-mission cases, saving or assisting 76 lives, and preserving property valued at over $2 million. LTJG Marcenelle also de-escalated a potential hostage situation, resulting in the safe release of passengers from the control of an intoxicated boat operator.

155.    During the period covering LTJG Marcenelle's superior performance, LTJG Marcenelle performed his duties while unvaccinated and with adherence to the Coast Guard's chosen health mitigation protocols.

156.    On the exact same day he was awarded the Achievement Medal, June 1, 2022, the Coast Guard also reprimanded LTJG Marcenelle for not being vaccinated.

157.    LTJG Marcenelle has consistently and fully supported and sustained Defendants' interests in military readiness, unit cohesion, good order, discipline, health, and safety.

**Plaintiffs' Sincerely Held Religious Beliefs**

158.    Plaintiffs are Christians.

159.    As Christians, Plaintiffs believe that abortion is a grave evil and contrary to their faith.

160.    Plaintiffs sincerely believe that receiving a vaccine that was derived from or tested using aborted fetal cell lines in its development would violate their conscience and is contrary to their faith.

161.    All of the COVID-19 vaccines currently approved by the FDA and available in the United States were derived from or tested using (as part of their development) aborted fetal cell lines. For this reason, Plaintiffs are unwilling to receive one of the COVID-19 vaccines currently available.

162.    In addition, in accordance with their faith, some or all Plaintiffs believe that the "body is the temple of the Holy Spirit" (1 Cor. 6:19-20), and that getting injected with a novel substance of unknown long-term effects would violate this belief.

163.    Plaintiffs do not oppose all vaccines.

**Plaintiffs' Natural Immunity**

164.    In August 2022, LTJG Stone took a COVID-19 antibody test and tested positive for COVID-19 antibodies.

165.    In approximately April 2020, BM1 Jackson experienced some COVID-19-type symptoms and believed and continues to believe he had COVID-19 at that time.

166.    In December 2021, LTJG Marcenelle contracted COVID-19 and tested positive for COVID-19 at a Naval Health clinic.

167.    In August 2022, LTJG Marcenelle took a COVID-19 antibody test and tested positive for COVID-19 antibodies.

168.    In September 2022, LTJG Marcenelle tested positive for COVID-19, experienced mild symptoms, comfortably ran six miles shortly after he tested positive, and quickly and fully recovered from COVID-19.

169.    According to the CDC, Plaintiffs' prior infection and positive antibody tests indicate natural immunity from COVID-19.

**Plaintiffs' Requests for and Defendants' Denial of Exemption and Accommodation**

170.    COMDTINST 1000.15 provides a form letter for a service member to request a religious accommodation ("Request Form").

171.    On September 22, 2021, using the Request Form, LTJG Stone timely submitted a written request for religious accommodation from the Mandates. LTJG Stone's Request Form included details on his success following CDC prevention measures, including social distancing, masking, and good hygiene, that kept him free from mission loss, despite being unvaccinated, and despite close contact with persons actively infected by COVID-19.

172.    Before applying, Stone's commanding officer told him and his other unvaccinated crewmates that "I don't want to discuss your religious beliefs because frankly, they don't matter

24

to me." He accordingly prepared a blanket negative endorsement of all religious accommodation requests, despite there being no requirement that commanding officers provide endorsements of religious accommodation requests in the first place. This was consistent with the fact that at approximately the same time, Coast Guard chaplains had been instructed to challenge religious objectors to see if the religious objection was a "ruse," while apparently no such instruction was given to those assessing medical or other secular requests.[6] Thus it was evident from the beginning that the Coast Guard's religious accommodation process was a ruse.

173.    On January 20, 2022, LTJG Stone received a denial (dated January 19) of his September 22, 2021, request for religious accommodation ("LTJG Stone's Initial Denial").

174.    On November 7, 2021, using the Request Form, BM1 Jackson timely submitted a written request for religious accommodation from the Mandates. BM1 Jackson's Request Form included details on the burden the Mandates presented to his beliefs, including the link of each available COVID-19 vaccine to abortion and his belief that his body is a temple of God. BM1 Jackson further documented his adherence to masking, social distancing, and testing guidelines, his voluntary sanitization enhancement protocols for his work space, and his willingness to take a different vaccine not burdening his religion should one be available in the future.

175.    BM1 Jackson received a denial dated December 14, 2021, of his November 7, 2021, request for religious accommodation ("BM1 Jackson's Initial Denial").

176.    On September 9, 2021, using the Request Form, LTJG Marcenelle timely submitted a written request for religious accommodation from the Coast Guard Mandate. LTJG Marcenelle explained the basis of his objection to the Coast Guard Mandate rooted in his

---

[6] *See*, *e.g.*, https://americanmilitarynews.com/2021/09/coast-guard-to-scrutinize-members-requesting-religious-exemptions-for-mandatory-covid-vaccine-leaked-document-reveals/.

Catholic faith, citing authoritative Catholic Church texts explaining his obligation to refrain from vaccination by the currently-available COVID-19 vaccines. LTJG Marcenelle stated he would receive a COVID-19 vaccine developed in accordance with his faith once such a vaccine became available.

177.    LTJG Marcenelle's commander left LTJG Marcenelle's religious accommodation request, including his personally-identifiable information, at her sister's house while on leave. LTJG Marcenelle resubmitted his documents on October 12, 2021.

178.    On February 10, 2022, LTJG Marcenelle received a denial (dated February 8) of his request for religious accommodation ("LTJG Marcenelle's Initial Denial").

179.    Each of LTJG Stone's Initial Denial, BM1 Jackson's Initial Denial, and LTJG Marcenelle's Initial Denial stated in part, "I do not question the sincerity of your beliefs or whether vaccine requirements substantially burden your religious practice."

180.    Each of LTJG Stone's Initial Denial, BM1 Jackson's Initial Denial, and LTJG Marcenelle's Initial Denial further stated in part, "I have concluded that there are no lesser restrictive means available other than vaccination to achieve the compelling government interest here."

181.    Both of LTJG Stone's Initial Denial and BM1 Jackson's Initial Denial further stated in part that the respective requests were denied because "limited access to advanced medical care while at-sea [] increases the health risks for yourself and your shipmates."

182.    Each of LTJG Stone's Initial Denial, BM1 Jackson's Initial Denial, and LTJG Marcenelle's Initial Denial further stated in part preventative hygiene and masking were "ineff[ective]."

183.    LTJG Marcenelle's Initial Denial further stated in part that his accommodation request was denied because he works "within close proximity of . . . Coast Guard Auxiliarists, some of whom are within high-risk categories."

184.    Coast Guard Auxiliarists are not required to be vaccinated.

185.    On February 2, 2022, LTJG Stone timely appealed the denial of his request for a religious accommodation. LTJG Stone's appeal letter enclosed multiple examples of virtually identical initial denial letters received by other Coast Guard service members. LTJG Stone also recorded that 12% of his fully-vaccinated shipmates tested positive for COVID and were forced to isolate while LTJG Stone continued performing his duties.

186.    LTJG Stone rebutted the false information in his initial denial, including correcting Captain Williams's incorrect statement that LTJG Stone had frequent interaction with migrants, detainees, commercial/recreational mariners, or others while underway.

187.    In late June 2022, LTJG Stone received a written purported denial of his February 2 appeal, signed by J. L. Knight ("LTJG Stone's Final Denial"). This purported final denial was originally signed by Mr. Knight on May 4, 2022.

188.    On December 27, 2021, BM1 Jackson timely appealed the denial of his request for a religious accommodation. BM1 Jackson highlighted factual errors in the initial denial letter.

189.    BM1 Jackson's appeal letter discussed other medical measures, including FDA-approved antiviral dugs and his natural immunity, which presented lesser restrictive means for protecting health while not burdening his religion.

190.    BM1 Jackson also recorded that a COVID-19 testing site was less than a mile away from his home, allowing him to obtain high-quality, rapid tests without stepping onto a Coast Guard installation.

191.    BM1 Jackson reminded the appeal authority of his commander's statement this his ship would "be able to maintain mission readiness with no hindrance to operations if BM1 Jackson is granted a religious accommodation for the COVID-19 vaccine."

192.    BM1 Jackson received a written purported denial of his December 27 appeal, signed by Rear Admiral M. L. Lafferty ("BM1 Jackson's Final Denial"). This purported final denial was originally signed by Rear Admiral Lafferty on May 3, 2022.

193.     On February 25, 2022, LTJG Marcenelle timely appealed the denial of his request for a religious accommodation. LTJG Marcenelle informed the appeal authority of his natural immunity and recorded that the initial denial letter LTJG Marcenelle received was largely identical to letters received by his colleagues.

194.    LTJG Marcenelle received a written purported denial of his February 25 appeal, signed by Rear Admiral E. C. Jones ("LTJG Marcenelle's Final Denial"). This purported final denial was originally signed by Rear Admiral Jones on May 16, 2022.

195.    Each of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial stated in part: "your appeal is denied."

196.    Each of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial further stated in part: "I find no error occurred in reaching the decision to deny your religious accommodation request."

197.    Each of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial further stated in part: "My decision in your case came only after extensive consideration. I personally reviewed your appeals package and consulted with a Judge Advocate to ensure I accurately applied the law and policy to your specific circumstances."

198.   Each of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial further asserted a generalized interest in requirement of "a ready military workforce."

199.   LTJG Stone's Final Denial noted his objection to the use of fetal tissue, and proposed that LTJG Stone may choose another COVID-19 from the World Health Organization's Emergency Use Listing, effectively mandating that he receive a non-FDA-approved vaccine.

200.   BM1 Jackson's Final Denial and LTJG Marcenelle's Final Denial did not include the fetal tissue note provided to LTJG Stone, despite BM1 Jackson and LTJG Marcenelle raising their objections to the use of aborted fetal tissue in their initial requests.

201.   Aside from the above-mentioned fetal tissue paragraph, as well as alterations for names and dates, each of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial were identical.

202.   Not one of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial addressed additional information or arguments presented in respective appeal letters.

203.   Not one of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial addressed why natural immunity was unavailable as a lesser restrictive means.

204.   Not one of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial defined a "ready military workforce."

205.     Not one of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial defined how an accommodation of any of the plaintiffs' religious accommodation requests would harm "a ready military workforce."

206.     Not one of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial explained how removing plaintiffs from the Coast Guard and leaving their duties unperformed advanced "a ready military workforce," despite stating that each plaintiff "play[s] a valuable role" in the Coast Guard workforce and national first responder mission.

207.     Not one of LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial set a deadline by which respective plaintiffs had to comply with the Coast Guard Mandate.

208.     LTJG Stone, BM1 Jackson, and LTJG Marcenelle were and are willing to perform their duties at the highest level and to take regular COVID-19 tests when working in-person, wear a mask, socially distance, and work remotely as appropriate.

209.     LTJG Stone voluntarily changed career fields away from his dream of high-tempo operational positions in order to continue serving in a role even more amenable to COVID mitigation protocols, including social distancing.

210.     Since the appeal denials were signed nearly four months ago, Plaintiffs have continued performing their required duties with no restrictions beyond the prevention protocols they had employed since the outbreak of COVID.

211.     The Coast Guard has relaxed prevention protocols during the past several months, and generally no longer requires masking, distancing, or asymptomatic testing of service members, including unvaccinated service members.

**The Coast Guard has Reprimanded and Initiated Discharge of Plaintiffs**

212.    On July 21, 2022, LTJG Stone's commander ordered him to receive the first dose of a fully FDA-approved COVID-19 vaccine by July 29, 2022—nearly three months after LTJG Stone's appeal was denied, nearly eleven months after the Coast Guard Mandate issued. The commander said the reason for his discharge is that he is not "worldwide deployable."

213.    On July 22, 2022, LTJG Stone's commander informed him that the Coast Guard had shifted policy from a willingness to lose members via natural attrition (i.e., allowing unvaccinated service members to continue serving to the end of their service commitments) to a "more proactive stance," due to the policy prerogatives of the new Commandant (Defendant Fagan).

214.    On or about July 25, 2022, the Coast Guard released ALCOAST 270/22 stating that the Coast Guard was beginning involuntary separation processing for active duty members who were non-compliant with the Coast Guard mandate, and transferring reserve members to the Inactive Service List. The policy stated that "vaccination is necessary to be world-wide deployable."

215.    On August 11, 2022, LTJG Stone's commander reprimanded him for "Willfully Disobeying a Superior Commissioned Officer" and "Failure to Obey other Lawful Order" under the Uniform Code of Military Justice. LTJG Stone's commander also stated that LTJG Stone "had the opportunity and means to follow the order [to receive the first dose of the COVID-19 vaccine] and failed to do so." The commander reiterated that the reason for his discharge is lack of worldwide deployability.

216.    LTJG Stone acknowledged receipt of the reprimand, but informed his commander that he did not believe the order to be lawful in light of its violation of RFRA and the First

Amendment as applied to him; and given that a whistleblower had confirmed that vaccine doses provided to the Coast Guard were not, in fact, FDA-approved because the doses had been manufactured in a different facility from those approved by the FDA.

217.    Just three weeks after LTJG Stone's vaccination due date, the CDC announced that "[r]eceipt of the primary series [of a COVID-19 vaccination]…provides minimal protection against infection and transmission."

218.    LTJG Stone continues to serve and perform his duties without vaccination, more than a year after the Coast Guard Mandate issued.

219.    On May 11, 2022, BM1 Jackson's commander, Lieutenant Commander David Zwirblis, ordered him to receive the first dose of a fully FDA-approved COVID-19 vaccine by May 24, 2022.

220.    Against his religious beliefs and under duress, BM1 Jackson attempted to comply with the order, but upon arrival at the vaccination clinic, discovered that the only available vaccines were labeled for Emergency Use. BM1 Jackson declined vaccination with an Emergency Use drug.

221.    Over six weeks later, on June 30, 2022, BM1 Jackson's commander reprimanded him for "Willfully Disobeying a Superior Commissioned Officer" and "Failure to Obey other Lawful Order" under the Uniform Code of Military Justice. BM1 Jackson's commander also stated that BM1 Jackson "had the opportunity and means to follow the order [to receive the first dose of the COVID-19 vaccine] and failed to do so."

222.    BM1 Jackson acknowledged receipt of the reprimand, but informed his commander that that the clinic did not have FDA-approved COVID-19 doses available for him to

comply with his commander's order to receive "the first dose of a fully FDA-approved COVID-19 vaccine."

223.    On or about August 24, 2022, another of BM1 Jackson's commanders, Lieutenant (LT) S. D. Gunderson, initiated action to discharge BM1 Jackson from the Coast Guard.

224.    LT Gunderson stated that he was initiating discharge proceedings because BM1 Jackson was not available for worldwide assignment.

225.    LT Gunderson informed BM1 Jackson that BM1 Jackson may expect to encounter prejudice in civilian life due to the discharge.

226.    BM1 Jackson is being forced to choose between being involuntarily discharged and requesting retirement, despite his desire to continue serving the United States in the Coast Guard using his nearly two decades of specialized training and experience.

227.    By refusing to take the COVID-19 vaccine, being forced into early retirement, and losing his Coast Guard position, BM1 Jackson stands to lose hundreds of thousands of dollars in pay, not counting the value of lost benefits including medical benefits. BM1 Jackson planned to rely on this compensation in retirement in due course. This financially coercive pressure imposes an irreparable substantial burden on his religious exercise.

228.    Especially given the operational tempo of his unit, forcing competent and capable unvaccinated service members such as BM1 Jackson to separate would exacerbate the dire recruitment and retention shortfalls identified by Dr. Michelle Navarro.

229.    For now, BM1 Jackson continues to serve and perform his duties without vaccination, more than a year after the Coast Guard Mandate issued.

230.    On May 27, 2022, LTJG Marcenelle's commander ordered him to receive the first dose of a fully FDA-approved COVID-19 vaccine by June 3, 2022.

231.    On May 31, 2022, LTJG Marcenelle went to the Naval Health Clinic Charleston and requested to receive a fully FDA-approved COVID-19 vaccine.

232.    Naval Health Clinic Charleston did not have a fully FDA-approved COVID-19 vaccine available. An employee at the clinic signed a memorandum produced by LTJG Marcenelle confirming that no such vaccine was available.

233.    On May 31, 2022, LTJG Marcenelle's commander, Captain J. D. Cole, reprimanded LTJG Marcenelle for "Willfully Disobeying a Superior Commissioned Officer" and "Failure to Obey other Lawful Order" under the Uniform Code of Military Justice. Captain Cole also stated that LTJG Marcenelle "had the opportunity and means to follow the order [to receive the first dose of the COVID-19 vaccine] and failed to do so."

234.    LTJG Marcenelle acknowledged receipt of the reprimand and provided the memorandum showing that the clinic did not have any doses of a fully FDA-approved COVID-19 vaccine. Captain Heather Mattern confirmed that LTJG Marcenelle had provided her with this documentation in signed, handwritten notes on the reprimand form.

235.    On the same day that he received a formal reprimand, LTJG Marcenelle received a Coast Guard Achievement Medal for his superior performance leading missions from April 2019 to June 2022, including using his unique law-enforcement background to deescalate a dangerous conflict with a boat captain.

236.    In addition to signing LTJG Marcenelle's formal reprimand for LTJG Marcenelle being unvaccinated, Captain J.D. Cole also signed the Coast Guard Achievement Medal for LTJG Marcenelle's meritorious service performed while unvaccinated.

237.    LTJG Marcenelle continues to serve and perform his duties without vaccination, more than a year after the Coast Guard Mandate issued.

238.     Service members approved to participate in the accommodation program (e.g., service members with medical or administrative exemptions for reasons other than religious belief) are permitted to continue serving without vaccination—presumably as long as they follow whatever current protection protocols are prescribed by Coast Guard leadership—without forced separation, leave restrictions, schooling restrictions, or promotion restrictions.

239.     Unlike those with medical and administrative accommodations, and unlike vaccinated service members who have "minimal protection against infection and transmission," the Coast Guard continues to threaten plaintiffs' right to future employment, and obstinately accepts the loss of fully trained and equipped officers and enlisted in the midst of a recruiting and retention crisis affecting all branches of the armed forces.

240.     By refusing to take the COVID-19 vaccine and losing their Coast Guard positions, Plaintiffs stand to lose a significant amount in salary and significant benefits. Plaintiffs' highly specialized training in maritime law enforcement operations cannot easily transfer into the civilian sector.

241.     Further, if any of the plaintiffs are discharged, they stand to lose their health insurance and opportunities for advancement and training.

242.     The Department of Veterans Affairs (VA) has conducted research on the treatment of "moral injury" in veterans.

243.     According to the VA, moral injury occurs when "people . . . perpetrate, fail to prevent, or witness events that contradict deeply held moral beliefs and expectations."

244.     Moral injury includes acts of commission, such as when a service member is compelled to do something against his beliefs, and acts of omission, such as when a service member fails to do something in line with their beliefs.

35

245.    Moral injury is defined as "the distressing psychological, behavioral, social, and sometimes spiritual aftermath of exposure to such events" of commission or omission.

246.    The VA notes that the guilt, shame, and sense of betrayal triggered by moral injury are associated with severe depression, functional impairment, suicidal ideation, and substance abuse.

247.    Service members compelled by senior leadership to force subordinates to comply with the Coast Guard vaccine mandate may experience moral injury, regardless of their own personal vaccination status.

248.    The Coast Guard Mandate has lowered Plaintiffs' morale as service members, because the Mandate has forced them to choose between their sincerely held religious beliefs and their livelihood.

249.    The Coast Guard Mandate has lowered the morale of numerous other service members for the same reasons.

250.    The Coast Guard Mandate has greatly damaged unit cohesion and morale by forcing service members to ostracize their peers and punish their subordinates on the sole basis of vaccination, while ignoring individual rights, capabilities, expertise, and relationships.

251.    The Coast Guard Mandate forces service members to suffer moral injury in the process.

252.    RFRA and the Constitution prohibit Defendants from forcing Plaintiffs to choose between their religious beliefs and their employment.

253.    The Coast Guard's process purporting to protect religious rights protected by federal law and the Constitution is both illusory and insincere.

## CLASS ACTION ALLEGATIONS

254.     This lawsuit is brought as a class action to redress Defendants' violations of federal statutory and constitutional law.

255.     The proposed Class consists of all members of the United States Coast Guard who (a) are subject to a mandate of the Department of Defense, Department of Homeland Security, or Coast Guard to receive a COVID-19 vaccine, (b) submitted a request for religious accommodation regarding such mandate based on a sincerely held religious belief, and (c) have received or will receive a purported final denial of such request from the Department of Defense, Department of Homeland Security, or Coast Guard.

256.     This lawsuit is properly maintained as a class action under Federal Rules of Civil Procedure 23(a) and (b)(2).

257.     The Class satisfies the "numerosity" requirement under Rule 23(a)(1).

258.     The exact number of members of the Class is not precisely known, but there are more than 1,200 members of the Coast Guard who have submitted religious accommodation requests regarding the Mandate and at least 881 members of the Coast Guard to date who have received purported final denials of their religious accommodation requests.

259.     Joinder of all individual Class members is impracticable.

260.     The Class satisfies the "commonality" requirement under Rule 23(a)(2).

261.     Defendants have engaged in a common course of conduct giving rise to violations of the legal rights sought to be enforced uniformly by Plaintiffs and the Class members.

262.     Similar or identical constitutional and statutory violations, processes, policies, practices, and harm are at issue with respect to each Class member.

263.     The harm sustained by Class members flows in each instance from a common nucleus of operative facts, including: Defendants' processes, policies, or practices of across-the-board denial of all religious accommodation requests, Defendants' failure to conduct individualized assessments of religious accommodation requests, and the lack of factual basis for Defendants' claim that the Mandates satisfy strict scrutiny.

264.     Each instance of harm suffered by Plaintiffs and the Class members has directly resulted from a common course of illegal conduct. Individual questions, if any, pale in comparison to the numerous common questions of fact and law presented in this lawsuit.

265.     Determination of the following common questions of law or fact will resolve in one stroke the following issues that are central to the validity of Plaintiffs' and each Class member's claims:

a.  Whether the Coast Guard's process that supposedly protects religious rights as required by RFRA and the First Amendment is illusory and insincere.

b.  Whether the religious accommodation requests the Coast Guard claims to have approved are for service members already slated for separation or retirement.

c.  Whether the Coast Guard has a policy, practice, or procedure of not conducting "to the person" assessment to which service members are entitled under RFRA and/or the First Amendment.

d.  Whether the Coast Guard can demonstrate that it has a compelling interest in denying any or all religious exemptions from the Mandates while willingly granting exemptions for secular purposes.

e.  Whether the Coast Guard can demonstrate that it has a compelling interest in denying any religious exemptions from the Mandates while leaving appreciable damage to that

supposedly compelling interest unprohibited, including allowing unvaccinated members of the Coast Guard Auxiliary and Coast Guard dependents into Coast Guard spaces, and failing to investigate for fraudulent vaccination records.

f. Whether the Coast Guard can demonstrate that vaccination of a religious service member is the least restrictive means of preventing the spread of COVID-19 when the Coast Guard is almost universally vaccinated, COVID-19 vaccination does not prevent COVID-19 infection or transmission, COVID-19 cases hit all time highs despite the almost universal vaccination, the CDC and Defendants recognize the existence of natural immunity, and the Coast Guard permits alternative prevention measures for secular objectors to vaccination.

266. The Class satisfies the "typicality" requirement under Rule 23(a)(3).

267. The claims alleged by the Plaintiffs and the resultant harms are typical of the claims of each member of the Class.

268. All absent Class members have been injured, or are at risk of injury, as a result of the same processes, policies, or practices.

269. The Class satisfies the "adequacy" requirement under Rule 23(a)(4).

270. Plaintiffs will fairly and adequately protect the interests of the Class.

271. Plaintiffs have a strong interest in vindicating not only their own rights but those of their fellow service members.

272. There are no conflicts of interest between the Plaintiffs and the other Class members.

273. Plaintiffs' counsel will adequately prosecute the action.

274.    Plaintiffs' counsel has extensive experience litigating class actions, other complex cases, and the types of claims asserted in this action.

275.    Plaintiffs' counsel is knowledgeable of the applicable law.

276.    Plaintiffs' counsel has committed sufficient resources to represent the Class.

277.    Plaintiffs satisfy the requirements of Rule 23(b)(2).

278.    Defendants have acted or failed to act on grounds generally applicable to the Class, necessitating declaratory and injunctive relief for the Class.

## FIRST CAUSE OF ACTION

**Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.**

279.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs of this Complaint.

280.    RFRA states that the government shall not substantially burden a person's exercise of religion even by means of a rule of general applicability. 42 U.S.C. § 2000bb-1.

281.    RFRA protects any exercise of religion, whether or not compelled by, or central to, a system of religious belief. 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5(7)(A)).

282.    The exercise of religion involves not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reasons.

283.    The Mandates acknowledge that RFRA protects Coast Guard service members.

### Exercise of Religion

284.    Plaintiffs sincerely believe that the exercise of their religion prevents them from submitting to injection of any of the presently available COVID-19 vaccines.

285.    Defendants acknowledge the sincerity and reasonableness of Plaintiffs' belief that their exercise of religion prevents them from receiving vaccination.

286.    More than 1,200 other Coast Guard service members share Plaintiffs' religious objection to being vaccinated for COVID-19.

287.    The government and reviewing courts may not question whether sincerely held religious beliefs are reasonable.

## Substantial Burden

288.    RFRA imposes strict scrutiny on all actions of the federal government that substantially burden a person's exercise of religion. 42 U.S.C. § 200bb-1(b).

289.    A person's exercise of religion is substantially burdened whenever a measure imposes substantial pressure on an adherent to modify his or her behavior and to violate his or her beliefs.

290.    The Mandates impose on Plaintiffs and all service members whose religious exercise prevents vaccination for COVID-19 the choice between violating their religious beliefs and ending their career and livelihood.

291.    Forcing people to violate their religious beliefs or lose their employment is a substantial burden on their religious beliefs.

292.    The Coast Guard has threatened, and carried out threats, to punish service members by denying them schooling, promotion, and assignments.

293.    These adverse impacts can have permanent and lasting effects on the careers of service members.

294.    These adverse impacts, currently being imposed on more than 1,200 service members in the Coast Guard alone, impose substantial pressure on each religious objector to vaccination to modify his or her behavior and to violate his or her beliefs.

## Strict Scrutiny

295.    Under RFRA, the Mandates are subject to strict scrutiny because they impose the above substantial burdens on the religious exercise of service members. 42 U.S.C. § 200bb-1(b).

296.    Strict scrutiny requires that, before imposing a substantial burden on a person's exercise of religion, the government must demonstrate that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 200bb-1(b).

297.    The Mandates fail strict scrutiny, both as applied to Plaintiffs and other Class members and facially as Defendants have interpreted them to disallow any religious accommodation.

**No Compelling Interest**

298.    Defendants may not rely on generalized or broadly formulated interests to justify requiring Plaintiffs or any service member to receive the COVID-19 vaccine in violation of their religious beliefs.

299.    Defendants must establish that they have a compelling governmental interest in denying an accommodation to each Plaintiff and each member of the Class in particular.

300.    Defendants do not have a compelling governmental interest in requiring each Plaintiff and Class member, or every Plaintiff and Class member, to receive a COVID-19 vaccine.

301.    Letters denying or purporting to deny Plaintiffs a religious accommodation cited only generalized interests, present in every case, of military readiness, unit cohesion, good order and discipline, and health and safety.

302.     Letters denying or purporting to deny Plaintiffs a religious accommodation offered no consideration of Plaintiffs' particular circumstances. This is insufficient to establish a compelling governmental interest in requiring Plaintiffs to receive a COVID-19 vaccine.

303.     Plaintiffs have all developed natural immunity to COVID-19.

304.     Defendants have identified nothing to support a compelling interest in denying Plaintiffs in particular an accommodation from the Mandates.

305.     Although the Mandates invite service members to apply for religious exemptions, the enforcement record shows that Defendants have adopted a policy of denying all religious accommodations without considering particular circumstances.

306.     RFRA requires that Defendants grant accommodation in every case where denying one does not pass strict scrutiny.

307.     To enforce a law without granting any religious accommodations, Defendants must establish that denying every possible religious accommodation passes strict scrutiny.

308.     Defendants cannot establish a compelling interest in denying every religious accommodation to the Mandates.

309.     Defendants cannot establish a compelling interest in denying any religious accommodation to the Mandates.

310.     There can be no compelling interest justifying substantially burdening religious practice when a government measure leaves appreciable damage to that supposedly vital interest unprohibited.

311.     Defendants have granted many accommodations for medical and administrative reasons.

312.    Allowance of accommodations for reasons other than religious ones demonstrates that Defendants can tolerate the risk posed by some service members remaining unvaccinated.

313.    Defendants' allowance of case-by-case exceptions to the "worldwide deployability" policy shows that it lacks a compelling interest in categorically denying all requests for religious accommodations from the COVID-19 vaccine Mandates.

314.    Defendants do not require vaccination of Coast Guard Auxiliary members, Inactive Reservists, and Coast Guard dependents, all of whom maintain access to Coast Guard facilities and often work, dine, and even live alongside active duty and reserve members.

315.    Defendants do not and cannot ensure that Coast Guard members tracked as "vaccinated" outside of a Coast Guard clinic were truly vaccinated, despite tremendous financial motivations and low risk of detection for Coast Guard members who submit fraudulent vaccination records.

316.    Defendants' delay in imposing the Mandates also belies any claim that their interest in enforcing them is compelling.

317.    The Mandates were issued months after vaccines became available and months after the Department of Justice formally advised that government entities could impose mandatory vaccination requirements. U.S. Dep't of Justice, Office of Legal Counsel, "Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization," July 6, 2021 (slip op.), https://www.justice.gov/olc/file/1415446/download.

318.    Defendants have allowed Plaintiffs to remain active in the Coast Guard for more than a year after issuing the Mandates.

319.    In the months since a vaccine-evading strain of SARS-CoV-2 virus emerged, risk of COVID-19 transmission among service members has greatly decreased due to high levels of previous infection among the population.

320.    In the months since a vaccine-evading strain of SARS-CoV-2 virus emerged, risk of COVID-19 infection among service members has greatly decreased due to vaccination and/or previous infection among the population.

321.    As of September 2022, the risk of medically significant disease, hospitalization, and death from COVID-19 has been greatly reduced.

322.    Any compelling interest in mandating vaccination has decreased accordingly.

323.    Defendants have not established and cannot establish a compelling interest in a military or Coast Guard-wide policy of denying religious accommodations to the Mandates, because RFRA requires that Defendants show a compelling interest to refuse each individual's accommodation in particular, because Defendants delayed the Mandates for months, because Defendants have granted accommodations for other reasons, and because the risks to the Coast Guard of and from infection and transmission of COVID-19 have greatly diminished.

**Not in Furtherance of Any Interest**

324.    The Mandates fail strict scrutiny because they do not in fact further the Coast Guard's asserted interest in mission accomplishment, unit cohesion, good order and discipline, or health and safety.

325.    The Mandates have not furthered the asserted government interest in mission accomplishment, because the Mandates are on a course to eliminate over 1,200 service members in the Coast Guard in the midst of a record-setting retention and recruiting crisis, while

consuming thousands of man-hours in the execution of an illusory process that yields the same result in all circumstances.

326.    The Mandates have not furthered the asserted government interest in unit cohesion because they have effected moral injury and ostracization of unvaccinated service members.

327.    The Mandates have not furthered the asserted government interest in good order and discipline but instead have been an occasion for revealing the Coast Guard's inability to abide by its own mandatory regulations in reviewing religious accommodation requests.

328.    The Mandates have not furthered the asserted compelling government interest in health and safety because near-universal vaccination pursuant to the Mandates has not prevented the Coast Guard from experiencing record high COVID-19 case rates.

**Not the Least Restrictive Means**

329.    The least-restrictive-means standard is exceptionally demanding in that it requires the government to show it lacks other means of achieving its desired goal.

330.    So long as the government can achieve its interests in a manner that does not burden religion, it must do so.

331.    This standard requires Defendants to show that measures less restrictive of protected religious practice could not address their interest in reducing the spread of COVID.

332.    Requiring Plaintiffs to be vaccinated against COVID-19 is not the least restrictive means Defendants could have employed to serve any compelling interest.

333.    Plaintiffs have worked successfully for the Coast Guard, fulfilling their job responsibilities completely, throughout the pandemic, including while vaccines have been available.

334.    Defendants' denials of Plaintiffs' religious accommodation provide no explanation of why they cannot continue to fulfill their duties taking the various preventive measures implemented during the height of the pandemic.

335.    The Coast Guard stated, without explanation, that Plaintiffs' work cannot be accommodated with the use of distancing measures, masking, hygiene requirements, and/or regular testing, even though those with medical and administrative accommodations and clinical-trial participants are permitted to work with such measures in place.

336.    Defendants have not shown that accommodating Plaintiffs remaining unvaccinated would increase their costs in any degree, given the continued presence of medically accommodated unvaccinated service members and the exemption for clinical-trial participants.

337.    If accommodations have little or no marginal cost, mandating that Plaintiffs be vaccinated cannot be the least restrictive means of preventing the spread of COVID-19.

338.    At the very least, Defendants have an obligation to demonstrate that universal vaccination—except for medical and administrative accommodation, exemption for clinical-trial participation, exclusion of Coast Guard Auxiliary, Inactive Reserves, and Coast Guard dependents—is the least restrictive way of pursuing their interests. That requires demonstrating why other paths to the same goal are inferior, which Defendants cannot do.

339.    Vaccinating someone with natural immunity, like Plaintiffs, does not minimize any risk to other service members.

340.    Not only is mandatory vaccination in Plaintiffs' cases not the least restrictive means of serving Defendants' interest in limiting the spread of COVID, vaccination does not serve that interest in any way at all.

341.    The denial of all service members' religious accommodations is not the least restrictive means to serve Defendants' interests.

342.    Universal denial of religious accommodations invites the nearly simultaneous separation of thousands of service members across the DOD and DHS, including more than 1,200 service members from the Coast Guard alone, and suggests an impermissible hostility to religion and an impermissible preference for medically-compromised military members over religious military members.

343.    In denying Plaintiffs' religious accommodation, Defendants claimed generally to be serving the interests of military readiness, unit cohesion, good order and discipline, and health and safety. These are not sufficiently compelling interests to satisfy strict scrutiny.

344.    Even if they were sufficiently compelling interests to satisfy strict scrutiny, Defendants have not demonstrated, and cannot demonstrate, that their interests in military readiness, unit cohesion, good order and discipline, and health and safety would be served, rather than harmed, by reducing many thousands of service members, including 1,200+ in the Coast Guard alone, from their ranks.

345.    To survive strict scrutiny, Defendants must show that separating 1,200+ religious objectors from the Coast Guard, with concomitant loss of trained personnel and enormous administrative burden, better serves Defendants' interests than accommodating these same service members as unvaccinated service members.

346.    In Plaintiffs' case, accommodating their continued service has little or no marginal financial cost to Defendants.

347.    In each Class member's case, Defendants cannot show that alternative measures of preventing the spread of COVID-19 that do not burden free exercise are insufficient when

Defendants permit such alternative measures to allow the continued service of service members who are exempt from the Mandates for secular purposes.

348.    Plaintiffs' early separations would cause the Coast Guard administrative difficulty, along with the impact of losing many productive years of service from service members with training, experience, and seniority.

349.    The Coast Guard cannot replace seasoned servicemembers having many years of experience with new recruits overnight.

350.    A blanket policy of denying religious accommodations and ending the careers of 1,200+ service members cannot credibly be described as the least restrictive means of serving the interests Defendants have identified.

351.    The Mandates are also not the least restrictive means to serve Defendants' interest in reducing the spread of COVID-19 or increasing the safety of service members, because it is by no means settled that the vaccinations Defendants insist upon actually add to the safety of the service members.

352.    Mandatory vaccination is also not the least restrictive means to serve Defendants' interest in reducing the spread of COVID-19 because it is by no means settled that vaccinations are more effective at preventing the spread of COVID-19 than alternative measures that do not burden free exercise, many of which the Coast Guard has adopted to accommodate the continued service of service members with secular exemptions from the Mandates.

353.    Denying each Class member's request for religious accommodation is not a necessary measure to prevent the spread of COVID-19 because the Coast Guard is otherwise nearly universally vaccinated.

354.    Defendants' policy of denying all religious accommodation requests no matter the circumstances is vastly out of step with policies in the rest of the country, including in the countless workplaces across the country that currently provide religious accommodations without any evidence of causing harm.

355.    Defendants' policy of denying all religious accommodation requests is willfully blind to the fact that sister services, including the Air Force, Marines, and even the Navy, currently perform their often substantially similar missions without significant interruption due to injunctions currently prohibiting discharge of service members based on vaccination status.

356.    The Navy has been enjoined from enforcing the COVID-19 vaccine mandate against all religious Navy service members since March 28, 2022—when this Court entered the injunction—and there is no evidence that that injunction has caused harm. The Navy has not filed a motion in this Court seeking vacation or modification of the injunction based on any changed circumstances.

357.    The Air Force has been restrained and enjoined from enforcing the COVID-19 vaccine mandate against all religious Air Force service members since July 14, 2022—when the Southern District of Ohio entered a TRO, and then the court issued a preliminary injunction on July 27—and there is no evidence that that TRO and injunction have caused harm. The Air Force has not filed a motion in that court seeking vacation or modification of the injunction based on any changed circumstances.

358.    The Marine Corps has been enjoined from enforcing the COVID-19 vaccine mandate against all religious Marine Corp service members since August 18, 2022—when the Middle District of Florida entered the injunction—and there is no evidence that that injunction

has caused harm. The Air Force has not filed a motion in that court seeking vacation or modification of the injunction based on any changed circumstances.

359.    Defendants cannot establish that the Mandates are the least restrictive means of pursuing a compelling interest.

## RFRA Relief

360.    Defendants' Mandates violate Plaintiffs' rights and the rights of their fellow service members under RFRA.

361.    Because of Defendants' policy and actions, Plaintiffs and the Class have suffered irreparable harm and are entitled to relief.

362.    Plaintiffs and the Class are entitled to a declaration that Defendants violated their rights under RFRA to the free exercise of religion and an order restraining and enjoining Defendants from denying their requests for religious accommodation, from forcing them to retire or separate from the military, and from taking any other illegal adverse action against them based on their unvaccinated status. Plaintiffs are entitled to the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Violation of the Free Exercise Clause of the First Amendment

### U.S. Const. amend. I

363.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs of this Complaint.

### Exercise of Religion

364.    Plaintiffs sincerely believe that the exercise of their religion prevents them from submitting to injection of any of the presently available COVID-19 vaccines.

365.    Defendants acknowledge the sincerity of Plaintiffs' belief that their exercise of religion prevents them from receiving vaccination.

366.    More than 1,200 other Coast Guard service members share Plaintiffs' religious objection to being vaccinated for COVID-19.

**The government and reviewing courts may not question whether sincerely held religious beliefs are reasonable. Not Neutral and Generally Applicable**

367.    The First Amendment's Free Exercise Clause prohibits the government from enacting laws burdening religious exercise that are not both neutral and generally applicable, unless they are narrowly tailored to a compelling a governmental interest.

368.    A law that is not neutral or not generally applicable and burdens religious exercise must satisfy strict scrutiny.

**The Mandates are not generally applicable.**

369.    A law is not generally applicable if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.

370.    The Mandates allow service members to remain unvaccinated for medical and administrative reasons or if they participate in a clinical trial while disallowing service members from refraining for religious reasons.

371.    Even assuming a Plaintiff or any other Class member poses a risk by remaining unvaccinated, such risk would be no greater than the risk posed by other accommodated personnel.

372.    Since Defendants accept a risk from people who are unvaccinated for secular reasons but not from people with religious reasons, the Mandates are not generally applicable.

373.     Where a law includes a system of individualized accommodations based on particular circumstances, the government may not refuse to grant accommodations on the basis of religious hardship.

374.     The Mandates allow accommodations from the vaccine mandate on the basis of several individualized situations, including for "needs of the service."

375.     Defendants have shown that accommodations based on medical and administrative circumstances and exemptions for clinical-trial participation are available, but they intend to deny all applications for religious accommodations.

376.     Defendants have granted medical and administrative accommodations.

377.     A mandate to which commanding officers grant accommodations for other reasons but not on the basis of religious belief is not generally applicable.

**Strict Scrutiny**

378.     A law that is not neutral or not generally applicable and burdens religious exercise must satisfy strict scrutiny.

379.     The Mandates fail strict scrutiny, both as applied to Plaintiffs and as applied to all service members.

**No Compelling Interest**

380.     Defendants may not rely on generalized or broadly formulated interests to justify requiring Plaintiffs or any service member to receive the COVID-19 vaccine in violation of their religious beliefs.

381.     Defendants must establish that they have a compelling governmental interest in denying an accommodation to each Plaintiff and each Class member in particular.

382.    Defendants do not have a compelling governmental interest in requiring each Plaintiff and Class member, or every Plaintiff and Class member, to receive a COVID-19 vaccine.

383.    Letters denying or purporting to deny Plaintiffs a religious accommodation cited only generalized interests, present in every case, of military readiness, unit cohesion, good order, and discipline, and health and safety.

384.    Letters denying and purporting to deny Plaintiffs a religious accommodation offered no consideration of Plaintiffs' particular circumstances. This is insufficient to establish a compelling governmental interest in requiring Plaintiffs to receive a COVID-19 vaccine.

385.    Plaintiffs have all developed natural immunity to COVID-19.

386.    Plaintiffs have effectively fulfilled their service responsibilities throughout the pandemic without putting anyone at risk, even while actually infected with COVID-19.

387.    Defendants have identified nothing to support a compelling interest in denying Plaintiffs in particular an accommodation from the Mandates.

388.    Defendants cannot rely on generalized statements of interest to justify denying Plaintiffs an accommodation, and Defendants can identify nothing to support a compelling interest in denying Plaintiffs in particular an accommodation.

389.    Defendants have not established and cannot establish a compelling interest in denying a religious accommodation to every Class member.

390.    Defendants have not established and cannot establish a compelling interest in denying a religious accommodation to any individual Class member, including any Plaintiff.

391.    There can be no compelling interest justifying substantially burdening religious practice when a government measure leaves appreciable damage to that supposedly vital interest unprohibited.

392.    Defendants have granted accommodations to the Mandates for administrative and medical reasons.

393.    Allowance of exceptions for other reasons demonstrates that Defendants can tolerate the risk posed by some service members remaining unvaccinated. Defendants cannot simultaneously claim they have a compelling interest in denying accommodations to the same Mandates to protect the exercise of religion.

394.    Defendants' allowance of exceptions to the Coast Guard's "worldwide deployability" policy shows that they lack a compelling interest in denying all requests for religious accommodations from the Mandates on the alleged ground that requesting service members are "non-worldwide deployable."

395.    Defendants also do not require vaccination of Coast Guard Auxiliary members, Inactive Reservists, and Coast Guard dependents, all of whom maintain access to Coast Guard facilities and often work, dine, and even live alongside active duty and reserve members.

396.    Defendants do not and cannot ensure that Coast Guard members tracked as "vaccinated" outside of a Coast Guard clinic were truly vaccinated, despite tremendous financial motivations and low risk of detection for Coast Guard members who submit fraudulent vaccination records.

397.    Defendants' delay in imposing the Mandates also belies any claim that their interest in enforcing them is compelling.

398.     The Mandates were issued months after vaccines became available and months after the Department of Justice formally advised that government entities could impose mandatory vaccination requirements. U.S. Dep't of Justice, Office of Legal Counsel, "Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization," July 6, 2021 (slip op.), https://www.justice.gov/olc/file/1415446/download.

399.     In the months since a vaccine-evading strain of SARS-CoV-2 virus emerged (i.e., the Omicron variant), risk of COVID-19 transmission among service members has greatly decreased due in part to high levels of previous infection among the population.

400.     In the months since a vaccine-evading strain of SARS-CoV-2 virus emerged, risk of COVID-19 infection among service members has greatly decreased due in part to vaccination and/or previous infection among the population.

401.     As of March 2022 (i.e., when the Omicron variant became the predominant strain), the risk of medically significant disease, hospitalization, and death from COVID-19 has been greatly reduced.

402.     Any compelling interest in mandating vaccination has decreased accordingly.

403.      Defendants have not established and cannot establish a compelling interest in a military or Coast Guard-wide policy of denying religious accommodations to the Mandates, because Defendants delayed the Mandates for months, because Defendants have granted accommodations for other reasons, and because the risks to the Coast Guard of and from infection and transmission of Covid-19 have greatly diminished.

**Not in Furtherance of Any Interest**

404.    The Mandates fail strict scrutiny because they do not in fact further the Coast Guard's asserted interests in mission accomplishment, unit cohesion, good order and discipline, or health and safety.

405.    The Coast Guard's willingness to grant secular exemptions but not religious exemptions belies any claimed compelling interest.

406.    The Mandates have not furthered the asserted government interest in mission accomplishment, because the Mandates are on a course to eliminate over 1,200 service members in the Coast Guard in the midst of a record-setting retention and recruiting crisis, in the process consuming thousands of man-hours in the execution of an illusory process that yields the same result in all circumstances.

407.    The Mandates have not furthered the asserted government interest in unit cohesion because they have effected moral injury and ostracization of unvaccinated service members.

408.    The Mandates have not furthered the asserted government interest in good order and discipline but instead have been an occasion for revealing the Coast Guard's inability to abide by its own mandatory regulations in reviewing religious accommodation requests.

409.    The Mandates have not furthered the asserted compelling government interest in health and safety because near-universal vaccination pursuant to the Mandates has not prevented the Coast Guard from experiencing record high COVID-19 case rates.

**Not the Least Restrictive Means**

410.    The least-restrictive-means standard is exceptionally demanding in that it requires the government to show it lacks other means of achieving its desired goal.

411.    So long as the government can achieve its interests in a manner that does not burden religion, it must do so.

412.    This standard requires Defendants to show that measures less restrictive of protected religious exercise could not address its interest in reducing the spread of COVID-19.

413.    Requiring Plaintiffs to be vaccinated against COVID-19 is not the least restrictive means Defendants could have employed to serve any compelling interest.

414.    Plaintiffs have worked successfully and with distinction for the Coast Guard, fulfilling their job responsibilities completely, throughout the pandemic, including while vaccines have been available.

415.    Defendants' denial of Plaintiffs' religious accommodation provide no explanation of why Plaintiffs cannot continue to fulfill their duties in taking the various preventative measures implemented during the height of the pandemic.

416.    The Coast Guard stated, without explanation, that Plaintiffs' work cannot be accommodated with the use of distancing measures, remote work, masking, hygiene requirements, and/or regular testing, even though those with medical and administrative accommodations and clinical-trial participants are permitted to work with such measures in place.

417.    Defendants have not shown that accommodating Plaintiffs remaining unvaccinated would increase their costs in any degree, given the continued presence of medically accommodated unvaccinated service members and the exemption for clinical-trial participants.

418.    If accommodations have little or no marginal cost, mandating that Plaintiffs or any individual Class member be vaccinated cannot be the least restrictive means of preventing the spread of COVID-19.

419.    At the very least, Defendants have an obligation to demonstrate that their policy of universal vaccination—except for medical and administrative accommodation and exemption for clinical-trial participation, exclusion of Coast Guard Auxiliary, Inactive Reserves, and Coast Guard dependents—is the least restrictive way of pursuing their interest. That requires demonstrating why other paths to the same goal are inferior, which Defendants cannot do.

420.    Vaccinating someone with natural immunity, like Plaintiffs, does not minimize any risk to other service members.

421.    Not only is mandatory vaccination in Plaintiffs' cases not the "least restrictive means" of serving Defendants' interest in limiting the spread of COVID-19, vaccination does not serve that interest in any way at all.

422.    Nor is the denial of religious accommodations to all Class members the least restrictive means to serve Defendants' interests.

423.    Universal denial of religious accommodations invites the nearly simultaneous separation of thousands of service members across the DOD and DHS, including more than 1,200 service members from the Coast Guard alone, and suggests an impermissible hostility to religion and an impermissible preference for medically compromised military members over religious military members.

424.    In denying Plaintiffs' religious accommodation, Defendants claimed generally to be serving the interests of military readiness, unit cohesion, good order, and discipline. These are not sufficiently compelling interests to satisfy strict scrutiny.

425.    Even if they were sufficiently compelling interests to satisfy strict scrutiny, Defendants have not demonstrated, and cannot demonstrate, that their interests in "military

readiness, unit cohesion, good order, and discipline" would be served, rather than harmed, by separating thousands of service members, including 1,200+ in the Coast Guard alone.

426.    To survive strict scrutiny, Defendants must show that separating the thousands of religious objectors from the military, with concomitant loss of trained personnel and enormous administrative burden, better serves the military's interests than accommodating these same service members as unvaccinated service members.

427.    Accommodating Plaintiffs' continued service has little or no marginal financial cost to Defendants.

428.    In each Class member's case, Defendants cannot show that alternative measures of preventing the spread of COVID-19 that do not burden free exercise are insufficient when Defendants permit such alternative measures to allow the continued service of service members who are exempt from the Mandates for secular purposes.

429.    Plaintiffs' early separations would cause the Coast Guard administrative difficulty, along with the impact of losing many productive years of service from service members with training, experience, and seniority.

430.    A blanket policy of denying religious accommodations and ending the careers of 1,200+ service members cannot credibly be described as the least restrictive means of serving the interests Defendants have identified.

431.    The Mandates are also not the least restrictive means to serve Defendants' interest in reducing the spread of COVID-19 or increasing the safety of service members, because it is by no means settled that the vaccinations Defendants insist upon actually add to the safety of the service members.

432.    Mandatory vaccination is also not the least restrictive means to serve Defendants' interest in reducing the spread of COVID-19 because it is by no means settled that vaccinations are more effective at preventing the spread of COVID-19 than alternative measures that do not burden free exercise, many of which the Coast Guard has adopted to accommodate the continued service of service members with secular exemptions from the Mandates.

433.    Denying each Class member's request for religious accommodation is not a necessary measure to prevent the spread of COVID-19 because the Coast Guard is otherwise nearly universally vaccinated.

434.    Defendants' policy of denying all religious accommodation requests no matter the circumstances is vastly out of step with policies in the rest of the country, including in the countless workplaces across the country that currently provide religious accommodations without any evidence of causing harm.

435.    Defendants' policy of denying all religious accommodation requests is willfully blind to the fact that sister services, including the Air Force, Marines, and even the Navy, currently perform their often substantially similar missions without significant interruption due to injunctions currently prohibiting discharge of service members based on vaccination status.

436.    The Navy has been enjoined from enforcing the COVID-19 vaccine mandate against all religious Navy service members since March 28, 2022—when this Court entered the injunction—and there is no evidence that that injunction has caused harm. The Navy has not made a motion in this Court seeking vacation or modification of the injunction based on any changed circumstances.

437.    The Air Force has been restrained and enjoined from enforcing the COVID-19 vaccine mandate against all religious Air Force service members since July 14, 2022—when the

Southern District of Ohio entered a TRO, and then the court issued a preliminary injunction on

July 27—and there is no evidence that that TRO and injunction have caused harm. The Air Force

has not made a motion in that court seeking vacation or modification of the injunction based on

any changed circumstances.

438.    The Marine Corps has been enjoined from enforcing the COVID-19 vaccine

mandate against all religious Marine Corps service members since August 18, 2022—when the

Middle District of Florida entered the injunction—and there is no evidence that that injunction

has caused harm. The Air Force has not made a motion in that court seeking vacation or

modification of the injunction based on any changed circumstances.

439.    Defendants cannot establish that the Mandates are the least restrictive means of

pursuing a compelling interest.

### The Mandates are not neutral

440.    Defendants' actions in this case, including their categorical denial of virtually all

religious accommodation requests while allowing secular exemptions, also fail to uphold the

First Amendment's promise of government neutrality towards religion.

### First Amendment relief

441.    Accordingly, Defendants' Mandates violate Plaintiffs' rights and the rights of all

Class members under the First Amendment to the United States Constitution.

442.    Because of Defendants' policy and actions, Plaintiffs and the Class have suffered

irreparable harm and are entitled to relief.

443.    Plaintiffs and the Class are entitled to a declaration that Defendants violated their

rights under the First Amendment to the free exercise of religion and an order restraining and

enjoining Defendants from denying their requests for religious accommodation, from forcing

them to retire or separate from the military, and from taking any other illegal adverse action against them based on their unvaccinated status.

### THIRD CAUSE OF ACTION

**Violation of the Administrative Procedure Act, 5 U.S.C. §§ 551, 701-06**

**(Denying Opportunity to Seek Exemption Based on Natural Immunity)**

444.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs of this Complaint.

445.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

446.    The Department of Defense, Department of Homeland Security, and the Coast Guard are "agencies" under the APA. 5 U.S.C. § 551(1).

447.    The Mandates are each a "rule" under the APA reviewable under the APA. 5 U.S.C. § 551(4).

448.    Defendants' wrongful actions are "agency actions" reviewable under the APA. 5 U.S.C. §§ 551(13), 704.

449.    With their Mandates, Defendants wrongfully denied Plaintiffs and other service members including all Class Members the opportunity to seek, under COMDTINST M6230.4, a medical exemption based on their natural immunity.

450.    The Court should hold unlawful and set aside the Mandates, because they are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.

451.    Defendants have violated Plaintiffs' rights and the rights of all Class Members under the APA.

### FOURTH CAUSE OF ACTION

**Violation of the Administrative Procedure Act, 5 U.S.C. §§ 551, 701-06 and/or RFRA**

**(Purported Final Denials Not Issued by Someone with Authority to Issue Them)**

452.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs of this Complaint.

453.    COMDTINST 1000.15 is a "rule" under the APA. 5 U.S.C. § 551(4).

454.    LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial are "orders" under the APA. 5 U.S.C. § 551(6).

455.    COMDTINST 1000.15 12(j)(2) requires that a service member may appeal an initial denial of a religious accommodation request to the official in the chain of command or chain of supervision one level above the officer or official who denied the initial request. The appellate authority must act on the appeal.

456.    Captain Anthony Williams issued LTJG Stone's Initial Denial, BM1 Jackson's Initial Denial, and LTJG Marcenelle's Initial Denial.

457.    In May 2022, when LTJG Stone's Final Denial, BM1 Jackson's Final Denial, and LTJG Marcenelle's Final Denial were signed, Dr. Navarro was the official in the chain of command or chain of supervision one level above Captain Anthony Williams.

458.    Dr. Navarro did not sign LTJG Stone's Final Denial, BM1 Jackson's Final Denial, or LTJG Marcenelle's Final Denial.

459.     None of the multiple officials who issued the purported final denials of Plaintiffs' appeals were in the chain of command of Captain Anthony Williams when the final denials were signed.

460.     Defendants' purported orders denying religious accommodations to Plaintiffs wrongfully were not issued in accordance with Defendants' own mandatory rules and were issued in excess of authority.

461.     Defendants' wrongful orders failing to comply with the mandatory rules are "agency actions" reviewable under the APA. 5 U.S.C. §§ 551(13), 704.

462.     The Court should hold unlawful and set aside the Plaintiffs' purported final denials, because they are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.

463.     The purported final denials issued to Plaintiffs are ultra vires and void.

464.     Defendants' purported final denials substantially burden Plaintiffs' sincerely held religious beliefs. By taking adverse action against Plaintiffs based on the void purported final denials, Defendants have denied Plaintiffs their legal rights including their religious freedom rights. The void purported final denials further no compelling interest governmental interest, and the void purported final denials are not the least restrictive means of furthering any compelling governmental interest.

465.     Defendants have violated Plaintiffs' rights under the APA and/or RFRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and provide the following relief:

1. an order that Plaintiffs may maintain this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

2. a declaratory judgment that the Mandates violate Plaintiffs' and Class members' rights under the First Amendment to the United States Constitution;

3. a declaratory judgment that the Mandates violate Plaintiffs' and Class members' rights under RFRA;

4. a declaratory judgment that the Mandates violate Plaintiffs' and Class members' rights under the APA;

5. a preliminary injunction and a permanent injunction prohibiting Defendants, their agents, officials, servants, employees, and any other persons acting in concert with them from enforcing the Mandates against Plaintiffs or any member of the Class and from taking any adverse action against Plaintiffs or any member of the Class on the basis of this lawsuit or of Plaintiffs' or any member's request for religious accommodation related to the Mandates;

6. an order declaring unlawful and setting aside the Mandates challenged in this Complaint;

7. Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 2412;

8. relief to which Plaintiffs may be entitled that is incidental to injunctive or declaratory relief;

9.  relief to which the Class may be entitled that is incidental to injunctive or declaratory relief;

10. all other and further relief to which Plaintiffs may be entitled; and

11. all other and further relief to which the Class may be entitled.

Dated: September 16, 2022

Respectfully submitted,

/s/ Charles W. Fillmore

Stephen Crampton*
THOMAS MORE SOCIETY – Senior Counsel
PO Box 4506
Tupelo, MS 38803
(662)255-9439
scrampton@thomasmoresociety.org

Michael McHale*
THOMAS MORE SOCIETY – Counsel
10506 Burt Circle, Ste. 110
Omaha, NE 68114
(402)501-8586
mmchale@thomasmoresociety.org

Adam S. Hochschild*
Hochschild Law Firm
THOMAS MORE SOCIETY – Special Counsel
PO Box 401
Plainfield, VT 05667
(314)503-0326
adam@hochschildlaw.com

Mary Catherine Hodes*
THOMAS MORE SOCIETY – Special Counsel
112 S. Hanley Rd., Second Floor
Clayton, MO 63105
(314)825-5725
mchodes@thomasmoresociety.org

Paul M. Jonna*
LiMandri & Jonna LLP
THOMAS MORE SOCIETY – Special Counsel
P.O. Box 9120
Rancho Santa Fe, CA 92067
(858)759-994
pjonna@limandri.com

Charles W. Fillmore
State Bar # 00785861
H. Dustin Fillmore III
State Bar # 06996010
THE FILLMORE LAW FIRM, L.L.P.
201 Main Street, Suite 700
Fort Worth, TX 76102
(817)332-2351
chad@fillmorefirm.com
dusty@fillmorefirm.com

Nathan Loyd*
THOMAS MORE SOCIETY – Special Counsel
5101 Old Highway 5, Box 442
Lebanon, GA 30146
(559)744-3664
nathaniel.loyd@thomasmoresociety.org

* *pro hac vice* applications forthcoming

*Counsel for Plaintiffs*