# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **ALARIC STONE**, **ERIC JACKSON**, and<br>**MICHAEL MARCENELLE**, on behalf of<br>themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**ALEJANDRO N. MAYORKAS**, in his official<br>capacity as Secretary of Homeland Security,<br>**LLOYD J. AUSTIN**, **III**, in his<br>official capacity as Secretary of Defense,<br>**LINDA L. FAGAN**, in her official<br>capacity as Commandant of the Coast Guard, and<br>**BRIAN K. PENOYER**, in his official capacity<br>as Assistant Commandant for Human<br>Resources of the Coast Guard,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

## <u>DECLARATION OF LIEUTENANT JUNIOR GRADE ALARIC STONE</u>

Pursuant to 28 U.S.C. § 1746, I, Alaric Stone, under penalty of perjury declare as follows:

1.      I am over the age of eighteen and I am competent to make this declaration.

2.      I have served in the United States Coast Guard as a commissioned officer for more than two years.

3.      I graduated first in the Coast Guard Academy Class of 2020 (the Distinguished Honor Graduate), achieving the highest overall performance in the academic, military, and physical components of the entire Coast Guard Academy program.

4.      I am directly related to Elmer Stone (he was my great-great uncle), the first Coast Guard aviator in history, who was co-commander of the first successful transatlantic flight on the Curtiss NC-4 flying boat in 1919. He is a member of the U.S. Navy Hall of Honor and the U.S.

Coast Guard Aviation Hall of Fame. The Coast Guard Cutter STONE (WMSL 758), commissioned in 2021, is named in his honor. He was a pioneer in military aviation and the top applicant for his Coast Guard Academy class. He has been my inspiration throughout my Coast Guard training and service. It is my deep desire to follow in his footsteps and serve our country in the Coast Guard with the kind of integrity, honor, dignity, and courage that he displayed in his time.

5.      Since graduating the Academy in 2020, I have successfully completed four at-sea, world-wide deployments of approximately three months each, three onboard USCGC JAMES (the Coast Guard's fifth National Security Cutter) and one onboard USCGC KIMBALL (the Coast Guard's seventh National Security Cutter). The National Security Cutter is "the largest and most technically advanced class of cutter in the Coast Guard, with robust capabilities for maritime homeland security, law enforcement, and national defense missions."[1] My deployments included three counter narcotics patrols, during which I contributed to the interdiction of over $1.6 billion of illicit narcotics. Further, I have participated in two major dockside availabilities onboard USCGC JAMES (major pier-side maintenance availabilities involving numerous contractors and support elements), and three temporary duty (TDY) assignments involving both CONUS (continental U.S.) and OCONUS (outside continental U.S.) travel, including one C-School (training school). I successfully completed all of the above without any COVID-19 related incident, both before and after COVID-19 vaccines were made available.

6.      Since commissioning in May 2020, I have never tested positive for COVID-19, never experienced COVID-19 symptoms, never missed a single workday due to quarantine or isolation, and was never unable to discharge my assigned duties due to COVID or my vaccination

---

[1] https://www.atlanticarea.uscg.mil/Area-Cutters/CGCJAMES/.

1

status; nor did I ever cause anyone to be quarantined or isolated, nor did I compromise any other personnel's safety or mission readiness.

7.      I served as my unit's COVID-19 response officer from the time that I reported onboard the USCGC JAMES. In that role I consistently upheld the Coast Guard's interests in military readiness, unit cohesion, good order, discipline, health, and safety. I implemented preventative protocols and COVID mitigation guidance with a high degree of success, and I was lauded for my efforts in my evaluations. More importantly, I helped keep my shipmates safe throughout the pandemic.

8.      Since the outset of the COVID-19 pandemic, USCGC JAMES has only had one deployment in which a crewmember tested positive after the ship departed its homeport on patrol. The day after USCGC JAMES departed Charleston to begin its scheduled JIATF-S (Joint Interagency Task Force South) counter-narcotics patrol in the Fall of 2020, several crewmembers tested positive for COVID. However, contact tracing and a disciplinary investigation discovered that this was not due to a failure of mitigation measures, but rather a failure of good order and discipline; the members had willfully chosen to disregard established pre-patrol guidelines pertaining to restriction of movement (ROM) and contracted COVID together during prohibited personal liberty activities. Importantly, there was no evidence of any further transmission occurring onboard the cutter during this period and a widespread outbreak was successfully averted through the appropriate employment of proven risk mitigation measures, and JAMES successfully completed its Fall 2020 patrol after only a brief delay. Following this incident, USCGC JAMES has not missed a single scheduled movement or deadline due to COVID. The following patrols I participated in were very successful while appropriate preventative protocols were properly implemented and adhered to. USCGC KIMBALL experienced no COVID-19

disruptions during their Winter 2021 Central Pacific Fisheries Patrol that I participated in, despite 80 percent of the crew being unvaccinated at the time.

9.      While underway during the height of the COVID pandemic, we operated in a "bubble" with minimal interaction with outside persons or entities. We employed strict health/PPE measures for personnel who did interact with detainees or other non-crewmembers, to include decontamination procedures before re-entering the ship and interacting with other crewmembers. After vaccines were made available, stringent mitigation measures remained in place for unvaccinated personnel (even before vaccination for COVID-19 became mandatory), while they were relaxed for vaccinated personnel. I was confined to the ship and precluded from participating in normal liberty as an unvaccinated member to reduce opportunities for outside exposure. I wore an N-95 mask continuously anywhere other than my berthing for two weeks after each crew-wide exposure to outside entities, until our ship's "bubble" was re-established. While in-port I continuously wore an N-95 mask while onboard the ship in alignment with CG masking guidelines promulgated at the time. At no time did I test positive or become symptomatic for COVID-19, nor was I forced to quarantine or isolate due to COVID-19 exposure or infection.

10.     During my final patrol onboard USCGC JAMES, the cutter made a scheduled portcall in Golfito, Costa Rica from 17-20 January 2022. Vaccinated crewmembers were authorized liberty while unvaccinated members were restricted to the cutter and the pier it was moored to. While many restrictions had been eased for vaccinated personnel, the guidance officially promulgated by the command required that all personnel (regardless of vaccination status) employ additional mitigation measures when unable to socially distance or when interacting with non-crewmembers, to include donning an N-95 mask. *See* **Exhibit 1**, attached,

3

USCGC James Notice 1700. Many members of the crew, including officers and members of the command, openly discussed their intent to flout this guidance. Many of the reports I received following the portcall indicated that the remaining restrictions were largely ignored, including by members of the command and even the Commanding Officer. The command also made the decision to dispense with masking onboard the cutter following the portcall, which had been a standard precautionary measure up to this point. *See id.* Following this portcall, there was an outbreak of illness onboard the ship. Many personnel displayed common COVID symptoms: loss of smell and taste, body aches, fever, chills, and other influenza like symptoms. A large portion of the vaccinated crew was rendered sick in quarters (SIQ) over a two-week period (some for as long as a week); the crew was 98% vaccinated at this time. Given the many indications of a potential COVID-19 outbreak, I expressed my concerns to both my command and the cutter's independent duty Health Specialist (HS). The HS indicated that they had been directed to refrain from testing personnel for COVID-19, despite the nature of the symptoms and the presence of an organic COVID-19 testing capability onboard. ***See* Exhibit 2**, attached, XO/HSC email. My Executive Officer further instructed me to stand-down any contact tracing efforts. *See id.*  I continued to employ the risk mitigation measures for unvaccinated members described above; I never contracted the illness, despite my fully vaccinated roommate onboard the ship being rendered SIQ. To my knowledge, neither of the other two unvaccinated crewmembers onboard the cutter at that time were impacted or rendered SIQ.

11.     In January of 2022, the Coast Guard issued a policy forbidding unvaccinated service members from executing Permanent Change of Station (PCS) orders, subject to the "needs" of the Service. ***See* Exhibit 3**, attached, PCS transfers policy for unvaccinated service members. Subsequent to this policy change, every unvaccinated Coast Guard Officer that I

know, to include myself, were issued PCS orders. When submitting my formal e-resume in anticipation of my scheduled transfer from USCGC JAMES, I prioritized shore units over command opportunities afloat and other operational assignments. I did this in spite of my preference for afloat and operational assignments to allow the Coast Guard to more easily accommodate my religious beliefs. Shore assignments offer a broader range of options for teleworking and social distancing.

12.    In June of 2022 I transferred from USCGC JAMES to the District 5 Intelligence Branch located in Portsmouth, Virginia. My PCS orders were updated to state that this transfer had been deemed as meeting the "needs of the Service."

13.    At the District 5 Intelligence Branch, I am responsible for providing maritime domain awareness to the District command and operational assets, supporting operational targeting efforts and target development, and provide indications and warnings of emerging threats within the District's Area of Responsibility. I also assist the Coast Guard Investigative Service and a number of Law Enforcement partners with case support. Furthermore, I regularly work with the Sector intelligence elements to coordinate information collection priorities and collaborate on analytical efforts. As for my working environment, I am in a relatively typical office setting with only five other personnel split up between three rooms and two additional offices. At my workstation I am regularly socially distanced from all members of the office but one (who is similarly young and in good health). Access to this setting is severely restricted to the six of us and a few others who have necessary clearance and need occasional access.

14.    No one in my office has expressed any concern about working with me (even though three of my five co-workers are aware of my vaccination status). In fact, my branch chief recently told me that he has already recommended that I be allowed to finish my tour at the

District 5 Intelligence Branch (which would delay my discharge until the summer of 2025), and indicated that both Captains in my immediate chain of command agreed to positively endorse this recommendation. This indicates to me that no one in my immediate or near chain of command views my presence as a threat to operational readiness. However, my branch chief has expressed that this recommendation is unlikely to have any significant impact on the decision rendered by the discharge board that will imminently review my record.

15.     In July 2022, I received my Officer Evaluation for my time aboard the USCGC JAMES. *See* **Exhibit 4**, attached, Officer Evaluation Report.  Objectively, evaluations of this caliber are exceptionally rare. The numerical rating for the Performance of Duties categories is on a scale of 1-7, with 7 being extremely rare. I received 7s in thirteen of the eighteen categories, and 6s in the remaining five. My Reporting Officer's comments recommended me for "in-zone reorder," i.e., for an extremely rare accelerated promotion. His comments stated that I am: "performing well above paygrade"; an "[e]xemplary officer that embodies critical leadership skills, work ethic, technical acumen, & commitment to core values"; "[i]intrinsically motivated . . . w/ limitless potential"; and he gave me the "[h]ighest recommendation for future afloat tours," and said I "will no-doubt excel & compete for O3 Command positions." He further stated that I am "Must-select for Cyber, Cryptology billets"—consistent with my current position at the District 5 Intelligence Branch—and observed that I have "[d]rive & passion w/ [an] impeccable academic record underscor[ing] highest rec[ommendation] for Public Admin, Law & Intel PG programs." Finally, he recommended that I be "Prime select[ed]" for "high vis[ibility] assignments incl[uding]" the "White House," the Coast Guard Liaison Office, Congress, and Flag aide.

16.     This evaluation occurred *after* my request for a religious accommodation from mandatory COVID-19 vaccination was finally denied in an internal appeal, effectively deeming me unfit for service (as discussed below) while the above evaluation concluded exactly the opposite.

17.     Although I have never experienced COVID-19 symptoms throughout the pandemic or missed a single day of work due to illness, on August 23, 2022, I obtained a COVID-19 antibody test that confirmed that I have had a prior infection and currently have antibodies to the COVID-19 virus. ***See* Exhibit 5**, attached, Stone antibodies test results. I had to appear in civilian clothes and make no mention of my active-duty service in order to receive the test, as earlier the same week I attempted to obtain an antibody test from a local CVS while still in uniform and was told by a CVS employee that they "weren't allowed" to conduct antibody tests on military service members. That was consistent with a prior ALCOAST policy message stating "providers should not test patients to assess for current or prior infection, or for prior immunity." ***See* Exhibit 6**, attached, Policy on medical exemptions from COVID-19 vaccination (at Sec. 4).

18.     Given my young age, excellent physical condition, and absence of any other comorbidities or medical conditions, I am extremely low risk for severe COVID complications.

19.     I am a devout Roman Catholic and have been actively involved in the Catholic faith community my whole life. Informed by my Catholic faith, I strongly oppose abortion as the wrongful termination of innocent human life. I thus strongly oppose the abortion and aborted-fetal-cell industries. To my knowledge, the majority of non-COVID-19 vaccines have not used aborted fetal cell lines in their development or testing. I understand that vaccinations are a condition of military service and am not opposed to vaccines in principle. However, guided by

7

my Catholic faith, it is my sincerely held religious belief that receiving a vaccine that made use of aborted fetal cell lines in its development or testing would be morally wrong under any circumstances. To that end, I am enrolled as a perpetual member in the Confraternity of Our Lady of Fatima, which certifies my religious belief that "the crime of abortion is so monstrous that any kind of concatenation with this crime, even a very remote one, such as vaccines that use aborted fetal cells for their testing or production, is immoral and cannot be accepted under any circumstances by a Catholic." *See* **Exhibit 7**, attached, Confraternity Affidavit.

20.     I have been and am still aware that all available COVID-19 vaccines authorized for use in the United States – either fully approved by the FDA (COMIRNATY) or available under Emergency Use Authorization (Johnson & Johnson, Moderna, Pfizer, and Novavax) utilized aborted fetal cell lines in their production or testing. These fetal cell lines are descended from fetal tissue taken from abortions of unborn children.

21.     Many, including officials in the Coast Guard and members of my command, have asserted that Novavax did not use aborted fetal cell lines in its production or testing. I believe those assertions are false. I understand that Novavax researchers admitted that aborted fetal tissue cells (HEK293T) were used in testing. *See, e.g.*, S. Bangaru, et al., *Structural analysis of full-length SARS-CoV-2 spike protein from an advanced vaccine candidate*, BIORXIV, Aug. 6, 2020, at 4-5, 34-35 (noting that Novavax researchers generated coronavirus spike proteins using HEK293 cells).[2] Novavax researchers again used HEK293T cells to study the effectiveness of the Novavax vaccine and optimal administration protocols. *See* Matthew Gorman, et al., *Fab and Fc contribute to maximal protection against SARS-CoV-2 following NVX-CoV2373 subunit*

---

[2] https://www.biorxiv.org/content/10.1101/2020.08.06.234674v1

*vaccine with Matrix-M vaccination*, CELL REPORTS MEDICINE, Aug. 31, 2021.[3] I understand that each of the three inventors of Novavax's COVID-19 vaccine patents (U.S. Patent. Nos. 10,953,089 and 11,253,586) were co-authors on these studies.

22.    Accordingly, because to the best of my understanding all available COVID-19 vaccines authorized for use and available in the United States utilized aborted fetal cell lines in their production or testing, it is my sincerely held religious belief that receiving any of these vaccines would be tantamount to cooperation in the evil of abortion, a mortal sin, and in direct violation of my Catholic faith.

23.    Before applying for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate, my commanding officer stated that he would negatively endorse all religious accommodation requests presented to him. He specifically stated: "I don't want to discuss your religious beliefs because frankly, they don't matter to me." He accordingly prepared a blanket negative endorsement of all religious accommodation requests without meeting with any crew members submitting such requests or reviewing any accommodation request submissions. There was no requirement for the commanding officer to provide any endorsement for members' religious accommodation requests. The negative endorsement did not offer any specific rationale or justification, citing only generalized interests in "maintaining mission readiness" and "protecting crewmembers and their families during the global pandemic." *See* **Exhibit 8**, attached, CO endorsement denial.

24.    On September 22, 2021, I submitted my request for religious accommodation to the mandate that Coast Guard service members obtain COVID-19 vaccination. *See* **Exhibit 9**, attached, Stone Religious Accommodation Request (RAR). I received notice of the denial of my

---

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7899467/

request for religious accommodation on January 20, 2022, almost four months after my initial request. *See* **Exhibit 10**, attached, RAR denial. The decision was issued by Captain Anthony Williams. Although the denial purported to rely in part on the close quarters of working and living conditions on my ship, it was a template letter that was distributed to virtually all unvaccinated Coast Guard service members seeking a religious accommodation, to include personnel assigned to different classes of cutters and even shore units. It ultimately cited generalized interests in military readiness; unit cohesion; good order and discipline; and the health and safety of service members in addition to other considerations that apply to virtually every other member of the Coast Guard assigned to an operational billet. *See* **Exhibit 11**, infra, at pp. 36-47. In short, the broadly formulated interests were not specific to my particular case, and completely ignored the efficacy of the mitigation measures I had employed up and to that point with absolute success. Moreover, I now work at the shore-based District 5 Intelligence Branch (effective June 2022), so none of the Coast Guard's original cited concerns about my living and working on a deploying cutter apply to my current circumstances.

25.     After receiving my denied religious accommodation, my commanding officer pulled me aside to discuss my intentions regarding an appeal. When I expressed my intention to appeal the decision, he stated that any appeal would be futile as "CG-133 would not have denied your appeal without the concurrence of CG-1, who is the appellate authority," indicating that the decision to deny my appeal had essentially already been made when my initial accommodation request was denied and the process was more nuanced than outlined in the Coast Guard's Religious Accommodation Manual.

26.     I timely appealed the denial of my religious accommodation request on February 3, 2022. *See* **Exhibit 11**, attached, Stone RAR appeal. I received notice of the final denial of the

appeal of my religious accommodation request on June 17, 2022, more than four months after

submitting my appeal. The appeal denial memo was dated May 4, 2022—indicating the

decision was withheld for more than a month, during which time I was transferring to the

District 5 Intelligence Branch.  *See* **Exhibit 12**, attached, RAR appeal denial. The memo

denying my appeal was electronically signed by James L. Knight, SES, who I understand at the

time my appeal was adjudicated served as the Deputy Assistant Commandant for Acquisitions.

The Coast Guard's Military Religious Accommodations Manual (CI 1000.15) indicates that the

appellate authority for any denied religious accommodation is "the official in the chain of

command or chain of supervision one level above the officer or official who took the final

action on the request." Captain Anthony Williams (CG-133) was the adjudicating authority who

denied my initial request for a religious accommodation to the Coast Guard's COVID-19

vaccine mandate; I believe Dr. D. M. Navarro, who was acting Assistant Commandant for

Human Resources for the Coast Guard at the time, is the official in the chain of command one

level above Captain Williams and as such should have been the appellate authority adjudicating

my appeal per the Coast Guard's Religious Accommodations Manual. The appeal denial is a

cookie-cutter, one page explanation baldly asserting that the reviewing authority considered my

personal circumstances, and ultimately concluding that "I find no error occurred" in the *initial*

"decision to deny [my] religious accommodation request." I have personal knowledge that this

letter is substantially identical to letters received by virtually all other unvaccinated Coast Guard

members. ***See*** **Marcenelle Decl; Jackson Decl.** Moreover, it entirely ignored that I was already

in the process of transferring to a shore-based intelligence unit, as noted. I had received

notification of my new assignment to the District 5 Intelligence Branch on April 18, 2022, and

this notice made it clear that my transfer was "based on needs of the service regardless of your

11

current vaccination status." ***See* Exhibit 13**, attached, PSC email. Thus, the appeal denial's mere affirmance of the initial denial of my religious accommodation request, which had been primarily based on the generalized living and working conditions onboard an operational, afloat unit, had little to nothing to do with my then - and still - existing circumstances. There is no imminent or even likely requirement at this point that I return to an operational/afloat unit in the future, and it is entirely possible that I could serve a full career in the Coast Guard at shore-based units moving forward, consistent with my skills, areas of interest, and aforementioned evaluation.

      27.     On July 21, 2022, I was formally counseled by my command representative Captain Bazemore on the memorandum denying my request for a religious accommodation. Captain Bazemore explained that the reason for my discharge was that I am allegedly not "worldwide deployable." In response to my observation that I had recently completed four successful worldwide deployments and am now assigned to an ashore unit (District 5 Intelligence Branch), he said: "The military doesn't split hairs; if you're not worldwide deployable, you're not fit for service." This response confirmed for me that the Coast Guard is simply applying a generalized standard without regard for my individual circumstances. Indeed, I am aware the military has an explicit policy for retaining non-worldwide-deployable members, even assuming arguendo I am not worldwide deployable. *See* DoD Instruction 1332.45.[4] Additionally, during the meeting I also stated my desire to further appeal the decision to the Coast Guard's Board of Corrections of Military Record (BCMR), but Captain Bazemore said there were no further opportunities to appeal. I was given a memo ordering me to seek vaccination or expect "administrative and disciplinary consequences," including "punish[ment]

---

[4] https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133245p.pdf?ver=2018-08-01-143025-053.

under the Uniform Code of Military Justice" for allegedly failing to obey a lawful order. I refused to sign this memo because I believe that my request for a religious accommodation was wrongfully denied. I provided a hand-written annotation requesting additional information on how to appeal to the BCMR, and noting I was presented this memo with the explanation that, "per CG policy, this is the end of your administrative process and there is no further mechanism for administrative appeal." *See* **Exhibit 14**, attached, First Counseling Memo**.**

28.     During the same counseling session, my supervisor and Captain Bazemore also informed me of an immediately forthcoming Coast Guard policy directing all commands to begin separation/disciplinary proceedings for all unvaccinated service members whose religious accommodation appeals had been denied. They said this policy was a result of the FDA's then-recent issuance of Emergency Use Authorization for the Novavax vaccine. Captain Bazemore then wrongly asserted that the Novavax vaccine did not use aborted fetal cell lines in its development and stated that the majority of religious accommodation requests to the COVID-19 vaccine, including mine, were now irrelevant (despite the fact the military can mandate only non-EUA, fully FDA-approved medications/vaccines for service members, absent a presidential waiver; *see* 10 U.S.C. § 1107a).

29.     After the meeting, I emailed Captain Bazemore the aforementioned S. Bangaru, et al., study regarding Novavax's use of HEK293T cells in its development. Captain Bazemore replied: "I'm not an expert, but I think it would be a challenge to find any modern vaccine that hasn't used some form of fetal cells for testing." *See* **Exhibit 15**, attached, Bazemore email. His email also stated that any appeal to the BCMR would be futile, since my "potential separation will be based on you not being worldwide deployable," and the "BCMR will not address that issue." Finally, he stated that the forthcoming ALCOAST policy requiring the imminent

discharge of unvaccinated service members was simply "a result of the CG Commandant changing," and thus "the CG's position will shift from" eliminating the unvaccinated "via natural attrition to the CG taking a more pro-active stance removing [them] from the service." (Id.)

30.     On July 25, 2022, the Coast Guard officially issued a policy stating that COVID-19 vaccination "is necessary to be world-wide deployable," and that "the Coast Guard is beginning involuntary administrative separation processing for all non-compliant Active Duty service members." It further stated that members who obtain vaccination are "[c]hoos[ing] to serve"— which I take as a direct insult to those of us who deeply desire to continue serving our country consistent with our sincerely held religious beliefs and the public good, but who are being stripped of our ability to serve and pressured to deny our deepest religious convictions. *See* **Exhibit 16**, attached, July 25 Policy.

31.     I am personally aware that the other two Coast Guard Officers currently assigned to the District 5 Intelligence Branch today are not worldwide deployable but are nonetheless permitted to remain in the Coast Guard. My branch chief told me he is unable to receive a mandated vaccine for another disease due to medical complications and as such is not worldwide deployable. And my immediate supervising officer, a former Army aviator, told me he is required to take weekly a certain refrigerated medication that is not guaranteed to be accessible worldwide for a different medical condition, and as such is also not worldwide deployable under the DoD regulations adopted by the Coast Guard.

32.     On August 11, 2022, I received my final counseling session and was presented a "CG-3307" memo declaring that I am allegedly "in violation of a lawful order." *See* **Exhibit 17**, Final Counseling Memo CG-3307. I wrote a brief, heartfelt statement of objection on the memo

14

emphasizing why I do not believe the vaccine mandate applied to me is "lawful" under RFRA, the First Amendment, and other federal law, given my four successful deployments during the pandemic, my new working conditions at the District 5 Intelligence Branch, the permission given to others to remain in the Coast Guard despite not being "worldwide deployable," and the unavailability of an actually FDA-approved vaccine in the U.S. given that the FDA-approved COMIRNATY is not available here and is distinct from the EUA Pfizer vaccine. After reading my statement, Captain Bazemore again told me I am not deployable, despite all of the foregoing facts to the contrary, and also compared my situation to not getting one's personal preference in a PCS transfer/assignment process—entirely disregarding the federal legal protections that I understand apply to a service member's religious beliefs. When Captain Bazemore asked if I had considered the implications of being allowed to "choose which orders were lawful or unlawful or which lawful orders" I will obey, I was flabbergasted and appalled. I explained that the process applied to me was wrong and that I believe the Coast Guard is committing an injustice, and as such the order is not lawful; I further explained that I gain no pleasure from the situation that I find myself in, being in conflict with an order issued by a superior, and I have done my utmost to obey every order I have been given up to this point.

33.    Subsequent to this meeting, I learned that I will be imminently reviewed by a single discharge board consisting of only three persons, consistent with the separation proceedings outlined in Commandant Instruction Manual (CIM) 1000.4, as I have less than 5 years of service as a commissioned officer in the Coast Guard. It is exceptionally likely this single discharge board will rubber stamp my prior denials and order my imminent discharge, in alignment with the process I have experienced up to this point. This will likely occur very soon, **i.e. in the next 30 days at the latest**. Importantly, Coast Guard policy requires that members of a

15

discharge board have no prior knowledge of the incident prompting them to evaluate a member for separation; given the publicity surrounding this process, and the Coast Guard's clear articulation in official policy messages that unvaccinated personnel are considered to be in violation of a lawful order and non-deployable, it will be next to impossible to find impartial members to compose the review board.

34.     I have also become aware that the Coast Guard recently issued a policy declaring that Coast Guard personnel will not be deemed non-worldwide deployable solely because they are HIV positive. Specifically, for those who are HIV positive but asymptomatic with clinically confirmed undetectable viral loads, non-deployability decisions "will be made on a case-by-case basis and must be justified by the Service member's inability to perform the duties to which he or she would be assigned." *See* **Exhibit 18**, attached, HIV deployability policy. Meanwhile, I do not have COVID-19 and indeed have confirmed natural immunity against it, and yet I am deemed categorically non-deployable despite my proven ability to successfully perform my assigned duties without fail since the start of the COVID-19 pandemic.

35.     I am also aware of and attach a Coast Guard memo dated August 5, 2022, confirming that by the end of Fiscal year 2022, "the Active-duty enlisted workforce will be approximately 2,268 personnel below strength compared to the Personal Allowance List (PAL)." The memo states that it will be impractical to achieve the necessary recruiting numbers to make up for this shortfall through Fiscal Year 2025. It also states that by the end of Fiscal Year 2022, "the Reserve Component enlisted workforce will be approximately 845 personnel below strength compared to PAL." *See* **Exhibit 19**, attached, Personnel shortage memo. I am also personally aware that there are shortfalls developing in the Officer Corps (not represented in the aforementioned memo), and that Coast Guard recruiting is at an all-time low as the Coast Guard

16

is routinely missing recruiting quotas. A recent public report stated that the Coast Guard is approximately 1,100 service members short in non-rated positions.[5]

36.    I do not oppose all vaccines. I oppose the COVID-19 vaccines for religious reasons.

37.    I have been willing and able and remain willing and able to work remotely, wear a mask, and test periodically as appropriate and required.

38.    I am aware of the following military orders purportedly requiring me to take the vaccine:

- Department of Defense August 24, 2021 mandate (**Exhibit 20**, attached).

- Coast Guard ALCOAST 305/21 COVID-19 vaccine mandate (**Ex. 21**, attached).

- Coast Guard ALCOAST 315/21 COVID-19 vaccine mandate (**Ex. 22**, attached).

- Coast Guard ALCOAST 270/22 COVID-19 vaccine mandate. (**Ex. 16**, attached).

39.    I am also aware of reported information showing that the Coast Guard initially denied nearly all of the more than 1,200 requests for religious accommodation from the COVID-19 vaccine mandate; granted only several requests on appeal (only for those already slated for separation or retirement from the Coast Guard); and provided some vaccine statistics in *Navy Seal 1 v. Biden*, No. 8:21-cv-02429 (M.D. Fla.) in January and February 2022, in Defendant Fagan's Senate Committee testimony in May 2022, and in *Bazzrea v. Mayorkas*, No. 3:22-cv-265 (S.D.Tex) in August 2022  *See* **Exhibit 23**, COVID-19 vaccine metrics; **Exhibit 24**, January 2022 exemption data; **Exhibit 25**, August 2022 exemption data.

40.    I am not aware of any military branch (including the Air Force, Navy, Army, Marines, and Coast Guard) granting any religious accommodation requests to service members

---

[5] https://federalnewsnetwork.com/defense-main/2022/07/coast-guard-upping-recruiting-effort-as-military-feels-pinch-in-talent-pool/.

not already slated for separation or retirement.  I'm aware that the Pentagon's Inspector General investigated whether the military's process for considering and denying religious accommodation requests to COVID-19 vaccination complies with its own protocols: https://www.military.com/daily-news/2022/03/02/pentagon-watchdog-investigate-militarys-covid-19-exemption-process.html. I'm also aware of a copy of the Inspector General's concluding memo attached to a letter of supplemental authority filed in *U.S. Navy SEALs 1-26  v. Biden*, Case Nos. 22-10077/22-10534. *See* **Exhibit 26**, attached, IG Memo.

41.     As made clear above, I believe my request for religious accommodation would not impact my ability to perform my duties. Also as shown above, I have had COVID-19 (unknowingly) and now have natural immunity which I believe has been shown to be superior to vaccine-induced immunity, which wanes after a matter of months.

42.     My Coast Guard career has been entirely in the interest of military readiness, unit cohesion, good order, discipline, health, and safety, as the foregoing demonstrates.

43.     As a result of my decision to forgo the vaccine, I now face a wide range of disciplinary and punitive measures, including:

(1) **Non-Judicial Punishment and Administrative Separation**: I am aware that this process will be initiated based on a service member's "refusal to obey a lawful order," without any reference to the member's underlying religious objection to COVID-19 vaccination that kept them from complying with such order. *See* **Exhibit 27**, attached.

(2) **Ineligibility for promotion and advancement**: as an unvaccinated service member whose internal appeal has been denied, I am no longer eligible for promotion and advancement as a matter of official Coast Guard policy.

(3) **Negative performance evaluation**: I will receive negative evaluations that mention only an alleged failure to obey a lawful order and/or to uphold medical readiness standards, omitting any reference to my underlying request for a religious accommodation from COVID-19 vaccination pursuant to federal law. These negative evaluations could potentially impact service members in a civilian capacity after being discharged from the Coast Guard. *See id.*

(4) **Discrimination in awards and recognitions**: I also will not be afforded the same opportunities for awards and recognitions as my peers, further harming my ability to progress in my career. In particular, I recently received a mediocre departing award from my previous assignment onboard USCGC JAMES despite having been nominated by my Department Head and endorsed by my Executive Officer for a superior award consistent with my accomplishments and contributions on the ship over the past two years. I am personally aware that my award was downgraded by my commanding officer because of my religious refusal to obtain COVID-19 vaccination.

(5) **Denied Training**: I have been denied access to training necessary to both fulfill my assigned duties and advance my development and career as a Coast Guard Officer. Specifically, I was prohibited from attending Boarding Officer School while assigned to USCGC JAMES due to restrictions on unvaccinated personnel attending C-Schools. More recently, I had orders that I had been issued to attend the Intelligence Officer Course at TRACEN Yorktown revoked on the basis that I am unvaccinated; this course deals with proper handling, processing, and dissemination of classified information, among many other topics and is required for my billet. The decision to revoke my orders was made despite the current Coast Guard policy allowing

unvaccinated personnel to attend C-Schools directly associated with their billet and primary duties, absent any specific training facility rule to the contrary. *See* **Exhibit 28**, attached, Policy on training-school permission for unvaccinated service members. I have been informed by a colleague currently stationed at TRACEN Yorktown, who is himself unvaccinated and has attended C-Schools at the training facility in the last month, that no such rule exists there. When I disputed this decision, I was told that my orders referenced the old (and now cancelled) policy prohibiting unvaccinated personnel from attending any C-Schools. When I provided the current policy described above, I was told that regardless of this policy my orders were cancelled because I am unvaccinated.

44.    I cannot in good conscience take any of the available COVID-19 vaccines. It is vitally important for me to adhere to my Catholic faith and not violate my religious convictions, even if this means risking work, compensation, and the potential for a highly-successful military career. I choose God first. Putting God first has formed my life, and led me to serve in the U.S. Coast Guard with honor and distinction. From all that I have heard and know, my ancestor Elmer Stone was a man of conviction and principle; I desire to be nothing less, which is why I have excelled in my duties, and want to continue giving my life in service to others and country as an officer of the U.S. Coast Guard.

45.    Some of the attached exhibits are redacted to remove some personal identifiers.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 15, 2022.

Alaric B. Stone

20