# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| **ALARIC STONE**, et al, on behalf of themselves and all others similarly situated, )<br>)<br>) | Case No. 4:22-cv-00825 |
| Plaintiffs, ) | |
| v. ) | |
| **ALEJANDRO N. MAYORKAS**, in his official capacity as Secretary of Homeland Security, et al. )<br>)<br>) | |
| Defendants. ) | |

## APPENDIX OF MATERIALS IN SUPPORT OF PLAINTIFFS' MOTIONS TO CERTIFY CLASS, TO APPOINT CLASS COUNSEL, AND FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### Index of Contents of Appendix

**Document(s)**                                                              **Begins at Appendix page**

1. Hochschild Declaration.................................................................................................1

2. Hodes Declaration......................................................................................................5

3. Jonna Declaration.......................................................................................................8

4. Stone Declaration.....................................................................................................12

5. Stone Exhibits..........................................................................................................33

6. Jackson Declaration................................................................................................163

7. Jackson Exhibits.....................................................................................................172

8. Marcenelle Declaration..........................................................................................231

9. Marcenelle Exhibits...............................................................................................244

10. Requena Declaration............................................................................................285

11. Requena Exhibits.................................................................................................287

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **ALARIC STONE, ERIC JACKSON**, and **MICHAEL MARCENELLE**, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) | |
| **ALEJANDRO N. MAYORKAS**, in his official capacity as Secretary of Homeland Security, **LLOYD J. AUSTIN, III**, in his official capacity as Secretary of Defense, **LINDA L. FAGAN**, in her official capacity as Commandant of the Coast Guard, and **BRIAN K. PENOYER**, in his official capacity as Assistant Commandant for Human Resources of the Coast Guard, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF ADAM HOCHSCHILD
## IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

I, Adam Hochschild, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am over the age of eighteen and am competent to make this declaration.

2.      I am submitting this declaration in support of Plaintiffs' Motion for Class Certification.

3.      I am one of Plaintiffs' attorneys in this case.

4.      I am a lawyer licensed to practice in the State of Vermont, the State of Missouri, the United States District Court for the District of Vermont, the United States District Court for the Eastern District of Missouri, the United States Court of Appeals for the Second Circuit, and the United States Court of Appeals for the Eleventh Circuit.

1

5.     Since December 2018, I have owned and operated my own law firm based in Vermont, Hochschild Law Firm, LLC. I maintain a national practice, representing clients in a variety of matters, primarily litigation, including complex commercial litigation and complex civil rights and constitutional litigation.

6.     Since 2019, through my firm I have served on certain matters—including this one—as Special Counsel for the Thomas More Society, a not-for-profit, national public interest law firm dedicated to restoring respect in law for life, family, and religious liberty. The Thomas More Society provides pro bono legal representation to plaintiffs and defendants involved in complex civil rights and constitutional litigation nationwide.

7.     The Thomas More Society and its attorneys have a substantial record of raising and diligently pursuing legal challenges to incursions on First Amendment and other civil rights.

8.     For example, a team of Thomas More Society attorneys (including myself and Stephen Crampton and Michael McHale who are also attorneys of record in this case) recently obtained a victory on appeal, after rehearing by the Second Circuit panel. In a case involving the First Amendment rights of pro-life sidewalk counselors in the context of the federal Freedom of Access to Clinic Entrances Act (FACE) and a similar state law and city ordinance, the District Court for the Eastern District of New York denied the State of New York's motion for preliminary injunction against our clients. The State appealed, and a panel of the Second Circuit Court of Appeals first reversed the denial of the preliminary injunction, but then granted our clients' petition for rehearing and vacated its own reversal of, and affirmed, the District Court's decision. *New York by James v. Griepp*, 11 F.4th 174 (2d Cir. 2021).

9.     Prior to joining the Thomas More Society in 2019, I practiced law at RUNNYMEDE law group (2016-2018), Clark & Sauer, LLC (2013-2015), Bryan Cave LLP

2

(now known as Bryan Cave Leighton Paisner LLP) (2010-2013), and Husch Blackwell Sanders, LLP (now known as Husch Blackwell LLP) (2000-2010) and represented clients across the nation. As an attorney at each of these firms, I represented clients—including Fortune 500 companies—primarily in complex commercial litigation, including in the fields of securities, telecommunications, and tax, among others.

10.     I have represented clients in several class action cases, including in *Bachman v. A.G. Edwards, Inc.*, No. 22052-01266 (Circuit Court of the City of St. Louis, Missouri) (securities); *Merrick v. Stifel Fin. Corp.*, No. 4:08CV1167–HEA (E.D.Mo.) (securities); *City of University City v. Sprint-Nextel*, No. 01-CC-004454 (Circuit Court of the County of St. Louis, Missouri) (telecommunications and tax); and *City of O'Fallon v. CenturyLink, Inc.*, No. 12SL-CC01723 (Circuit Court of the County of St. Louis, Missouri) (telecommunications and tax). In *Bachman*, for example, I successfully argued before the Missouri Court of Appeals, Eastern District, in favor of affirming the trial court's order approving settlement. *Bachman v. A.G. Edwards, Inc.*, 344 S.W.3d 260 (Mo. Ct. App. 2011).

11.     The Thomas More Society is an entire law firm of specialists in the laws applicable in this case, including the Religious Freedom Restoration Act (RFRA) and the First Amendment. In February 2022, for example, our team won a preliminary injunction barring the Air Force from forcing an officer to retire for declining to receive a COVID-19 vaccination. *Air Force Officer v. Austin*, No. 5:22-cv-00009-TES, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022). After entry of the preliminary injunction in that case, we expended considerable effort adding and fully briefing similar claims on behalf of a proposed Air Force-wide class. (That case is currently stayed pending resolution of a related Air Force class-action case in which the District

3

3

Court granted class-wide relief.)  We are fully prepared to prosecute this similar matter on behalf of the proposed class.

12.     I and co-counsel and other Thomas More Society attorneys have been contacted, both before and during the *Air Force Officer* case and before filing the instant action, by many putative class members with interests similar to Plaintiffs'.

13.     I understand the nature and magnitude of the expenses involved in litigating class action lawsuits and, as attorneys associated with Thomas More Society, counsel have sufficient resources to vigorously prosecute this action.

Dated this 15th day of September 2022.

Adam Hochschild

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **ALARIC STONE**, **ERIC JACKSON**, and )<br>**MICHAEL MARCENELLE**, on behalf of )<br>themselves and all others similarly situated, )<br>  )<br>  Plaintiffs, )<br>v.  )<br>  )<br>**ALEJANDRO N. MAYORKAS**, in his official )<br>capacity as Secretary of Homeland Security, )<br>**LLOYD J. AUSTIN, III**, in his )<br>official capacity as Secretary of Defense, )<br>**LINDA L. FAGAN**, in her official )<br>capacity as Commandant of the Coast Guard, and )<br>**BRIAN K. PENOYER**, in his official capacity )<br>as Assistant Commandant for Human )<br>Resources of the Coast Guard, )<br>  )<br>  Defendants. ) | Case No. |

## DECLARATION OF MARY CATHERINE HODES
## IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

I, Mary Catherine Hodes, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am over the age of eighteen and am competent to make this declaration.

2.     I am submitting this declaration in support of Plaintiffs' Motion for Class Certification.

3.     I am one of Plaintiffs' attorneys in this case.

4.     I am a lawyer licensed to practice in the State of Missouri, the State of Illinois (inactive), the United States District Court for the Eastern District of Missouri, the United States

1

Court of Appeals for the Second Circuit, and the United States Court of Appeals for the Eleventh Circuit.

5.      I am Special Counsel for the Thomas More Society, a not-for-profit, national public interest law firm dedicated to restoring respect in law for life, family, and religious liberty. The Thomas More Society provides pro bono legal representation to plaintiffs and defendants involved in complex civil rights and constitutional litigation nationwide.

6.      The Thomas More Society and its attorneys have a substantial record of raising and diligently pursuing Religious Freedom Restoration Act (RFRA) and First Amendment challenges to incursions on religious freedom.

7.      For example, I and fellow Thomas More Society attorneys are awaiting determinations in the Eastern District of New York and the Second Circuit Court of Appeals as to our clients' RFRA and First Amendment challenges to New York State and New York City's "Boss Bills," which prohibit pro-life employers from refusing to hire someone who has had an abortion.  *Slattery v. Cuomo*, No. 21-911 (2d. Cir.); *Slattery v. City of New York*, 1:20-cv-00580-PKC-RLM (E.D.N.Y.).

8.      Prior to joining the Thomas More Society in 2018, I litigated constitutional and civil rights cases with D. John Sauer, now Solicitor General of the State of Missouri, first at Clark & Sauer, LLC, and then at James Otis Law Group, LLC.

9.      From approximately 2008 to 2012, I practiced law at Schlichter, Bogard & Denton, in the appellate section of their ERISA fiduciary class action practice. The team I worked with brought novel, large-scale class actions against employers for breach of fiduciary

duties within their 401(k) plans. Two of the cases I worked on, *Spano v. Boeing* and *Abbott v. Lockheed Martin*, were litigated for 9 years and ultimately resulted in $57 million and $62 million settlements, respectively, for employees. Courts have credited Schlichter's ERISA class action team for reforming the entire 401(k) industry through their numerous successful class actions challenging financial abuse: "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one[.]" *Spano v. Boeing Co.*, No. 06-743, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016).

10.     The Thomas More Society is an entire law firm of specialists in the laws applicable in this case, including RFRA and the First Amendment. In February 2022, for example, our team won a preliminary injunction barring the Air Force from forcing an officer to retire for declining to receive a COVID-19 vaccination. *Air Force Officer v. Austin*, No. 5:22-cv-00009-TES, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022). After entry of the preliminary injunction in that case, we expended considerable effort adding and fully briefing similar claims on behalf of a proposed Air Force-wide class. (That case is currently stayed pending resolution of a related Air Force class-action case in which the District Court granted class-wide relief.) We are fully prepared to prosecute this similar matter on behalf of the proposed class.

11.     I understand the nature and magnitude of the expenses involved in litigating class action lawsuits and, as attorneys associated with Thomas More Society, counsel have sufficient resources to vigorously prosecute this action.

Dated this 15th day of September 2022.

Mary Catherine Hodes
Mary Catherine Hodes

3

7

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **ALARIC STONE**, **ERIC JACKSON**, and<br>**MICHAEL MARCENELLE**, on behalf of<br>themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**ALEJANDRO N. MAYORKAS**, in his official<br>capacity as Secretary of Homeland Security,<br>**LLOYD J. AUSTIN, III**, in his<br>official capacity as Secretary of Defense,<br>**LINDA L. FAGAN**, in her official<br>capacity as Commandant of the Coast Guard, and<br>**BRIAN K. PENOYER**, in his official capacity<br>as Assistant Commandant for Human<br>Resources of the Coast Guard,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

## DECLARATION OF PAUL M. JONNA
## IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

I, Paul M. Jonna, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am over the age of eighteen and am competent to make this declaration.

2.      I am submitting this declaration in support of Plaintiffs' Motion for Class Certification.

3.      I am one of Plaintiffs' attorneys in this case.

4.      I am a lawyer licensed to practice in the State of California, the United States District Courts for the Southern, Central, Eastern, and Northern Districts of California, the United States Court of Appeals for the Ninth Circuit, and the United States Supreme Court.

1

5.      Since 2016, I have been a named partner in the California law firm of LiMandri &

Jonna LLP, and I have worked with Charles LiMandri since 2013. We represent corporate and

individual clients in the areas of complex business, securities, and real estate litigation, and we

have a very successful First Amendment and Religious Freedom Restoration Act (RFRA)

practice. Our firm successfully defended Establishment Clause challenges to the Mt. Soledad

War Memorial from 2004 to 2016, in serial actions in both state and federal court. *See, e.g.*,

*Paulson v. Abdelnour*, 145 Cal. App. 4th 400 (2006); *San Diegans for Mt. Soledad Nat. War

Memorial v. Paulson*, 548 U.S. 1301 (2006) (Kennedy, J., in chambers). In that same time frame,

we were involved in RFRA challenges to the Affordable Care Act's mandate that religious

nonprofits provide health insurance to their employees covering contraception and abortifacients.

*Priests for Life v. Sebelius*, No. 12–CV–753 (FB) (E.D.N.Y. Apr. 12, 2013).

6.      More recently, in 2018, we obtained the first judicial ruling nationwide that a

wedding professional's First Amendment rights excused her from participating in wedding

ceremonies violative of her conscience. *D.F.E.H. v. Miller*, No. BCV-17-102855, 2018 WL

747835 (Cal. Super. Feb. 5, 2018). In 2020, we obtained the first two judicial rulings holding that

California's lockdown of Churches violated Free Exercise principles. *County of Los Angeles v.

Grace Community Church of the Valley*, No. 20STCV30695, 2020 WL 5553662 (Cal. Super.

Aug. 14, 2020) (denying TRO to California to prohibit indoor worship services); *Burfitt v.

Newsom*, No. BCV-20-102267, 2021 WL 2152961 (Cal. Super. Dec. 10, 2020) (enjoining

California from prohibiting indoor worship services). Both of these rulings were called into

question by orders of the California Court of Appeal until those appellate orders become moot in

2021 when we obtained a similar ruling from the U.S. Supreme Court. *South Bay United*

2

9

*Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021). I argued the *South Bay* case at the District Court level three times.

7.      Prior to 2013, I was an associate at the national law firm of Gordon & Rees, where I represented a broad range of clients, including major Fortune 500 companies, small and large businesses, and leading national and international insurers in complex commercial litigation and class actions in state and federal courts throughout California.

8.      In my career I have represented clients in dozens of class actions, including plaintiffs in many of them.

9.      Prior to joining Gordon & Rees, I was an associate at Bernstein Litowitz Berger & Grossmann, where I represented plaintiff institutional investors in complex litigation and securities class actions, including, for example, *Public Employees Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, No. 08 Civ. 10841 (JSR) (S.D.N.Y. Jun. 16, 2011) ($315 million recovery); *In re Wells Fargo Mortgage Pass-Through Certificate Litigation*, No. 09-CV-1376-LHK (PSG) (N.D. Cal. Nov. 14, 2011) ($125 million); and *In re AXA Rosenberg Investor Litigation*, No. CV 11-00536 JSW (N.D. Cal. Mar. 26, 2012) ($65 million).

10.     Since 2019, our firm has served as Special Counsel for the Thomas More Society to represent pro bono clients in high-profile, complex constitutional cases throughout the country. The Thomas More Society is a not-for-profit, national public interest law firm dedicated to restoring respect in law for life, family, and religious liberty. The Thomas More Society provides pro bono legal representation to plaintiffs and defendants involved in complex civil rights and constitutional litigation in state and federal courts nationwide.

11.     The Thomas More Society has taken a leading role in litigation challenging vaccine mandates across the country.  For example, Thomas More Society attorneys, including

Michael McHale, who is one of Plaintiff's attorneys of record in this case, won an injunction against the State of New York's mandate for health care workers before being overturned by a panel of the Second Circuit, *Dr. A. v. Hochul*, No. 1:21-CV-1009, 2021 WL 4734404 (N.D.N.Y. Oct. 12, 2021), *reversal noted by Dr. A v. Hochul*, 142 S. Ct. 552 (2021) (Gorsuch, J., dissenting from denial of application).  And Thomas More Society attorneys, including myself, succeeded in delaying the vaccine mandate imposed by the San Diego Unified School District in *Doe v. San Diego Unified Sch. Dist.*, __ S. Ct. __, 2022 WL 498812 (Feb. 18, 2022) (denying application without prejudice due to cessation of mandate).

12.     The Thomas More Society is an entire law firm of specialists in the laws applicable in this case, including RFRA and the First Amendment.  In February 2022, for example, our team won a preliminary injunction barring the Air Force from forcing an officer to retire for declining to receive a COVID-19 vaccination.  *Air Force Officer v. Austin*, No. 5:22-cv-00009-TES, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022).  After entry of the preliminary injunction in that case, we expended considerable effort adding and fully briefing similar claims on behalf of a proposed Air Force-wide class.  (That case is currently stayed pending resolution of a related Air Force class-action case in which the District Court granted class-wide relief.)  We are fully prepared to prosecute this similar matter on behalf of the proposed class.

13.     I understand the nature and magnitude of the expenses involved in litigating class action lawsuits and, as attorneys associated with the Thomas More Society, counsel have sufficient resources to vigorously prosecute this action.

Dated this 15th day of September 2022.


_____
Paul M. Jonna

4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **ALARIC STONE**, **ERIC JACKSON**, and | ) | |
| **MICHAEL MARCENELLE**, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| **ALEJANDRO N. MAYORKAS**, in his official | ) | |
| capacity as Secretary of Homeland Security, | ) | |
| **LLOYD J. AUSTIN, III**, in his | ) | |
| official capacity as Secretary of Defense, | ) | |
| **LINDA L. FAGAN**, in her official | ) | |
| capacity as Commandant of the Coast Guard, and | ) | |
| **BRIAN K. PENOYER**, in his official capacity | ) | |
| as Assistant Commandant for Human | ) | |
| Resources of the Coast Guard, | ) | |
| | ) | |
| Defendants. | ) | |

## **DECLARATION OF LIEUTENANT JUNIOR GRADE ALARIC STONE**

Pursuant to 28 U.S.C. § 1746, I, Alaric Stone, under penalty of perjury declare as follows:

1.      I am over the age of eighteen and I am competent to make this declaration.

2.      I have served in the United States Coast Guard as a commissioned officer for more than two years.

3.      I graduated first in the Coast Guard Academy Class of 2020 (the Distinguished Honor Graduate), achieving the highest overall performance in the academic, military, and physical components of the entire Coast Guard Academy program.

4.      I am directly related to Elmer Stone (he was my great-great uncle), the first Coast Guard aviator in history, who was co-commander of the first successful transatlantic flight on the Curtiss NC-4 flying boat in 1919. He is a member of the U.S. Navy Hall of Honor and the U.S.

Coast Guard Aviation Hall of Fame. The Coast Guard Cutter STONE (WMSL 758), commissioned in 2021, is named in his honor. He was a pioneer in military aviation and the top applicant for his Coast Guard Academy class. He has been my inspiration throughout my Coast Guard training and service. It is my deep desire to follow in his footsteps and serve our country in the Coast Guard with the kind of integrity, honor, dignity, and courage that he displayed in his time.

5.      Since graduating the Academy in 2020, I have successfully completed four at-sea, world-wide deployments of approximately three months each, three onboard USCGC JAMES (the Coast Guard's fifth National Security Cutter) and one onboard USCGC KIMBALL (the Coast Guard's seventh National Security Cutter). The National Security Cutter is "the largest and most technically advanced class of cutter in the Coast Guard, with robust capabilities for maritime homeland security, law enforcement, and national defense missions."[1] My deployments included three counter narcotics patrols, during which I contributed to the interdiction of over $1.6 billion of illicit narcotics. Further, I have participated in two major dockside availabilities onboard USCGC JAMES (major pier-side maintenance availabilities involving numerous contractors and support elements), and three temporary duty (TDY) assignments involving both CONUS (continental U.S.) and OCONUS (outside continental U.S.) travel, including one C-School (training school). I successfully completed all of the above without any COVID-19 related incident, both before and after COVID-19 vaccines were made available.

6.      Since commissioning in May 2020, I have never tested positive for COVID-19, never experienced COVID-19 symptoms, never missed a single workday due to quarantine or isolation, and was never unable to discharge my assigned duties due to COVID or my vaccination

---

[1] https://www.atlanticarea.uscg.mil/Area-Cutters/CGCJAMES/.

1

status; nor did I ever cause anyone to be quarantined or isolated, nor did I compromise any other personnel's safety or mission readiness.

7.      I served as my unit's COVID-19 response officer from the time that I reported onboard the USCGC JAMES. In that role I consistently upheld the Coast Guard's interests in military readiness, unit cohesion, good order, discipline, health, and safety. I implemented preventative protocols and COVID mitigation guidance with a high degree of success, and I was lauded for my efforts in my evaluations. More importantly, I helped keep my shipmates safe throughout the pandemic.

8.      Since the outset of the COVID-19 pandemic, USCGC JAMES has only had one deployment in which a crewmember tested positive after the ship departed its homeport on patrol. The day after USCGC JAMES departed Charleston to begin its scheduled JIATF-S (Joint Interagency Task Force South) counter-narcotics patrol in the Fall of 2020, several crewmembers tested positive for COVID. However, contact tracing and a disciplinary investigation discovered that this was not due to a failure of mitigation measures, but rather a failure of good order and discipline; the members had willfully chosen to disregard established pre-patrol guidelines pertaining to restriction of movement (ROM) and contracted COVID together during prohibited personal liberty activities. Importantly, there was no evidence of any further transmission occurring onboard the cutter during this period and a widespread outbreak was successfully averted through the appropriate employment of proven risk mitigation measures, and JAMES successfully completed its Fall 2020 patrol after only a brief delay. Following this incident, USCGC JAMES has not missed a single scheduled movement or deadline due to COVID. The following patrols I participated in were very successful while appropriate preventative protocols were properly implemented and adhered to. USCGC KIMBALL experienced no COVID-19

2

disruptions during their Winter 2021 Central Pacific Fisheries Patrol that I participated in, despite 80 percent of the crew being unvaccinated at the time.

9.    While underway during the height of the COVID pandemic, we operated in a "bubble" with minimal interaction with outside persons or entities. We employed strict health/PPE measures for personnel who did interact with detainees or other non-crewmembers, to include decontamination procedures before re-entering the ship and interacting with other crewmembers. After vaccines were made available, stringent mitigation measures remained in place for unvaccinated personnel (even before vaccination for COVID-19 became mandatory), while they were relaxed for vaccinated personnel. I was confined to the ship and precluded from participating in normal liberty as an unvaccinated member to reduce opportunities for outside exposure. I wore an N-95 mask continuously anywhere other than my berthing for two weeks after each crew-wide exposure to outside entities, until our ship's "bubble" was re-established. While in-port I continuously wore an N-95 mask while onboard the ship in alignment with CG masking guidelines promulgated at the time. At no time did I test positive or become symptomatic for COVID-19, nor was I forced to quarantine or isolate due to COVID-19 exposure or infection.

10.    During my final patrol onboard USCGC JAMES, the cutter made a scheduled portcall in Golfito, Costa Rica from 17-20 January 2022. Vaccinated crewmembers were authorized liberty while unvaccinated members were restricted to the cutter and the pier it was moored to. While many restrictions had been eased for vaccinated personnel, the guidance officially promulgated by the command required that all personnel (regardless of vaccination status) employ additional mitigation measures when unable to socially distance or when interacting with non-crewmembers, to include donning an N-95 mask. *See* **Exhibit 1**, attached,

USCGC James Notice 1700. Many members of the crew, including officers and members of the command, openly discussed their intent to flout this guidance. Many of the reports I received following the portcall indicated that the remaining restrictions were largely ignored, including by members of the command and even the Commanding Officer. The command also made the decision to dispense with masking onboard the cutter following the portcall, which had been a standard precautionary measure up to this point. *See id.* Following this portcall, there was an outbreak of illness onboard the ship. Many personnel displayed common COVID symptoms: loss of smell and taste, body aches, fever, chills, and other influenza like symptoms. A large portion of the vaccinated crew was rendered sick in quarters (SIQ) over a two-week period (some for as long as a week); the crew was 98% vaccinated at this time. Given the many indications of a potential COVID-19 outbreak, I expressed my concerns to both my command and the cutter's independent duty Health Specialist (HS). The HS indicated that they had been directed to refrain from testing personnel for COVID-19, despite the nature of the symptoms and the presence of an organic COVID-19 testing capability onboard. ***See* Exhibit 2**, attached, XO/HSC email. My Executive Officer further instructed me to stand-down any contact tracing efforts. *See id.*  I continued to employ the risk mitigation measures for unvaccinated members described above; I never contracted the illness, despite my fully vaccinated roommate onboard the ship being rendered SIQ. To my knowledge, neither of the other two unvaccinated crewmembers onboard the cutter at that time were impacted or rendered SIQ.

11.     In January of 2022, the Coast Guard issued a policy forbidding unvaccinated service members from executing Permanent Change of Station (PCS) orders, subject to the "needs" of the Service. ***See* Exhibit 3**, attached, PCS transfers policy for unvaccinated service members. Subsequent to this policy change, every unvaccinated Coast Guard Officer that I

know, to include myself, were issued PCS orders. When submitting my formal e-resume in anticipation of my scheduled transfer from USCGC JAMES, I prioritized shore units over command opportunities afloat and other operational assignments. I did this in spite of my preference for afloat and operational assignments to allow the Coast Guard to more easily accommodate my religious beliefs. Shore assignments offer a broader range of options for teleworking and social distancing.

12.     In June of 2022 I transferred from USCGC JAMES to the District 5 Intelligence Branch located in Portsmouth, Virginia. My PCS orders were updated to state that this transfer had been deemed as meeting the "needs of the Service."

13.     At the District 5 Intelligence Branch, I am responsible for providing maritime domain awareness to the District command and operational assets, supporting operational targeting efforts and target development, and provide indications and warnings of emerging threats within the District's Area of Responsibility. I also assist the Coast Guard Investigative Service and a number of Law Enforcement partners with case support. Furthermore, I regularly work with the Sector intelligence elements to coordinate information collection priorities and collaborate on analytical efforts. As for my working environment, I am in a relatively typical office setting with only five other personnel split up between three rooms and two additional offices. At my workstation I am regularly socially distanced from all members of the office but one (who is similarly young and in good health). Access to this setting is severely restricted to the six of us and a few others who have necessary clearance and need occasional access.

14.     No one in my office has expressed any concern about working with me (even though three of my five co-workers are aware of my vaccination status). In fact, my branch chief recently told me that he has already recommended that I be allowed to finish my tour at the

5

District 5 Intelligence Branch (which would delay my discharge until the summer of 2025), and indicated that both Captains in my immediate chain of command agreed to positively endorse this recommendation. This indicates to me that no one in my immediate or near chain of command views my presence as a threat to operational readiness. However, my branch chief has expressed that this recommendation is unlikely to have any significant impact on the decision rendered by the discharge board that will imminently review my record.

15.     In July 2022, I received my Officer Evaluation for my time aboard the USCGC JAMES. ***See* Exhibit 4**, attached, Officer Evaluation Report.  Objectively, evaluations of this caliber are exceptionally rare. The numerical rating for the Performance of Duties categories is on a scale of 1-7, with 7 being extremely rare. I received 7s in thirteen of the eighteen categories, and 6s in the remaining five. My Reporting Officer's comments recommended me for "in-zone reorder," i.e., for an extremely rare accelerated promotion. His comments stated that I am: "performing well above paygrade"; an "[e]xemplary officer that embodies critical leadership skills, work ethic, technical acumen, & commitment to core values"; "[i]intrinsically motivated . . . w/ limitless potential"; and he gave me the "[h]ighest recommendation for future afloat tours," and said I "will no-doubt excel & compete for O3 Command positions." He further stated that I am "Must-select for Cyber, Cryptology billets"—consistent with my current position at the District 5 Intelligence Branch—and observed that I have "[d]rive & passion w/ [an] impeccable academic record underscor[ing] highest rec[ommendation] for Public Admin, Law & Intel PG programs." Finally, he recommended that I be "Prime select[ed]" for "high vis[ibility] assignments incl[uding]" the "White House," the Coast Guard Liaison Office, Congress, and Flag aide.

6

16.     This evaluation occurred *after* my request for a religious accommodation from mandatory COVID-19 vaccination was finally denied in an internal appeal, effectively deeming me unfit for service (as discussed below) while the above evaluation concluded exactly the opposite.

17.     Although I have never experienced COVID-19 symptoms throughout the pandemic or missed a single day of work due to illness, on August 23, 2022, I obtained a COVID-19 antibody test that confirmed that I have had a prior infection and currently have antibodies to the COVID-19 virus. ***See* Exhibit 5**, attached, Stone antibodies test results. I had to appear in civilian clothes and make no mention of my active-duty service in order to receive the test, as earlier the same week I attempted to obtain an antibody test from a local CVS while still in uniform and was told by a CVS employee that they "weren't allowed" to conduct antibody tests on military service members. That was consistent with a prior ALCOAST policy message stating "providers should not test patients to assess for current or prior infection, or for prior immunity." ***See* Exhibit 6**, attached, Policy on medical exemptions from COVID-19 vaccination (at Sec. 4).

18.     Given my young age, excellent physical condition, and absence of any other comorbidities or medical conditions, I am extremely low risk for severe COVID complications.

19.     I am a devout Roman Catholic and have been actively involved in the Catholic faith community my whole life. Informed by my Catholic faith, I strongly oppose abortion as the wrongful termination of innocent human life. I thus strongly oppose the abortion and aborted-fetal-cell industries. To my knowledge, the majority of non-COVID-19 vaccines have not used aborted fetal cell lines in their development or testing. I understand that vaccinations are a condition of military service and am not opposed to vaccines in principle. However, guided by

7

my Catholic faith, it is my sincerely held religious belief that receiving a vaccine that made use of aborted fetal cell lines in its development or testing would be morally wrong under any circumstances. To that end, I am enrolled as a perpetual member in the Confraternity of Our Lady of Fatima, which certifies my religious belief that "the crime of abortion is so monstrous that any kind of concatenation with this crime, even a very remote one, such as vaccines that use aborted fetal cells for their testing or production, is immoral and cannot be accepted under any circumstances by a Catholic." ***See* Exhibit 7**, attached, Confraternity Affidavit.

20.     I have been and am still aware that all available COVID-19 vaccines authorized for use in the United States – either fully approved by the FDA (COMIRNATY) or available under Emergency Use Authorization (Johnson & Johnson, Moderna, Pfizer, and Novavax) utilized aborted fetal cell lines in their production or testing. These fetal cell lines are descended from fetal tissue taken from abortions of unborn children.

21.     Many, including officials in the Coast Guard and members of my command, have asserted that Novavax did not use aborted fetal cell lines in its production or testing. I believe those assertions are false. I understand that Novavax researchers admitted that aborted fetal tissue cells (HEK293T) were used in testing. *See, e.g.*, S. Bangaru, et al., *Structural analysis of full-length SARS-CoV-2 spike protein from an advanced vaccine candidate*, BIORXIV, Aug. 6, 2020, at 4-5, 34-35 (noting that Novavax researchers generated coronavirus spike proteins using HEK293 cells).[2] Novavax researchers again used HEK293T cells to study the effectiveness of the Novavax vaccine and optimal administration protocols. *See* Matthew Gorman, et al., *Fab and Fc contribute to maximal protection against SARS-CoV-2 following NVX-CoV2373 subunit*

---

[2] https://www.biorxiv.org/content/10.1101/2020.08.06.234674v1

*vaccine with Matrix-M vaccination*, CELL REPORTS MEDICINE, Aug. 31, 2021.[3] I understand that each of the three inventors of Novavax's COVID-19 vaccine patents (U.S. Patent. Nos. 10,953,089 and 11,253,586) were co-authors on these studies.

22. Accordingly, because to the best of my understanding all available COVID-19 vaccines authorized for use and available in the United States utilized aborted fetal cell lines in their production or testing, it is my sincerely held religious belief that receiving any of these vaccines would be tantamount to cooperation in the evil of abortion, a mortal sin, and in direct violation of my Catholic faith.

23. Before applying for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate, my commanding officer stated that he would negatively endorse all religious accommodation requests presented to him. He specifically stated: "I don't want to discuss your religious beliefs because frankly, they don't matter to me." He accordingly prepared a blanket negative endorsement of all religious accommodation requests without meeting with any crew members submitting such requests or reviewing any accommodation request submissions. There was no requirement for the commanding officer to provide any endorsement for members' religious accommodation requests. The negative endorsement did not offer any specific rationale or justification, citing only generalized interests in "maintaining mission readiness" and "protecting crewmembers and their families during the global pandemic." ***See* Exhibit 8**, attached, CO endorsement denial.

24. On September 22, 2021, I submitted my request for religious accommodation to the mandate that Coast Guard service members obtain COVID-19 vaccination. ***See* Exhibit 9**, attached, Stone Religious Accommodation Request (RAR). I received notice of the denial of my

---

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7899467/

request for religious accommodation on January 20, 2022, almost four months after my initial request. *See* **Exhibit 10**, attached, RAR denial. The decision was issued by Captain Anthony Williams. Although the denial purported to rely in part on the close quarters of working and living conditions on my ship, it was a template letter that was distributed to virtually all unvaccinated Coast Guard service members seeking a religious accommodation, to include personnel assigned to different classes of cutters and even shore units. It ultimately cited generalized interests in military readiness; unit cohesion; good order and discipline; and the health and safety of service members in addition to other considerations that apply to virtually every other member of the Coast Guard assigned to an operational billet. *See* **Exhibit 11**, infra, at pp. 36-47. In short, the broadly formulated interests were not specific to my particular case, and completely ignored the efficacy of the mitigation measures I had employed up and to that point with absolute success. Moreover, I now work at the shore-based District 5 Intelligence Branch (effective June 2022), so none of the Coast Guard's original cited concerns about my living and working on a deploying cutter apply to my current circumstances.

25.     After receiving my denied religious accommodation, my commanding officer pulled me aside to discuss my intentions regarding an appeal. When I expressed my intention to appeal the decision, he stated that any appeal would be futile as "CG-133 would not have denied your appeal without the concurrence of CG-1, who is the appellate authority," indicating that the decision to deny my appeal had essentially already been made when my initial accommodation request was denied and the process was more nuanced than outlined in the Coast Guard's Religious Accommodation Manual.

26.     I timely appealed the denial of my religious accommodation request on February 3, 2022. *See* **Exhibit 11**, attached, Stone RAR appeal. I received notice of the final denial of the

appeal of my religious accommodation request on June 17, 2022, more than four months after

submitting my appeal. The appeal denial memo was dated May 4, 2022—indicating the

decision was withheld for more than a month, during which time I was transferring to the

District 5 Intelligence Branch. *See* **Exhibit 12**, attached, RAR appeal denial. The memo

denying my appeal was electronically signed by James L. Knight, SES, who I understand at the

time my appeal was adjudicated served as the Deputy Assistant Commandant for Acquisitions.

The Coast Guard's Military Religious Accommodations Manual (CI 1000.15) indicates that the

appellate authority for any denied religious accommodation is "the official in the chain of

command or chain of supervision one level above the officer or official who took the final

action on the request." Captain Anthony Williams (CG-133) was the adjudicating authority who

denied my initial request for a religious accommodation to the Coast Guard's COVID-19

vaccine mandate; I believe Dr. D. M. Navarro, who was acting Assistant Commandant for

Human Resources for the Coast Guard at the time, is the official in the chain of command one

level above Captain Williams and as such should have been the appellate authority adjudicating

my appeal per the Coast Guard's Religious Accommodations Manual. The appeal denial is a

cookie-cutter, one page explanation baldly asserting that the reviewing authority considered my

personal circumstances, and ultimately concluding that "I find no error occurred" in the *initial*

"decision to deny [my] religious accommodation request." I have personal knowledge that this

letter is substantially identical to letters received by virtually all other unvaccinated Coast Guard

members. *See* **Marcenelle Decl; Jackson Decl.** Moreover, it entirely ignored that I was already

in the process of transferring to a shore-based intelligence unit, as noted. I had received

notification of my new assignment to the District 5 Intelligence Branch on April 18, 2022, and

this notice made it clear that my transfer was "based on needs of the service regardless of your

11

current vaccination status." ***See*** **Exhibit 13**, attached, PSC email. Thus, the appeal denial's mere

affirmance of the initial denial of my religious accommodation request, which had been

primarily based on the generalized living and working conditions onboard an operational, afloat

unit, had little to nothing to do with my then - and still - existing circumstances. There is no

imminent or even likely requirement at this point that I return to an operational/afloat unit in the

future, and it is entirely possible that I could serve a full career in the Coast Guard at shore-

based units moving forward, consistent with my skills, areas of interest, and aforementioned

evaluation.

27.     On July 21, 2022, I was formally counseled by my command representative

Captain Bazemore on the memorandum denying my request for a religious accommodation.

Captain Bazemore explained that the reason for my discharge was that I am allegedly not

"worldwide deployable." In response to my observation that I had recently completed four

successful worldwide deployments and am now assigned to an ashore unit (District 5

Intelligence Branch), he said: "The military doesn't split hairs; if you're not worldwide

deployable, you're not fit for service." This response confirmed for me that the Coast Guard is

simply applying a generalized standard without regard for my individual circumstances. Indeed,

I am aware the military has an explicit policy for retaining non-worldwide-deployable members,

even assuming arguendo I am not worldwide deployable. *See* DoD Instruction 1332.45.[4]

Additionally, during the meeting I also stated my desire to further appeal the decision to the

Coast Guard's Board of Corrections of Military Record (BCMR), but Captain Bazemore said

there were no further opportunities to appeal. I was given a memo ordering me to seek

vaccination or expect "administrative and disciplinary consequences," including "punish[ment]

---

[4] https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133245p.pdf?ver=2018-08-
01-143025-053.

under the Uniform Code of Military Justice" for allegedly failing to obey a lawful order. I refused to sign this memo because I believe that my request for a religious accommodation was wrongfully denied. I provided a hand-written annotation requesting additional information on how to appeal to the BCMR, and noting I was presented this memo with the explanation that, "per CG policy, this is the end of your administrative process and there is no further mechanism for administrative appeal." *See* **Exhibit 14**, attached, First Counseling Memo**.**

28.     During the same counseling session, my supervisor and Captain Bazemore also informed me of an immediately forthcoming Coast Guard policy directing all commands to begin separation/disciplinary proceedings for all unvaccinated service members whose religious accommodation appeals had been denied. They said this policy was a result of the FDA's then-recent issuance of Emergency Use Authorization for the Novavax vaccine. Captain Bazemore then wrongly asserted that the Novavax vaccine did not use aborted fetal cell lines in its development and stated that the majority of religious accommodation requests to the COVID-19 vaccine, including mine, were now irrelevant (despite the fact the military can mandate only non-EUA, fully FDA-approved medications/vaccines for service members, absent a presidential waiver; *see* 10 U.S.C. § 1107a).

29.     After the meeting, I emailed Captain Bazemore the aforementioned S. Bangaru, et al., study regarding Novavax's use of HEK293T cells in its development. Captain Bazemore replied: "I'm not an expert, but I think it would be a challenge to find any modern vaccine that hasn't used some form of fetal cells for testing." *See* **Exhibit 15**, attached, Bazemore email. His email also stated that any appeal to the BCMR would be futile, since my "potential separation will be based on you not being worldwide deployable," and the "BCMR will not address that issue." Finally, he stated that the forthcoming ALCOAST policy requiring the imminent

13

discharge of unvaccinated service members was simply "a result of the CG Commandant changing," and thus "the CG's position will shift from" eliminating the unvaccinated "via natural attrition to the CG taking a more pro-active stance removing [them] from the service." (Id.)

30.     On July 25, 2022, the Coast Guard officially issued a policy stating that COVID-19 vaccination "is necessary to be world-wide deployable," and that "the Coast Guard is beginning involuntary administrative separation processing for all non-compliant Active Duty service members." It further stated that members who obtain vaccination are "[c]hoos[ing] to serve"— which I take as a direct insult to those of us who deeply desire to continue serving our country consistent with our sincerely held religious beliefs and the public good, but who are being stripped of our ability to serve and pressured to deny our deepest religious convictions. *See* **Exhibit 16**, attached, July 25 Policy.

31.     I am personally aware that the other two Coast Guard Officers currently assigned to the District 5 Intelligence Branch today are not worldwide deployable but are nonetheless permitted to remain in the Coast Guard. My branch chief told me he is unable to receive a mandated vaccine for another disease due to medical complications and as such is not worldwide deployable. And my immediate supervising officer, a former Army aviator, told me he is required to take weekly a certain refrigerated medication that is not guaranteed to be accessible worldwide for a different medical condition, and as such is also not worldwide deployable under the DoD regulations adopted by the Coast Guard.

32.     On August 11, 2022, I received my final counseling session and was presented a "CG-3307" memo declaring that I am allegedly "in violation of a lawful order." *See* **Exhibit 17**, Final Counseling Memo CG-3307. I wrote a brief, heartfelt statement of objection on the memo

14

emphasizing why I do not believe the vaccine mandate applied to me is "lawful" under RFRA, the First Amendment, and other federal law, given my four successful deployments during the pandemic, my new working conditions at the District 5 Intelligence Branch, the permission given to others to remain in the Coast Guard despite not being "worldwide deployable," and the unavailability of an actually FDA-approved vaccine in the U.S. given that the FDA-approved COMIRNATY is not available here and is distinct from the EUA Pfizer vaccine. After reading my statement, Captain Bazemore again told me I am not deployable, despite all of the foregoing facts to the contrary, and also compared my situation to not getting one's personal preference in a PCS transfer/assignment process—entirely disregarding the federal legal protections that I understand apply to a service member's religious beliefs. When Captain Bazemore asked if I had considered the implications of being allowed to "choose which orders were lawful or unlawful or which lawful orders" I will obey, I was flabbergasted and appalled. I explained that the process applied to me was wrong and that I believe the Coast Guard is committing an injustice, and as such the order is not lawful; I further explained that I gain no pleasure from the situation that I find myself in, being in conflict with an order issued by a superior, and I have done my utmost to obey every order I have been given up to this point.

33.     Subsequent to this meeting, I learned that I will be imminently reviewed by a single discharge board consisting of only three persons, consistent with the separation proceedings outlined in Commandant Instruction Manual (CIM) 1000.4, as I have less than 5 years of service as a commissioned officer in the Coast Guard. It is exceptionally likely this single discharge board will rubber stamp my prior denials and order my imminent discharge, in alignment with the process I have experienced up to this point. This will likely occur very soon, **i.e. in the next 30 days at the latest**. Importantly, Coast Guard policy requires that members of a

15

discharge board have no prior knowledge of the incident prompting them to evaluate a member for separation; given the publicity surrounding this process, and the Coast Guard's clear articulation in official policy messages that unvaccinated personnel are considered to be in violation of a lawful order and non-deployable, it will be next to impossible to find impartial members to compose the review board.

34.     I have also become aware that the Coast Guard recently issued a policy declaring that Coast Guard personnel will not be deemed non-worldwide deployable solely because they are HIV positive. Specifically, for those who are HIV positive but asymptomatic with clinically confirmed undetectable viral loads, non-deployability decisions "will be made on a case-by-case basis and must be justified by the Service member's inability to perform the duties to which he or she would be assigned." ***See* Exhibit 18**, attached, HIV deployability policy. Meanwhile, I do not have COVID-19 and indeed have confirmed natural immunity against it, and yet I am deemed categorically non-deployable despite my proven ability to successfully perform my assigned duties without fail since the start of the COVID-19 pandemic.

35.     I am also aware of and attach a Coast Guard memo dated August 5, 2022, confirming that by the end of Fiscal year 2022, "the Active-duty enlisted workforce will be approximately 2,268 personnel below strength compared to the Personal Allowance List (PAL)." The memo states that it will be impractical to achieve the necessary recruiting numbers to make up for this shortfall through Fiscal Year 2025. It also states that by the end of Fiscal Year 2022, "the Reserve Component enlisted workforce will be approximately 845 personnel below strength compared to PAL." ***See* Exhibit 19**, attached, Personnel shortage memo. I am also personally aware that there are shortfalls developing in the Officer Corps (not represented in the aforementioned memo), and that Coast Guard recruiting is at an all-time low as the Coast Guard

16

is routinely missing recruiting quotas. A recent public report stated that the Coast Guard is approximately 1,100 service members short in non-rated positions.[5]

36.      I do not oppose all vaccines. I oppose the COVID-19 vaccines for religious reasons.

37.      I have been willing and able and remain willing and able to work remotely, wear a mask, and test periodically as appropriate and required.

38.      I am aware of the following military orders purportedly requiring me to take the vaccine:

- Department of Defense August 24, 2021 mandate (**Exhibit 20**, attached).

- Coast Guard ALCOAST 305/21 COVID-19 vaccine mandate (**Ex. 21**, attached).

- Coast Guard ALCOAST 315/21 COVID-19 vaccine mandate (**Ex. 22**, attached).

- Coast Guard ALCOAST 270/22 COVID-19 vaccine mandate. (**Ex. 16**, attached).

39.      I am also aware of reported information showing that the Coast Guard initially denied nearly all of the more than 1,200 requests for religious accommodation from the COVID-19 vaccine mandate; granted only several requests on appeal (only for those already slated for separation or retirement from the Coast Guard); and provided some vaccine statistics in *Navy Seal 1 v. Biden*, No. 8:21-cv-02429 (M.D. Fla.) in January and February 2022, in Defendant Fagan's Senate Committee testimony in May 2022, and in *Bazzrea v. Mayorkas*, No. 3:22-cv-265 (S.D.Tex) in August 2022  *See* **Exhibit 23**, COVID-19 vaccine metrics; **Exhibit 24**, January 2022 exemption data; **Exhibit 25**, August 2022 exemption data.

40.      I am not aware of any military branch (including the Air Force, Navy, Army, Marines, and Coast Guard) granting any religious accommodation requests to service members

---

[5] https://federalnewsnetwork.com/defense-main/2022/07/coast-guard-upping-recruiting-effort-as-military-feels-pinch-in-talent-pool/.

not already slated for separation or retirement.  I'm aware that the Pentagon's Inspector General investigated whether the military's process for considering and denying religious accommodation requests to COVID-19 vaccination complies with its own protocols: https://www.military.com/daily-news/2022/03/02/pentagon-watchdog-investigate-militarys-covid-19-exemption-process.html. I'm also aware of a copy of the Inspector General's concluding memo attached to a letter of supplemental authority filed in *U.S. Navy SEALs 1-26  v. Biden*, Case Nos. 22-10077/22-10534. ***See*** **Exhibit 26**, attached, IG Memo.

41.     As made clear above, I believe my request for religious accommodation would not impact my ability to perform my duties. Also as shown above, I have had COVID-19 (unknowingly) and now have natural immunity which I believe has been shown to be superior to vaccine-induced immunity, which wanes after a matter of months.

42.     My Coast Guard career has been entirely in the interest of military readiness, unit cohesion, good order, discipline, health, and safety, as the foregoing demonstrates.

43.     As a result of my decision to forgo the vaccine, I now face a wide range of disciplinary and punitive measures, including:

(1) **Non-Judicial Punishment and Administrative Separation**: I am aware that this process will be initiated based on a service member's "refusal to obey a lawful order," without any reference to the member's underlying religious objection to COVID-19 vaccination that kept them from complying with such order. *See* **Exhibit 27**, attached.

(2) **Ineligibility for promotion and advancement**: as an unvaccinated service member whose internal appeal has been denied, I am no longer eligible for promotion and advancement as a matter of official Coast Guard policy.

18

(3) **Negative performance evaluation**: I will receive negative evaluations that mention only an alleged failure to obey a lawful order and/or to uphold medical readiness standards, omitting any reference to my underlying request for a religious accommodation from COVID-19 vaccination pursuant to federal law. These negative evaluations could potentially impact service members in a civilian capacity after being discharged from the Coast Guard. *See id.*

(4) **Discrimination in awards and recognitions**: I also will not be afforded the same opportunities for awards and recognitions as my peers, further harming my ability to progress in my career. In particular, I recently received a mediocre departing award from my previous assignment onboard USCGC JAMES despite having been nominated by my Department Head and endorsed by my Executive Officer for a superior award consistent with my accomplishments and contributions on the ship over the past two years. I am personally aware that my award was downgraded by my commanding officer because of my religious refusal to obtain COVID-19 vaccination.

(5) **Denied Training**: I have been denied access to training necessary to both fulfill my assigned duties and advance my development and career as a Coast Guard Officer. Specifically, I was prohibited from attending Boarding Officer School while assigned to USCGC JAMES due to restrictions on unvaccinated personnel attending C-Schools. More recently, I had orders that I had been issued to attend the Intelligence Officer Course at TRACEN Yorktown revoked on the basis that I am unvaccinated; this course deals with proper handling, processing, and dissemination of classified information, among many other topics and is required for my billet. The decision to revoke my orders was made despite the current Coast Guard policy allowing

19

unvaccinated personnel to attend C-Schools directly associated with their billet and primary duties, absent any specific training facility rule to the contrary. *See* **Exhibit 28**, attached, Policy on training-school permission for unvaccinated service members. I have been informed by a colleague currently stationed at TRACEN Yorktown, who is himself unvaccinated and has attended C-Schools at the training facility in the last month, that no such rule exists there. When I disputed this decision, I was told that my orders referenced the old (and now cancelled) policy prohibiting unvaccinated personnel from attending any C-Schools. When I provided the current policy described above, I was told that regardless of this policy my orders were cancelled because I am unvaccinated.

44.   I cannot in good conscience take any of the available COVID-19 vaccines. It is vitally important for me to adhere to my Catholic faith and not violate my religious convictions, even if this means risking work, compensation, and the potential for a highly-successful military career. I choose God first. Putting God first has formed my life, and led me to serve in the U.S. Coast Guard with honor and distinction. From all that I have heard and know, my ancestor Elmer Stone was a man of conviction and principle; I desire to be nothing less, which is why I have excelled in my duties, and want to continue giving my life in service to others and country as an officer of the U.S. Coast Guard.

45.   Some of the attached exhibits are redacted to remove some personal identifiers.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 15, 2022.

Alaric B. Stone

20

32

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commanding Officer
CGC JAMES (WMSL 754)

1050 Register Street.
Charleston, SC 29405

CGCJAMESNOTE 1700
14 JAN 2022
CANCELLED: 21 JAN 2022

COAST GUARD CUTTER JAMES NOTICE 1700

Subj:   LIBERTY GUIDANCE AND RESTRICTIONS FOR GOLFITO, COSTA RICA

Ref:    (a) COMLANTAREA 011606Z JUN 21
        (b) U.S. Embassy Costa Rica COVID-19 Information of 17 Dec 21
        (c) Safety Bulletin – CDC Environmental Cleaning & Disinfection Guidance
        (d) USSDO Costa Rica Security Briefing, 17 September 2021
        (e) COVID-19 and Other Communicable Disease Infection Plan, JAMESINST 5400,
            4.B.9 (series)
        (f) COVID-19 Mitigation and liberty plan for Golfito, Costa Rica, 08 Jan 2022

1.  PURPOSE. This notice establishes policies and guidance regarding OCONUS port liberty in
    Golfito, Costa Rica.

2.  ACTION. All personnel attached to CGC JAMES will become familiar with the contents of
    this notice and shall comply with the guidance contained. Where conflict exists with other unit
    level instructions, this notice takes precedence. Internet release is not authorized. Intranet
    release is authorized.

3.  DIRECTIVES AFFECTED. All previous versions of JAMNOTE 1700 are cancelled.

4.  DISCLAIMER. This guidance is not a substitute for applicable legal requirements. It is
    intended to provide operational guidance for personnel assigned to CGC JAMES and is not
    intended to nor does it impose legally-binding requirements on any party outside the Coast
    Guard.

5.  MAJOR CHANGES. None, initial promulgation.

6.  ENVIRONMENTAL ASPECT AND IMPACT CONSIDERATIONS. None.

7.  DISTRIBUTION. No paper distribution will be made for this JAMES notice. An electronic
    version will be made available on the Public Drive in the JAMES instructions folder.

8.  DISCUSSION. The purpose of this notice is to establish guidelines for OCONUS liberty in
    Golfito, Costa Rica. Although regular liberty and portcall opportunities are becoming
    possible again, the spread of the vaccine resistant Omicron variant continues to make COVID
    transmission a significant threat to JAMES' operational readiness; all personnel must
    exercise ownership of their health, wellbeing, and liberty activities. The guidelines and
    restrictions associated with OCONUS liberty have become more complex as countries have

1

33

Subj: LIBERTY GUIDANCE AND RESTRICTIONS FOR        CGCJAMNOTE 1700
     GOLFITO, COSTA RICA                              14 JAN 2022

implemented additional local requirements. To this end, all JAMES personnel shall familiarize themselves with and adhere to the guidelines outlined below.

a. <u>General Liberty Guidance.</u> All persons onboard JAMES shall abide by the following general liberty guidelines:

  (1) Unvaccinated crewmembers are limited to the pier only. All personnel (vaccinated and unvaccinated) must don an N95 mask when unable to socially distance or when interacting with non-crewmembers.

  (2) Per references (b) through (f), vaccinated crew members departing on liberty will adhere to the following local guidelines and liberty policies.

    (a) Don an N-95 for the duration of the portcall in public spaces and indoor settings, except when eating/drinking or alone. Many Costa Rican indoor bars and restaurants are returning to normal operating capacity, although some are continuing to operate at reduced capacity.

    (b) Local markets, shops, restaurants, charters, and other outer excursions and activities are permitted. Guided excursions and private charters are all authorized, but must remain within the Golfito City limits and/or depart/return to the port of Golfito for chartered vessels with no stops outside the travel limits.

    (c) Carry a Liberty Shore Pass provided by the Immigration Regional Office and Military ID at all times.

    (d) The Buddy System is required. Liberty groups must travel in parties of two or more.

    (e) Only members that are 21 years of age or older are permitted to consume alcohol. Consumption of alcohol is prohibited for all personnel after 1900 on evenings before duty and after 2200 on Wednesday, 19 January.

    (f) Authorized transportation includes bicycles, walking, and contracted libo vans. Taxis are not authorized. Motorcycles, mopeds, two-wheel vehicles, ATVs, snowmobiles, and car rentals are not authorized.

  (3) Liberty expires aboard JAMES at 2300 each night for personnel not staying in a hotel. Personnel staying in a hotel shall be in their hotel by 2300 each night.

  (4) Liberty expires for all hands on Wednesday, 19 January at 2200. Crewmembers may remain on the pier until 2300, but must be checked in with the OOD by 2200. All hands must be onboard JAMES by 2300.

b. <u>Hotel Guidelines.</u> Personnel staying in a hotel shall adhere to the following requirements:

  (1) Vaccinated JAMES crewmembers are authorized to stay in a hotel. Hotels must be located within Golfito City limits.

Subj: LIBERTY GUIDANCE AND RESTRICTIONS FOR
GOLFITO, COSTA RICA

(2) Crewmembers staying in hotels must notify the Quarterdeck of the name of their hotel, room number, buddy/roommate, and provide contact numbers prior to 1800 on the day of the overnight stay. Buddies staying in separate rooms must provide both room numbers. The Quarterdeck shall maintain a log of all personnel staying off the ship.

(3) Only crewmembers of the same gender may share hotel rooms; the following groups may share hotel rooms:

(a) Officers may share hotel rooms.

(b) Chiefs and Senior Chiefs may share rooms.

(c) First and Second Class Petty Officers may share rooms.

(d) Second and Third Class Petty Officers may share rooms.

(e) Third Class Petty Officers and E-3s may share rooms.

(f) E-3s and below may share rooms.

c. Restricted Areas.

(1) Liberty activities are only permitted within Golfito City limits. It is prohibited to cross the Limit Zone of Transit, which is in violation of Costa Rican immigration law. If you cross the Limit Zone you will be labeled as an undocumented person, and the regulation specifies that the person must be repatriated to his or her country.

(2) All houses of prostitution, the vicinity of the Costa Rica/Panama border and the entire city of Paso Canoas are off limits. The neighborhoods adjacent to the main street in Golfito are off limits. You must stay within the Golfito town limits. Playa Cacao is within the authorized liberty area. If you end up outside of Golfito, your immigration status is undocumented, you may be arrested, and it will be very difficult to get back to the cutter. The following establishments are off limits: Bar Samoa del Sur, Bar Restaurant Golfo Dulce, Bar Tequila, Bar La Pista, and Bar Restaurant Quepenos.

(a) The Beach of Pavones and the surrounding Pavones area is not authorized.

d. Alcohol.

(1) All personnel are prohibited from bringing open containers of alcohol onboard JAMES, to include re-sealed or partially consumed bottles of alcohol. Personnel may bring unopened containers of alcohol onboard, but must immediately contact the OOD and check it into the ship's liquor locker.

e. Post-Golfito.

(1) All personnel shall wear N95 masks for 72 hours following the portcall.

3

Subj: LIBERTY GUIDANCE AND RESTRICTIONS FOR                    CGCJAMNOTE 1700
    GOLFITO, COSTA RICA                                              14 JAN 2022

   (2) After 72 hours unvaccinated personnel will shift to cloth masks until 14 days have
       elapsed following the portcall.

   (3) COVID screening will be conducted by HSC before masks are relaxed.

9. RECORDS MANAGEMENT CONSIDERATION. This JAMES Notice has been thoroughly
   reviewed during the directives clearance process, and it has been determined there are
   records scheduling requirements, in accordance with Federal Records Act, 44 U.S.C. 3101 et
   seq., NARA requirements, and Information and Life Cycle Management Manual,
   COMDTINST M5212.12 (series). This policy does not have any significant or substantial
   changes to existing records management requirements.

10. FORMS/REPORTS. None.

11. REQUEST FOR CHANGES. For all change requests to this notice, route comments through
    the chain of command, to the Executive Officer.

                          _T. D. v_

                          T. D. Vance
                          Captain, U.S. Coast Guard
                          Coast Guard Cutter JAMES (WMSL 754)

Enclosure:  (1) JAMES Liberty Guidance and Restrictions for Golfito, Costa Rica
                acknowledgement page.

                                    4

**Stone, Alaric B LTJG USCG (USA)**

| | |
|---|---|
| **From:** | Thomas, Michael C CDR USCG CGC JAMES (USA) |
| **Sent:** | Friday, January 21, 2022 2:27 PM |
| **To:** | Stone, Alaric B LTJG USCG (USA) |
| **Subject:** | RE: Contact Tracing |

<span style="color:red">EXHIBIT 2</span>

Afternoon Alaric,

No need for contact tracing efforts at this point.  All contact tracers can standdown for now.  If we need to move out, I'll let you know.

Thanks for touching base.


Very Respectfully,


XO


**From:** Stone, Alaric B LTJG USCG (USA) ▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, January 21, 2022 1:33 PM
**To:** Thomas, Michael C CDR USCG CGC JAMES (USA)▮▮▮▮▮▮▮▮▮▮
**Subject:** Contact Tracing

Good afternoon XO,

I hope you are doing well!

I was checking in with HSC about OSCS today (see below email traffic) regarding his SIQ status; in my comms with Doc I found out that we had more folks SIQ than I first realized (some starting on or around our departure date from Golfito). Following up from a contact tracing perspective; do we need to do any contact tracing for any of the sick individuals? I know that at least one member had a fever and several were showing ILI symptoms, but according to HSC we haven't tested anyone.

I am hoping to clarify the expectation for our contact tracers in situations like these; do you want them to initiate contact tracing efforts after report of ILI symptoms or wait until testing results (which in this case it sounds like we aren't doing).

Very respectfully,
LTJG Alaric Stone

**From:** Johnson, Heather L CPO USCG CGC JAMES (USA) ▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, January 21, 2022 11:30 AM
**To:** Stone, Alaric B LTJG USCG (USA)▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: OSCS▮▮▮▮▮ Medical Status

Good Morning Mr. Stone,

1

I just checked in with OSCS. He will be SIQ for another 24 hours but does report starting to feel a little better.

The command is currently aware of our members feeling ill (to include symptoms, locations of members' berthings, etc) but testing has not been requested. I do know we had some of our people, including OSCS, that were sick prior to our portcall so I don't believe their illnesses are COVID related.

For CIC, I am going to recommend that a thorough disinfection happen of the space and will also recommend to XO that we have a field day focusing on disinfecting high-touch areas and berthing areas.

V/R,
HSC Heather Johnson, IDHS
USCGC JAMES (WMSL-754)
1050 Register Street
North Charleston, SC 29405
███████████████

To subscribe to monthly readiness email reminders, log on to CGBI HTTP://CGBI.OSC.USCG.MIL from any CG workstation, click on "my profile" in the top right hand corner, and follow the instructions provided in the "my personal notifications" section.

This communication and its attachments are confidential to the Coast Guard Health Care Program and to the intended recipient (s). Information contained in this communication may be subject to the provisions of the Privacy Act of 1974 and Health Insurance Portability and Accountability Act. If you have received this email in error, please advise the sender immediately and delete the entire message together with all attachments. All unintended recipients are hereby notified that any use, distribution, copying or any other action regarding this email is strictly prohibited

**From:** Stone, Alaric B LTJG USCG (USA) ███████████████
**Sent:** Friday, January 21, 2022 11:01 AM
**To:** Johnson, Heather L CPO USCG CGC JAMES (USA) ███████████████
**Subject:** OSCS ███████ Medical Status

Good morning HSC,

I hope that you are doing well!

I'm checking in to stay up-to-date on OSCS ███████ status; I checked in with him today and he still seems to be feeling very poorly. Have you had a chance to check in with him today/update his duty status?

Additionally, thinking about the CIC workspace, do you have any concerns that his condition might be related to COVID? Is there any plan to test him/the other members SIQ?

Thank you for the above information; want to make sure we're hitting the appropriate wickets and keeping everyone cared for/healthy.

V/r,
LTJG Alaric Stone

EXHIBIT 3

```
R 261519Z JAN 22
FM COMCOGARD PSC WASHINGTON DC
TO ALCGPSC
BT
UNCLAS
26 JAN 22
ALCGPSC 016/22
SUBJ: PCS TRANSFERS FOR MEMBERS UNVACCINATED AGAINST COVID-19
A. ALCOAST 305/21
B. ALCOAST 315/21
C. ALCOAST 352/21
D. ALCOAST 420/21
E. ALCOAST 446/21
F. ALCGPSC 104/21
```

1. As the COVID-19 pandemic continues, the safety and welfare of our entire workforce remains a top priority to ensure mission readiness.  References (a) thru (c) directed the vaccination of all members. References (d) and (e) provided additional guidance regarding the execution of this direction. Reference (f) established the implementation guidelines for the administrative risk mitigation and leadership measures announced in reference (c).  This ALCGPSC establishes administrative risk mitigation measures for Permanent Change of Station (PCS) orders.

2. Subject to needs of the Service, service members who refuse full vaccination are ineligible to execute PCS orders. This direction does not apply to members who are receiving PCS orders based on Separation Authorizations for separations that will be completed by 1 October 2022, or members who have a current COVID -19 vaccination medical exemption or approved religious accommodation.

3.  The term "fully vaccinated" is currently defined in reference (a), but may be updated as the pandemic progresses. Temporary medical exemptions will be considered "current" for purposes of execution of PCS orders as long as they do not expire prior to departure from the unit.

4.  Servicing Personnel Offices and Personnel and Admin Shops are directed to amend all unexecuted PCS orders and include in all future PCS orders the following statement: "Subject to the needs of the Service, service members who refuse full vaccination are ineligible to execute PCS orders."

4. Questions regarding this direction may be addressed to:
A. OPM: CAPT Catherine Carabine (█████████████████████);
B. RPM: LCDR Cecilia Williams (█████████████████████);
C. EPM: LT Charles Collins (████████████████).

5. Released by RDML S. N. Gilreath, Commander, Personnel Service Center.
The Service Center for our Most Important Resource - Our People.

6. Internet release not authorized.

EXHIBIT 4

| DEPARTMENT OF HOMELAND SECURITY<br>**U.S. Coast Guard**<br>**OFFICER EVALUATION REPORT** (W4/O1/O2) | Validation |
|---|---|

### OER GUIDANCE

The Officer Evaluation Report is the single most significant document in the management of an officer's career. It is the official record of performance used to determine an officer's potential for promotion, retention, advanced education, command screening and for selection to positions of increased responsibility. Accordingly, our Officer Evaluation System demands integrity, fairness, accuracy, and timeliness. The responsibility for preserving these tenets rests upon all parties. In addition to regular feedback and mid-period counseling, providing timely, accurate, evaluations is a basic leadership function. While every member is responsible for providing carefully crafted supporting material, it is incumbent upon the OER rating chain to draft the appropriate sections and ensure each officer receives the feedback he or she deserves.

### 1. ADMINISTRATIVE INFORMATION:

| a. REPORTED-ON OFFICER NAME (Last) | (Initials) | b. UNIT |
|---|---|---|
| Stone | A . B . | USCGC JAMES (WMSL 754) |

| c. PERIOD OF REPORT | d. OCCASION FOR REPORT | e. GRADE | f. EMPLID | g. DATE OF RANK | h. DATE REPORTED |
|---|---|---|---|---|---|
| 01Feb2022 to 20Jun2022 | Detachment/PCS of ROO | O2 | | 20Nov2021 | 22Jun2020 |

| i. MID-TERM COUNSELING DOCUMENTATION | j. DATE COUNSELED | k. COUNSELOR NAME | l. ROO SIGNATURE |
|---|---|---|---|
| Mandated. See PSCINST M1611.1(series) for guidance. | 06Apr2022 | W . C . Nelson | STONE.ALARIC.BJORN |

### 2. DESCRIPTION OF DUTIES: List primary duty and summarize all duties and responsibilities.   Click here - email form to Supervisor

| a. PRIMARY DUTY: COMBAT INFO CENTER (CIC) OFFICER | b. PAL TITLE: DECK WATCH OFFICER (DWO) |
|---|---|

DWO: Conns/navigates cutter while at sea, mooring & special evolutions. Inport (I/P) Officer of the Deck: Supervises 13 mbr duty section; resp. to CO for daily routine, safety/security of cutter & crew. Combat Info Center Officer: leads 18 E4-E8, resp for trng, execution of LE/SAR ops thru CIC. Small Unmanned Air System (sUAS) Coord: Resp for employment & integration w/4 contractors. Helicopter Control Officer (HCO), Training Officer (Train-O), COVID-19 Response Officer, XO's Admin Assistant.

### 3a. PERFORMANCE OF DUTIES:   Open

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ● a. Planning and Preparedness: | 7 | ○ f. Speaking and Listening: | 6 | ● d. Teamwork: | 7 | ○ c. Responsibility: | 7 |
| ○ b. Using Resources: | 6 | ○ g. Writing: | 7 | ○ e. Workplace Climate: | 7 | ○ d. Professional Presence: | 7 |
| ○ c. Results/Effectiveness: | 7 | **3b. LEADERSHIP SKILLS:** Open | | ○ f. Evaluations: | 6 | ● e. Health and Well-Being: | 6 |
| ● d. Adaptability: | 7 | ○ a. Looking Out for Others: | 7 | **3c. PROFESSIONAL QUALITIES:** Open | | | |
| ○ e. Professional Competence: | 7 | ○ b. Developing Others: | 6 | ● a. Initiative: | 7 | Supervisor selects the 5 performance dimensions for O2 & 3 dimensions for W4/O1 that best characterize this officer. Comments are required for the selected dimensions and any marks of 1, 2 and 3. | |
| | | ○ c. Directing Others: | 7 | ○ b. Judgment: | 7 | | |

Acting WMSL Support Dept Head for 40 days, posn billeted for specialized F&S CWO; flawlessly managed additional 16 E4-E8 & oversaw CG Dining Facility, pay/allowances, PCS/TDY orders & 120+ crew medical readiness. Overcame FY22 funding shortfalls & FSMS transition challenges during hi-tempo maint. period; procured $150k in mission critical gear/supplies meeting all objectives w/no loss of mission efficacy. Actively engaged O6 Brazilian Navy Delegation during unit visit; conveyed robust sUAS brief to lay groundwork for country's inaugural maritime sUAS program, fostering key West Hem partnership. Principal project ofcr for hi-vis Congress Staff visit & cutter Change of Cmd Ceremony w/superb mgmt of 50 guests & $15k event budget. Drove 550 line item worklist & tracked 92k man-hrs, incl. monthly maint. items & contract work for 120-day I/P. Strengthened jr ofcr inclusion ISO MCPOCG Directives & CCTI; vol'd to assist E-7 during key career milestone. Vol'd 20 hrs as CGA cadet mentor, prepared future CG leaders ahead of graduation. Qual'd Boarding Tm Mbr; increased LE acumen for pro dev. Org'd 40-person prof. exchange between CIC & JIATF-S ops watchstanders o/b cutter; advanced critical WMSL/TACON CD partnership.

### 4. SUPERVISOR AUTHENTICATION:   Click here - email form to RO

| a. FIRST, MIDDLE INITIAL, LAST NAME | b. GRADE | c. EMPLID | d. POSITION TITLE | e. DATE |
|---|---|---|---|---|
| P . A . Windt | O5 | | Operations Officer | 18Jul2022 |

### 5. REPORTING OFFICER AUTHENTICATION:   a. EVALUATION   ● Concur   ○ Do not concur

b. COMPARISON SCALE: Compare this officer with others of the same grade whom you have known in your career.

| Unsatisfactory | Marginally performing officer | One of the many high performing officers who form the majority of this grade | | | One of few distinguished officers | Best officer of this grade |
|---|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ● | ○ |

c. REPORTING OFFICER COMMENTS: Supplement or amplify Supervisor's evaluation. Describe ability to assume greater leadership roles and responsibilities (e.g. command, special assignment, and skills.)

Recommend in-zone reorder; performing well above paygrade. Exemplary officer that embodies critical leadership skills, work ethic, technical acumen, & commitment to core values. Intrinsically motivated & forward leaning w/limitless potential. Highest recommendation for future afloat tours as WMSM/WMEC OPS, WMSL CSO; will no-doubt excel & compete for O3 Command positions. Must-select for Cyber, Cryptology billets. Drive & passion w/impeccable academic record underscores highest rec for Public Admin, Law & Intel PG programs. Prime select, high vis assignments incl: White House, CGLO, Congress, & Flag aide.

| d. FIRST, MIDDLE INITIAL, LAST NAME | e. GRADE | f. EMPLID | g. POSITION TITLE | h. DATE |
|---|---|---|---|---|
| M . C . Thomas | O5 | | Executive Officer | 19Jul2022 |

| i. ATTACHMENTS: | Click here - email form to ROO |
|---|---|

### 6. REPORTED-ON OFFICER:   I understand my signature does not constitute agreement or disagreement.  I acknowledge I have reviewed the report.

| a. SIGNATURE: | b. DATE | Active duty click here-<br>email form to PSC-OPM-3 | Reserve click here -<br>email form to PSC-RPM-1 |
|---|---|---|---|
| STONE.ALARIC.BJORN | 20Jul2022 | | |

### PRIVACY ACT STATEMENT

**Authority:** 14 USC 633 and COMDTINST M1000.3 (series). **Purpose:** To determine an officer's suitability for promotion, selection and assignment. **Routine Uses:** Same. **Disclosure:** Mandatory. Failure to disclose required information may adversely affect promotion, selection and assignment decisions.

CG-5310B (02/19)

**Stone, Alaric**

| | | |
|---|---|---|
| Patient ID: ▮ | DOB: ▮ | **Patient Report** |
| Specimen ID: ▮ | Age: ▮ | Account Number: ▮ |
| | Sex: **Male** | Ordering Physician: **E MARSHALL** |

 **labcorp**

Ordered Items: **SARS-CoV-2 Semi-Quant Total Ab; Drawing Fee**

EXHIBIT 5

| Date Collected: **08/22/2022** | Date Received: **08/22/2022** | Date Reported: **08/23/2022** | Fasting: **Yes** |
|---|---|---|---|

## SARS-CoV-2 Semi-Quant Total Ab

| Test | Current Result and Flag | Previous Result and Date | Units | Reference Interval |
|---|---|---|---|---|
| SARS-CoV-2 Semi-Quant Total Ab [A, 01] | 12.7 | | U/mL | Negative<0.8 |
| SARS-CoV-2 Spike Ab Interp [A, 01] | Positive<br>Antibodies against the SARS-CoV-2 spike protein receptor binding domain (RBD) were detected. It is yet undetermined what level of antibody to SARS-CoV-2 spike protein correlates to immunity against developing symptomatic SARS-CoV-2 disease. Studies are underway to measure the quantitative levels of specific SARS-CoV-2 antibodies following vaccination. Such studies will provide valuable insights into the correlation between protection from vaccination and antibody levels.<br>Roche Elecsys Anti-SARS-CoV-2 S | | | |

**Disclaimer**

The Previous Result is listed for the most recent test performed by Labcorp in the past 5 years where there is sufficient patient demographic data to match the result to the patient. Results from certain tests are excluded from the Previous Result display.

**Icon Legend**

▲ Out of Reference Range   ■ Critical or Alert

**Comments**

A: This test has not been FDA cleared or approved. This test has been authorized by FDA under an Emergency Use Authorization (EUA). This test is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of COVID-19 under Section 564(b)(1) of the Act, 21 U.S.C. 360bbb-3(b)(1), unless the authorization is terminated or revoked sooner. This test has been authorized only for detecting the presence of antibodies against SARS-CoV-2, not for any other viruses or pathogens.

**Performing Labs**

01: BN - Labcorp Burlington 1447 York Court, Burlington, NC, 27215-3361 Dir: Sanjai Nagendra, MD
For Inquiries, the physician may contact Branch: 800-762-4344 Lab: 800-762-4344

| **Patient Details** | **Physician Details** | **Specimen Details** |
|---|---|---|
| **Stone, Alaric** | **E MARSHALL** | Specimen ID: ▮ |
| ▮ | ▮ | Control ID: ▮ |
| | ▮ | Alternate Control Number: |
| | | Date Collected: **08/22/2022 1614  Local** |
| Phone: | | Date Received: 08/22/2022 0000  ET |
| Date of Birth: ▮ | Phone: **800-845-6167** | Date Entered: 08/22/2022 1649  ET |
| Age: ▮ | Account Number: ▮ | Date Reported: **08/23/2022 1307  ET** |
| Sex: **Male** | Physician ID: ▮ | Rte: 00 |
| Patient ID: ▮ | NPI: ▮ | |
| Alternate Patient ID: ▮ | | |

**labcorp**

Date Created and Stored  08/23/22 1309 ET   **Final Report**  Page 1 of 1

©2022 Laboratory Corporation of America® Holdings
All Rights Reserved   Enterprise Report Version 2.00

This document contains private and confidential health information protected by state and federal law.
If you have received this document in error please call 800  762 4344

EXHIBIT 6

R 131600Z SEP 21
FM COMDT COGARD WASHINGTON DC
TO ALCOAST COMDT NOTICE
BT
UNCLAS
ACN 089/21
SSIC 6000
SUBJ:  COVID-19: PERMANENT AND TEMPORARY MEDICAL EXEMPTIONS TO
COVID-19 IMMUNIZATION REQUIREMENT
A. Coast Guard Medical Manual, COMDTINST M6000.1F
B. COMDT COGARD WASHINGTON DC 072247Z SEP 21/ALCOAST 315/21
C. COVID-19 PLANORD, Enclosure 2
D. Immunizations and Chemoprophylaxis for the Prevention of
Infectious Diseases, COMDTINST M6230.4G
1. This ACN announces an update to REF (A).
2. Background. COVID-19 is a disease caused by infection with the
SARS-CoV-2 virus. REF (B) mandates COVID-19 vaccination for military
members. Maximum vaccination of the force will reduce transmission
of disease, reduce severity of disease among personnel who become
infected, preserve medical resources, and facilitate mission
accomplishment at the individual, unit, and organizational levels.
3. Permanent medical exemptions will be granted only when an
individual has a medical contraindication to the required COVID-19
vaccine(s). Consistent with Centers for Disease Control and
Prevention (CDC) Advisory Committee on Immunization Practice (ACIP)
guidelines, criteria for permanent exemption from COVID-19
vaccination are:
   a) Severe allergic reaction (e.g., anaphylaxis) after a previous
dose or to a component of the COVID-19 vaccine; or,
   b) Immediate allergic reaction of any severity to a previous
dose or known (diagnosed) allergy to a component of the COVID-19
vaccine.
4. Research is ongoing as to whether previous infection with
COVID-19 confers immunity. Because research is ongoing, previous
COVID-19 infection is not considered proof of immunity. No serologic
(antibody) test exists that is FDA approved, or is ACIP recommended,
as proof of immunity. The only acceptable proof of immunity is
completion of a COVID-19 vaccination series, as defined by ACIP.
A history of COVID-19 disease and/or positive serology (antibody)
test does not exempt a Service Member from being required to be
vaccinated for COVID-19. Because a history of disease or serology
does not exempt a member from the vaccination requirement,
providers should not test patients to assess for current or prior
infection, or for current or prior immunity.
5. Consistent with ACIP Best Practice guidelines, individuals who
are moderately to severely ill with COVID-19, or any other illness,
should receive a temporary medical exemption from vaccination.
These individuals must be fully vaccinated once they have recovered
from their acute illness. Vaccination of individuals with confirmed
current COVID-19 infection should be deferred until the individual
has met the criteria in REF (C) to discontinue isolation.
6. Persons who were treated for COVID-19 with monoclonal antibodies
or convalescent plasma should receive a temporary medical exemption
of 90 days before receiving a COVID-19 vaccine.
7. Evidence on the safety and effectiveness of COVID-19 vaccination
indicates that the benefits of immunization outweigh any known or
potential risks of COVID-19 vaccination during pregnancy. COVID-19
vaccination is recommended for all people who are pregnant or
breastfeeding. Pregnancy or breastfeeding are not criteria for
permanent medical exemptions from COVID-19 vaccination. Pregnant

patients who have concerns about vaccination must have their
concerns addressed by appropriate clinical consultation. Such
consultation should generally include the patient's prenatal care
provider. If the care provider determines that it is appropriate
to defer vaccination until later in pregnancy or post-pregnancy,
a temporary medical exemption from vaccination until that time
should be provided.
8. Service Members who are actively enrolled in COVID-19 clinical
trials should be granted temporary medical exemption from COVID-19
vaccination until their participation in the trial is complete to
avoid invalidating such clinical trial results.
9. Healthcare providers should refer to the following for
detailed guidance regarding vaccine medical contraindications
and precautions, and required screening and evaluation of
recipients: CDC COVID-19 Vaccine Information Statements (VIS);
FDA Emergency Use Authorization Fact Sheets for Healthcare
Providers; CDC guidance on triage of people with a history of
allergies or allergic reactions; and CDC ACIP Interim Clinical
Considerations for Use of COVID-19 Vaccines Currently Approved
or Authorized in the United States, including Ingredients included
in COVID-19 vaccines.
10. Authority to grant temporary medical exemptions shall remain
with the local military-employed or affiliated Medical Officer (MO).
Clinic staffs shall maintain awareness of all temporary exemptions
granted within their AOR and shall take lead in assisting MOs
achieve waiver consistency. TRICARE Prime Remote civilian primary
care managers or network providers do not have authority to grant
temporary exemptions.
11. Concurrent with the release of this ACN, COMDT (CG-1121)
is now the final approval authority for any permanent medical
exemption to any mandatory vaccine (REFs B and D). CG MOs may
apply for a permanent medical exemption to one or more vaccines
on behalf of a patient by submitting a package to their Senior
Medical Executive consisting of medical documentation (including
specialist consultation, if applicable) supporting the exemption
and an official memo requesting the exemption. The official memo
is routed from the MO, through the Senior Medical Executive, to
COMDT (CG-1121). CG MOs are reminded that they may utilize the
Clinical Consultation Service (CCS), Immunization Health Branch,
Defense Health Agency, to assess the appropriateness of a possible
permanent medical exemption. The CCS can be reached at:
(Copy and Paste URL Below into Browser)

https://www.health.mil/Military-Health-Topics/Health-Readiness/
Immunization-Healthcare/Clinical-Consultation-Services

or at 1-877-438-8222, Option 1. When the requesting MO is a
Senior Medical Executive, requests are routed to COMDT (CG-1121)
through HSWL SC (om). Permanent exemptions will be granted on a
case-by-case basis. Permanent exemptions for COVID-19 that have
been granted prior to the release of this ACN will be evaluated
by COMDT (CG-1121).
12. These changes in policy will be incorporated into the next
revision of REF (A), which will be released within the next year.
13. This message will be cancelled on 12 SEP 2022.
14. POC: CAPT John Iskander, Chief of Preventive Medicine and
Population Health, ███████████████████ .
15. Released by RADM Dana Thomas, Director of Health, Safety and
Work-Life, COMDT (CG-11).
16. Internet release is not authorized.

EXHIBIT 7



# Affidavit of Membership in the Confraternity of Our Lady of Fatima

This is to certify that

## ALARIC STONE

Is a perpetual member of the Confraternity of Our Lady of Fatima in good standing and as such holds to the following deeply held religious belief that

*the crime of abortion is so monstrous that any kind of concatenation with this crime, even a very remote one, such as vaccines that use aborted fetal cells for the testing or production, is immoral and cannot be accepted under any circumstances by a Catholic.*

I sign this in perpetuity for all existing and future members and hold that any copies of my signature for this affidavit are as valid as this original.

+Bishop Athanasius Schneider

117 Hollywood Blvd | Steubenville, OH 43952 | Email – info@livefatima.io

44

6230
16 Sep 2021

FIRST ENDORSEMENT on memo 6230 of 16 Sep 2021

From:   Todd D. Vance, CAPT
        CGC *James* (WMSL 754)

To:     Commandant, Office of Military Personnel (CG-133)

Subj:   REQUEST FOR RELIGIOUS ACCOMMODATION

1.  I do not endorse this request for a religious accommodation for an immunization exemption.

2.  My endorsement is based on the ability to maintain mission readiness for USCGC JAMES and to protect the crew members and their families during the global pandemic.

#

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commanding Officer
USCGC JAMES (WMSL 754)

1050 Register Street
N. Charleston, SC 29405
Phone:
Email:

6320
22 SEP 2021

From:  Alaric B. Stone, ENS

To:    Commandant (CG-133)
Thru:  (1) Joseph A. Seifert, LT
       (2) Todd D. Vance, CAPT
       (3) Commandant (CG-112)

Subj:  REQUEST FOR RELIGIOUS ACCOMMODATION

Ref:   (a) Military Religious Accommodations, COMDTINST 1000.15
       (b) COMDT COGARD Washington DC 072247Z September 21/ALCOAST 315/21

1.  I respectfully request a waiver of policy in accordance with Ref (a) to accommodate a religious practice based on sincerely held religious beliefs.  I request a waiver to the immunization policy requiring receipt of the Coronavirus Disease 2019 (COVID-19) vaccine. This is the first request of this nature that I have made.

2.  I am a practicing member of the Roman Catholic Church, baptized, confirmed, and in good standing (see enclosures 1-4). I have been actively involved in the Catholic Faith and Church Community my entire life, and the teachings of the Catholic Church are foundational in forming my conscience with respect to this accommodation request. Over the past year I have become aware that all COVID-19 vaccines currently available in the United States have been produced using morally-compromised fetal tissue derived from aborted fetuses. The Pfizer/BioNTech and Moderna vaccines made use of the HEK-293 line of aborted fetal cells in their development and testing, while Johnson & Johnson uses the PER C6 line of fetal cells in in development, testing, and production of its vaccine (see enclosure 5). The Catholic Church's teachings on the sanctity of life and dignity of every person, from the moment of conception until natural death, are clearly defined and immovable. As a Catholic I firmly believe that abortion constitutes homicide perpetrated against children in their mother's wombs, the most defenseless of all human beings. Furthermore, guided by my conscience and informed by the teachings of the Church, I have a moral duty to refuse vaccines that are created using human cells derived from abortion; to do otherwise would be tantamount to material cooperation with evil.

3.  As discussed above, the teachings of the Catholic Church on the subject of abortion are very clear; below are excerpts from the *Catechism of the Catholic Church*, a compendium of teachings that the Church uses to instruct the laity on the faith, addressing the subject of abortion.

    a.  Paragraph 2270: "Human life must be respected and protected absolutely from the moment of conception. From the first moment of existence, a human being must be recognized as having the rights of a person – among which is the inviolable right of every

46

innocent being to life."

b. Paragraph 2271: "Since the first century the Church has affirmed the moral evil of every procured abortion.  This teaching has not changed and remains unchangeable. Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to moral law: You shall not kill the embryo by abortion and shall not cause the newborn to perish. God, the Lord of life, has entrusted to men the noble mission of safeguarding life, and men must carry it out in a manner worth of themselves. Life must be protected with the utmost care from the moment of conception: abortion and infanticide are abominable crimes."

c. Paragraph 2273: "The inalienable right to life of every innocent human individual is a constitutive element of a civil society and its legislation: The inalienable rights of the person must be recognized and respected by civil society and the political authority. These human rights depend neither on single individuals nor on parents; nor do they represent a concession made by society and the state; they belong to human nature and are inherent in the person by virtue of the creative act from which the person took his origin. Among such fundamental rights one should mention in this regard every human being's right to life and physical integrity from the moment of conception until death.

4. These fundamental teachings have been amplified by many among the religious and the laity over the centuries, and extended to the use of aborted fetuses and fetal cell material in the medical field. The 1983 *Charter of the Rights of the Family* published by the Holy See explicitly states "respect for the dignity of the human being excludes all experimental manipulation or exploitation of the human embryo." Furthermore, the duty of Catholics to resist the use of unethical vaccines that use morally-compromised fetal cells in their testing or production is also a matter of Church doctrine. The Pontifical Academy for Life codified the Catholic Church's official position on the use of unethical vaccines in its 2005 letter *Moral Reflections on Vaccines Prepared from Cells Derived from Aborted Human Foetuses*. This letter states Catholics should "take recourse, if necessary, to the use of conscientious objection with regard to the use of vaccines produced by means of cell lines of aborted human foetal origin. Equally, they should oppose by all means (in writing, through the various associations, mass media, etc.) the vaccines which do not yet have morally acceptable alternatives, creating pressure so that alternative vaccines are prepared, which are not connected with the abortion of a human foetus." This same letter also states "As regards the diseases against which there are no alternative vaccines which are available and ethically acceptable, it is right to abstain from using these vaccines if it can be done without causing… significant risks to their health." The Pontifical Academy for Life also goes to great lengths to explain that "the use of vaccines whose production is connected with procured abortion constitutes at least a mediate remote passive material cooperation to the abortion, and an immediate passive material cooperation with regard to their marketing." The responsibility of Catholics to oppose the use of morally compromised vaccines is compounded by the fact that the use of these vaccines "encourages and entrenches the practice of abortion," normalizing and legitimizing the practice within society at large.

5. The responsibility and right of Catholics to oppose and refuse morally compromised vaccines in the context of the COVID-19 pandemic has been reaffirmed by the Congregation for the Doctrine of the Faith in their Instruction *Note on the Morality of Using Some Anti-COVID-19*

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION                        6320
                                                                                 22 SEP 2021

*Vaccines*. This instruction states "…Practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary." It explains that the decision to oppose or resort to the use of morally compromised vaccines is a matter of individual conscience. The right to make this conscience decision, informed by Catholic teaching, and to have it respected is protected by the clear teaching of the Church; below are excerpts from the *Catechism of the Catholic Church* regarding the right to conscience:

  a. Paragraph 1776: "Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment… For man has in his heart a law inscribed by God… His conscience is man's most secret core and sanctuary. There he is alone with God whose voice echoes in his depths."

  b. Paragraph 1782: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters."

  c. Paragraph 1783: "Conscience must be informed and moral judgement enlightened. A well-formed conscience is upright and truthful. It formulates judgements according to reason, in conformity with the true good willed by the wisdom of the creator. The education of conscience is indispensable for human beings who are subjected to negative influences and tempted by sin to prefer their own judgement and to reject authoritative teachings."

  d. Paragraph 1788: "To this purpose, man strives to interpret the data of experience and the signs of the times assisted by the virtue of prudence, by the advice of competent people, and by the help of the Holy Spirit and his gifts."

  e. Paragraph 1789: "Some rules apply in every case: One may never do evil so that good may result from it; the Golden Rule: 'Whatever you wish that men would do to you, do so to them.' Charity always proceeds by way of respect for one's neighbor and his conscience: 'Thus sinning against your brethren and wounding their conscience . . . you sin against Christ.' Therefore 'it is right not to . . . do anything that makes your brother stumble.'"

6. The importance of conscience in evaluating right and wrong in the context of the Catholic faith cannot be understated, so much so that the Fourth Lateran Council stated "Whatever is done in opposition to conscience is conducive to damnation." I am a member of the Catholic organization the Confraternity of our Lady of Fatima in good standing under the guidance of Bishop Athanasius Schneider who, on this issue of conscience, has come down against any use of the available abortion-derived vaccines because it would be sinful to cooperate, even indirectly, in the crime of abortion (see enclosure 6). Guided by my conscience and informed by the teachings of the Church, I have determined that I possess a moral duty to refuse any vaccines that are created using human cells derived from abortion. Receiving any of the available COVID vaccines, and any other vaccine that has been developed through the use of aborted fetal cells, would force me to violate my conscience and become complicit in the act of abortion which is contrary to the teachings of my Catholic faith.

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION                        6320
                                                                                        22 SEP 2021

7.  I have only become aware over the past year that several of the vaccines that I have received
    in the past may have been morally compromised vaccines derived from aborted fetal tissues. It
    is because of the publicity surrounding the COVID-19 vaccines that I discovered that there are
    vaccines produced using morally compromised cell lines. I recognize that if I had prior
    knowledge of the use of aborted fetal cells in the development of these vaccines, I would have
    pursued a religious accommodation for these as well. However, the *Catechism of the Catholic
    Church* is clear that I am absolved of mortal sin in this case because I did not consent to the act
    knowing that it was sinful. The Catechism states "For a sin to be mortal, three conditions must
    together be met: Mortal sin is sin whose object is grave matter and which is also committed
    with full knowledge and deliberate consent." However, now that I have been educated and
    informed, I would be required to violate my conscience and make a deliberate choice to
    commit a grave sin if I were to continue to use morally compromised vaccines.

8.  Unfortunately, there are certain authoritative Church figures, including the Holy Father Pope
    Francis, who have promoted mass vaccination in light of the current pandemic, causing
    serious turmoil within the Catholic community. It is imperative to note that his position on the
    vaccine was not issued "ex cathedra" (clarifying church doctrine) and represents his opinion
    in a time of fear and uncertainty. The Church's teaching that "…vaccination is not, as a rule, a
    moral obligation and that, therefore, it must be voluntary" and informed by individual
    conscience remains Doctrine. The Vatican, Bishops, and priests are free to express their
    opinions, but these opinions should never be confused with the Doctrine of the Catholic
    Church and should never be given equal or superior weight and authority.

9.  In their Instruction, *Note on the Morality of Using Some Anti-COVID-19 Vaccines*, the
    Congregation for the Doctrine of the Faith is clear that Catholics who "…for reasons of
    conscience, refuse vaccines produced with cell lines from aborted fetuses, must do their
    utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles
    for the transmission of the infectious agent."

    a.  Since the outset of the COVID pandemic, I have taken the moral responsibility outlined
        above very seriously. It compliments and reinforces the professional duty that I have to
        the Coast Guard to maintain my military readiness, operational effectiveness, and both
        my own safety and that of my shipmates. I have meticulously adhered to preventative
        protocols recommended by the Coast Guard, CDC, and others (use of appropriate PPE to
        include continuous use of N-95 masks, social distancing, and limiting risky behaviors
        both on and off-duty) with absolute success; I have remained uninfected for more than a
        year despite being unvaccinated. Measures such as social distancing, masking, and good
        hygiene remain extremely effective means of preventing COVID transmission and
        infection, so much so that the CDC has come to the conclusion that these are critically
        necessary even for vaccinated persons. Furthermore, given my age and physical
        condition, I am not at risk for any severe adverse effects should I be infected.

    b.  I have successfully completed three WMSL deployments in the last year, two onboard
        USCGC JAMES and one while TDY onboard USCGC KIMBALL. When appropriate
        preventative protocols were followed, JAMES and KIMBALL were unaffected by
        COVID-19 disruptions related to their operational tasking or mission, despite the
        presence of unvaccinated personnel. Each patrol involved contact with COVID positive

                                                                                                    49

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION                6320
                                                                                                22 SEP 2021

entities, and the preventative protocols in place worked without fail. During JAMES'
most recent patrol more than 92% of the crew was vaccinated; the presence of
unvaccinated personnel did not negatively impact JAMES' ability to execute its mission
or impose restrictions or inconveniences upon vaccinated personnel.

c.  Understanding that I have serious moral and conscience objections to using the morally
compromised COVID-19 vaccines currently available, the above clearly shows that there
are effective alternatives to vaccination that would allow me to further the Coast Guard's
interest of maintaining an operationally ready workforce and protecting its members.
Currently 98% of JAMES' crew are vaccinated, well above even the highest CDC
estimates required for herd immunity.

d.  As I am due to rotate from JAMES during the FY22 assignment season, I have radically
altered my planned career intentions to better position myself to accommodate the Coast
Guard's interests in this matter. While I planned to seek assignment to another afloat unit
following the completion of my assignment onboard JAMES, I have since altered my e-
resume requesting assignment to Cyber and Intelligence billets that would be able to
more easily accommodate my conscience objection to the use of morally-compromised
COVD-19 vaccines.

10. On 08 September myself and the other crewmembers onboard JAMES seeking religious
accommodations to the COVID-19 vaccine requirement were counseled by our commanding
officer in accordance with reference (b). Our CO made it explicitly clear that any religious
accommodation request submitted would be negatively endorsed as it was forwarded for
consideration to CG-133. This statement was issued prior to any discussion regarding the
nature of the specific religious accommodation requests or the actual submission of any of
these requests. My CO further indicated that he did not care to discuss members' religious
beliefs because frankly they "did not matter." There was no discussion of alternatives for
satisfying the Coast Guard's interests while accommodating individually held religious
beliefs. There was no acknowledgement that alternative measures to using morally
compromised vaccines exist and were successfully employed during JAMES' previous
deployments. Since this counseling, I have been informed that any person who is not
vaccinated will be prohibited from sailing with JAMES during its upcoming patrol in
November, regardless of the status of any accommodation request. I have interpreted this as
coercive action that does not appropriately recognize the concerns discussed above.

11. I am aware that, pursuant to my rights under the Religious Freedom Restoration Act
("RFRA"), 42 U.S.C. Sec. 2000bb-1, et seq., the U.S. Coast Guard must "demonstrate" that
any substantial burden on my sincere religious beliefs described above--whether
mandatory COVID vaccination, any alternative to vaccination, or any action taken by the
Coast Guard upon denying an accommodation to vaccination--is the "least restrictive means"
of furthering a compelling government interest. *See Singh v. McHugh*, 185 F. Supp. 3d 201,
222 (D.D.C. 2016) (holding that while courts must "give due respect to [the Army's]
articulation of important military interests . . . [courts must] hold defendants to their burden
of demonstrating that the denial of the limited accommodation sought in this case is the least
restrictive means to advance the compelling interest"). I respectfully submit that my
command's overt hostility to my and several of my shipmates' expressed intent to seek
religious accommodation is out of compliance with RFRA and the First Amendment's

                                                                                                50

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION                6320
                                                                                          22 SEP 2021

requirement of religious neutrality. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) (government officials' derisive statements about religious claimant's beliefs violated First Amendment). I also submit that the alternative protocols and precautions I have meticulously followed since the outset of COVID, as described in Paragraph 9(a)-(d) above, are less restrictive means in ample furtherance of the Coast Guard's interests. When these protocols were appropriately implemented and followed during my three WMSL deployments over the past year, there were zero COVID-19 outbreaks. My understanding is that RFRA protects me in continuing to exercise those highly effective precautions in lieu of receiving a vaccine that violates my deeply held religious beliefs and thus allows me to remain with the Coast Guard in service to my country.

12. I have every reason professionally to take one of the available COVID-19 vaccines. However, guided by my conscience and informed by the teachings of the Church, I have a moral duty to refuse vaccines that are created using human cells derived from abortion. I joined the Coast Guard in large part because its humanitarian mission aligned with my faith. I am wholly committed to the Coast Guard's mission, to serving those I am charged with leading, and to serving my nation. I am grateful for the opportunity to make this appeal on behalf of my faith and respectfully request that I am granted this religious accommodation request.

13. I met with and have been counseled by the Sector Charleston Command Chaplain, LT Joseph Seifert on 03 September 2021. I met with and have been counseled by the Naval Health Clinic Charleston Primary Care Manager, LT Nicholas Petri on 22 September 2021. Both have provided memorandums which are included as Encl (7) and Encl (8) respectively. Additionally, I have obtained a letter from my former Chaplain, CAPT (ret.) Michael Parisi (see enclosure 9) addressing my request.

14. My contact information is ███████████ and ████████████████ for clarification/elaboration on any of the statements provided above.


                                                    #


Enclosures: (1) Catholic Baptismal Certificate
                      (2) First Communion Certificate
                      (3) Certificate of Reconciliation
                      (4) Confirmation Certificate
                      (5) COVID-19 Vaccines and Treatments in Development – Children of God For Life
                      (6) Certificate of Membership in Confraternity of Our Lady of Fatima
                      (7) RELIGIOUS ACCOMMODATION, Chaplain J. A. Seifert
                      (8) MEDICAL COUNSELING FOR RELIGIOUS EXEMPTION REQUEST FOR
                            MANDATORY VACCINES, Dr. N. C. Petri
                      (9) Letter to Accompany Religious Accommodation Request, Rev. Michael J. Parisi,
                            CAPT, Chaplain Corps, US Navy (ret.)

U.S. Department of
Homeland Security

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-133

6230

**JAN 1 9 2022**

**MEMORANDUM**

From:   A. W. Williams, CAPT
        COMDT (CG-133)

Reply to
Attn of:

To:     A. B. Stone, ENS
        CGC JAMES (WMSL 754)

Subj:   REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
        GUARD'S COVID-19 VACCINATION MANDATE

Ref:    (a)  Your memo 6320 of 22 SEP 21
        (b)  ALCOAST 305/21 R 262212Z AUG 21
        (c)  ALCOAST 315/21 R 072247Z SEP 21
        (d)  Military Religious Accommodations, COMDTINST M1000.15 (series)
        (e)  Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
             COMDTINST M6230.4 (series)
        (f)  42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
        (g)  U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1. Reference (a) is your request that the Coast Guard accommodate a religious practice so that
you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c).
I am the adjudication authority for religious accommodation requests pursuant to reference (d). I
have carefully reviewed your request in accordance with references (d)-(f). **Your request is
denied.**

2. I made this decision after considering your right to free exercise of your religion or religious
beliefs and the government's compelling interest in mission accomplishment, to include military
readiness; unit cohesion; good order and discipline; and the health and safety of you, the
members assigned to your unit and within the Coast Guard, and the public with whom the Coast
Guard regularly interacts. I then considered whether requiring you to receive the COVID-19
vaccine is the least restrictive means available to achieve this compelling interest. It was your
burden to establish the religious nature and sincerity of your beliefs and that receiving the
vaccine would substantially burden your religious belief or practice. For the purpose of this
administrative decision, I do not question the sincerity of your religious belief or whether
vaccine requirements substantially burden your religious practice. The Coast Guard reserves the
opportunity to make these determinations, but I do not need to address them here to resolve your
request.

3. I have concluded that there are no lesser restrictive means available other than vaccination to
achieve the compelling government interest here. In assessing your request, I considered that the
Coast Guard is a military service that must be ready at all times to perform its military and other
missions. The military nature of the Coast Guard and the readiness obligations of military
service would likely suffice to require vaccination. In addition, the Coast Guard is unique
amongst the military services because of the nature of its missions that include support of the

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE       6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law. The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here. In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies. Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard. The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit. Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs. Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts. The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4. I also considered that you are assigned to an operational billet. In your current assignment to CGC JAMES, your duties require inport and underway watchstanding, unit training, and other frequent interactions with crewmembers in smaller, enclosed spaces that do not afford the opportunity to consistently social distance in accordance with the Center for Disease Control's recommended guidelines. In addition, you and your shipmates are required to continuously cohabitate the cutter for extended periods of time with limited berthing, dining, and work space options available for distancing. The diverse and unpredictable nature of your unit's underway operations include interactions with commercial and recreational mariners, migrants and detainees, foreign and domestic port visits, and limited access to advanced medical care while at-sea or while operating in remote locations, which increases the health risks for you and your shipmates.

   a. Social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public because of the operational nature of your billet. As a member assigned to an operational unit, you are unable to accomplish your daily missions while in isolation, in quarantine, or at home. Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible. The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates. Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day.

   b. Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination. Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public. The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

   c. Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19 test. By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

2

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE        6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

5.  Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public. Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19. This in turn decreases the military readiness of the unit and the Coast Guard as a whole. You must be medically ready and able to perform your duties for your unit to function effectively.

6.  I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution. **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7.  You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8.  If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

9.  You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of Reference (g).

10.  If you do not begin the COVID-19 regimen or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

#

Copy:    CGC JAMES (WMSL 754)
         COMDT (CG-00A)
         COMDT (CG-00H)
         COMDT (CG-112)

3

**EXHIBIT 11**

**U.S. Department of Homeland Security**

**United States Coast Guard**

USCGC JAMES (WMSL 754)
United States Coast Guard

1050 Register Street
N. Charleston, SC 29405

███████████████████

6320
02 FEB 2022

# MEMORANDUM

From: A. B. Stone, LTJG
CGC JAMES (WMSL 754)

To:    COMDT (CG-1)
Thru:  COMDT (CG-133)

Subj:  APPEAL OF DENIED REQUEST FOR RELIGIOUS ACCOMMODATION FROM
       THE COAST GUARD'S COVID-19 VACCINATION MANDATE

Ref:   (a) ALCOAST 305/21 R 262212Z AUG 21
       (b) ALCOAST 315/21 R 072247Z SEP 21
       (c) ALCOAST 352/21 R 271530Z SEP 21
       (d) ALCOAST 420/21 R 151816Z NOV 21
       (e) ALCOAST COMDT NOTICE 131600Z SEP 21
       (f) ALCOAST COMDT NOTICE 302024Z AUG 21
       (g) ALCOAST CG PSC NOTICE 261519Z JAN 22
       (h) Military Religious Accommodations, COMDTINST 1000.15 (series)
       (i) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
           COMDTINST M6230.4 (series)
       (j) 42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
       (k) U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1. I am appealing the decision outlined in enclosure (1) (the 19 January 2022 memo issued to
me by CG-133) denying my request for a religious accommodation to the Coast Guard's
COVID-19 vaccine mandate (see enclosure (2)). I submit my appeal on the basis that CG-133's
denial of my accommodation request significantly burdens my religious practice and deprives me
of my rights under federal law without appropriately establishing a compelling government
interest for doing so or demonstrating that vaccination is the least restrictive means with which
the Coast Guard can achieve its interests.

2. My appeal is based upon the Religious Freedom Restoration Act of 1993 (RFRA) and the
First Amendment of the United States Constitution, both of which protect my fundamental right
to the free exercise of my religion.

3. As articulated in enclosure (2), I am a practicing Roman Catholic. All of the COVID-19
vaccines currently available are derived from or were tested on (as part of their development)
aborted fetal tissue. For this reason, guided by my conscience and the teachings of the Church, I
am strongly opposed to receiving any of the COVID-19 vaccines currently available (see
enclosure (2) for additional information). Both my current and former military chaplains
provided statements, attached as enclosures to my accommodation request, attesting to the

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS          6320
      ACCOMMODATION                                                      02 FEB 2022

sincerity of my beliefs as they pertain to this issue.

4.   RFRA imposes strict scrutiny on all actions of the federal government that substantially burden a person's exercise of religion. 42 U.S.C. § 2000bb-1(b). The government burdens religion when it "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). This is especially true when the government imposes a choice between one's job or one's religious belief. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963). CG-133's decision denying my request for a religious accommodation to the Coast Guard's vaccine mandate imposes on me the choice between violating my religious beliefs or ending my career and livelihood. As such, the Coast Guard's COVID-19 vaccine mandate is subject to strict scrutiny because it imposes a substantial burden on the exercise of my religious beliefs.

5.   Strict scrutiny requires that the government, before imposing a substantial burden on a person's exercise of religion, must demonstrate that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest 42 U.S.C. § 2000bb-1(b). I submit that CG-133's memo denying my request for a religious accommodation fails to demonstrate that the Coast Guard's COVID-19 Vaccine Mandate furthers a compelling governmental interest or appropriately show that vaccination is the least restrictive means with which the Coast Guard can achieve its interests.

6.   In evaluating my accommodation request, the Coast Guard must articulate that it has a compelling government interest in denying my accommodation request in particular and cannot rely on generalized or broadly formulated interests to justify requiring me to receive an unethically produced COVID-19 vaccine in violation of my religious beliefs. Although stemming the spread of COVID-19 is unquestionably a compelling interest, its limits are finite. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020).

    a.   Without an individualized assessment of my specific case and circumstances, the Coast Guard cannot demonstrate a compelling interest in vaccinating me specifically. *U.S. Navy Seals 1-26, et al., v. Biden, et al.*, No. 4:21-cv-01236 (N.D. Tex. Jan. 3, 2022). The assessment provided by CG-133 in enclosure (1) is not individually tailored or specific to my circumstances. Enclosures (3) through (6) are examples of memos issued to other unvaccinated personnel stationed onboard JAMES and at other Coast Guard units whose requests for religious accommodations to the Coast Guard's COVID-19 vaccine mandate were also denied by CG-133. These memos are virtually identical to the one that I received (see enclosure (1)), indicating that these are template denial letters. All of the enclosed denial memos cite generalized interests of "military readiness; unit cohesion; good order and discipline; and the health and safety" in addition to other considerations that apply to virtually every other member of the Coast Guard assigned to an operational billet. These broadly formulated interests are not specific to my case.

    b.   Under strict scrutiny, Coast Guard needs to establish that approving my religious accommodation request would impose a real (not theoretical) adverse impact on military readiness, unit cohesion, good order and discipline, and health or safety. CG-133's assessment ignores the information that I provided in my original accommodation request (see enclosure (2), paragraphs 9.a. through 9.d.) regarding the actual (not theoretical) circumstances of my case.

2

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS            6320
     ACCOMMODATION                                                      02 FEB 2022

This information makes it abundantly clear that Coast Guard does not need me to be vaccinated to discharge my assigned duties or protect its interests. To reiterate:

    (1)   For the past 18 months (both before and after COVID-19 vaccines became available) I have maintained a critical deployment/mission ready posture, contrary to the claims made in the memo denying my request. I have never been sick with or tested positive for COVID-19. I have never missed a single workday due to quarantine or isolation, and I have never been unable to discharge any of my assigned duties due to COVID-19 disruptions or my vaccination status. I have never caused anyone else to be quarantined or isolated, nor have I compromised other personnel's safety or mission readiness.

    (2)   I have successfully completed four WMSL deployments (approx. 3 months each), two major dockside availabilities, three temporary duty assignments involving travel (both CONUS and OCONUS travel) between units, and attended one C-School without incident or disruptions to myself, my unit, or my assigned mission.

    (3)   I have served as my unit's COVID-19 response officer since reporting onboard JAMES. I have consistently upheld the Coast Guard's interests in military readiness, unit cohesion, good order, discipline, health, and safety. I have implemented preventative protocols and COVID mitigation guidance with a high degree of success, and have been lauded for my efforts in my evaluations; more importantly I have kept my shipmates safe throughout the pandemic.

    (4)   Given my age, excellent physical condition, and absence of any other comorbidities or medical conditions, I am extremely low risk for severe COVID complications.

    (5)   At least 98% of JAMES' permanent party crew is fully vaccinated, well above even the highest estimates required for herd immunity.

    (6)   I have only four months remaining at my current operational assignment before I am eligible for transfer to another unit. In less than a month (by the end of February 2022), I will have completed my last scheduled deployment with CGC JAMES (I am currently in a deployed status). I have requested transfer to either Cyber or Intelligence positions following the conclusion of my tour onboard CGC JAMES, both of which offer a broader range of options for teleworking and social distancing. If allowed to transfer, it is likely that I would succeed in securing such a billet; I already meet the clearance requirements for such positions and have begun to develop professional expertise in these fields (earned IC Intern Competency, etc). This belies the assertion that my assignment to an operational billet (which is virtually complete) is a compelling interest for denying my accommodation request.

   c.   As is evident from paragraphs 6.b.(1)-(6) above, the broadly formulated interests and assertions of theoretical adverse impacts expressed in enclosure (1) ring hollow when considering the facts of my case. Enclosure (1) identifies nothing to support a compelling interest in denying my accommodation request in particular. Judge Reed O'Connor stated in a January 3rd court ruling in the Northern District of Texas enjoining the application of the Navy's COVID-19 Mandate to 35 anonymous Navy special warfare soldiers, "Without individualized assessment, the [Navy] cannot demonstrate a compelling interest in vaccinating these particular

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS          6320
     ACCOMMODATION                                                   02 FEB 2022

Plaintiffs. By all accounts, Plaintiffs have safely carried out their jobs during the pandemic. Prior to the vaccine mandate, at least six Plaintiffs conducted large-scale trainings and led courses without incident." *U.S. Navy Seals 1-26, et al., v. Biden, et al.*, No. 4:21-cv-01236 (N.D. Tex. Jan. 3, 2022). The circumstances of this case that precipitated this ruling mirror my situation almost perfectly as is evident from paragraphs 6.a. and 6.b.(1)-(6) above.

    d.   My command's negative endorsement of my accommodation request similarly cited broadly formulated interests not specific to my case (see enclosure (7) for negative endorsement attached to all religious accommodation requests originating onboard JAMES). The negative endorsement simply states, "I do not endorse this request for a religious accommodation for an immunization exemption. My endorsement is based on the ability to maintain mission readiness for USCGC JAMES and to protect the crew members and their families during the global pandemic." Nothing in this statement supports a compelling interest in denying my accommodation request in particular and ignores the evidence I provided in paragraphs 6.b.(1)-(6) above, which my command was aware of.  As outlined in my accommodation request, this negative endorsement was issued on the basis of indiscriminate hostility to all religious accommodation requests (see enclosure (2), paragraph 10). I and other crewmembers seeking religious accommodations were informed by our CO that any and all religious accommodation requests would be negatively endorsed, without first meeting with a member of the command or discussing the specific nature of our requests. Furthermore, my CO stated that crewmember's religious beliefs "did not matter." Given that CG-133 inevitably relied upon this negative endorsement in deciding to deny my accommodation request, I submit that CG-133's decision to deny my accommodation request is based (at least partially) upon a prejudiced and discriminatory recommendation provided by my command.

7.   Even if the Coast Guard has a broad compelling interest in the widespread vaccination of its force, it has achieved this goal without my participation. In the months since vaccinations were introduced, risk of transmission among service members has greatly decreased due to voluntary vaccination and infection rates; any compelling interest in mandating vaccination has decreased accordingly. At least 95% of all active-duty Coast Guard service members have been vaccinated (see enclosure (8)); the remaining 5% are unlikely to undermine the Coast Guard's efforts. Today I and other unvaccinated service members present a lower risk of infection and transmission than in the earlier days of the pandemic. With a 95% vaccination rate, the Coast Guard's Herd immunity is at an all-time high. Many unvaccinated service members have tested positive for antibodies, showing the presence of natural immunity (I myself have never been afforded the opportunity to test for antibodies due to the restrictions outlined in reference (e)), further undermining CG-133's assertion that a compelling interest exists. *U.S. Navy Seals 1-26, et al., v. Biden, et al.*, No. 4:21-cv-01236 (N.D. Tex. Jan. 3, 2022). Additionally, COVID-19 treatments (such as Pfizer's oral anti-viral PAXLOVID) are becoming increasingly effective at reducing hospitalizations and death, further undermining the narrative that vaccination is the only option to protect service member's health (see enclosure (9)).

8.   Furthermore, the Coast Guard is willing to grant exemptions to the COVID-19 vaccine requirement for non-religious reasons. Its vaccine mandate includes exceptions for those participating in clinical trials and those with medical contraindications and allergies to the vaccines (see references (a) and (e)). These service members present at least as much of an obstacle to Coast Guard military and medical readiness as I do due to their unvaccinated status.

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS          6320
     ACCOMMODATION                                                                     02 FEB 2022

As a result, the mandate is under-inclusive. "Indeed under-inclusiveness… is often regarded as a telltale sign that the government's interest in enacting a liberty-restraining pronouncement is not in fact 'compelling.'" *BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604, 616 (5th Cir. 2021). The Coast Guard's policy of allowing accommodations for reasons other than religious ones demonstrates that it can tolerate risk posed by some service members remaining unvaccinated, further undermining the assertion articulated in enclosure (1) that the Coast Guard has a compelling government interest in denying my accommodation request in particular. Judge Steven Merryday stated in a February 2nd court ruling in the Middle District of Florida enjoining the application of the Navy and Marine Corps' COVID-19 mandates to two anonymous senior officers, "The military is most likely unable to establish, and certainly has not established, that permitting the relatively small number of RFRA objectors, even if every request for exemption (much less the two at issue in this motion) were sincere and successful, to serve without adverse consequences to their standing and the terms and conditions of their service will adversely affect the public's interest in the maintenance and readiness of the nation's military forces." *Navy Seal 1, et al. v. Joseph R. Biden, et al.*, No. 8:21-cv-2429-SDM-TGW (M.D. FLA. Feb. 2, 2022).

9.   The least restrictive means standard under RFRA is exceptionally demanding in that it requires the government to show it lacks other means of achieving its goal; so long as the government can achieve its interests in a manner that does not burden the exercise of religion, it must do so. This requires the Coast Guard to show that means less restrictive of my First Amendment religious freedoms could not address its interest in reducing the spread of COVID-19. Enclosure (1) does not properly establish that vaccination against COVID-19 is the least restrictive means of preventing the spread of COVID-19 in my specific case.

    a.   Enclosure (1) lists alternatives to vaccination and provides broad statements about how they are insufficient to mitigate the spread of COVID-19 or are impracticable to implement given my current assignment to an operational unit. However, unsurprisingly given that enclosure (1) is a boilerplate denial non-specific to my case (see paragraph 6.b. above for discussion), these broad statements are not accurate. It ignores the information that I provided in my original accommodation request (see enclosure (2), paragraphs 9.a. through 9.d.) and fails to explain why I cannot continue to fulfill my duties using many of the same highly effective mitigation measures that I have employed with absolute success since the beginning of the pandemic.

       (1)   As discussed in enclosure (2), I take my responsibility to prevent the spread of COVID-19 very seriously. In their Instruction, *Note on the Morality of Using Some Anti-COVID-19 Vaccines*, the Congregation for the Doctrine of the Faith is clear that Catholics who "…for reasons of conscience, refuse vaccines produced with cell lines from aborted fetuses, must do their utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles for the transmission of the infectious agent." This moral responsibility compliments and reinforces the professional duty that I have to the Coast Guard to maintain my military readiness, operational effectiveness, and both my own safety and that of my shipmates. My faith is not at odds with protecting the Coast Guard's interests.

       (2)   For the past 18 months I have maintained a critical deployment/mission ready posture, contrary to the claims made by CG-133 that this is impossible. I have never been sick with or tested positive for COVID-19. I have never missed a single workday due to quarantine or

5

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS          6320
     ACCOMMODATION                                                           02 FEB 2022

isolation, and I have never been unable to discharge any of my assigned duties due to COVID-19 disruptions or my vaccination status. I have never caused anyone else to be quarantined or isolated, nor have I compromised other personnel's safety or mission readiness.

(3)   Although I deploy and work in a confined environment (i.e. a ship), I share a berthing with only one other individual onboard the ship. While deployed, I wear an N-95 respirator continuously until our ship's "bubble" is established/re-established after each exposure to outside entities. Inport I wear an N-95 respirator continuously onboard the ship. This practice has proven to be highly effective; there has not been a single documented case of COVID-19 transmission (vaccinated or unvaccinated) occurring onboard JAMES since these measures were implemented (both inport and underway). All infections have occurred due to participation in high risk activities while off duty.

(4)   The CDC acknowledges that N-95 respirators are 95% effective at preventing COVID transmission and infection when used properly, stating, "When worn consistently and properly, they provide the highest level of protection from particles, including COVID-19. Additionally, they contain your respiratory droplets and particles so you do not expose others" (see enclosure (10)). This indicates that use of appropriate PPE coupled with good hygiene can provide a level of protection far superior to any currently available vaccination regimen (no vaccination regimen has even close to a 95% efficacy at preventing infection or transmission over time). During JAMES' most recent dockside availability (i.e. within the last 4 months), more than 12% of the fully vaccinated permanent party crew tested positive for COVID-19 and were forced to isolate. Vaccinated personnel follow a more lax PPE regimen involving the loose use of cloth masks. In the last 18 months none of the remaining unvaccinated crewmembers onboard JAMES have tested positive for or been isolated due to COVID-19. Unvaccinated members follow strict PPE and hygiene guidelines involving the continuous use of N-95 respirators. This indicates that use of appropriate PPE (N-95 masks) and diligent hygiene protocols are much more effective than CG-133 claims in enclosure (1).

(5)   My duties onboard JAMES do not require me to have frequent interaction with migrants, detainees, commercial/recreational mariners, or other non-JAMES crewmembers while underway. While inport JAMES employs strict PPE guidelines for crewmembers and non-crewmembers alike, mitigating the risk of outside infection.

b.   If any doubt exists as to the efficacy of the alternative mitigation measures discussed above, I offer that my record speaks for itself. I have completed four WMSL deployments (approx. 3 months each), two major dockside availabilities, three temporary duty assignments involving travel (both CONUS and OCONUS travel) between units, and attended one C-School without incident or disruptions to myself, my unit, or my assigned mission. The broad and apocryphal claims expressed by CG-133 in enclosure (1) that no less restrictive alternatives to vaccination exist are at odds with the evidence I have presented above. My arguments are informed by nearly 18 months of experience operating without disruption in a novel COVID-19 environment since the outset of the pandemic and leading my unit's efforts to battle COVID-19. Few Coast Guard service members have maintained the operational tempo that I have during the same period, or with such success in mitigating COVID-19 impacts. I submit that those evaluating my request at CG-133 lack the same level of experience and made their determination regarding the disposition of my request using abstract, aggregate data that does not accurately

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS     6320
     ACCOMMODATION                              02 FEB 2022

capture the circumstances of my case. CG-133's assessment is not specifically tailored, nor is it grounded in reality.

    c.    Furthermore, enclosure (1) fails to convincingly establish that no less restrictive means than vaccination exist to achieve the Coast Guard's goal of preventing the spread of COVID-19 due to the disingenuous treatment of persons with non-religious exemption requests. While CG-133 states in enclosure (1) that my work cannot be accommodated with the use of highly effective N-95 masking and hygiene measures, the Coast Guard has already accommodated people participating in clinical trials and those with medical contraindications and allergies to the vaccines using the same measures (see references (a) and (e)). Enclosure (1) provides no evidence that accommodating my religious beliefs would increase the Coast Guard's costs in any degree, given the continued presence of medically accommodated unvaccinated service members and the exemption for clinical trial participants. If accommodations have little or no marginal cost, mandating that I be vaccinated in conflict with my deeply held religious beliefs cannot be the least restrictive means of preventing the spread of COVID-19.

10. The First Amendment's Free Exercise Clause prohibits the government from enacting laws burdening religious exercise that are not both neutral and generally applicable unless they are narrowly tailored to a compelling government interest; a law that is not neutral or generally applicable and burdens religious exercise must satisfy strict scrutiny. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021). Government regulations are not neutral, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise. The Coast Guard's mandate is not generally applicable or neutral. By accepting applications for exemptions, the process invites and individualized assessment of the reasons why a service member is not vaccinated, meaning it is not generally applicable. Furthermore, because the Coast Guard's enforcement of its COVID-19 vaccine requirement shows that it is willing to allow service members to remain unvaccinated for medical and administrative reasons (i.e. participating in a clinical trial) while disallowing service members from refraining for religious reasons (not a single religious accommodation request has been approved; see enclosure (11)), it is not neutral. This means that the Coast Guard's vaccine mandate is subject to strict scrutiny under the First Amendment's Free Exercise Clause. As discussed in the preceding paragraphs, enclosure (1) does not properly establish a compelling Coast Guard interest or prove vaccination is the least restrictive means of achieving the goal of preventing the spread of COVID-19. This means that the decision issued by CG-133 also violates my rights under the First Amendment's Free Exercise Clause.

11. While I am grateful for the opportunity to make this appeal on behalf of my faith, I do not believe that it will be given serious or appropriate consideration commensurate with the issue at stake; my religious freedom.

    a.    My command has already informed me that "the writing is on the wall," and this appeal is an exercise in futility given that the same office that denied my initial accommodation request is also adjudicating this appeal (i.e. CG-1).

    b.    The evidence available up and to this point overwhelmingly indicates that the Coast

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS          6320
      ACCOMMODATION                                    02 FEB 2022

Guard's religious accommodation process is not sincere. Enclosure (11) is aggregate data (accurate as of 21 January 2021) regarding religious, administrative, and medical accommodations to the Coast Guard's vaccine mandate. Despite receiving over 1,300 religious accommodation requests, the Coast Guard has not granted a single one. As stated in Judge Steven Merrydays injunction order, "This record creates a strong inference that the services are discriminatorily and systematically denying religious accommodation requests without a meaningful or fair hearing and without the showing required under RFRA (while simultaneously granting medical exemptions and permitting unvaccinated persons to continue in service without adverse consequence). One struggles to imagine a wholesome and lawful explanation for the results evidenced in this record. The military is well aware of the frailty of their arguments in defense of their practices… The military faces a trivial, if any, prospect of material injury as a result of permitting the service members continued service under the same terms and conditions and with the same privileges and emoluments as currently prevail, especially because the military permits… unvaccinated persons to serve without adverse consequence." *Navy Seal 1, et al. v. Joseph R. Biden, et al.*, No. 8:21-cv-2429-SDM-TGW (M.D. FLA. Feb. 2, 2022).

    c.   The use of boilerplate denial letters (see paragraph 6.a. for discussion) belies the assertion that the evaluation/decision process is individually tailored to fairly assess the particular circumstances of each requestor's situation (see enclosures (1) and (3) through (6)).

    d.   The Coast Guard's initial promulgation of reference (f), the Coast Guard Military Religious Accommodations Manual, was made nearly a week after the service announced its decision to mandate the COVID-19 vaccine (see reference (a)). While this manual is supposed to articulate guidance for all manner of religious accommodation requests, the timing of its release indicates that its promulgation was reactionary to scrutiny regarding the mandate's apparent lack of accommodation for members with religious objections. In short, a sloppy attempt by the Coast Guard to make it seem that it was operating in compliance with federal law. The above points lend further credence to this assessment.

    e.   The Coast Guard has already punitively stripped unvaccinated service members of eligibility to hold command positions and their ability to pursue C-Schools, training opportunities, and advanced education programs critical to remaining competitive within the service and eligible for promotion (see reference (c)). These measures were implemented prior to any accommodation requests being reviewed and represent unwarranted punitive action without an appropriate basis (see paragraphs 6 through 9 discussing Coast Guard's lack of a compelling government interest, belying the assertion that these measures are intended to "mitigate risk"). This is in direct violation of the Coast Guard's Religious Accommodations manual which states, "Under Section 2000bb-1 of Title 42, United States Code, also known as 'The Religious Freedom Restoration Act,' Section 533(a)(1) of Public Law 112-239 and other laws applicable to the accommodation of religious practices, the Armed Forces must accommodate the beliefs of a member of the armed forces reflecting the conscience, moral principles, or religious beliefs of the member and, in so far as practicable, may not use such beliefs as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training or assignment" (see reference (h)). The statement in reference (c) that these measures are intended to "ensure Coast Guard leaders are positioned to employ effective service engagement strategies to further encourage vaccination" is a thinly veiled euphemism for applying coercive pressure on service members to submit to vaccination in violation of their deeply held religious beliefs without a fair

8

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS                    6320
ACCOMMODATION                                                          02 FEB 2022

assessment of their individual circumstances. When considered in the context of the other evidence presented in this appeal and the Coast Guard's repeated statement that its goal is a "100% vaccinated service" (see references (a) – (c)), it is clear that these measures are indicative of a particular hostility on the part of the Coast Guard towards members seeking religious accommodations to the COVID-19 vaccine.

   f.  The promulgation of reference (g), indicating that I and other unvaccinated service members will be prohibited from reassignment to new units and from executing Permanent Change of Station (PCS) orders, is evidence of the Coast Guard beginning to de-integrate unvaccinated members from the rest of the service. It is evidence that the Coast Guard has already determined that it intends to punitively discharge all unvaccinated service members. While reference (g) provides exceptions for personnel who have received approved religious accommodations, enclosure (11) makes it clear that no such accommodations are forthcoming.

12. While being a member of the military entails service, suffering, and sacrifice, it does not involve wholly laying aside your citizenry and giving up the rights that you swear to protect as a member of the armed forces. George Washington wrote in 1775 that "When we assumed the Soldier, we did not lay aside the Citizen." The COVID-19 pandemic provides the Coast Guard no license to abrogate my fundamental religious freedoms. There is no COVID-19 exception to the first amendment. There is no military exclusion to the Constitution. Having established that CG-133's decision to deny my religious accommodation request violates my rights under federal law and the constitution, I respectfully resubmit my request that I am granted a religious accommodation to the Coast Guard's vaccine mandate.

13. My contact information is ████████████ and ██████████████████ for clarification/elaboration on any of the statements provided above.


#


Enclosures: (1) REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE, From: CAPT A. W.
Williams; To: LTJG A. B. Stone, CGC JAMES (WMSL 754)
(2) REQUEST FOR RELIGIOUS ACCOMMODATION, ENS A. B. Stone
(3) REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE, From: CAPT A. W.
Williams; To: BM3 J. P. Unger, CGC JAMES (WMSL 754)
(4) REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE, From: CAPT A. W.
Williams; To: FN C. J. Seymour, CGC JAMES (WMSL 754)
(5) REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE, From: CAPT A. W.
Williams; To: LTJG B. A. Zarlengo, CGC HOLLYHOCK (WLB 214)
(6) REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE, From: CAPT A. W.
Williams; To: ME2 M. E. Keightley, CG SEC CHARLESTON
(7) FIRST ENDORSEMENT on memo REQUEST FOR RELIGIOUS

Subj: APPEAL OF DENIED REQUEST FOR RELIGIOUS            6320
    ACCOMMODATION                                            02 FEB 2022

      ACCOMMODATION
(8) CGHQ COVID-19 Policy Brief, Current as of 1400Z 05JAN2022
(9) Pfizer Oral Anti-Viral Study, PAXLOVID
(10) CDC Types of Masks and Respirators
(11) U.S. Coast Guard Court-Ordered Data Current as of 21 January 2021

10

U.S. Department of
Homeland Security

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-133

6230

**JAN 1 9 2022**

**MEMORANDUM**

From:  A. W. Williams, CAPT
       COMDT (CG-133)

Reply to
Attn of:

To:    A. B. Stone, ENS
       CGC JAMES (WMSL 754)

Subj:  REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
       GUARD'S COVID-19 VACCINATION MANDATE

Ref:   (a)  Your memo 6320 of 22 SEP 21
       (b)  ALCOAST 305/21 R 262212Z AUG 21
       (c)  ALCOAST 315/21 R 072247Z SEP 21
       (d)  Military Religious Accommodations, COMDTINST M1000.15 (series)
       (e)  Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
            COMDTINST M6230.4 (series)
       (f)  42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
       (g)  U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1. Reference (a) is your request that the Coast Guard accommodate a religious practice so that
you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c).
I am the adjudication authority for religious accommodation requests pursuant to reference (d). I
have carefully reviewed your request in accordance with references (d)-(f). **Your request is
denied.**

2. I made this decision after considering your right to free exercise of your religion or religious
beliefs and the government's compelling interest in mission accomplishment, to include military
readiness; unit cohesion; good order and discipline; and the health and safety of you, the
members assigned to your unit and within the Coast Guard, and the public with whom the Coast
Guard regularly interacts. I then considered whether requiring you to receive the COVID-19
vaccine is the least restrictive means available to achieve this compelling interest. It was your
burden to establish the religious nature and sincerity of your beliefs and that receiving the
vaccine would substantially burden your religious belief or practice. For the purpose of this
administrative decision, I do not question the sincerity of your religious belief or whether
vaccine requirements substantially burden your religious practice. The Coast Guard reserves the
opportunity to make these determinations, but I do not need to address them here to resolve your
request.

3. I have concluded that there are no lesser restrictive means available other than vaccination to
achieve the compelling government interest here. In assessing your request, I considered that the
Coast Guard is a military service that must be ready at all times to perform its military and other
missions. The military nature of the Coast Guard and the readiness obligations of military
service would likely suffice to require vaccination. In addition, the Coast Guard is unique
amongst the military services because of the nature of its missions that include support of the

65

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE       6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law. The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here. In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies. Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard. The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit. Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs. Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts. The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4. I also considered that you are assigned to an operational billet. In your current assignment to CGC JAMES, your duties require inport and underway watchstanding, unit training, and other frequent interactions with crewmembers in smaller, enclosed spaces that do not afford the opportunity to consistently social distance in accordance with the Center for Disease Control's recommended guidelines. In addition, you and your shipmates are required to continuously cohabitate the cutter for extended periods of time with limited berthing, dining, and work space options available for distancing. The diverse and unpredictable nature of your unit's underway operations include interactions with commercial and recreational mariners, migrants and detainees, foreign and domestic port visits, and limited access to advanced medical care while at-sea or while operating in remote locations, which increases the health risks for you and your shipmates.

   a.  Social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public because of the operational nature of your billet. As a member assigned to an operational unit, you are unable to accomplish your daily missions while in isolation, in quarantine, or at home. Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible. The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates. Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day.

   b.  Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination. Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public. The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

   c.  Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19 test. By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

2

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE        6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

5.   Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public.  Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19.  This in turn decreases the military readiness of the unit and the Coast Guard as a whole.  You must be medically ready and able to perform your duties for your unit to function effectively.

6.   I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution.  **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7.   You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8.   If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

9.   You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of Reference (g).

10.   If you do not begin the COVID-19 regimen or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

                                                #

Copy:    CGC JAMES (WMSL 754)
             COMDT (CG-00A)
             COMDT (CG-00H)
             COMDT (CG-112)

3

**U.S. Department of Homeland Security**

**United States Coast Guard**

USCGC JAMES (WMSL 754)
United States Coast Guard

1050 Register Street
N. Charleston, SC 29405

6320
22 SEP 2021

From: Alaric B. Stone, ENS

To:    Commandant (CG-133)
Thru: (1) Joseph A. Seifert, LT
       (2) Todd D. Vance, CAPT
       (3) Commandant (CG-112)

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION

Ref:  (a) Military Religious Accommodations, COMDTINST 1000.15
       (b) COMDT COGARD Washington DC 072247Z September 21/ALCOAST 315/21

1. I respectfully request a waiver of policy in accordance with Ref (a) to accommodate a religious practice based on sincerely held religious beliefs. I request a waiver to the immunization policy requiring receipt of the Coronavirus Disease 2019 (COVID-19) vaccine. This is the first request of this nature that I have made.

2. I am a practicing member of the Roman Catholic Church, baptized, confirmed, and in good standing (see enclosures 1-4). I have been actively involved in the Catholic Faith and Church Community my entire life, and the teachings of the Catholic Church are foundational in forming my conscience with respect to this accommodation request. Over the past year I have become aware that all COVID-19 vaccines currently available in the United States have been produced using morally-compromised fetal tissue derived from aborted fetuses. The Pfizer/BioNTech and Moderna vaccines made use of the HEK-293 line of aborted fetal cells in their development and testing, while Johnson & Johnson uses the PER C6 line of fetal cells in development, testing, and production of its vaccine (see enclosure 5). The Catholic Church's teachings on the sanctity of life and dignity of every person, from the moment of conception until natural death, are clearly defined and immovable. As a Catholic I firmly believe that abortion constitutes homicide perpetrated against children in their mother's wombs, the most defenseless of all human beings. Furthermore, guided by my conscience and informed by the teachings of the Church, I have a moral duty to refuse vaccines that are created using human cells derived from abortion; to do otherwise would be tantamount to material cooperation with evil.

3. As discussed above, the teachings of the Catholic Church on the subject of abortion are very clear; below are excerpts from the *Catechism of the Catholic Church*, a compendium of teachings that the Church uses to instruct the laity on the faith, addressing the subject of abortion.

   a. Paragraph 2270: "Human life must be respected and protected absolutely from the moment of conception. From the first moment of existence, a human being must be recognized as having the rights of a person – among which is the inviolable right of every

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION          6320
                                                                                              22 SEP 2021

innocent being to life."

b. Paragraph 2271: "Since the first century the Church has affirmed the moral evil of every
   procured abortion.  This teaching has not changed and remains unchangeable. Direct
   abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to
   moral law: You shall not kill the embryo by abortion and shall not cause the newborn to
   perish. God, the Lord of life, has entrusted to men the noble mission of safeguarding life,
   and men must carry it out in a manner worth of themselves. Life must be protected with
   the utmost care from the moment of conception: abortion and infanticide are abominable
   crimes."

c. Paragraph 2273: "The inalienable right to life of every innocent human individual is a
   constitutive element of a civil society and its legislation: The inalienable rights of the
   person must be recognized and respected by civil society and the political authority.
   These human rights depend neither on single individuals nor on parents; nor do they
   represent a concession made by society and the state; they belong to human nature and
   are inherent in the person by virtue of the creative act from which the person took his
   origin. Among such fundamental rights one should mention in this regard every human
   being's right to life and physical integrity from the moment of conception until death."

4. These fundamental teachings have been amplified by many among the religious and the laity
   over the centuries, and extended to the use of aborted fetuses and fetal cell material in the
   medical field. The 1983 *Charter of the Rights of the Family* published by the Holy See
   explicitly states "respect for the dignity of the human being excludes all experimental
   manipulation or exploitation of the human embryo." Furthermore, the duty of Catholics to
   resist the use of unethical vaccines that use morally-compromised fetal cells in their testing
   or production is also a matter of Church doctrine. The Pontifical Academy for Life codified
   the Catholic Church's official position on the use of unethical vaccines in its 2005 letter
   *Moral Reflections on Vaccines Prepared from Cells Derived from Aborted Human Foetuses*.
   This letter states Catholics should "take recourse, if necessary, to the use of conscientious
   objection with regard to the use of vaccines produced by means of cell lines of aborted
   human foetal origin. Equally, they should oppose by all means (in writing, through the
   various associations, mass media, etc.) the vaccines which do not yet have morally
   acceptable alternatives, creating pressure so that alternative vaccines are prepared, which are
   not connected with the abortion of a human foetus." This same letter also states "As regards
   the diseases against which there are no alternative vaccines which are available and ethically
   acceptable, it is right to abstain from using these vaccines if it can be done without causing…
   significant risks to their health." The Pontifical Academy for Life also goes to great lengths
   to explain that "the use of vaccines whose production is connected with procured abortion
   constitutes at least a mediate remote passive material cooperation to the abortion, and an
   immediate passive material cooperation with regard to their marketing." The responsibility of
   Catholics to oppose the use of morally compromised vaccines is compounded by the fact that
   the use of these vaccines "encourages and entrenches the practice of abortion," normalizing
   and legitimizing the practice within society at large.

5. The responsibility and right of Catholics to oppose and refuse morally compromised vaccines
   in the context of the COVID-19 pandemic has been reaffirmed by the Congregation for the
   Doctrine of the Faith in their Instruction *Note on the Morality of Using Some Anti-COVID-19*

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION          6320
                                                    22 SEP 2021

*Vaccines*. This instruction states "…Practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary." It explains that the decision to oppose or resort to the use of morally compromised vaccines is a matter of individual conscience. The right to make this conscience decision, informed by Catholic teaching, and to have it respected is protected by the clear teaching of the Church; below are excerpts from the *Catechism of the Catholic Church* regarding the right to conscience:

a. Paragraph 1776: "Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment… For man has in his heart a law inscribed by God… His conscience is man's most secret core and sanctuary. There he is alone with God whose voice echoes in his depths."

b. Paragraph 1782: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters."

c. Paragraph 1783: "Conscience must be informed and moral judgement enlightened. A well-formed conscience is upright and truthful. It formulates judgements according to reason, in conformity with the true good willed by the wisdom of the creator. The education of conscience is indispensable for human beings who are subjected to negative influences and tempted by sin to prefer their own judgement and to reject authoritative teachings."

d. Paragraph 1788: "To this purpose, man strives to interpret the data of experience and the signs of the times assisted by the virtue of prudence, by the advice of competent people, and by the help of the Holy Spirit and his gifts."

e. Paragraph 1789: "Some rules apply in every case: One may never do evil so that good may result from it; the Golden Rule: 'Whatever you wish that men would do to you, do so to them.' Charity always proceeds by way of respect for one's neighbor and his conscience: 'Thus sinning against your brethren and wounding their conscience . . . you sin against Christ.' Therefore 'it is right not to . . . do anything that makes your brother stumble.'"

6. The importance of conscience in evaluating right and wrong in the context of the Catholic faith cannot be understated, so much so that the Fourth Lateran Council stated "Whatever is done in opposition to conscience is conducive to damnation." I am a member of the Catholic organization the Confraternity of our Lady of Fatima in good standing under the guidance of Bishop Athanasius Schneider who, on this issue of conscience, has come down against any use of the available abortion-derived vaccines because it would be sinful to cooperate, even indirectly, in the crime of abortion (see enclosure 6). Guided by my conscience and informed by the teachings of the Church, I have determined that I possess a moral duty to refuse any vaccines that are created using human cells derived from abortion. Receiving any of the available COVID vaccines, and any other vaccine that has been developed through the use of aborted fetal cells, would force me to violate my conscience and become complicit in the act of abortion which is contrary to the teachings of my Catholic faith.

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION          6320
                                                                                                22 SEP 2021

7.  I have only become aware over the past year that several of the vaccines that I have received
    in the past may have been morally compromised vaccines derived from aborted fetal tissues. It
    is because of the publicity surrounding the COVID-19 vaccines that I discovered that there are
    vaccines produced using morally compromised cell lines. I recognize that if I had prior
    knowledge of the use of aborted fetal cells in the development of these vaccines, I would have
    pursued a religious accommodation for these as well. However, the *Catechism of the Catholic
    Church* is clear that I am absolved of mortal sin in this case because I did not consent to the act
    knowing that it was sinful. The Catechism states "For a sin to be mortal, three conditions must
    together be met: Mortal sin is sin whose object is grave matter and which is also committed
    with full knowledge and deliberate consent." However, now that I have been educated and
    informed, I would be required to violate my conscience and make a deliberate choice to
    commit a grave sin if I were to continue to use morally compromised vaccines.

8.  Unfortunately, there are certain authoritative Church figures, including the Holy Father Pope
    Francis, who have promoted mass vaccination in light of the current pandemic, causing
    serious turmoil within the Catholic community. It is imperative to note that his position on the
    vaccine was not issued "ex cathedra" (clarifying church doctrine) and represents his opinion
    in a time of fear and uncertainty. The Church's teaching that "…vaccination is not, as a rule, a
    moral obligation and that, therefore, it must be voluntary" and informed by individual
    conscience remains Doctrine. The Vatican, Bishops, and priests are free to express their
    opinions, but these opinions should never be confused with the Doctrine of the Catholic
    Church and should never be given equal or superior weight and authority.

9.  In their Instruction, *Note on the Morality of Using Some Anti-COVID-19 Vaccines*, the
    Congregation for the Doctrine of the Faith is clear that Catholics who "…for reasons of
    conscience, refuse vaccines produced with cell lines from aborted fetuses, must do their
    utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles
    for the transmission of the infectious agent."

    a.  Since the outset of the COVID pandemic, I have taken the moral responsibility outlined
        above very seriously. It compliments and reinforces the professional duty that I have to
        the Coast Guard to maintain my military readiness, operational effectiveness, and both
        my own safety and that of my shipmates. I have meticulously adhered to preventative
        protocols recommended by the Coast Guard, CDC, and others (use of appropriate PPE to
        include continuous use of N-95 masks, social distancing, and limiting risky behaviors
        both on and off-duty) with absolute success; I have remained uninfected for more than a
        year despite being unvaccinated. Measures such as social distancing, masking, and good
        hygiene remain extremely effective means of preventing COVID transmission and
        infection, so much so that the CDC has come to the conclusion that these are critically
        necessary even for vaccinated persons. Furthermore, given my age and physical
        condition, I am not at risk for any severe adverse effects should I be infected.

    b.  I have successfully completed three WMSL deployments in the last year, two onboard
        USCGC JAMES and one while TDY onboard USCGC KIMBALL. When appropriate
        preventative protocols were followed, JAMES and KIMBALL were unaffected by
        COVID-19 disruptions related to their operational tasking or mission, despite the
        presence of unvaccinated personnel. Each patrol involved contact with COVID positive

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION          6320
                                                    22 SEP 2021

entities, and the preventative protocols in place worked without fail. During JAMES'
most recent patrol more than 92% of the crew was vaccinated; the presence of
unvaccinated personnel did not negatively impact JAMES' ability to execute its mission
or impose restrictions or inconveniences upon vaccinated personnel.

c.  Understanding that I have serious moral and conscience objections to using the morally
compromised COVID-19 vaccines currently available, the above clearly shows that there
are effective alternatives to vaccination that would allow me to further the Coast Guard's
interest of maintaining an operationally ready workforce and protecting its members.
Currently 98% of JAMES' crew are vaccinated, well above even the highest CDC
estimates required for herd immunity.

d.  As I am due to rotate from JAMES during the FY22 assignment season, I have radically
altered my planned career intentions to better position myself to accommodate the Coast
Guard's interests in this matter. While I planned to seek assignment to another afloat unit
following the completion of my assignment onboard JAMES, I have since altered my e-
resume requesting assignment to Cyber and Intelligence billets that would be able to
more easily accommodate my conscience objection to the use of morally-compromised
COVD-19 vaccines.

10. On 08 September myself and the other crewmembers onboard JAMES seeking religious
accommodations to the COVID-19 vaccine requirement were counseled by our commanding
officer in accordance with reference (b). Our CO made it explicitly clear that any religious
accommodation request submitted would be negatively endorsed as it was forwarded for
consideration to CG-133. This statement was issued prior to any discussion regarding the
nature of the specific religious accommodation requests or the actual submission of any of
these requests. My CO further indicated that he did not care to discuss members' religious
beliefs because frankly they "did not matter." There was no discussion of alternatives for
satisfying the Coast Guard's interests while accommodating individually held religious
beliefs. There was no acknowledgement that alternative measures to using morally
compromised vaccines exist and were successfully employed during JAMES' previous
deployments. Since this counseling, I have been informed that any person who is not
vaccinated will be prohibited from sailing with JAMES during its upcoming patrol in
November, regardless of the status of any accommodation request. I have interpreted this as
coercive action that does not appropriately recognize the concerns discussed above.

11. I am aware that, pursuant to my rights under the Religious Freedom Restoration Act
("RFRA"), 42 U.S.C. Sec. 2000bb-1, et seq., the U.S. Coast Guard must "demonstrate" that
any substantial burden on my sincere religious beliefs described above--whether
mandatory COVID vaccination, any alternative to vaccination, or any action taken by the
Coast Guard upon denying an accommodation to vaccination--is the "least restrictive means"
of furthering a compelling government interest. *See Singh v. McHugh*, 185 F. Supp. 3d 201,
222 (D.D.C. 2016) (holding that while courts must "give due respect to [the Army's]
articulation of important military interests . . . [courts must] hold defendants to their burden
of demonstrating that the denial of the limited accommodation sought in this case is the least
restrictive means to advance the compelling interest"). I respectfully submit that my CO's
overt hostility to my and several of my shipmates' expressed intent to seek religious
accommodation is out of compliance with RFRA and the First Amendment's requirement of

72

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION          6320
                                                                            22 SEP 2021

religious neutrality. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138
S. Ct. 1719 (2018) (government officials' derisive statements about religious claimant's
beliefs violated First Amendment). I also submit that the alternative protocols and
precautions I have meticulously followed since the outset of COVID, as described in
Paragraph 9(a)-(d) above, are less restrictive means in ample furtherance of the Coast Guard's
interests. When these protocols were appropriately implemented and followed during my
three WMSL deployments over the past year, there were zero COVID-19 outbreaks. My
understanding is that RFRA protects me in continuing to exercise those highly effective
precautions in lieu of receiving a vaccine that violates my deeply held religious beliefs and
thus allows me to remain with the Coast Guard in service to my country.

12. I have every reason professionally to take one of the available COVID-19 vaccines.
However, guided by my conscience and informed by the teachings of the Church, I have a
moral duty to refuse vaccines that are created using human cells derived from abortion. I
joined the Coast Guard in large part because its humanitarian mission aligned with my faith. I
am wholly committed to the Coast Guard's mission, to serving those I am charged with
leading, and to serving my nation. I am grateful for the opportunity to make this appeal on
behalf of my faith and respectfully request that I am granted this religious accommodation
request.

13. I met with and have been counseled by the Sector Charleston Command Chaplain, LT Joseph
Seifert on 03 September 2021. I met with and have been counseled by the Naval Health
Clinic Charleston Primary Care Manager, LT Nicholas Petri on 22 September 2021. Both
have provided memorandums which are included as Encl (7) and Encl (8) respectively.
Additionally, I have obtained a letter from my former Chaplain, CAPT (ret.) Michael Parisi
(see enclosure 9) addressing my request.

14. My contact information is ████████ and ████████████ for
clarification/elaboration on any of the statements provided above.


                                          #


Enclosures: (1) Catholic Baptismal Certificate
            (2) First Communion Certificate
            (3) Certificate of Reconciliation
            (4) Confirmation Certificate
            (5) COVID-19 Vaccines and Treatments in Development – Children of God For Life
            (6) Certificate of Membership in Confraternity of Our Lady of Fatima
            (7) RELIGIOUS ACCOMMODATION, Chaplain J. A. Seifert
            (8) MEDICAL COUNSELING FOR RELIGIOUS EXEMPTION REQUEST FOR
                MANDATORY VACCINES, Dr. N. C. Petri
            (9) Letter to Accompany Religious Accommodation Request, Rev. Michael J. Parisi,
                CAPT, Chaplain Corps, US Navy (ret.)

THIS IS TO CERTIFY THAT

# HOLY BAPTISM

WAS ADMINISTERED TO

Alaric Bjorn Stone

BY Lorna Williams

IN St. Paul's Cathedral CHURCH

CITY Buffalo STATE NY

DATE OF BAPTISM ███████████

WITNESSES OR SPONSORS ███████████

\* \* \*

DATE OF BIRTH ███████ SEX M

PLACE OF BIRTH ███████

PARENTS ███████

\* \* \*

SIGNED Mary Ellen Keeler

TITLE Parish Secretary

ENCL(1)

74



FIRST COMMUNION CERTIFICATE

_Marie Bjorn Stone_

received

# THE HOLY EUCHARIST

for the first time

on the _2nd_ day of _May_, _2006_

at _Our Lady of Hope, Potomac Falls, Virginia_

_Rev. William A. Saunders_

Past r

I am the bread of life
whoever eats this bread will live forever

ENCL (2)
75

# Certificate of Reconciliation

## Alaric Bjorn Stone

celebrated for the first time
The Sacrament of

# RECONCILIATION

on this 25th day of February, in the year 2006

in the city of Potomac Falls

in the state of Virginia

Church Our Lady of Hope

Director Rev. William P. Saunders

Receive the Holy Spirit:
Whose sins you shall forgive,
They are forgiven them...

John 20:22-23

ENCL(3)



Be sealed with the gift
of the Holy Spirit

Augustine

Alaric Stone

Received The Sacrament

of

Confirmation

on the 15TH day of August

in the year 2010

Bishop Barry Jones
Celebrant

in Christ the King church

Priest

ENCL(4)

77

# Covid-19 Vaccines and Treatments in Development - Updated Jan 12, 2021
## Listed in Alphabetical Order

**Altimmune**
**Based on intranasal vaccine proprietary technology; Uses PER-C6 Aborted fetal cells**
https://www.globenewswire.com/news-release/2020/02/28/1992600/0/en/Altimmune-Completes-First-Development-Milestone-Toward-a-Single-Dose-Intranasal-COVID-19-Vaccine.html
**And Patent:**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=10,183,069.PN.&OS=PN/10,183,069&RS=PN/10,183,069

**AstraZeneca**
**Vaccine candidate: ChAdOx1 and AZD1222 Uses HEK-293 cells and MRC-5 cells**
**(Also partnered with University of Oxford listed below)**
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5516308/
**And**
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3396660/

**Athersys – Multistem - Treatment**
**Uses Bone Marrow Adult Stem Cells**
https://seekingalpha.com/article/4332788-athersys-now-in-play-for-covidminus-19-fda-fast-tracked-therapy-for-ards

**AVM Biotech – AVM-0703 Treatment/Preventative**
**Steroid supercharge patient immune system**
Steroid supercharges immune system, targeting T-cells, NKT cells which attack Covid-19 virus**.**
www.avmbiotech.com

**BCG Vaccine: No cells involved**
https://www.fda.gov/media/78331/download
**And**
https://www.tribuneindia.com/news/nation/bcg-vaccine-to-be-tested-in-covid-19-battle-71090

**BioNTech and Pfizer**
**Uses K562 cells in protein expression; Patent No. 10,669,322**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=10,669,322.PN.&OS=PN/10,669,322&RS=PN/10,669,322
**NOTE: Tested on HEK-293; not in the product**
https://www.biorxiv.org/content/10.1101/2020.09.08.280818v1.full.pdf

**British American Tobacco (BAT)**
**Tobacco company in Australia – morally produced using tobacco leaves.**
https://www.telegraph.co.uk/business/2020/04/01/cigarette-maker-claims-coronavirus-vaccine-breakthrough/

**CanSino Biologics**
**Vaccine candidate: Ad5-nCoV** http://www.cansinotech.com/html/1///179/180/408.html
**Using HEK 293 cells (See page 25)**
http://www.jshealth.com/jgzn/zzjg/ymlcpjs/ymlcpjs_gzdt/201612/W020161214426550507006.pdf

Produced by Children of God for Life  www.cogforlife.org
*Direct Link to this Document on-line is:*  *https://cogforlife.org/wp-content/uploads/CovidCompareMoralImmoral.pdf*


ENCL (5)

**Codagenix and Serum Institute**
**CDX-CoV – Morally produced - Uses Vero Cells**
https://patents.google.com/patent/US20190233476A1/en?assignee=codagenix&oq=codagenix

**Curevac**
**mRNA uses patients muscle cells to build antibody; imitates the natural viral infection and activates our own immune defense system.**
https://www.curevac.com/covid-19

**Inovio Pharmaceuticals**
**Vaccine candidate: INO-4800 Uses HEK-293 cells Patent no. 10,548,971 Feb 4, 2020**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=10,548,971.PN.&OS=PN/10,548,971&RS=PN/10,548,971

**Institute of Microbiology, Chinese Academy of Sciences, Zhifei Longcom**
**RBD-Dimer Uses Chinese Hamster Ovary cells**
https://theprint.in/health/cansino-moderna-novavax-a-list-of-covid-vaccines-under-clinical-trials-across-the-world/454051/

**Israel – Pluristem**
**Using placenta donated from newborn babies**
https://www.pluristem.com/the-placenta-difference/
https://www.jpost.com/health-science/israeli-cell-therapy-to-treat-acute-covid-19-patients-prevent-ards-621016

**Johnson & Johnson/Janssen Tech.**
**Ad-Vac – Uses aborted fetal PER C6**
https://www.jnj.com/johnson-johnson-announces-a-lead-vaccine-candidate-for-covid-19-landmark-new-partnership-with-u-s-department-of-health-human-services-and-commitment-to-supply-one-billion-vaccines-worldwide-for-emergency-pandemic-use
**And**
https://www.janssen.com/infectious-diseases-and-vaccines/patented-technologies
**And**
**Johnson & Johnson/Emergent Biosolutions**
https://investors.emergentbiosolutions.com/news-releases/news-release-details/emergent-biosolutions-signs-agreement-be-us-manufacturing?field_nir_news_date_value[min]=

**JPII Medical Research Inst.  And CET**
**(Cellular Engineering Technology)**
Uses stem cell from postnatal placental tissue
https://www.jp2mri.org/

**Lindsley F. Kimball Research Inst, NY Blood Ctr & Beijing Inst Microbiology & Epidemiology**
**Uses HEK-293 cells**
https://www.nature.com/articles/s41423-020-0400-4#Sec1

**Massachusetts Eye and Ear**
**Using HEK-293**
**AAV Covid Adenovirus vector**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-bool.html&r=12&f=G&l=50&co1=AND&d=PTXT&s1=Vandenberghe&OS=Vandenberghe&RS=Vandenberghe

Produced by Children of God for Life  www.cogforlife.org
*Direct Link to this Document on-line is:  https://cogforlife.org/wp-content/uploads/CovidCompareMoralImmoral.pdf*

ENCL(5)

**Medicago/GSK/Dynavax**
**Uses VLPs produced in plant cells (CoVLP)**
https://www.ctvnews.ca/health/coronavirus/the-hunt-for-a-vaccine-canadian-company-begins-human-testing-of-covid-19-candidate-1.5022960
**And with GSK adjuvant**
https://www.medicago.com/en/newsroom/gsk-and-medicago-announce-collaboration-to-develop-a-novel-adjuvanted-covid-19-candidate-vaccine/

**Merck and IAVI**
**Using Merck's Ervebo**
**(Ebola Vaccine Platform)**
**Uses Vero cells**
https://www.businesswire.com/news/home/20200526005274/en/

**Moderna And NIAID**
**Vaccine candidate: mRNA-1273**
**Uses HEK 293 aborted fetal cells in design, development, protein production and testing**
https://www.nejm.org/doi/full/10.1056/NEJMoa2022483
**And**
https://www.nature.com/articles/s41586-020-2622-0
**And**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=10,583,203.PN.&OS=PN/10,583,203&RS=PN/10,583,203
**And**
https://www.biocentury.com/article/304254/moderna-novavax-among-biotechs-working-on-novel-virus-but-vaccine-at-least-a-year-out
**And**
https://science.sciencemag.org/content/367/6483/1260.full
**And**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=10,583,203.PN.&OS=PN/10,583,203&RS=PN/10,583,203
**And – full facts in one document:**
https://cogforlife.org/2020/11/16/moderna-covid-19-vaccine-facts-not-fiction/

**Novavax – NVX-CoV2373**
https://ir.novavax.com/news-releases/news-release-details/novavax-identifies-coronavirus-vaccine-candidate-accelerates
**Uses Insect cells:**
**https://www.novavax.com/page/8/vaccine-technology**
**Matrix uses Saponin:**
https://www.novavax.com/page/10/matrix-m-adjuvant-technology
**Tested on HEK aborted fetal cells:**
https://www.biorxiv.org/content/10.1101/2020.08.06.234674v1.full

**Pfizer**
**See BioNTech/Pfizer listing above**

Produced by Children of God for Life  www.cogforlife.org
*Direct Link to this Document on-line is:  https://cogforlife.org/wp-content/uploads/CovidCompareMoralImmoral.pdf*



**Regeneron – Sanofi**
**Treatment for Covid-19**
**Kevzara – Uses Blood donor and Chinese Hamster Ovary (CHO cells Package insert:**
http://products.sanofi.us/Kevzara/Kevzara.pdf
And Patent:
https://patents.google.com/patent/US8080248B2/en

**Regeneron**
**Antibody Treatment for Covid-19 REGN-CoV2 – Uses Blood donor and Chinese**
**Hamster Ovary (CHO) in the product**
**Used HEK-293 to develop Spike Protein and in testing**
http://patft.uspto.gov/netacgi/nph-
Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1
=10,787,501.PN.&OS=PN/10,787,501&RS=PN/10,787,501
And
https://science.sciencemag.org/content/sci/suppl/2020/06/15/science.abd0831.DC1/abd0831_Baum_SM.pdf

**Sanofi Pasteur Sars-CoV – insect cells**
https://www.hhs.gov/about/news/2020/02/18/hhs-engages-sanofis-recombinant-technology-for-2019-novel-
coronavirus-vaccine.html
And
**Sanofi Partners with GSK**
**Insect cells and AS03 adjuvant**
https://www.wsj.com/articles/glaxosmithkline-sanofi-team-up-for-coronavirus-vaccine-
11586875480?mod=lead_feature_below_a_pos1

**Sinovac Biotech**
**PiCoVacc – Uses Vero Cells**
https://www.news-medical.net/news/20200421/PiCoVacc-vaccine-candidate-for-COVID-19-effective-in-animal-
trials.aspx
**UPDATE - HEK cells used to test final product:**
https://science.sciencemag.org/content/sci/suppl/2020/05/05/science.abc1932.DC1/abc1932_Gao_SM.pdf

**Sorrento Therapeutics**
STI-6991 is an I-Cell™ COVID-19 cellular vaccine made of K562 cells from 53 year old female cancer patient
https://finance.yahoo.com/news/sorrento-launches-novel-cell-covid-140059499.html
And
https://www.sciencedirect.com/science/article/pii/S2590098620300130?via%3Dihub

**Symvivo**
**Uses e-Coli and Bifidobacterium**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-
bool.html&r=2&f=G&l=50&co1=AND&d=PTXT&s1=symvivo&OS=symvivo&RS=symvivo

**The University of Oxford**
**Vaccine candidate: ChAdOx1 and AZD1222 Uses HEK-293 cells and MRC-5 cells**
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5516308/
And
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3396660/

Produced by Children of God for Life  www.cogforlife.org
*Direct Link to this Document on-line is:  https://cogforlife.org/wp-content/uploads/CovidCompareMoralImmoral.pdf*


ENCL(S)

**The University of Oxford - partnership with Merck Germany:**
**(Note:  Merck Germany is not the same as Merck USA)**
https://www.prnewswire.com/in/news-releases/merck-supports-jenner-institute-to-reach-first-milestone-in-covid-19-vaccine-manufacturing-891225678.html

**With AstraZeneca AZD1222**
https://www.astrazeneca.com/content/astraz/media-centre/press-releases/2020/astrazeneca-and-oxford-university-announce-landmark-agreement-for-covid-19-vaccine.html
**And**
https://www.bitchute.com/video/AmUWT3xEZt7F/

**University of Pittsburgh**
**Using HEK-293**
https://pittsburgh.cbslocal.com/2020/04/02/university-of-pittsburgh-medical-school-coronavirus-potential-vaccine-unveiled/
**Linked in the article: Materials and Methods**
https://www.thelancet.com/pdfs/journals/ebiom/PIIS2352-3964(20)30118-3.pdf

**Valneva**
**VLA2001**
**Uses Vero (monkey kidney) cells**
https://www.precisionvaccinations.com/vaccines/vla2001-covid-19-vaccine

**Vaxart VXA-CoV2-1**
**AD5 vector patent – HEK-293**
http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-bool.html&r=9&f=G&l=50&co1=AND&d=PTXT&s1=vaxart&OS=vaxart&RS=vaxart



# Affidavit of Membership in the Confraternity of Our Lady of Fatima

This is to certify that

## ALARIC STONE

Is a perpetual member of the Confraternity of Our Lady of Fatima in good standing and as such holds to the following deeply held religious belief that

*the crime of abortion is so monstrous that any kind of concatenation with this crime, even a very remote one, such as vaccines that use aborted fetal cells for the testing or production, is immoral and cannot be accepted under any circumstances by a Catholic.*

I sign this in perpetuity for all existing and future members and hold that any copies of my signature for this affidavit are as valid as this original.

+ *Athanasius Schneider*

+Bishop Athanasius Schneider

117 Hollywood Blvd | Steubenville, OH 43952 | Email - info@livefatima.io