

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Sector Charleston

1050 Register St.
N. Charleston, SC 29401

6230
07 SEP 2021

# MEMORANDUM

From:   J. A. Seifert, LT
        Sector Charleston

To:     T. D. Vance, CAPT
        CGC James

Subj:   RELIGIOUS ACCOMMODATION

Ref:    (a) Accommodation of Religious Practices, DODI 1300.17
        (b) Religious Ministries in the Coast Guard, COMDINST M1 1730.4 (series)
        (c) Immunizations and Chemoprophylaxis for the Prevention of Infectious Disease
            COMDTINST M6230.4 (series)
        (d) ALCOAST 305-21
        (e) CI 1000.15

1.   On September 3, 2021, Chaplain Seifert conducted a non-confidential interview of ENS Alaric Stone regarding his religious accommodation request. The discussion was agreed upon as standing outside the bonds of full confidentiality and met the requirement of initiating a request for a religious exemption to immunization.

2.   ESN Stone is requesting an exemption from receiving the Covid Vaccine as mandated according to reference (d) based on his Roman Catholic faith.

3.   The underlying basis for this request is the service member's religious conviction that abortion is immoral as expressed in Catholic teaching. He shared that the RC Catechism is extremely clear that abortion and the support of it is a grave sin. He expressed that there has been some heated debate within the Catholic church regarding the vaccine, including a released opinion from the Pope allowing for it. However, this does not negate the Church's 2,000 + years of tradition and history on the matter. According to his Catholic faith, ENS Stone has a religious & moral objection to any vaccine that has been produced, developed, or tested using cell lines of aborted fetuses. Another resource that supports his viewpoint is the Pontifical Academy of Life, an organization of RCC that does research on bioethics and Catholic moral theology. ENS stone has been raised as a Conservative Catholic and has been involved in the church his whole life. This includes time in the U.S. as well as New Zealand. He has been involved in altar serving, Sunday School, worship, prayer, and many other devotional practices. He also was involved with the Catholic community during his time at the Coast Guard Academy. He received pastoral care from a Catholic Chaplain, Father parisi, who also supports his religious conviction of not receiving the Covid vaccine. ENS Stone expressed that he has every reason to take the vaccine professionally. He loves the Coast Guard and its mission. He desires to have the most operational billets available. During his time on the ship, he underwent restrictions, including staying on the ship at ports due to his unvaccinated status. He is already looking into other billets such as cryptology that would be less likely to jeopardize the Coast Guard's mission.

ENCL(7)

84

4.  We did discuss alternate means to this accommodation. If a vaccine were produced that was not morally compromised, he would be willing to receive it. He is also willing to continue with other precautionary measures such as wearing a mask, social distancing, and other necessary restrictions.

5.  In the professional opinion of the interviewing chaplain, ENS Stone is wholly sincere in his practice of the Roman Catholic faith. He incorporates his beliefs into his daily life and his faith informs his religious objection to receive the mandated vaccine by the Coast Guard.

6.  If you have further questions please use my contact information listed below:
    Chaplain Joseph A. Seifert

    █████████████████████

                                    #


Enclosures:  (1) Confidentiality Release
             (2) Chaplain Interview Checklist

ENGL(7)

Enclosure (4) to COMDTINST 1000.15

## ADVISEMENT ABOUT STATEMENTS MADE DURING A
## RELIGIOUS ACCOMMODATION INTERVIEW

I, ___ENS ALAREC STONE___ , have been advised that statements that
are made during the course of my religious accommodation interview are not confidential and
may be disclosed by Chaplain ___LT SEIFERT___ to further my religious accommodation
request.

___03 SEP 2021___
Date

Member

___03 SEP 2021___
Date

Chaplain

## PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS
is requesting the information on this form.

AUTHORITY: 14 U.S.C. § 505

PURPOSE: To obtain information from a person seeking a military religious accommodation in
order to identify the free exercise of religion asserted by the member in order make a
determination that balances the free exercise of religion with military readiness, unit cohesion,
and good order and discipline.

ROUTINE USES: Authorized USCG officials will use this information to determine if a
religious accommodation can be approved pursuant to Section 533(a)(1) of Public Law 112-239
(2013), as amended. Any external disclosures of information within this record will be made in
accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933
(October 28, 2011).

CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION: Providing this information
is voluntary. However, failure to provide this information may delay the administrative process.

1

ENCL(7)

Enclosure (3) to COMDTINST 1000.15

## Religious Accommodation Interview Checklist

| Applicant: ENS ALARIC STONE | Date of Interview(s): 03 SEP 2021 |
|---|---|
| Rate/Rank: ENS/O1 | Chaplain Interviewer: LT Joseph A. Seifert |
| Phone: ▮ | Phone: ▮ |
| Email: ▮ | Email: ▮ |
| Command: USCGC JAMES | Chaplain's Command: SECTOR CHARLESTON |

Interview Preliminaries:

| Yes | No | N/A | |
|---|---|---|---|
| X | | | Review COMDTINST 1000.15 on religious accommodation. |
| X | | | Notify Applicant that interview is not confidential/privileged and will be used to advise command on request. |
| X | | | Obtain Applicant's signed waiver (see attached). |
| X | | | Explain to Applicant that confidential support can be obtained through either 1) another chaplain or 2) a separate counseling session. |
| | X | | Has the Applicant been granted a policy waiver for this practice previously? |
| | | | Does the Applicant's declared faith group reflect the belief cited in the application? |

The application is for a waiver from the following:

| Yes | No | N/A | |
|---|---|---|---|
| | | | Uniform standards |
| | | | Grooming standards |
| X | | | Immunization requirements |
| | | | DNA sampling |
| | | | Other |

Interview Results:

| Yes | No | N/A | |
|---|---|---|---|
| X | | | Applicant communicated his/her beliefs in an honest and sincere manner. |
| X | | | Applicant was credible (consistently keeps tenets, practices, etc.). |
| X | | | Applicant's demeanor and pattern of conduct are consistent with the request. |
| X | | | Applicant participates in activities associated with the belief(s). |
| X | | | Persons supporting the claim are credible. |
| X | | | Applicant's request is supported by letter(s) of verification or endorsement from an organization espousing the beliefs which are the basis for the claim. |
| X | | | Alternate means of accommodating the practice were explored in the interview. |

Process Checklist:

| Yes | No | N/A | |
|---|---|---|---|
| X | | | Chaplain has prepared a memorandum memorializing the interview, following the guidance, specifically identifying the religious importance of the accommodation to the Applicant. |
| X | | | Chaplain reviewed memorandum with Applicant and provided a copy. |
| X | | | Chaplain submitted the memorandum and this document to the command. |
| X | | | Chaplain referred Applicant to command to process request. |

1

EXL(7)



U.S. Department of
Homeland Security

United States
Coast Guard

Commanding Officer
United States Coast Guard
CG Base Charleston

1050 Register St.
North Charleston, SC 29405
Staff Symbol (b)

6010
22 Sep 2021

# MEMORANDUM

From:   N.C. Petri, LT, MC, USN
       Naval Medicine Readiness and Training
       Command Charleston

Nicholas C. Petri, DO
LT, MC, USN
NPI/1144859729

To:   COMDT (CG-133)
Thru:   COMDT (CG-112)

Subj:   MEDICAL COUNSELING FOR RELIGIOUS EXEMPTION REQUEST FOR
       MANDATORY VACCINES

Ref:   (a) Immunizations and Chemoprophylaxis for the Prevention of Infection Diseases,
           COMDTINST M6230.4G
       (b) Ezeanolue E, Harriman K, Hunter P, Kroger A, Pellegrini C General Best Practice
           Guidelines for Immunization. https://www.cdc.gov/vaccines/hcp/acip-recs/general-
           recs/index.html

1. In accordance with reference (a), certain vaccines are mandatory for all Coast Guard Active
Duty (AD) and Selected Reserve (SELRES) personnel to ensure for medical readiness and to
avoid disruption of Coast Guard mission accomplishment.

2. I have counseled Stone, Alaric B regarding vaccines and discussed the potential benefits and
risks associated with exemption from vaccines as well as the potential risks of infection incurred
by unvaccinated individuals.

3. Based upon review of the available medical record and direct interview, and in accordance
with reference (b), it is my opinion that Stone, Alaric B does not have an identifiable or disclosed
medical condition that would absolutely contraindicate receipt of these immunizations.



St. Catherine of Siena Rectory
10 North Pocono Road
Mountain Lakes, NJ  07046


1 September 2021


Dear Sir or Ma'am:


Ensign Alaric Stone, USCG, is a practicing Catholic, faithful to his church's sacramental life and moral teachings.  He and I have known each other well for more than five years, since the day before he reported to the Coast Guard Academy.  From 2016 to 2018, when I left New London, he didn't miss Mass and took part enthusiastically in opportunities to grow spiritually and to learn more about his faith.  He is unswervingly loyal to the Coast Guard and possessed of unshakeable integrity, a keen intellect, a curious mind, and an insatiable appetite for hard work.


Mr. Stone is submitting a request for a waiver from the Coast Guard's immunization policy because of his strong and deeply-held opposition to the practice of abortion, which the Catholic Church consistently teaches is homicide perpetrated against children in their mothers' wombs, the most defenseless human beings.  Mr. Stone has learned that cell lines from aborted fetuses were used in the development, manufacture, and testing of all the available COVID-19 vaccines.  He believes with all his heart that to accept these vaccines is to co-operate with evil, with the murder of innocent children.  Although not all people of good will, or even all Catholics, have come to the same conclusion, Mr. Stone's convictions in this regard are sincere and well-founded.


Please do not hesitate to let me know if I can be of any further assistance.


Sincerely,


Rev. Michael J. Parisi
Captain, Chaplain Corps, US Navy (ret.)
Pastor


ENCL (9)
89



U.S. Department of
Homeland Security

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-133

6230

JAN 2 0 2022

**MEMORANDUM**

From: A. W. Williams, CAPT
COMDT (CG-133)

Reply to
Attn of:

To:

CGC JAMES (WMSL 754)

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE

Ref: (a) Your memo 6320 of 29 SEP 21
(b) ALCOAST 305/21 R 262112Z AUG 21
(c) ALCOAST 315/21 R 072247Z SEP 21
(d) Military Religious Accommodations, COMDTINST M1000.15 (series)
(e) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
COMDTINST M6230.4 (series)
(f) 42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
(g) U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1. Reference (a) is your request that the Coast Guard accommodate a religious practice so that
you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c).
I am the adjudication authority for religious accommodation requests pursuant to reference (d). I
have carefully reviewed your request in accordance with references (d)-(f). **Your request is
denied.**

2. I made this decision after considering your right to free exercise of your religion or religious
beliefs and the government's compelling interest in mission accomplishment, to include military
readiness; unit cohesion; good order and discipline; and the health and safety of you, the
members assigned to your unit and within the Coast Guard, and the public with whom the Coast
Guard regularly interacts. I then considered whether requiring you to receive the COVID-19
vaccine is the least restrictive means available to achieve this compelling interest. It was your
burden to establish the religious nature and sincerity of your beliefs and that receiving the
vaccine would substantially burden your religious belief or practice. For the purpose of this
administrative decision, I do not question the sincerity of your religious belief or whether
vaccine requirements substantially burden your religious practice. The Coast Guard reserves the
opportunity to make these determinations, but I do not need to address them here to resolve your
request.

3. I have concluded that there are no lesser restrictive means available other than vaccination to
achieve the compelling government interest here. In assessing your request, I considered that the
Coast Guard is a military service that must be ready at all times to perform its military and other
missions. The military nature of the Coast Guard and the readiness obligations of military
service would likely suffice to require vaccination. In addition, the Coast Guard is unique
amongst the military services because of the nature of its missions that include support of the

90

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE        6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law. The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here. In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies. Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard. The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit. Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs. Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts. The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4.  I also considered that you are assigned to an operational billet. In your current assignment to CGC JAMES, your duties require inport and underway watchstanding, deck and navigation operations, unit training, and other frequent interactions with crewmembers in smaller, enclosed spaces that do not afford the opportunity to consistently social distance in accordance with the Center for Disease Control's recommended guidelines. In addition, you and your shipmates are required to continuously cohabitate the cutter for extended periods of time with limited berthing, migrants and detainees, dining, and work space options available for distancing. The diverse nature of your unit's underway operations includes interactions with commercial and recreational mariners, migrants and detainees, foreign and domestic port visits, and limited access to advanced medical care while at-sea or operating in remote locations, which increases the health risks for you and your shipmates.

    a.  Social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public because of the operational nature of your billet. As a member assigned to an operational unit, you are unable to accomplish your daily missions while in isolation, in quarantine, or at home. Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible. The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates. Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day.

    b.  Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination. Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public. The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

    c.  Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19 test. By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

2

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE      6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

5.  Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public.  Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19.  This in turn decreases the military readiness of the unit and the Coast Guard as a whole.  You must be medically ready and able to perform your duties for your unit to function effectively.

6.  I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution.  **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7.  You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8.  If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

9.  You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of reference (g).

10.  If you do not begin the COVID-19 regimen or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

#

Copy:   CGC JAMES (WMSL 754)
        COMDT (CG-00A)
        COMDT (CG-00H)
        COMDT (CG-112)

3



U.S. Department of
Homeland Security

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-133

6230

# MEMORANDUM

JAN 1 9 2022

From: A/W Williams, CAPT
COMDT (CG-133)

Reply to
Attn of:

To:

CGC JAMES (WMSL 754)

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE

Ref: (a) Your memo 6230 of 15 SEP 21
(b) ALCOAST 305/21 R 262212Z AUG 21
(c) ALCOAST 315/21 R 072247Z SEP 21
(d) Military Religious Accommodations, COMDTINST M1000.15 (series)
(e) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
COMDTINST M6230.4 (series)
(f) 42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
(g) U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1.  Reference (a) is your request that the Coast Guard accommodate a religious practice so that
you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c).
I am the adjudication authority for religious accommodation requests pursuant to reference (d). I
have carefully reviewed your request in accordance with references (d)-(f). **Your request is
denied.**

2.  I made this decision after considering your right to free exercise of your religion or religious
beliefs and the government's compelling interest in mission accomplishment, to include military
readiness; unit cohesion; good order and discipline; and the health and safety of you, the
members assigned to your unit and within the Coast Guard, and the public with whom the Coast
Guard regularly interacts. I then considered whether requiring you to receive the COVID-19
vaccine is the least restrictive means available to achieve this compelling interest. It was your
burden to establish the religious nature and sincerity of your beliefs and that receiving the
vaccine would substantially burden your religious belief or practice. For the purpose of this
administrative decision, I do not question the sincerity of your religious belief or whether
vaccine requirements substantially burden your religious practice. The Coast Guard reserves the
opportunity to make these determinations, but I do not need to address them here to resolve your
request.

3.  I have concluded that there are no lesser restrictive means available other than vaccination to
achieve the compelling government interest here. In assessing your request, I considered that the
Coast Guard is a military service that must be ready at all times to perform its military and other
missions. The military nature of the Coast Guard and the readiness obligations of military
service would likely suffice to require vaccination. In addition, the Coast Guard is unique
amongst the military services because of the nature of its missions that include support of the

93

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE      6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law. The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here. In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies. Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard. The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit. Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs. Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts. The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4. I also considered that you are assigned to an operational billet. In your current assignment to CGC JAMES, your duties require watchstanding, training, and other frequent interactions with crewmembers in smaller, enclosed spaces that do not afford the opportunity to consistently social distance in accordance with the Center for Disease Control's recommended guidelines. In addition, you and your shipmates are required to continuously cohabitate the cutter for extended periods of time with limited berthing, dining, and work space options available for distancing. The diverse nature of your unit's underway operations include the possibilities of interactions with commercial and recreational mariners, migrants and detainees, foreign and domestic port visits, and limited access to advanced medical care while at-sea, which increases the health risks for you and your shipmates.

   a. Social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public because of the operational nature of your billet. As a member assigned to an operational unit, you are unable to accomplish your daily missions while in isolation, in quarantine, or at home. Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible. The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates. Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day.

   b. Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination. Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public. The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

   c. Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19 test. By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

2

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE        6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

5.  Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public.  Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19.  This in turn decreases the military readiness of the unit and the Coast Guard as a whole.  You must be medically ready and able to perform your duties for your unit to function effectively.

6.  I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution.  **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7.  You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8.  If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

9.  You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of reference (g).

10. If you do not begin the COVID-19 regimen or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

#

Copy:   CGC JAMES (WMSL 754)
        COMDT (CG-00A)
        COMDT (CG-00H)
        COMDT (CG-112)

3

95



U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-133

6230

**JAN 19 2022**

**MEMORANDUM**

From: A. W. Williams, CAPT /CAPT
COMDT (CG-133)

To: CGC HOLLYHOCK (WLB 214)

Reply to
Attn of:

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
GUARD'S COVID-19 VACCINATION MANDATE

Ref: (a) Your memo 6230 of 30 SEP 21
(b) ALCOAST 305/21 R 262212Z AUG 21
(c) ALCOAST 315/21 R 072247Z SEP 21
(d) Military Religious Accommodations, COMDTINST M1000.15 (series)
(e) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
COMDTINST M6230.4 (series)
(f) 42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
(g) U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1. Reference (a) is your request that the Coast Guard accommodate a religious practice so that
you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c).
I am the adjudication authority for religious accommodation requests pursuant to reference (d). I
have carefully reviewed your request in accordance with references (d)-(f). **Your request is
denied.**

2. I made this decision after considering your right to free exercise of your religion or religious
beliefs and the government's compelling interest in mission accomplishment, to include military
readiness; unit cohesion; good order and discipline; and the health and safety of you, the
members assigned to your unit and within the Coast Guard, and the public with whom the Coast
Guard regularly interacts. I then considered whether requiring you to receive the COVID-19
vaccine is the least restrictive means available to achieve this compelling interest. It was your
burden to establish the religious nature and sincerity of your beliefs and that receiving the
vaccine would substantially burden your religious belief or practice. For the purpose of this
administrative decision, I do not question the sincerity of your religious belief or whether
vaccine requirements substantially burden your religious practice. The Coast Guard reserves the
opportunity to make these determinations, but I do not need to address them here to resolve your
request.

3. I have concluded that there are no lesser restrictive means available other than vaccination to
achieve the compelling government interest here. In assessing your request, I considered that the
Coast Guard is a military service that must be ready at all times to perform its military and other
missions. The military nature of the Coast Guard and the readiness obligations of military
service would likely suffice to require vaccination. In addition, the Coast Guard is unique
amongst the military services because of the nature of its missions that include support of the

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE        6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law. The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here. In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies. Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard. The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit. Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs. Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts. The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4. I also considered that you are assigned to an operational billet. In your current assignment to CGC HOLLYHOCK, your duties as an Underway Deck Watch Officer and Inport Officer of the Day require watchstanding, training, deck operations, and other frequent interactions with crewmembers in smaller, enclosed spaces that do not afford the opportunity to consistently social distance in accordance with the Center for Disease Control's recommended guidelines. In addition, you and your shipmates are required to continuously cohabitate for extended periods of time with limited berthing, dining, and work space options available for distancing. The dynamic nature of your unit's underway operations includes the possibilities of interactions with commercial and recreational mariners, foreign and domestic port visits, and limited access to advanced medical care while at sea, which increases the health risks for you and your shipmates.

    a.  Social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public because of the operational nature of your billet. As a member assigned to an operational unit, you are unable to accomplish your daily missions while in isolation, in quarantine, or at home. Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible. The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates. Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day.

    b.  Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination. Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public. The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

    c.  Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19 test. By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

2

97

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE      6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

5.  Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public.  Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19.  This in turn decreases the military readiness of the unit and the Coast Guard as a whole.  You must be medically ready and able to perform your duties for your unit to function effectively.

6.  I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution.  **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7.  You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8.  Additionally, Chaplain Jewell's endorsement indicated that your request was broader and you would like an accommodation to be exempt from immunizations which use cells derived from aborted fetus in the testing, development or production. Although you did not include that in your request I will address it. The Coast Guard cannot predict which immunizations or vaccines in the future will be mandated and of those how they will be developed. Therefore, because of the broad nature of your request, **it is denied**. You may submit requests for individual vaccines.

9.  If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

10. You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of Reference (g).

11. If you do not begin the COVID-19 regimen or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

#

Copy:   CGC HOLLYHOCK (WLB 214)
        COMDT (CG-00A)
        COMDT (CG-00H)
        COMDT (CG-112)

3



U.S. Department of
Homeland Security

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-133

6230
**DEC 2 7 2021**

**MEMORANDUM**

From:    A. W. Williams, CAPT
         COMDT (CG-133)

To:      ▮▮▮▮▮▮▮▮▮ ME2
         CG SEC Charleston

Reply to
Attn of:

Subj:    REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
         GUARD'S COVID-19 VACCINATION MANDATE

Ref:     (a)  Your memo 6230 of 24 NOV 2021
         (b)  ALCOAST 305/21 R 262212Z AUG 21
         (c)  ALCOAST 315/21 R 072247Z SEP 21
         (d)  Military Religious Accommodations, COMDTINST M1000.15 (series)
         (e)  Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
              COMDTINST M6230.4 (series)
         (f)  42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
         (g)  U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1.   Reference (a) is your request that the Coast Guard accommodate a religious practice so that
you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c).
I am the adjudication authority for religious accommodation requests pursuant to reference (d). I
have carefully reviewed your request in accordance with references (d)-(f). **Your request is
denied.**

2.   I made this decision after considering your right to free exercise of your religion or religious
beliefs and the government's compelling interest in mission accomplishment, to include military
readiness; unit cohesion; good order and discipline; and the health and safety of you, the
members assigned to your unit and within the Coast Guard, and the public with whom the Coast
Guard regularly interacts. I then considered whether requiring you to receive the COVID-19
vaccine is the least restrictive means available to achieve this compelling interest. It was your
burden to establish the religious nature and sincerity of your beliefs and that receiving the
vaccine would substantially burden your religious belief or practice. For the purpose of this
administrative decision, I do not question the sincerity of your religious belief or whether
vaccine requirements substantially burden your religious practice. The Coast Guard reserves the
opportunity to make these determinations, but I do not need to address them here to resolve your
request.

3.   I have concluded that there are no lesser restrictive means available other than vaccination to
achieve the compelling government interest here. In assessing your request, I considered that the
Coast Guard is a military service that must be ready at all times to perform its military and other
missions. The military nature of the Coast Guard and the readiness obligations of military
service would likely suffice to require vaccination. In addition, the Coast Guard is unique
amongst the military services because of the nature of its missions that include support of the

99

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE      6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law. The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here. In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies. Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard. The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit. Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs. Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts. The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4.  I also considered that you are assigned to an operational billet. In your current assignment to Sector Charleston's Response Department as a member of the Sector Boarding team, your duties require routine engagement with a myriad of people including your shipmates, members of the boating public, commercial mariners and passengers, and interagency partners. These partnerships are vital to enabling your unit to execute its homeland security, law enforcement, and maritime environmental response missions within your area of operations. Additionally, given the dynamic nature of your unit's operations, you are expected to be readily available to support operations during surge operations, contingencies, and other major incidents, should they occur. These interactions however, place you inside offices, vessels, and other communal meeting locations with insufficient options to consistently maintain compliance with the recommended Center for Disease Control social distancing guidelines.

    a.  Social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public because of the operational nature of your billet. As a member assigned to an operational unit, you are unable to accomplish your daily missions while in isolation, in quarantine, or at home. Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible. The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates. Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day.

    b.  Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination. Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public. The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

    c.  Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19 test. By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

2

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE       6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

5.  Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public.  Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19.  This in turn decreases the military readiness of the unit and the Coast Guard as a whole.  You must be medically ready and able to perform your duties for your unit to function effectively.

6.  I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution.  **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7.  You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8.  If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

9.  You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of Reference (g).

10.  If you do not begin the COVID-19 regime or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

#

Copy:   CG SEC Charleston
        COMDT (CG-00A)
        COMDT (CG-00H)
        COMDT (CG-112)

3

101

6230
16 Sep 2021

FIRST ENDORSEMENT on memo 6230 of 16 Sep 2021

*T. D. V*

From:  Todd D. Vance, CAPT
       CGC *James* (WMSL 754)

To:    Commandant, Office of Military Personnel (CG-133)

Subj:  REQUEST FOR RELIGIOUS ACCOMMODATION

1.  I do not endorse this request for a religious accommodation for an immunization exemption.

2.  My endorsement is based on the ability to maintain mission readiness for USCGC JAMES and to protect the crew members and their families during the global pandemic.

#

# Pfizer Announces Additional Phase 2/3 Study Results Confirming Robust Efficacy of Novel COVID-19 Oral Antiviral Treatment Candidate in Reducing Risk of Hospitalization or Death

Tuesday, December 14, 2021 - 06:45am

- *Final data available from all high-risk patients enrolled in EPIC-HR study (n= 2,246) confirmed prior results of interim analysis showing PAXLOVID™ (nirmatrelvir [PF-07321332] tablets and ritonavir tablets) reduced risk of hospitalization or death by 89% (within three days of symptom onset) and 88% (within five days of symptom onset) compared to placebo; no deaths compared to placebo in non-hospitalized, high-risk adults with COVID-19*
- *The above data have been shared with the U.S. Food and Drug Administration (FDA) as part of an ongoing rolling submission for*

*Emergency Use Authorization (EUA)*

- *Separately, interim analyses of an ongoing second study in standard-risk adults (EPIC-SR) showed a 70% reduction in hospitalization and no deaths in the treated population, compared to placebo, in the secondary endpoint; the novel primary endpoint of self-reported, sustained alleviation of all symptoms for four consecutive days, as compared to placebo, was not met. The study continues*

- *An approximate 10-fold decrease in viral load at Day 5, relative to placebo, was observed in both EPIC-HR and EPIC-SR, indicating robust activity against SARS-CoV-2 and representing the strongest viral load reduction reported to date for a COVID-19 oral antiviral agent*

- *Recent in vitro data confirm that nirmatrelvir is a potent inhibitor of the Omicron 3CL protease, which, combined with existing in vitro antiviral and protease inhibition data from other Variants of Concern (VoC) including Delta, indicates that PAXLOVID will retain robust antiviral activity against current VoCs as well as other coronaviruses*


NEW YORK--(BUSINESS WIRE)-- Pfizer Inc. (NYSE: PFE) today announced final results from an analysis of all 2,246 adults enrolled in its Phase 2/3 EPIC-HR (**E**valuation of **P**rotease **I**nhibition for **C**OVID-19 in **H**igh-**R**isk Patients) trial of its novel COVID-19 oral antiviral candidate PAXLOVID™ (nirmatrelvir [PF-07321332] tablets and ritonavir tablets). These results were consistent with the interim analysis announced in November 2021, showing PAXLOVID significantly reduced the risk of hospitalization or death for any cause by 89% compared to placebo in non-hospitalized, high-risk adult patients with COVID-19 treated within three days of symptom onset. In a secondary endpoint, PAXLOVID reduced the risk of hospitalization or death for any cause by 88% compared to placebo in patients treated within five days of symptom onset, an increase from the 85% observed in the interim analysis. The EPIC-HR data have been shared with the U.S. Food and Drug Administration (FDA) as part of an ongoing rolling submission for Emergency Use Authorization (EUA).

"This news provides further corroboration that our oral antiviral candidate, if authorized or approved, could have a meaningful impact on the lives of many, as the data further support the efficacy of PAXLOVID in reducing hospitalization and death and show a substantial decrease in viral load. This underscores the treatment candidate's potential to save the lives of patients around the world," said Albert Bourla, Chairman and Chief Executive Officer, Pfizer. "Emerging variants of concern, like Omicron, have exacerbated the need for accessible treatment options for those who contract the virus, and we are confident that, if authorized or approved, this potential treatment could be a critical tool to help quell the pandemic."

**EPIC-HR Final Results**

In the final analysis of the primary endpoint from all patients enrolled in EPIC-HR, an 89% reduction in COVID-19-related hospitalization or death from any cause compared to placebo in patients treated within three days of symptom onset was observed, consistent with the interim analysis. In addition, a consistent safety profile was observed.

0.7% of patients who received PAXLOVID were hospitalized through Day 28 following randomization (5/697 hospitalized with no deaths), compared to 6.5% of patients who received placebo and were hospitalized or died (44/682 hospitalized with 9 subsequent deaths). The statistical significance of these results was high ($p<0.0001$). In a secondary endpoint, PAXLOVID reduced the risk of hospitalization or death for any cause by 88% compared to placebo in patients treated within five days of symptom onset; 0.8% of patients who received PAXLOVID were hospitalized or died through Day 28 following randomization (8/1039 hospitalized with no deaths), compared to 6.3% of patients who received placebo (66/1046 hospitalized with 12 subsequent deaths), with high statistical significance ($p<0.0001$). Relative risk reduction was 94% in patients 65 years of age or older, one of the populations at highest risk for hospitalization or death; 1.1% of patients who received PAXLOVID were hospitalized through Day 28 (1/94 hospitalized with no deaths), compared to

105

16.3% of patients who received placebo (16/98 hospitalized with 6 deaths), with high statistical significance (p<0.0001). In the overall study population through Day 28, no deaths were reported in patients who received PAXLOVID as compared to 12 (1.2%) deaths in patients who received placebo.

In the EPIC-HR trial, in a secondary endpoint, SARS-CoV-2 viral load at baseline and Day 5 have been evaluated for 499 patients. After accounting for baseline viral load, geographic region, and serology status, PAXLOVID reduced viral load by approximately 10-fold, or 0.93 $\log_{10}$ copies/mL, relative to placebo, indicating robust activity against SARS-CoV-2 and representing the strongest viral load reduction reported to date for an oral COVID-19 agent.

Treatment-emergent adverse events were comparable between PAXLOVID (23%) and placebo (24%), most of which were mild in intensity. Fewer serious adverse events (1.6% vs. 6.6%) and discontinuation of study drug due to adverse events (2.1% vs. 4.2%) were observed in patients dosed with PAXLOVID, compared to placebo, respectively.

All other secondary endpoints for this study, which are available on clinicaltrials.gov (NCT04960202), were not yet available for this review. Full study data are expected to be released later this month and submitted to a peer-reviewed publication.

**EPIC-SR Interim Results**

Interim analyses of the EPIC-SR (**E**valuation of **P**rotease **I**nhibition for **C**OVID-19 in **S**tandard-**R**isk Patients) Phase 2/3 study, which included unvaccinated adults who were at standard risk (i.e., low risk of hospitalization or death) as well as vaccinated adults who had one or more risk factors for progressing to severe illness, showed that the novel primary endpoint of self-reported, sustained alleviation of all symptoms for four consecutive days, as compared to placebo, was not met.

The key secondary endpoint showed a 70% reduction in hospitalization and no deaths in the treated population for any cause compared to placebo. Additionally, there was approximately a 10-fold, or 1 $\log_{10}$ copies/mL, decrease in viral load compared to placebo, consistent with results from the Phase 2/3 EPIC-HR study.

The data were reviewed by an independent Data Monitoring Committee (DMC) and, based on the totality of the data available, the DMC recommended that the trial continue.

At the EPIC-SR interim analysis, which included 45% of the trial's planned enrollment, 0.6% of those who received PAXLOVID were hospitalized following randomization (2/333 hospitalized with no deaths), compared to 2.4% of patients who received placebo and were hospitalized or died (8/329 hospitalized with no deaths). A follow-on analysis at 80% of enrolled patients was consistent with these findings. In this analysis, 0.7% of those who received PAXLOVID were hospitalized following randomization (3/428 hospitalized with no deaths), compared to 2.4% of patients who received placebo and were hospitalized or died (10/426 hospitalized with no deaths); p=0.051.

Treatment-emergent adverse events were comparable between PAXLOVID (22%) and placebo (21%), most of which were mild in intensity. Rates of serious adverse events (1.4% vs. 1.9%) and discontinuation of study drug due to adverse events (2.1% vs. 1.2%) were also comparable between PAXLOVID and placebo.

All other secondary endpoints for this study, which are available on clinicaltrials.gov (NCT05011513), were not yet available for this review. The study is now fully enrolled, and further data will be released upon analysis of the full study data expected later this month.

**About PAXLOVID™ (nirmatrelvir [PF-07321332] tablets and ritonavir tablets)**

PAXLOVID is an investigational SARS-CoV-2 protease inhibitor antiviral therapy. It was developed to be administered orally so that, if authorized or approved, it can be prescribed at the first sign of infection or at first awareness of an exposure – potentially helping patients avoid severe illness (which can lead to hospitalization and death) or avoid disease development following contact with a household member who contracts COVID-19 – subject to the clinical success of the rest of the EPIC development program. Nirmatrelvir [PF-07321332], which originated in Pfizer laboratories, is designed to block the activity of the SARS-CoV-2-3CL protease, an enzyme that the coronavirus needs to replicate. Co-administration with a low dose of ritonavir helps slow the metabolism, or breakdown, of nirmatrelvir in order for it to remain active in the body for longer periods of time at higher concentrations to help combat the virus.

Nirmatrelvir is designed to inhibit viral replication at a stage known as proteolysis, which occurs before viral RNA replication. In preclinical studies, nirmatrelvir did not demonstrate evidence of mutagenic DNA interactions.

Current variants of concern can be resistant to treatments that are focused on the spike protein expressed on the surface of the SARS-CoV-2 virus, due to the mutations in this region. PAXLOVID, however, works intracellularly on the protease of the SARS-CoV-2 virus by inhibiting viral replication. Nirmatrelvir has shown consistent in vitro antiviral activity against the previously identified variants of concerns (i.e., alpha, beta, delta, gamma, lambda, and mu). In addition, nirmatrelvir potently inhibited the 3CL protease associated with Omicron in an in vitro biochemical assay. This indicates nirmatrelvir's potential to maintain robust antiviral activity against Omicron. Additional in vitro antiviral studies with this variant are underway.

If authorized or approved, PAXLOVID will be administered at a dose of 300 mg (two 150 mg tablets) of nirmatrelvir with one 100 mg tablet of ritonavir, given twice-daily for five days. One box contains five blister packs of PAXLOVID, as

co-packaged nirmatrelvir tablets with ritonavir tablets, providing all required doses for a full five-day treatment course.

**About the Phase 2/3 EPIC-HR Study Top-Line Results**

The final analysis of the primary endpoint evaluated data from 2,246 adults who were enrolled by November 4, 2021. At the time of the decision to stop recruiting patients, enrollment was at 75% of the 3,000 planned patients from clinical trial sites across North and South America, Europe, Africa, and Asia, with 41% of patients located in the United States. Enrolled individuals had a laboratory-confirmed diagnosis of mild to moderate SARS-CoV-2 infection within a five-day period and were required to have at least one characteristic or underlying medical condition associated with an increased risk of developing severe illness from COVID-19. Each patient was randomized (1:1) to receive PAXLOVID or placebo orally every 12 hours for five days.

**About the Phase 2/3 EPIC-SR Study Interim Analyses**

The primary analysis of the interim data, consisting of the first 45% of patients enrolled in the study, included 673 adults, of whom 338 received PAXLOVID and 335 received placebo. At the time of the interim analyses, EPIC-SR had reached its planned enrollment of more than 1,140 adults from clinical trial sites across North and South America, Europe, Africa, and Asia, and the United States. Enrolled individuals had a laboratory-confirmed diagnosis of mild to moderate SARS-CoV-2 infection within a five-day period and were either unvaccinated adults who were at standard risk (i.e., low risk of hospitalization or death) or vaccinated adults who had one or more risk factors for progressing to severe illness from COVID-19. Each patient was randomized (1:1) to receive PAXLOVID or placebo orally every 12 hours for five days.

**About the EPIC Development Program**

The EPIC (**E**valuation of **P**rotease **I**nhibition for **C**OVID-19) Phase 2/3 development program for nirmatrelvir; ritonavir consists of three clinical trials

109

spanning a broad spectrum of patients, including adults who have been exposed to the virus through household contacts, as well as adults at both standard risk and high risk of progressing to severe illness.

In July 2021, Pfizer initiated the first of these trials, known as EPIC-HR (**E**valuation of **P**rotease **I**nhibition for **C**OVID-19 in **H**igh-**R**isk Patients), a randomized, double-blind study of non-hospitalized adult patients with COVID-19, who are at high risk of progressing to severe illness. At the recommendation of an independent Data Monitoring Committee and in consultation with the U.S. Food and Drug Administration (FDA), Pfizer ceased further enrollment into the study in early November 2021 due to the overwhelming efficacy demonstrated in results from an interim analysis. Data have been submitted to the FDA as part of its submission for Emergency Use Authorization, and findings from the EPIC-HR interim analysis have been submitted to a peer-reviewed journal for publication.

In August 2021, Pfizer began the Phase 2/3 EPIC-SR (**E**valuation of **P**rotease **I**nhibition for **C**OVID-19 in **S**tandard-**R**isk Patients), to evaluate efficacy and safety in patients with a confirmed diagnosis of SARS-CoV-2 infection who are at standard risk (i.e., low risk of hospitalization or death).

In September, Pfizer initiated the Phase 2/3 EPIC-PEP (**E**valuation of **P**rotease **I**nhibition for **C**OVID-19 in **P**ost-**E**xposure **P**rophylaxis) to evaluate efficacy and safety in adults exposed to SARS-CoV-2 by a household member. This trial is ongoing.

For more information on the EPIC Phase 2/3 clinical trials for PAXLOVID, visit clinicaltrials.gov.

**About Pfizer: Breakthroughs That Change Patients' Lives**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and

110

manufacture of health care products, including innovative medicines and vaccines. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 170 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.Pfizer.com. In addition, to learn more, please visit us on www.Pfizer.com and follow us on Twitter at @Pfizer and @Pfizer News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Disclosure Notice**

The information contained in this release is as of December 14, 2021. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about Pfizer's efforts to combat COVID-19 and Pfizer's investigational oral antiviral candidate PAXLOVID (including qualitative assessments of available data, including interim data, potential benefits, expectations for clinical trials, a submission to the FDA requesting Emergency Use Authorization (EUA), the anticipated timing of data readouts, regulatory submissions, regulatory approvals or authorizations, potential to maintain antiviral activity against variants, planned investment and anticipated manufacturing, distribution and supply), involving substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical endpoints, commencement and/or completion dates for clinical trials, regulatory submission dates, regulatory approval dates and/or launch dates, as well as

risks associated with preclinical and clinical data (including the Phase 2/3 interim data and the other data discussed in this release), including the possibility of unfavorable new preclinical, clinical or safety data and further analyses of existing preclinical, clinical or safety data, including the risk that final results from EPIC-SR could differ from the interim data; the ability to produce comparable clinical or other results including efficacy, safety and tolerability profile observed to date, in additional studies or in larger, more diverse populations following commercialization; the risk that preclinical and clinical trial data are subject to differing interpretations and assessments, including during the peer review/publication process, in the scientific community generally, and by regulatory authorities; whether regulatory authorities will be satisfied with the design of and results from these and any future preclinical and clinical studies; whether and when any drug applications or submissions to request emergency use or conditional marketing authorization for any potential indications for PAXLOVID may be filed in particular jurisdictions and if obtained, whether or when such emergency use authorization or licenses will expire or terminate; whether and when regulatory authorities in any jurisdictions may approve any such applications or submissions for PAXLOVID (including the submission for EUA pending with the FDA), which will depend on myriad factors, including making a determination as to whether the product's benefits outweigh its known risks and determination of the product's efficacy and, if approved, whether it will be commercially successful; decisions by regulatory authorities impacting labeling or marketing, manufacturing processes, safety and/or other matters that could affect the availability or commercial potential of PAXLOVID, including development of products or therapies by other companies; risks related to the availability of raw materials for PAXLOVID; the risk that we may not be able to create or scale up manufacturing capacity on a timely basis or maintain access to logistics or supply channels commensurate with global demand, which would negatively impact our ability to supply the estimated numbers of courses of PAXLOVID within the projected time periods; whether and when additional purchase agreements will be reached; the risk that demand for any products may be

reduced or no longer exist; uncertainties regarding the impact of COVID-19 on Pfizer's business, operations and financial results; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2020 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at https://www.sec.gov/ and www.pfizer.com.

View source version on businesswire.com: https://www.businesswire.com/news/home/20211214005548/en/

Pfizer:
Media Relations
+1 (212) 733-1226
PfizerMediaRelations@pfizer.com

Investor Relations
+1 (212) 733-4848
IR@pfizer.com

Source: Pfizer Inc.

113





## COVID-19



We have the tools to
**Fight Omicron**


Vaccines & Booster

Masks


Testing

# Types of Masks and Respirators

Updated Jan. 21, 2022

## Summary of Recent Changes

Updates as of January 14, 2022    ⌄

- Added information to present similar content for masks and respirators
- Clarified that people can choose respirators such as N95s and KN95s, including removing concerns related to supply shortages for N95s
- Clarified that "surgical N95s" are a specific type of respirator that should be reserved for healthcare settings
- Clarified that some types of masks and respirators provide more protection to the wearer than others

View Previous Updates

## Key Messages:

- Masking is a critical public health tool for preventing spread of COVID-19, and it is important to remember that any mask is better than no mask.
- To protect yourself and others from COVID-19, CDC continues to recommend that you wear the most protective mask you can that fits well and that you will wear consistently.
- Masks and respirators are effective at reducing transmission of SARS-CoV-2, the virus that causes COVID-19, when worn consistently and correctly.
- Some masks and respirators offer higher levels of protection than others, and some may be harder to tolerate or wear consistently than others. It is most important to wear a well-fitted mask or respirator correctly that is comfortable for you and that provides good protection.
- While all masks and respirators provide some level of protection, properly fitted respirators provide the highest level of protection. Wearing a highly protective mask or respirator may be most important for certain higher risk situations, or by some people at increased risk for severe disease.
- CDC's mask recommendations provide information that people can use to improve how well their masks protect them.

For information about how to use your N95 correctly, see How to Use Your N95 Respirator.

This page describes different types of masks and respirators that you can use to protect yourself and others from getting and spreading COVID-19. Masks and respirators can provide varying degrees of protection, with well-fitting National Institute for Occupational Safety and Health (NIOSH)-approved respirators offering the most protection. Masking is a critical public health tool for preventing spread of COVID-19, and it is important to remember that any mask is better than no mask.  This page presents options in order of least to most protective. To protect yourself and others from COVID-19, CDC continues to recommend that you wear the most protective mask you can that fits well and that you will wear consistently.

## Types of Masks and Respirators

Masks are made to contain droplets and particles you breathe, cough, or sneeze out. If they fit closely to the face, they can also provide you some protection from particles spread by others, including the virus that causes COVID-19.

Respirators are made to protect you by filtering the air and fitting closely on the face to filter out particles, including the virus that causes COVID-19. They can also contain droplets and particles you breathe, cough, or sneeze out so you do not spread them to others.

# Choosing a Mask or Respirator for Different Situations

Masks and respirators (i.e., specialized filtering masks such as "N95s") can provide different levels of protection depending on the type of mask and how they are used. Loosely woven cloth products provide the least protection, layered finely woven products offer more protection, well-fitting disposable surgical masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection.

Whatever product you choose, it should provide a good fit (i.e., fitting closely on the face without any gaps along the edges or around the nose) and be comfortable enough when worn properly (covering your nose and mouth) so that you can keep it on when you need to. Learn how to improve how well your mask protects you by visiting CDC's Improve How Your Mask Protects You page.

A respirator has better filtration, and if worn properly the whole time it is in use, can provide a higher level of protection than a cloth or procedural mask. A mask or respirator will be less effective if it fits poorly or if you wear it improperly or take it off frequently. Individuals may consider the situation and other factors when choosing a mask or respirator that offers greater protection.

- When caring for someone who is sick with COVID-19.
- If you are at increased risk for severe illness, for example, people who are immunocompromised, older adults, and people with certain underlying medical conditions.
- When working at a job where you interact with large numbers of the public, especially when not everyone is consistently wearing a mask. For example, bus drivers and grocery store workers.
- When riding on planes, buses, trains, or other forms of public transportation*, especially if it is for a long period of time on crowded conveyances.
- When physical distancing is not possible or when you are in crowded indoor or outdoor public settings.
- If you are not up to date on COVID-19 vaccinations.

*Note: The options listed on this page may be used to fulfill the requirements of CDC's Mask Order for public transportation. Learn more about attributes of masks needed to fulfill the requirements of the Order at this website.

# Masks

When choosing a mask, look at how well it fits. Gaps can let air with respiratory droplets leak in and out around the edges of the mask. Gaps can be caused by choosing the wrong size or type of mask and when a mask is worn with facial hair.

It is important to check that it fits snugly over your nose, mouth, and chin.

Check for gaps by cupping your hands around the outside edges of the mask.

- Make sure no air is flowing from the area near your eyes or from the sides of the mask.
- If the mask has a good fit, you will feel warm air come through the front of the mask and may be able to see the mask material move in and out with each breath.

## Cloth Masks

**Cloth Masks** can be made from a variety of fabrics and many types of cloth masks are available.

**Wear cloth masks with**



- A proper fit over your nose, mouth, and chin to prevent leaks
- Multiple layers of tightly woven, breathable fabric
- Nose wire
- Fabric that blocks light when held up to bright light source

**Do NOT wear cloth masks with**



- Gaps around the sides of the face or nose
- Exhalation valves, vents, or other openings (see example)
- Single-layer fabric or those made of thin fabric that don't block light
- Wet or dirty material

## Procedure Masks

Disposable **procedure** masks are widely available. They are sometimes referred to as surgical masks or medical procedure masks.

**Wear procedure masks with**

- A proper fit over your nose, mouth, and chin to prevent leaks
- Multiple layers of non-woven material
- A nose wire

**Do NOT wear procedure masks with**

- Gaps around the sides of the face or nose (see example)
- Wet or dirty material



Ways to have better fit and extra protection with cloth and disposable masks

- Wear two masks (disposable mask underneath **AND** cloth mask on top)
- Combine either a cloth mask or disposable mask with a fitter or brace

- Knot and tuck ear loops of a 3-ply mask where they join the edge of the mask
  - For disposable procedure masks, fold and tuck the unneeded material under the edges. (For instructions, see the following https://youtu.be/GzTAZDsNBe0 ☐ )
- Use masks that attach behind the neck and head with either elastic bands or ties (instead of ear loops)







## Masks that Meet a Standard

Some masks are designed and tested to ensure they perform at a consistent level. These masks are labeled to tell you what standard they meet. These masks are labeled:

- MEETS ASTM F3502 ☐
- MEETS WORKPLACE PERFORMANCE
- MEETS WORKPLACE PERFORMANCE PLUS

These are new standards. Lists of masks that meet these standards and more information on their availability can be found on the NIOSH Personal Protective Equipment Information (PPE-Info) webpage. These masks have markings printed on the product to indicate they are authentic.



Follow manufacturer's instructions on how to wear, store, and clean or properly dispose of the mask. These should be worn according to the manufacturer's instructions without modifications.

**Wear masks that meet a standard with**

- A proper fit over your nose and mouth to prevent leaks
- Multiple layers of non-woven material
- A nose wire

**Do NOT wear masks that meet a standard**

- If it is hard to breathe while wearing them
- If they are wet or dirty
- With other masks or respirators
- As a replacement for NIOSH-approved respiratory protection when required by your job

# Respirators

117

When choosing a respirator, look at how well it fits and read the manufacturer instructions. These instructions should include information on how to wear, store, and clean or properly dispose of the respirator. Respirators have markings printed on the product to indicate they are authentic, see appropriate N95 markings 🖼 and KN95 markings.

It is important for respirators to form a seal to the face to work properly. Gaps can let air with respiratory droplets leak in and out around the edges of the mask. Gaps can be caused by choosing the wrong size or type of respirator or when a respirator is worn with facial hair.

It is important to determine if your respirator fits properly. NIOSH and OSHA have developed a video and factsheet 📕 demonstrating how to determine if the respirator fits properly (user seal check) and how to properly put on and take off a respirator. The information in the video and factsheet about how to use an N95 respirator also applies to international respirators, like KN95 respirators.

Most publicly available respirators are disposable and should be discarded when they are dirty, damaged, or difficult to breathe through.

More information on these two types of respirators is provided below.

## Respirators that Meet International Standards

Some respirators are designed and tested to meet international standards. The most widely available respirators that meet an international standard are **KN95 respirators**. Other examples include 1st, DL2, DL3, DS2, DS3, FFP2, FFP3, KN100, KP95, KP100, P2, P3, PFF2, PFF3, R95, and Special.

### Poor quality KN95 respirators

- About 60% of KN95 respirators NIOSH evaluated during the COVID-19 pandemic in 2020 and 2021 did not meet the requirements that they intended to meet.
  - Using a poor-quality product may not provide the level of protection indicated.
- Learn about factors to consider when purchasing an international respirator. This webpage and a webinar provide reliable information to guide you.

### What to know about international respirators

- They are designed to standards that do not often have a quality requirement.
- They filter varying levels of particles in the air depending on the standard they are designed to meet.
- They seal tightly to your face when fitted properly.
- It is important to pick a respirator that fits your face and seals well since not all fit the same.

### Do NOT wear international respirators

- If they have exhalation valves, vents, or other openings
- If it is hard to breathe while wearing them
- If they are wet or dirty
- With other masks or respirators
- As a replacement for NIOSH-approved respiratory protection when required by your job

## NIOSH-Approved Respirators

NIOSH approves many types of filtering facepiece respirators. The most widely available are **N95 respirators**, but other types (N99, N100, P95, P99, P100, R95, R99, and R100) offer the same or better protection as an N95 respirator. Lists of

118

respirators that are NIOSH-approved can be found on the NIOSH-Approved Particulate Filtering Facepiece Respirators webpage.

CDC recommends that specially labeled "surgical" N95 respirators — a special subtype of N95 respirators that provide additional protection against hazards present during medical procedures, such as blood splatter — should be reserved for use by healthcare personnel.



Employers who want to distribute N95 respirators to employees shall follow an Occupational Safety and Health (OSHA) respiratory protection program ☐ .

#### What to know about NIOSH-approved respirators

- When worn consistently and properly, they provide the highest level of protection from particles, including the virus that causes COVID-19. Additionally, they contain your respiratory droplets and particles so you do not expose others.
- They seal tightly to your face when fitted properly.
- It is important to pick a respirator that fits your face and seals well since not all fit the same.
- Respirators approved by NIOSH are evaluated against a specific US standard that includes a quality requirement.
- They filter at least 95% of particles in the air when approved by NIOSH and when you have a proper fit.

#### Do NOT wear NIOSH-approved respirators

- If it is hard to breathe while wearing them
- If they are wet or dirty
- With other masks or respirators

# Considerations for Children

## Masks

Anyone ages 2 years or older who is not vaccinated or not up to date on vaccines should wear masks in indoor public spaces. This recommendation also applies to people who are up to date on their vaccines when they are in an area of substantial or high transmission. CDC also currently recommends universal indoor masking for all teachers, staff, students, and visitors to K-12 schools, regardless of their vaccination status or the area's transmission rates. The benefits of mask-wearing are well-established.

## Respirators

Parents and caregivers may have questions about NIOSH-approved respirators (such as N95s) for children. Although respirators may be available in smaller sizes, they are typically designed to be used by adults in workplaces, and therefore have not been tested for broad use in children.

## Selecting Masks

- Masks and respirators should not be worn by children younger than 2 years.
- Choose a well-fitting and comfortable mask or respirator that your child can wear properly. A poorly fitting or uncomfortable mask or respirator might be worn incorrectly or removed often, and that would reduce its intended benefits.
  - Choose a size that fits over the child's nose and under the chin but does not impair vision.
- Follow the user instructions for the mask or respirator. These instructions may show how to make sure the product fits properly.

119

- Some types of masks and respirators may feel different if your child is used to wearing a regular cloth or disposable procedure masks.

## Safety precautions

- If your child has a medical condition, such as a heart or lung problem, ask their healthcare provider before they use methods to improve mask fit or use an ASTM F3502 mask or a respirator.
- If your child has a hard time breathing, gets dizzy, or has other symptoms while you are trying to get the mask to fit better or when using an ASTM F3502 mask or a respirator, choose a regular cloth or disposable mask. They should continue to follow CDC guidance to protect themselves and others. Consult your healthcare provider if these symptoms do not resolve.

# Alternative Masks for Special Situations

Clear masks or cloth masks with a clear plastic panel are an alternative type of mask that may be helpful when interacting with certain groups of people, such as:



- People who are deaf or hard of hearing
- Young children or students learning to read
- Students learning a new language
- People with disabilities
- People who need to see the proper shape of the mouth for making appropriate vowel sounds

The FDA cleared for marketing a transparent medical mask. These transparent medical masks should be reserved for use by healthcare workers and patients who require them.

If you use this type of mask, make sure

- You can breathe easily
- Excess moisture does not collect on the inside of the mask

For more information on science behind improving how your mask protects you, see:

- Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2
- Efficacy of Portable Air Cleaners and Masking for Reducing Indoor Exposure to Simulated Exhaled SARS-CoV-2 Aerosols — United States, 2021
- Maximizing Fit for Cloth and Medical Procedure Masks to Improve Performance and Reduce SARS-CoV-2 Transmission and Exposure, 2021

# Previous Updates

Updates from Previous Content                                                                    ⌄

**As of September 23, 2021**

- Added section on considerations for children

**As of September 10, 2021**

- Made minor updates to the sections on Cloth Masks and Disposable Masks
- Updated the section on Masks that Meet a Standard
- Added section about Respirators that Meet International Standards (e.g., KN95s)
- Added considerations for use of NIOSH-approved respirators because the availability of NIOSH-approved N95 respirators has increased significantly over the last several months
- Added section on Alternative Masks for Special Situations
- Updated section on Choosing a Mask or Respirator for Different Situations

## Related Pages

› Your Guide to Masks

› Improve How Your Mask Protects You

› How to Use Your N95 Respirator

Last Updated Jan. 21, 2022

121

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| NAVY SEAL 1, *et al.,* | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:21-cv-02429 |
| | ) | |
| JOSEPII R. BIDEN, in his official capacity | ) | |
| as President of the United States, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF COMMANDER BROOKE GRANT

I, Commander Brooke Grant, hereby declare and state:

1.      I am a commissioned officer serving on active duty in the United States Coast Guard.  I have served on active duty in the Coast Guard for over 19 years and am currently serving as Chief, Military Personnel Policy Development Division.  I have served in this position since August, 2021.  My prior assignments include Logistics Department Head, United States Coast Guard Sector Key West; Deputy, Office of Legal Policy and Program Development; and Staff Attorney, United States Seventh Coast Guard District Legal Office.   I am generally aware of the allegations set forth in the pleadings filed in this matter and make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.  My office is the office that originally receives requests for religious accommodation from the COVID-19 vaccination requirements at Coast Guard Headquarters.

2.      Subject to the data limitations and important context listed in my declaration

1

submitted January 7, 2022, Exhibit 1, attached to this declaration, provides an update to the available information ordered by the court. Order, 34 ECF No. 40.

      3.      I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Dated: January 21, 2022

GRANT.BROOKE.E.1013312210
Digitally signed by
GRANT.BROOKE.E.1013312210
Date: 2022.01.21 12:20:17 -05'00'

_____
BROOKE GRANT
Commander
U.S. Coast Guard

Exhibit 1 to Declaration of CDR Grant

## U.S. Coast Guard Court-Ordered Data

Current as of 21 January 2021

(1) Number of religious exemption requests from COVID-19 vaccination:

| # Initial Requests Under Review | # Initial Request Approved | # Initial Requests Denied | # Denials Where Chaplain Determined Belief Sincere | Total Initial Requests |
|---|---|---|---|---|
| 959 | 0 | 335 | 335 | 1304[1] |

| # Denials w/o Appeal Before Deadline[2] | # Appeals Under Review | # Appeals Denied | # Appeals Approved | Fully Resolved Requests | |
|---|---|---|---|---|---|
| | | | | Aggregate # of Approved Requests | Aggregate # of Denied Requests |
| Unknown | 125 | 0 | 0 | 0 | 0 |

(2) Number of medical-exemption requests from COVID-19 vaccination:

| Temporary Medical Exemption Requests | Permanent Medical Exemptions Denied | Permanent Medical Exemptions Granted | Total Permanent Medical Exemption Requests |
|---|---|---|---|
| Unknown | 4 | 6 | 12 |

(3) Number of courts-martial and separation proceedings pending or concluded against a service member whose request for a religious exemption was denied after appeal:

| Courts-Martial | | Administrative Separation (ADSEP) | |
|---|---|---|---|
| Pending | Concluded | ADSEP Initiated | ADSEP Completed |
| 0 | N/A | 0 | 0 |

---

[1] Ten members have withdrawn their request after deciding to receive the vaccine.

[2] A number of appeal timeline extensions have been granted for good cause or when reasonable. The deadline is based on when the command notifies the member of the decision, not on the date the decision is signed or sent to the Command. Appeals submitted after deadline will likely still be considered.

U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave SE
Washington, DC 20020
Staff Symbol: CG-1

6230
04 May 2022

# MEMORANDUM

From:    J. L. Knight, SES
         Appellate Authority

To:      A. B. Stone, LTJG

Subj:    DECISION ON APPEAL OF RELIGIOUS ACCOMMODATION DENIAL

Ref:     (a)  Your memo 6320 of 02 FEB 22
         (b)  CG-133 denial memo 6230 of 19 JAN 22
         (c)  Military Religious Accommodations, COMDTINST 1000.15 (series)
         (d)  ALCOAST 305/21 R 262212Z AUG 21
         (e)  ALCOAST 315/21 R 072247Z SEP 21

1. I have personally reviewed and fully considered your appeal (reference (a)) of the decision to deny your request for a religious accommodation (reference (b)). I find no error occurred in reaching the decision to deny your religious accommodation request. As such, and in accordance with reference (c), your appeal is denied.

2. My decision in your case came only after extensive consideration. I personally reviewed your appeals package and consulted with a Judge Advocate to ensure I accurately applied the law and policy to your specific circumstances. My actions in denying your request are intended to meet Coast Guard requirements as a ready military workforce and national first responder in which you play a valuable role.

3. I noted in your appeal that you objected to the use of fetal tissue in the development and testing of vaccines. A member who has received all required doses of a vaccine listed on the World Health Organization (WHO) emergency use listing (EUL) is compliant with the Coast Guard's COVID-19 vaccine mandate, as described in references (d) and (e). If you are aware of a vaccine on this list that satisfies your stated religious objections and choose to receive all required doses, you would be considered fully vaccinated and in compliance with references (d) and (e). I encourage you to engage with your command to discuss ways in which you could become compliant, should you elect to pursue this option.

4. I realize my denial of your appeal is not welcome news. It takes courage to submit an accommodation request that requires sharing your closely held beliefs, as well as to trust others to treat those beliefs thoughtfully. I also understand that you may have experienced additional stress during this process and, if so, strongly encourage you to take advantage of the many resources the Coast Guard provides to help you best manage that stress. Contact your command if you have questions about how to access these resources.

5. I have no doubt that you have made significant sacrifices along your journey, investing yourself in our Coast Guard and the Nation. I hope you will decide to comply with the Coast Guard's vaccine requirement and continue your service well into the future.

#

EXHIBIT 13

# M Gmail

alaric stone ▓▓▓▓▓▓▓▓▓▓▓▓▓

---

## Fw: LTJG Stone_Execution of Orders

**Stone, Alaric B LTJG USCG (USA)**▓▓▓▓▓▓▓▓▓▓▓▓    Sat, Sep 10, 2022 at 6:51 AM
To: alaric stone ▓▓▓▓▓▓▓▓▓▓▓

---

**From:** Behney, Todd M CDR USCG PSC (USA) ▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Monday, April 18, 2022 6:50 PM
**To:** Stone, Alaric B LTJG USCG (USA) ▓▓▓▓▓▓▓▓▓
**Cc:** Thomas, Michael C CDR USCG CGC JAMES (USA) ▓▓▓▓▓▓▓▓▓▓▓▓    Wheeler, Mary Katherine N
LCDR USCG PSC (USA) ▓▓▓▓▓▓▓▓▓▓▓▓▓
**Subject:** LTJG Stone_Execution of Orders

*Greetings from OPM-2.*

*IAW ALCGPSC 016/22, you are directed to execute your PCS orders based on needs of the service. You are directed to inform your SPO or P&A representative of this update to your PSC Orders Notes and they are authorized to make your orders "READY" to execute   The following verbiage was added to your orders*

*"In accordance with ALCGPSC 016/22, you are directed to execute these PCS orders based on needs of the service regardless of your current vaccination status. This does not exempt you from becoming compliant with the COVID-19 vaccination mandate established in ALCOAST 305/21 or the risk mitigation and leadership measures established in ALCOAST 352/21. Failure to comply with ALCOAST 305/21 may lead to further administrative or disciplinary action to include involuntary separation from the Coast Guard "*

*Your Assignment Officer is standing by for any questions    thank you*

Re pectfully,

Todd M  Behney, CDR

Chief, Officer A  ignment  Branch

PSC OPM 2

▓▓▓▓▓▓▓▓▓▓

DEPARTMENT OF HOMELAND SECURITY
U.S. COAST GUARD

**EXHIBIT 14**

## ADMINISTRATIVE REMARKS

### PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.
**AUTHORITY**: 14 U.S.C. § 505
**PURPOSE**: To document a USCG service member's achievements, accomplishments, Uniform Code of Military Justice (UCMJ) infraction(s), or any other USCG military pay or personnel activity.
**ROUTINE USES**: Authorized USCG officials will use this information to validate a USCG service member's achievements, accomplishments, UCMJ infraction(s) or any other USCG military pay or personnel activity. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).
**CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION:** Providing this information is voluntary. However, failure to provide this information may result in a delay in administrating this form.

Entry Type: Performance and Discipline (P&D-41C)
Reference: (a) COMDT COGARD WASHINGTON DC 072247Z SEP 21/ALCOAST 315/21
(b) DoD Instruction 6205.02, DoD Immunization Program (23 Jul 19)
(c) Immunizations and Chemoprophylaxis, COMDTINST M6230.4 (series)
(d) Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 801– 946 (as amended)

Responsible Level: Unit
Entry:

As required by reference (a), and consistent with the processes outlined in references (b) and (c), you are required to receive a COVID-19 vaccine in accordance with Food and Drug Administration-approved labeling and guidance.

You were counseled and indicated that you intended to seek a medical exemption or religious accommodation. Your request for a medical exemption or religious accommodation was denied on 04 May 2022 by the COVID Religious Appeal Appellate Authority, Mr. J. L. Knight, SES.

You are hereby ordered to report to the Vaccination Clinic of your choice by 1500 on Friday, 29 July 2022, to receive the first dose of a fully FDA-approved COVID-19 vaccine. A violation of this order may subject you to administrative and disciplinary consequences and is punishable under the Uniform Code of Military Justice (ref (d)), including under Article 90 (willfully disobeying superior commissioned officer) and Article 92(2) (failure to obey a lawful order).

21JUL2022:

Lamont S. Bazemore, CAPT

CGD Five XO of Military Personnel

21JUL2022: I acknowledge the above order.

*[handwritten]* I REQUESTED ADDITIONAL INFORMATION ON HOW TO APPEAL THE DISPOSITION OF MY RELIGIOUS ACCOMMODATION REQUEST AND

Alaric B. Stone, LTJG SUBSEQUENT APPEAL TO THE BCMR PER THE GUIDANCE ISSUED BY THE U.S. DEPARTMENT OF JUSTICE AS A MEANS OF SEEKING FURTHER ADMINISTRATIVE RECOURSE. I WAS PROVIDED THIS PAGE 7 AS ~~5TH ENDORSE~~ ~~PER COPIES~~ THE END OF YOUR ADMINISTRATIVE PROCESS AND THERE IS NO FURTHER MECHANISM FOR ADMINISTRATIVE APPEAL

| 1. NAME OF PERMANENT UNIT | 2. NAME OF UNIT PREPARING THIS FORM | |
|---|---|---|
| CGD Five (dri) | CGD Five | |
| 3. NAME OF MEMBER (Last, First, MI) | 4. EMPLOYEE ID NUMBER | 5. GRADE/RATE |
| Stone, Alaric, B. | ▬▬▬ | O2/LTJG |

File original in SPO PDR, Email copy to CG PSC-BOPS-C-MR

CG-3307 (05/20)
PREVIOUS EDITIONS ARE OBSOLETE

*[handwritten]* Mbr refused to sign. Terdell Nash, LCDR

Page 1 of 1

*[handwritten]* 21 Jul 22

128

 alaric stone ▇▇▇▇▇

**Counseling Follow-up**

Stone, Alaric B LTJG USCG (USA ▇▇▇▇▇▇▇▇▇                                                    Fri, Jul 22, 2022 at 11 53 AM

---

**From**  Bazemore, Lamont S CAPT USCG D5 (USA) ▇▇▇▇▇▇▇▇▇
**Sent**  Friday, July 22, 2022 11:38 AM
**To**  Stone, Alaric B LTJG USCG (USA) ▇▇▇▇▇ ▇▇▇▇▇
**Cc**  Nash, Terdell A LCDR USCG LANTAREA (USA) ▇▇▇▇▇    Dove, Brian L CWO-2 USCG D5 (USA) ▇▇▇▇▇
**Subject**  RE: Counseling Follow-up

Alaric,

Thanks for sharing the article. I'm not an expert, but I think it would be a challenge to find any modern vaccine that hasn't used some form of fetal cells for testing.  Researchers aren't allowed to test on human subjects until much later in the testing phase.

I followed up with the Chief of Staff (CoS) and Legal (LCDR Lee) this morning regarding any additional process steps to appeal your religious accommodation appeal denial.

Neither the CoS or LCDR Lee are aware of any additional steps. I also provided the CoS with a copy of your CG-3307.  You can pursue the BCMR process, but that will not prevent the CG from taking steps to separate you from the service. LCDR Lee passed that the CG's COVID Vaccination Accommodation & Appeal process is the most robust of any military service. Considering all documentation and action executed has been in alignment with CG policy, in the absence of a policy or law change, I don't foresee your BCMR being successful expunging COVID related CG-3307s from your record.  Because your potential separation will be based on you not being worldwide deployable, a BCMR will not address that issue.

CoS mentioned that another COVID ALCOAST will be released soon.  t's expected that as a result of the CG Commandant changing, the CG's position will shift from non-compliant COVID vaccinated personnel being loss via natural attrition to the CG taking a more proactive stance removing non-vaccinated members from the service.

I know you have much to contemplate over the next week.

Respectfully,

CAPT Lamont S. Bazemore, PMP

USCG Fifth District

Chief, Planning & Force Readiness

XO of Military Personnel

CO of Enlisted Personnel

▇▇▇▇▇▇▇

▇▇▇▇▇

---

**From**  Stone, Alaric B LTJG USCG (USA) ▇▇▇▇▇▇▇
**Sent**  Friday, July 22, 2022 9:07 AM
**To**  Bazemore, Lamont S CAPT USCG D5 ▇▇▇▇▇▇▇

**Cc**  Nash, Terdell A LCDR USCG LANTAREA (US██████████)
**Subject**  Counseling Follow-up

Good morning CAPT Bazemore,

Thank you again for your time yesterday.

I am emailing to follow up on our discussion, specifically regarding the Novavax vaccine. There was some conflicting information that came up during the counseling session; at the outset of the counseling you stated that the Novavax vaccine was recently given EUA status and did not make use of aborted fetal cell material in its testing or production. As I discussed yesterday, this is at odds with the information I have found in the course of my research.

I've attached a study documenting testing performed by Novavax as part of the development of their COV D-19 vaccine. The study states that the HEK-293 line of aborted fetal cells was used in testing of the vaccine. Unfortunately, as I stated yesterday, this means that aborted fetal cell material was used to develop the Novavax vaccine (similar to the other vaccine candidates currently available).

This is one of several documents I came across when conducting my initial research into the issue; I hope it's helpful in providing context for our discussion yesterday.

Very respectfully,

LTJG Alaric Stone

D5 DRI

██████████

██████████

██████████████

██████████████████

130

```
R 251158Z JUL 22  MID200080053692U
FM COMDT COGARD WASHINGTON DC
TO ALCOAST
BT
UNCLAS
ALCOAST 270/22
SSIC 6230
SUBJ:  COVID-19: MANDATING COVID-19 VACCINATION FOR MILITARY
MEMBERS UPDATE
A. COMDT COGARD WASHINGTON DC 262212Z AUG 21/ALCOAST 305/21
B. COMDT COGARD WASHINGTON DC 072247Z SEP 21/ALCOAST 315/21
C. COMDT COGARD WASHINGTON DC 271530Z SEP 21/ALCOAST 352/21
D. COMDT COGARD WASHINGTON DC 080148Z OCT 21/ALCGPSC 104/21
E. COMDT COGARD WASHINGTON DC 151816Z NOV 21/ALCOAST 420/21
F. COMDT COGARD WASHINGTON DC 081530Z DEC 21/ALCOAST 446/21
G. COMDT COGARD WASHINGTON DC 261519Z JAN 22/ALCGPSC 016/22
H. COMDT COGARD WASHINGTON DC 092217Z MAR 22/ALCOAST 078/22
I. COMDT COGARD WASHINGTON DC 071848Z APR 22/ALCOAST 131/22
J. COMDT COGARD WASHINGTON DC 021850Z MAY 22/ALCOAST 157/22
K. Military Religious Accommodations, COMDTINST 1000.15
L. Immunization and Chemoprophylaxis for the Prevention of
Infectious Disease, COMDTINST M6230.4G
M. Military Separations, COMDTINST M1000.4
1. This ALCOAST provides overarching guidance on the Coast Guard's
next steps regarding the COVID-19 vaccine mandate in REFS (A) and
(B). REFs (A) - (J) are the existing policy measures that
supplement REFS (K) - (L), and are in place to help the Coast
Guard maintain a safe and ready military workforce protected
against COVID-19, necessary to execute our important missions.Â
Templates for COVID-19 CG-3307 forms are posted at:
(Copy and Paste the URL into Browser)

https://www.dcms.uscg.mil/ppc/pd/page7/

under "Performance, Discipline (PD), & General Counseling",
including the newly-established CG-3307 P&D-41F/G to document
compliance with the vaccination mandate following the issuance
of COMDT (CG-3307) P&D-41D/E.
2. Vaccination against COVID-19 is a requirement for all
servicemembers in the Coast Guard.Â Vaccination is necessary to be
world-wide deployable and protects individual medical readiness,
which protects unit and Service readiness. Further, as a military
service, compliance with lawful orders is non-negotiable.Â Therefore,
the Coast Guard is beginning involuntary administrative separation
processing for all non-compliant Active Duty servicemembers.Â All
non-compliant Reserve servicemembers will be processed for
involuntary transfer to the Inactive Status List (ISL).
Additionally, non-compliant Reserve servicemembers are not
authorized voluntary Reserve Component Category (RCC) changes and
may not be issued voluntary active duty orders of any type.
   a. The Needs of the Service - including, but not limited to,
rate, officer specialty, and command concerns - may delay the
effective date of separation, but all non-compliant servicemembers
will be processed for separation IAW REF (M).
   b. Absent derogatory matters of record, enlisted servicemembers
who are separated for COVID-19 vaccine refusal will typically
receive an RE-3 re-enlistment code, which would ordinarily allow
re-enlistment once the servicemember becomes vaccinated against
COVID-19.
3. Novavax. The Food and Drug Administration recently issued an
Emergency Use Authorization for the Novavax COVID-19 Vaccine,
Adjuvanted. Servicemembers who complete the Novavax regime would
be in compliance with the Coast Guard's COVID-19 vaccine mandate.
While the Coast Guard will work to stock Novavax at our clinics
```

following CDC approval, we cannot guarantee availability. As with
previous vaccines, members may obtain a Novavax vaccination
through DoD clinics/MTFs and TRICARE providers, as well as
commercial pharmacies.
4. Choose to Serve. Every member of the Coast Guard is a valuable,
strategic resource. Therefore, non-compliant servicemembers who
elect to receive an approved COVID-19 vaccine prior to their
effective separation date will be removed from the involuntary
separation process and restored to their prior active duty or
reserve status. Service members who choose to comply are choosing
to continue their service.
5. Additional guidance to assist
commands with the execution of this update can be found at:
(Copy and Paste the URL into Browser)

https://cg.portal.uscg.mil/units/cgcpe2/Pages/HomeCOP.aspx

Contact COMDT (CG-1331) at HQSPolicyandStandards@uscg.mil with
questions.
6. VADM Paul Thomas, Deputy Commandant for Mission Support (DCMS),
sends.
7. Internet release is not authorized.

DEPARTMENT OF HOMELAND SECURITY

U.S. COAST GUARD

EXHIBIT 17

## ADMINISTRATIVE REMARKS

### PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.
**AUTHORITY**: 14 U.S.C. § 505
**PURPOSE**: To document a USCG service member's achievements, accomplishments, Uniform Code of Military Justice (UCMJ) infraction(s), or any other USCG military pay or personnel activity.
**ROUTINE USES**: Authorized USCG officials will use this information to validate a USCG service member's achievements, accomplishments, UCMJ infraction(s) or any other USCG military pay or personnel activity. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).
**CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION:** Providing this information is voluntary. However, failure to provide this information may result in a delay in administrating this form.

Entry Type: Performance and Discipline (P&D-41D)

Responsible Level: Unit
Entry: Negative

On 21 July 2022, you were ordered to report to a Vaccination Clinic of your choice by 1500 on Friday, 29 July 2022, to receive the first dose of the COVID-19 vaccine. You acknowledged receiving the order on 21 July 2022. You failed to report as ordered. You did not have an approved or pending religious or medical exemption on the date that you were ordered to report to receive the vaccine. You had the opportunity and means to follow the order and failed to do so.

You are in violation of Article 90 ("Willfully Disobeying a Superior Commissioned Officer") and Article 92(2) ("Failure to Obey other Lawful Order") of the Uniform Code of Military Justice.

11 Aug 2022:

Lamont S. Bazemore, CAPT
CGD Five XO of Military Personnel

11 Aug 2022    I acknowledge receipt of this CG-3307.

Alaric B. Stone, LTJG

Member refused to sign: Terdell. A. Nash
11 Aug 2022

| 1. NAME OF PERMANENT UNIT | 2. NAME OF UNIT PREPARING THIS FORM | |
|---|---|---|
| CGD Five (dri) | CGD Five | |
| 3. NAME OF MEMBER (Last, First, MI) | 4. EMPLOYEE ID NUMBER | 5. GRADE/RATE |
| Stone, Alaric, B. | ▮▮▮▮▮ | O2/LTJG |

File original in SPO PDR, Email copy to CG PSC-BOPS-C-MR

CG-3307 (05/20)
PREVIOUS EDITIONS ARE OBSOLETE

Page 1 of 1

*I ACKNOWLEDGE RECEIPT OF THIS PAGE 7, BUT DO NOT
ACKNOWLEDGE THAT I AM IN VIOLATION OF A LAWFUL ORDER
BASED ON THE STATEMENT NOTED ON THE REVERSE AND
STIPULATED IN MY ORIGINAL RA AND SUBSEQUENT
APPEAL (SEE REVERSE ———▷)

133

Since my previous counseling I have been informed by my command that appeal of the decision issued on my religious accommodation request to the CG BCMR is not an approved step w/in the CG accommodation process and that I have exhausted all avenues of appeal, despite statements by DOJ indicating otherwise on public record. Further, I have been informed that any attempt to appeal my case to the BCMR will be futile, as the decision to deny my accommodation request is based on "the requirement that servicemembers be 'world wide deployable'."

The CG's denial of virtually all RA requests to the Covid-19 vaccine requirement, communicated/justified using cookie cutter/template denial letters (while providing medical/administrative accommodations) is evidence of an undifferentiated denial of all religious accommodation requests (unlawful under the Religious Freedom Restoration Act (RFRA)) and a lack of neutrality (unlawful under the 1st amendment). Further, the articulated statement that the CG's only option is to discharge unvaccinated servicemembers because they are not "world wide deployable" shows clearly that the CG is not considering "the least restrictive ~~means~~ means" in evaluating servicemembers requests. Further, the fact that numerous servicemembers w/in my command (2 in my shop alone), and accross the CG enterprise, do not meet the standards under CG/DOD medical standards to be considered "world wide deployable" but only servicemembers seeking RAs (religious accommodations) to the Covid-19 vaccine requirement are being discharged/threatened with discharge under this standard, shows a particular hostility towards accommodating servicemembers religious beliefs.

Given the above, I respectfully dispute the assertion that my accommodation request has been given appropriate review as required by law (not defined by CG policy, which is supposed to implement the requirements of law), and as such the validity of this order. The legality of this order is predicated upon the assumption that my accommodation request received appropriate review, and all evidence indicates this process is anything but sincere, with the results predetermined and the steps a pantomime of what is required under law.

Further, according to the July 30th declaration of CG LT Coppin the "FDA approved Comirnaty" that the CG recently stated is available to servicemembers is manufactured in France (confirmed by Pfizer representatives). Unfortunately this means that the available "FDA approved Comirnaty" is not in reality an FDA approved version of the vaccine for distribution in the U.S. according to the approved manufacturing locations specified in its BLA license. This French manufacturing location is not an authorized manufacturing location per the FDA's Comirnaty BLA supplement approval letter dated Dec 16th, 2021 (only the Pfizer, Puurs facility in Belgium is authorized). As such, based on this info, the CG does not have an appropriate FDA approved vaccine available as specified in Sec. Def's order requiring Covid vaccination for the armed forces.

134

```
R 211135Z JUL 22  MID200080045805U
FM COMDT COGARD WASHINGTON DC                          EXHIBIT 18
TO ALCOAST
BT
UNCLAS
ALCOAST 267/22
SSIC 6110
SUBJ:  HIV POLICY UPDATES
A. Coast Guard Human Immunodeficiency Virus (HIV) Program,
COMDTINST M6230.9A
B. DOD memo, 6 JUN 2022: Policy Regarding Human Immunodeficiency
Virus-Positive Personnel within the Armed Forces
1. This ALCOAST is an update to REF (A) and contains several USCG
policy modifications for HIV positive service members IAW the
guidance published in REF (B).
2. REF (B) states that in view of significant advances in the
diagnosis, treatment and prevention of HIV, it is necessary to
update policy with respect to individuals who have been identified
as HIV-positive. REF (B) states current service members who have
been identified as HIV-positive, are asymptomatic, and who have
clinically confirmed undetectable viral load (hereinafter "covered
personnel"), will have no restrictions applied to their
deployability or to their ability to commission while a service
member, solely on the basis of their HIV-positive status.
This supersedes any restrictions currently in Chapter 1 of REF (A)
for covered personnel, which includes Coast Guard Academy cadets and
midshipmen, ROTC cadets and midshipmen, and other participants in
in-service commissioning program. Covered personnel will not be
deemed "non-deployable" solely for the reason that they are
HIV-positive. Decisions on the deployability of covered personnel
will be made on a case-by-case basis and must be justified by the
Service member's inability to perform the duties to which he or she
would be assigned.
3. POC: CAPT Shane C. Steiner (Chief, Operational Medicine,
COMDT (CG-1121), ███████████████████████████.
4. RADM Dana L. Thomas, Director of Health, Safety and
Work-Life (CG-11), sends.
5. Internet release is authorized.
```

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave SE
Washington, DC  20593-7907
Staff Symbol: CG-1

5311
05 Aug 2022

# MEMORANDUM

From:    Dr. Donna Mischell Navarro
         Dr. D. M. Navarro, SES
         Acting CG-1

Reply to
Attn of:

To:      Distribution

Subj:    FISCAL YEAR 2023 ENLISTED TRAINING AND ACCESSIONS PLAN (ETAP)

Ref:     (a)  Coast Guard Recruiting Manual, COMDTINST M1100.2 (series)

1.  This Enlisted Training and Accessions Plan (ETAP) for Fiscal Year (FY) 2023 is forwarded for execution. It provides a three year outlook for enlisted Active and Reserve Component accessions and A-school enrollment needs. The principal focus is the allocation of accession and training resources to meet the needs of the Active Duty and Reserve workforces. The FY23 ETAP considers requirements and constraints amongst stakeholders to set achievable accessions and training targets which address the risk posed by large body-to-billet gaps. Demographic guidance for accessions is provided to Coast Guard Recruiting Command separately.

2.  <u>Active Duty Current State and Accessions Need</u>. By the end of FY22, the Active Duty enlisted workforce will be approximately 2,268 personnel below strength compared to the Personnel Allowance List (PAL). This body-to-billet gap was incurred through below-target recruitment since FY19 and continues to be exacerbated by programmed billet growth. In an unconstrained resource environment, accession of 5,100 recruits per year for three years would be necessary to close the Active Duty body-to-billet gap between now and the end of FY25. This target is impractical due to resource constraints: TRACEN Cape May is currently equipped for a throughput of 4,500 total recruits (active and reserve) per year, and CGRC is resourced to access 3,700 recruits per year. The table below sets the active duty accessions target at 4,200 recruits per year to balance these constraints with the needs of the service:

| **Active Duty Accession Program** | **FY22 planned/actual**[a] | **FY23** | **FY24** | **FY25** |
|---|---|---|---|---|
| Cape May Basic (8 weeks): | 4,160        2,800 | 4,120 | 4,120 | 4,120 |
| DEPOT[b]: | 40        40 | 80 | 80 | 80 |
| **Total:** | **4,200        2,840** | **4,200** | **4,200** | **4,200** |
| | | | | |
| **End of FY Forecasts**[c] | | | | |
| E-4 and above body-to-billet gap: | -468       -1,509 | -1,258 | -1,064 | -500 |
| Non-rate body-to-billet gap: | -303       -760 | -978 | -1,213 | -1,417 |
| **Total body-to-billet difference:** | **-771       -2,269** | **-2,236** | **-2,277** | **-1,917** |

a. Planned figures come from the FY22 ETAP. Actual figures are current FY22 projections.

b. Direct Entry Petty Officer Training (DEPOT). Includes up to 40 lateral entry accessions.

c. The accuracy of forecasts is +/- 200 each year due to uncertainty in the personnel loss rate.

Subj:  FISCAL YEAR 2023 ENLISTED TRAINING AND ACCESSIONS          5311
PLAN

3.  <u>Selected Reserve Current State and Accessions Need</u>. By the end of FY22, the Reserve Component enlisted workforce will be approximately 845 personnel below strength compared to PAL. Accession of 900 Selected Reserve (SELRES) personnel per year for three years is necessary to close the Reserve body-to-billet gap between now and the end of FY25. The table below presents reserve targets as mission/*ideal*.  Current resources support attainment of the mission targets, which sustains the current size of the enlisted SELRES force, but does not grow it.  The *ideal* target would close the body-to-billet gap by the end of FY25 but would require additional resources, specifically TRACEN Cape May capacity and recruiters.

| SELRES Accession Program | FY22 planned/actual | | FY23 | FY24 | FY25 |
|---|---|---|---|---|---|
| IADT[d]: | 50 | 87 | *50/150* | *50/150* | *50/150* |
| DEPOT: | 200 | 138 | *200/250* | *200/250* | *200/250* |
| ISTT[e]: | 400 | 375 | *400/500* | *400/500* | *400/500* |
| **Total:** | **650** | **600** | ***650/900*** | ***650/900*** | ***650/900*** |
| | | | | | |
| **Total body-to-billet difference[f]:** | -726 | -845 | -800/*-550* | -751/*-281* | -708/*-42* |

d. Initial Active Duty Training (IADT).

e. In-Service Transfer Team (ISTT).

f. Forecasts in this table are based on a 3-year average SELRES enlisted annual loss rate of 11.7%.

4.  <u>Total TRACEN Cape May Throughput</u>. A detailed breakdown is in Enclosure (1). While these quotas represent the planned allocation of TRACEN Cape May seats between the Active and Reserve Components, CGRC will maximize resource utilization based on recruits who are ready to ship to specific classes.  For example, a rack that would otherwise go empty in an Active Duty Basic class can be filled by a Reserve accession completing IADT.

| Accession Programs | FY22 planned/actual | | FY23 | FY24 | FY25 |
|---|---|---|---|---|---|
| Cape May Basic & IADT: | 4,210 | 2,887 | 4,170 | 4,170 | 4,170 |
| DEPOT: | 240 | 178 | 280 | 280 | 280 |
| **Total:** | **4,450** | **3,065** | **4,450** | **4,450** | **4,450** |

5.  <u>Class A-School Training</u>. The planned Active Duty, Reserve, and International A-school enrollment is detailed in Enclosure (2). The requested enrollment amounts are based on forecasted needs in the Active Duty and Reserve workforces for each rating considering limited training system capacity. Future enrollment numbers assume robust attendance at all A-schools; however, those enrollments may be reduced by the presence of a large non-rate shortage. The combined throughput of A-schools is not presently considered to be a limiting factor for the enlisted workforce.

| Workforce | FY22 planned/actual[g] | | FY23[h] | FY24 | FY25 |
|---|---|---|---|---|---|
| Active Duty: | 3,350 | 2,727 | 3,074 | 3,481 | 3,481 |
| Reserve: | 383 | 373 | 383 | 383 | 383 |
| International: | 164 | 84 | 138 | 138 | 138 |
| **Total:** | **3,897** | **3,184** | **3,595** | **4,002** | **4,002** |

g. Planned figures come from the FY22 ETAP. Actual figures are forecast accessions from known reservations.

h. Current quotas approved for FY23; international and reserve quotas assumed constant for FY24 and FY25.

2

Subj:  FISCAL YEAR 2023 ENLISTED TRAINING AND ACCESSIONS          5311
    PLAN

6. <u>Deviations</u>. This ETAP may be updated as needed to account for changes in budget, billet reprogramming, and workforce dynamics. Enclosure (2), the A-school Enrollment Needs Forecast is updated and published quarterly by CG-126; the most recent version will be considered authoritative.

#

Enclosures:    (1) FY23 CGRC Cape May Load Plan
               (2) FY23 A-School Enrollment Forecast

Dist:   COMDT (CG-00B)
      COMDT (CG-8, 821, 833)
      CG DCMS (DCMS-DPR)
      COMDT (CG-11)
      COMDT (CG-12)
      COMDT (CG-13)
      COMDT (CG-R)
      PSC (EPM, RPM)
      CGRC
      CG FORCECOM (FC-T)
      CG TRACEN Cape May



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

EXHIBIT 20

AUG 2 4 2021

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                       COMMANDERS OF THE COMBATANT COMMANDS
                       DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense
                Service Members

      To defend this Nation, we need a healthy and ready force.  After careful consultation with medical experts and military leadership, and with the support of the President, I have determined that mandatory vaccination against coronavirus disease 2019 (COVID-19) is necessary to protect the Force and defend the American people.

      Mandatory vaccinations are familiar to all of our Service members, and mission-critical inoculation is almost as old as the U.S. military itself.  Our administration of safe, effective COVID-19 vaccines has produced admirable results to date, and I know the Department of Defense will come together to finish the job, with urgency, professionalism, and compassion.

      I therefore direct the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19.

      Service members are considered fully vaccinated two weeks after completing the second dose of a two-dose COVID-19 vaccine or two weeks after receiving a single dose of a one-dose vaccine.  Those with previous COVID-19 infection are not considered fully vaccinated.

      Mandatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance.  Service members voluntarily immunized with a COVID-19 vaccine under FDA Emergency Use Authorization or World Health Organization Emergency Use Listing in accordance with applicable dose requirements prior to, or after, the establishment of this policy are considered fully vaccinated.  Service members who are actively participating in COVID-19 clinical trials are exempted from mandatory vaccination against COVID-19 until the trial is complete in order to avoid invalidating such clinical trial results.

      Mandatory vaccination requirements will be implemented consistent with DoD Instruction 6205.02, "DoD Immunization Program," July 23, 2019.  The Military Departments should use existing policies and procedures to manage mandatory vaccination of Service members to the extent practicable.  Mandatory vaccination of Service members will be subject to any identified contraindications and any administrative or other exemptions established in Military Department policy.  The Military Departments may promulgate appropriate guidance to carry out the requirements set out above.  The Under Secretary of Defense for Personnel and



Readiness may provide additional guidance to implement and comply with FDA requirements or Centers for Disease Control and Prevention recommendations.

The Secretaries of the Military Departments should impose ambitious timelines for implementation. Military Departments will report regularly on vaccination completion using established systems for other mandatory vaccine reporting.

Our vaccination of the Force will save lives. Thank you for your focus on this critical mission.

2

R 262212Z AUG 21
FM COMDT COGARD WASHINGTON DC
TO ALCOAST
BT
UNCLAS FOUO                                                    EXHIBIT 21
ALCOAST 305/21
SSIC 6230
SUBJ:  COVID 19: MANDATING COVID 19 VACCINATION FOR
MILITARY MEMBERS
A. SECDEF MEMO DTD 24 AUG 21: Memorandum for Senior Pentagon
Leadership, Commanders of the Combatant Commands, and Defense
Agency and DoD Field Activity Directors
B. DoD Immunization Program, DoDI 6205.02, DTD 23 JUL 19
C. Immunizations and Chemoprophylaxis, COMDTINST M6230.4 (series)
1. In REF (A) the Secretary of Defense determined that mandating the
vaccine against Coronavirus Disease 2019 (COVID 19) for Service
members is necessary to protect the military and defend the American
people. The Secretary of Defense directed the Secretaries of the
Military Departments to immediately begin full vaccination of all
active duty or Ready Reserve members of the Armed Forces, under
Department of Defense (DoD) authority, who are not fully vaccinated
against COVID-19. The Secretary of Defense directed that only
vaccines that have received full licensure from the Food and Drug
Administration (FDA) be used for mandatory vaccination. He also
directed that vaccination requirements be implemented consistent
with REF (B) and that the Military Departments use existing policies
and procedures, to the extent practicable, to manage mandatory
vaccination of Service members.
2. REF (B) applies to the Coast Guard at all times by agreement with
the Department of Homeland Security, and REF (C) is a joint
directive that also applies to the Coast Guard.
3. REF (C) will be updated to reflect the Secretary of Defense's
direction. Consistent with the Secretary of Defense's direction, all
Coast Guard active duty and Ready Reserve members who are not fully
vaccinated, unless they are granted an exemption or accommodation,
are required to receive the Pfizer BioNTech COVID 19 vaccine as an
initial series, and subsequently as indicated, to comply with
recommended vaccine schedules necessary to achieve full vaccination
against COVID-19. The Pfizer-BioNTech COVID-19 was granted license
by the Food and Drug Administration (FDA) on 23 Aug 2021.
4. Currently, Service members who have already received all required
doses of an FDA licensed vaccine, a vaccine administered under the
FDA's Emergency Use Authorization (EUA), or a vaccine on the World
Health Organization Emergency Use Listing are considered fully
vaccinated two weeks after the last required dose. Service members
who voluntarily receive any of those vaccines after the
establishment of this policy will also be considered fully
vaccinated after having met the vaccine manufacturer's dosing and
timing requirements. Those with previous COVID-19 infection are not
considered fully vaccinated. Service members who are currently
enrolled and actively participating in a COVID-19 clinical trial are
exempt from mandatory vaccination until the trial is complete to
avoid invalidating such clinical trial results. Vaccines are readily
available at Coast Guard clinics, military treatment facilities,
and civilian healthcare providers.
5. Further implementation guidance on mandatory vaccination is
forthcoming.
6. A fully vaccinated Service will save lives, and we will move
ambitiously to fully vaccinate our Service members. Consistent with
the Secretary of Defense's guidance, my intention is to use, to the
extent practicable, existing policies and procedures to manage the
mandatory vaccination of our Service members. We will ensure the
expeditious promulgation of policies and procedures where existing
guidance is insufficient or incomplete.

Case 4:22-cv-00825-P   Document 6-1   Filed 09/16/22   Page 59 of 84   PageID 561

7. Commanding Officers shall ensure that all Service members are
aware of this message and made available and scheduled for
vaccination in coordination with servicing medical personnel.
Commanding Officers and leaders shall not commence administrative
or disciplinary action based solely on a Service member's decision
to decline vaccination until such implementing guidance is
promulgated.

8. POC: CDR S.E. Russell, CVIC Incident Commander, ██████████,
COVID19@uscg.mil.

9. ADM K. L. Schultz, Commandant (CCG), sends.

10. Internet release is not authorized.

R 072247Z SEP 21
FM COMDT COGARD WASHINGTON DC                          **EXHIBIT 22**
TO ALCOAST
BT
UNCLAS
ALCOAST 315/21
SSIC 6230
SUBJ:  COVID-19: MANDATING COVID-19 VACCINATION FOR
MILITARY MEMBERS: UPDATE 1
A. COMDT COGARD WASHINGTON DC 262212Z AUG 21/ALCOAST 305/21
B. Coast Guard Medical Manual, COMDTINST M6000.1 (series)
C. Military Religious Accommodation, COMDTINST 1000.15 (series)
D. Immunization and Chemoprophylaxis for the Prevention of
Infectious Diseases, COMDTINST M6230.4 (series)
1. The Coast Guard has been and continues to focus on mission
and personnel readiness amid the ongoing COVID-19 pandemic.
COVID-19 has negatively impacted both for over 18 months. Data and
modeling also indicate that available vaccines are effective
against severe illness and mortality caused by COVID-19. A fully
vaccinated military force saves lives, protects those we serve
alongside and our loved ones, and ensures our readiness. Commanders,
Commanding Officers, and Officers in Charge shall lead by example,
and act with a sense of urgency to meet this intent as soon as
operations allow, starting immediately.
2. Commanders, Commanding Officers, and Officers in Charge shall
direct unvaccinated active duty and ready reserve members to
initiate the COVID-19 vaccination regimen immediately, and in doing
so shall ensure members are scheduled and made available to receive
the vaccine. Active duty and ready reserve members without approved
exemptions shall get fully vaccinated against COVID-19. Counseling
of unvaccinated members on this requirement, the timeline for
vaccination, and the process to request medical exemption or
religious accommodation shall be documented through Administrative
Remarks Form, CG-3307. Commanders, Commanding Officers and Officers
in Charge shall only use the template provided. The standard
administrative remarks template for this counseling is available at
the COVID Community of Practice Portal Page:
(Copy and Paste URL Below into Browser)

https://cg.portal.uscg.mil/units/cgcpe2/Pages/HomeCOP.aspx?View=%7
B4724ff56-43ee-4941-beaf-5af3500e88f4%7D

3. Given the need to safeguard the workforce, and maintain
readiness, the Coast Guard will determine additional measures
necessary to mitigate health risks to members of the Service and
our communities posed by those who are not yet vaccinated. These
measures may include additional restrictions on official travel,
liberty, and leave, as well as cancellation of "A" and "C" school
orders. Further guidance regarding these measures will be provided
separately.
4. All members shall be provided any vaccine that has received Food
and Drug Administration (FDA) licensure. Currently, the
Pfizer-BioNTech COVID-19 vaccine meets this requirement. Members
may also choose to receive any COVID-19 vaccine that is fully
approved by the FDA, administered under the FDA's Emergency Use
Authorization (EUA), or a vaccine on the World Health Organization
Emergency Use Listing. Additional quantities of vaccine are being
delivered to Coast Guard clinics to accelerate vaccination of the
entire workforce and are available for any active duty or ready
reserve member. This message does not change the existing authority

for Coast Guard clinics to vaccinate Coast Guard civilian employees, contractors, or Coast Guard dependent family members who voluntarily seek vaccination.

5. All military personnel may voluntarily get vaccinated outside of a Coast Guard clinic in accordance with REF (A), but must meet the timeline prescribed by their Commanders, Commanding Officers, and Officers in Charge. Personnel who have TRICARE may receive their vaccination from their Primary Care Provider or from a civilian pharmacy that accepts TRICARE. There is no charge for the vaccine at pharmacies in the Tricare network. A list of CG clinics supporting all units in the CG is available at:
(Copy and Paste URL Below into Browser)

https://www.reserve.uscg.mil/Portals/2/Documents/PDF/HSWL_HRC_list
_SELRES%232.pdf?ver=2018-08-17-135417-933

The COVID vaccine is federally funded and may also be available free of charge through state and local health departments.

6. Members shall request and retain the hard copy immunization record from the vaccination clinic site. Those members who get vaccinated outside of a Coast Guard clinic shall provide the following information to their cognizant Coast Guard clinic:
(1) date the vaccine was administered, (2) the vaccine name or code, (3) the manufacturer and lot number, (4) the dose administered, and (5) clinic site. Providing false vaccination information is a violation of Article 107, UCMJ and may also result in administrative and/or disciplinary action.

7. This message constitutes a lawful general order. Failure to comply with any of its provisions is a failure to obey a lawful order punishable under Article 92 of the Uniform Code of Military Justice (UCMJ). It may result in punitive and/or administrative action, including initiation of discharge proceedings.

8. Additional guidance is forthcoming. Updates will provide direction to commands regarding mandatory vaccination documentation and procedures, and additional detail regarding administrative measures for unvaccinated personnel to safeguard the workforce and maintain readiness.

9. POC: S.E. Russell, CVIC Incident Commander, ███████████,
COVID19@uscg.mil.

10. RADM K. E. Lunday, Acting Deputy Commandant for Mission Support (DCMS), sends.

11. Internet release is not authorized.

EXHIBIT 23



# COVID 19 Military Vaccination Metrics
### Data updated 25 MAY 22

| Vaccination Status | Active (40,857) | | Reserve (6,030) | | Total (46,887) | |
|---|---|---|---|---|---|---|
| Fully Vaccinated | 39,744 | 97% | 5,623 | 93% | 45,367 | 97% |
| Partially Vaccinated | 178 | 1% | 36 | 1% | 214 | 1% |
| Unvaccinated | 935 | 2% | 371 | 6% | 1,306 | 2% |
| Boosted | 12,390 | | 960 | | 13,350 | |

## Notes

| | |
|---|---|
| Fully Vaccinated | Direct report from MRRS |
| Unvaccinated | Calculated from MRRS = Unvaccinated – Partially Vaccinated |
| Partially Vaccinated | Calculated from MRRS = members showing 1 dose of a 2 shot series, RA, Admin refusal = [Unvaccinated – (RA Requested + Medical Temporary + Medical Permanent + Partially Vaccinated)]  • Does not include those overdue for 2nd dose of 2 shot series  • Includes members who have not submitted any paperwork for exemptions & do not have any documented vaccination in MRRS |
| Hard Refusal | |
| RA Received by CG-133 | Sum of In review, Withdrawn, RA Total Granted, RA Total Denied |
| RA Total Granted | [Initial response: Granted] + [Appeal: Approved] |
| RA Appeal in Progress | Not captured in MRRS. Tracked manually |
| RA Appeal Approved | Not captured in MRRS. Tracked manually |
| Appeal: Denied | Member status changed to "Hard Refusal." Not captured in MRRS. Tracked manually |
| No Appeal Submitted | Includes BOTH members within and past the 10 day initial decision notification |
| Vaccine Compliance | Members who decide to receive vaccine after RA denied |
| On hold | Members with retirements/separations prior to 01JAN23, in the Medical Board process, or cadets at USCGA, or missing documentation |
| If initial Response is denied and member takes no action, after 10 days they are "Admin Refusal" | |
| Members in accession programs (Recruit Training, CGA, OCS, etc.) are still included in this report. | |

| Unvaccinated Status | Total | Active | Reserve |
|---|---|---|---|
| Hard Refusal* | 301 | 155 | 146 |
| Medical Exempt Permanent | 4 | 3 | 1 |
| Medical Exempt Temporary | 32 | 30 | 2 |
| RA Received by CG-133 | 1336 | 1047 | 289 |
| Pending | 2 | 2 | 0 |
|    Administrative Exemption | 45 | 40 | 5 |
|    Other | 39 | 30 | 9 |
|    RA Total Granted | 4 | 4 | 0 |
|    RA Total Denied | 1246 | 971 | 275 |
|    Appeal: Submitted | 951 | 758 | 193 |
|    Processing | 5 | 3 | 2 |
|    Hold | 1 | 0 | 1 |
|    With Legal | 1 | 1 | 0 |
|    Post-Legal Edits | 3 | 3 | 0 |
|    At Decision Authority | 5 | 5 | 0 |
|    At Appellant Authority | 14 | 12 | 2 |
|    Ready for Signature | 187 | 142 | 45 |
|    Retired/Separated | 9 | 5 | 4 |
|    Admin Exemption | 43 | 40 | 3 |
|    Appeals Signed (Denied) | 673 | 542 | 131 |
|    Appeals Signed (Approved) | 4 | 2 | 2 |
|    Other | 6 | 3 | 3 |
|    Appeals Sent to CMDS | 706 | 574 | 132 |
|    No Appeal Submitted** | 198 | 139 | 59 |
|    Appeal Submission Pends | 3 | 3 | 0 |
|    Vaccine Compliance | 128 | 100 | 28 |

EXHIBIT 24

Exhibit 1 to Declaration of CDR Grant

**U.S. Coast Guard Court-Ordered Data**

Current as of 21 January 2021

(1) Number of religious exemption requests from COVID-19 vaccination:

| # Initial Requests Under Review | # Initial Request Approved | # Initial Requests Denied | # Denials Where Chaplain Determined Belief Sincere | Total Initial Requests |
|---|---|---|---|---|
| 959 | 0 | 335 | 335 | 1304[1] |

| # Denials w/o Appeal Before Deadline[2] | # Appeals Under Review | # Appeals Denied | # Appeals Approved | Fully Resolved Requests | |
|---|---|---|---|---|---|
| | | | | Aggregate # of Approved Requests | Aggregate # of Denied Requests |
| Unknown | 125 | 0 | 0 | 0 | 0 |

(2) Number of medical-exemption requests from COVID-19 vaccination:

| Temporary Medical Exemption Requests | Permanent Medical Exemptions Denied | Permanent Medical Exemptions Granted | Total Permanent Medical Exemption Requests |
|---|---|---|---|
| Unknown | 4 | 6 | 12 |

(3) Number of courts-martial and separation proceedings pending or concluded against a service member whose request for a religious exemption was denied after appeal:

| Courts-Martial | | Administrative Separation (ADSEP) | |
|---|---|---|---|
| Pending | Concluded | ADSEP Initiated | ADSEP Completed |
| 0 | N/A | 0 | 0 |

EXHIBIT 25

# Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **MICHAEL BAZZREA, et al.,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | **CA No. 3:22-cv-00265** |
| | ) | |
| **ALEJANDRO MAYORKAS, et al.,** | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### DECLARATION OF COMMANDER BROOKE GRANT

I, Commander Brooke Grant, hereby declare and state:

1.      I am a commissioned officer serving on active duty in the United States Coast Guard.  I have served on active duty in the Coast Guard for over 20 years and am currently serving as Chief, Military Personnel Policy Development Division (CG-1331).  I have served in this position since August 2021.  My prior assignments include Logistics Department Head, United States Coast Guard Sector Key West; Deputy, Office of Legal Policy and Program Development; and Staff Attorney, United States Seventh Coast Guard District Legal Office.  I am generally aware of the allegations set forth in the pleadings filed in this matter and make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.  CG-1331 is the Coast Guard Headquarters office that originally receives requests for religious accommodation from the COVID-19 vaccination requirement.

2.      Exhibit 1, attached to this declaration, provides updated data with respect to the COVID-19 vaccination requirement.  However, certain data elements are either not available or

require further explanation.

3.     Requests for religious accommodation from the COVID-19 vaccination requirement in the Coast Guard are centrally managed, with the Office of Military Personnel Policy, CG-133, serving as the final approval authority.  Religious accommodation requests are not tracked until they reach Coast Guard Headquarters.  Accordingly, the column labeled "Total Initial Requests" reflects only the number of religious accommodation requests that have been received at Headquarters.  Most requests for a religious accommodation from the COVID-19 vaccination requirement have been adjudicated.

4.     In March 2022, the Coast Guard granted an administrative exemption to the vaccination requirement for all members with an approved separation or retirement date no later than October 1, 2022.  The Coast Guard did not act on any pending religious accommodation requests or appeals that were submitted by members who qualified for this administrative exemption.

5.     Permanent medical exemptions from vaccine requirements are also centrally managed at Coast Guard Headquarters through the Office of Occupational Medicine, CG-112.  CG-112 does not actively track the number of applications for permanent medical exemptions that have been submitted or denied.  All permanent medical exemptions granted thus far are based on a documented severe allergic reaction to a COVID-19 vaccine or a component of the vaccine.

6.     Temporary medical exemptions are processed by medical officers in the field.  The Coast Guard does not maintain a database from which it can determine a complete and accurate account of all temporary medical exemptions that have been granted.  In addition, because the temporary exemptions expire and are based on medical conditions that could arise during a reporting period (e.g., a member may be granted a medical exemption if he or she is infected with

COVID-19 and therefore ineligible to be vaccinated for the duration of the infection and for a period afterwards), changes in the total number of temporary medical exemptions from one reporting period to another would not reflect the total number of temporary medical exemptions that have been granted.  For example, during any given period, two temporary medical exemptions might expire and two new temporary medical exemptions might be granted, but the total number of temporary medical exemptions would remain the same.

7.      The Coast Guard has not taken any action to Courts-Martial members that have refused an order to become vaccinated. The Coast Guard has initiated administrative separations for enlisted members and board action for officers who have not complied with COVID-19 vaccination requirements.   Of the administrative separations that have been completed, all members received a discharge with a characterization of honorable.

8.       I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Dated: August 30, 2022

Brooke Grant
Digitally signed by Brooke Grant
Date: 2022.08.30 08:31:19 -04'00'

_____
BROOKE GRANT
Commander
U.S. Coast Guard

Exhibit 1 to Declaration of CDR Grant

## U.S. Coast Guard COVID-19 Vaccination Requirement Data

### Current as of 29 August 2022

(1) Number of religious exemption from COVID-19 vaccination:

| # Initial Requests Under Review | # Initial Request Approved | # Initial Requests Denied | Total Initial Requests |
|---|---|---|---|
| 1 | 5 | 1236[1] | 1343 |

| # Appeals Under Review | # Appeals Denied | # Appeals Approved | Fully Resolved Requests | |
|---|---|---|---|---|
| | | | Aggregate # of Approved Requests | Aggregate # of Denied Requests |
| 3 | 881[2] | 7 | 12 | 1183 |

(2) Number of medical-exemption requests from COVID-19 vaccination:

| Temporary Medical Exemption Requests | Permanent Medical Exemptions Denied | Permanent Medical Exemptions Granted | Total Permanent Medical Exemption Requests |
|---|---|---|---|
| Unknown | Unknown | 8 | Unknown[3] |

(3) Number of courts-martial and separation proceedings pending or concluded against a service member whose request for a religious exemption was denied after appeal:

| Courts-Martial | | Administrative Separation (ADSEP) | |
|---|---|---|---|
| Pending | Concluded | ADSEP Initiated | ADSEP Completed |
| 0 | N/A | 81 | 73 |

[1] This does not include members who submitted a religious accommodation request but were then granted an administrative exemption based on an approved separation or retirement date no later than October 1, 2022.
[2] This does not include members who submitted a religious-accommodation appeal but were then granted an administrative exemption based on an approved separation or retirement date no later than October 1, 2022.
[3] The Coast Guard is not actively tracking requests and continues to process permanent medical exemption requests when received.

# HACKERSTEPHENS LLP

EXHIBIT 26

HEATHER GEBELIN HACKER                                    (512) 399-3022

Partner                                      Heather@HackerStephens.com

September 13, 2022

Lyle W. Cayce, Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

**Via ECF**

Re: *U.S. Navy SEALs 1-26 v. Biden*, No. 22-10077 consolidated with 22-10534

Dear Mr. Cayce,

Pursuant to Federal Rule of Appellate Procedure 28(j), Plaintiffs-Appellees submit additional authority and newly discovered facts that counsel just became aware of this morning.[1] On June 2, 2022, the Department of Defense Acting Inspector General (DoDIG) sent a memo to the Secretary of Defense to inform him "of potential noncompliance with standards for reviewing and documenting the denial of religious accommodation requests of Service members identified through complaints submitted to [DoDIG]" regarding DoD's handling of religious accommodation requests pertaining to the COVID-19 vaccine mandate. Among DoDIG's findings, which undermine Defendants-Appellants' arguments in this appeal:

- There is a "trend of generalized assessments rather than the individualized assessment that is required by Federal law and DoD and Military Service policies."
- The denial memorandums reviewed "did not reflect an individualized analysis demonstrating that the Senior Military Official considered the full range of facts and circumstances relevant to the particular religious accommodation request."

---

[1] See *DoDIG memo to SECDEF highlights deliberate violation of Federal Law within the DoD*, Terminal X (Sept. 13, 2022), https://trmlx.com/dodig-memo-to-secdef-highlights-deliberate-violation-of-federal-law-within-the-dod/.

*U.S. Navy SEALs 1-26 v. Biden*, No. 22-10077 consolidated with 22-10534
Page 2

- The "volume and rate at which decisions were made to deny requests is concerning. . . . Assuming a 10-hour work day with no breaks or attention to other matters, the average review period was about 12 minutes for each package. Such a review period seems insufficient to process each request in an individualized manner and still perform the duties required of their position."

A copy of the memo is attached.

Respectfully submitted,

/s/Heather Gebelin Hacker
Heather Gebelin Hacker
Counsel for Plaintiffs-Appellees

Encl: Info Memo from DoD Acting Inspector General Sean W. O'Donnell to Defense Secretary Lloyd Austin

cc: All counsel of record via ECF

**CUI**



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

SEP – 2 2022

MEMORANDUM FOR UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND
READINESS

SUBJECT:  Referral of Info Memo from the Office of Inspector General Regarding Coronavirus
Disease 2019 Religious Accommodation Requests

Mandatory vaccination against coronavirus disease 2019 (COVID-19) is necessary to
protect the Force and ensure its readiness to defend the American people.  Uniform standards
must be applied to all requests for medical or administrative exemption in a manner consistent
with the law and DoD policy, including DoD Instruction 6205.02, "DoD Immunization
Program," and DoD Instruction 1300.17, "Religious Liberty in the Military Services."

The DoD Office of Inspector General transmitted the attached Info Memo regarding
information it received and reviewed concerning denials of religious accommodation requests
from COVID-19 vaccination requirements.  I am referring the Info Memo to you for appropriate
action, in coordination with the Secretaries of the Military Departments and the DoD Office of
General Counsel, as necessary and appropriate.

Attachment:
As stated

cc:
Secretaries of the Military Departments
General Counsel of the DoD
Acting Inspector General of DoD



OSD005557-22/CMD007059-22

Controlled by:  DoD OIG
Controlled by:  Administrative Investigations
CUI Categories:  PRIIG/INV/WHSTL
Limited Dissemination Control:  FEDCON
POC:  Marguerite Garrison 703-604-8500

**CUI**

154



**INSPECTOR GENERAL**
DEPARTMENT OF DEFENSE
4800 MARK CENTER DRIVE
ALEXANDRIA, VIRGINIA 22350-1500

**INFO MEMO**

June 02, 2022

**FOR:** SECRETARY OF DEFENSE                    DepSecDef Action_____

**FROM:** Sean W. O'Donnell, Acting Inspector General   *Sean W O'Donnell*

**SUBJECT:** Denials of Religious Accommodation Requests Regarding Coronavirus
Disease-2019 Vaccination Exemptions

- **Purpose.** To inform you of potential noncompliance with standards for reviewing and documenting the denial of religious accommodation requests of Service members identified through complaints submitted to my office.

- The Department of Defense (DoD) Hotline received dozens of complaints regarding denied religious accommodation requests from Service members. We found a trend of generalized assessments rather than the individualized assessment that is required by Federal law and DoD and Military Service policies.[1]

- The denial memorandums we reviewed generally did not reflect an individualized analysis, demonstrating that the Senior Military Official considered the full range of facts and circumstances relevant to the particular religious accommodation request. For example, an Air Force general denied one Airman's request with the brief statement: "I disapprove your request for exemption from vaccinations under the provisions of AFI 48-110, paragraph 2-6.b.3."

---

[1] The Religious Freedom Restoration Act of 1993 (RFRA) prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b). The U.S. Supreme Court has clarified that RFRA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'— the particular claimant whose sincere exercise of religion is being substantially burdened." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-27 (2014) (citation omitted).

DoD Instruction 1300.17, "Religious Liberty in the Military Services," paragraph 3.2.d. ., requires that "[o]fficials charged with making recommendations or taking final action on a Service member's request for the accommodation of religious practices will review each request individually, considering the full range of facts and circumstances relevant to the specific request.… The means that is least restrictive to the requestor's religious practice and that does not impede a compelling governmental interest will be determinative." [Emphasis added.]

Prepared By: John Fazakerley, SA to DIG AI
Phone Number: 703-604 8764

Controlled by: DoD OIG
Controlled by: Administrative Investigations
CUI Category: PRIIG/INV/WHSTL
Limited Dissemination Control: FEDCON
POC: Marguerite Garrison 703-604-8500

**CUI**

OSD004843-22/CMD006126-22

CUI

Case: 22-10077     Document: 00516469579     Page: 5     Date Filed: 09/13/2022
Case 4:22-cv-00825-P   Document 6-1   Filed 09/16/22   Page 73 of 84   PageID 575

- We also reviewed appellate authority decisions that overturned denials of religious accommodation requests. Some of the appellate decisions included documentation that demonstrated a greater consideration of facts and circumstances involved in a request.

- Additionally, the volume and rate at which decisions were made to deny requests is concerning. The appeal authorities of the Services we reviewed indicated that an average of 50 denials per day were processed over a 90-day period. Assuming a 10-hour work day with no breaks or attention to other matters, the average review period was about 12 minutes for each package. Such a review period seems insufficient to process each request in an individualized manner and still perform the duties required of their position.

- We bring this to your attention for any action you deem appropriate to ensure that published guidance, including DoD Instruction 1300.17, "Religious Liberty in the Military Services," are followed when acting on requests for religious exemption from coronavirus disease-2019 (COVID-19) vaccination requirements. We will make available to the DoD General Counsel the complaints received by the Hotline that support our comments.

- Finally, we want to remind you of our recently announced Audit of Military Departments' Processing of Coronavirus Disease-2019 Vaccination Exemptions and Disciplinary Actions for Active Duty Service Members (Project No. D2022-D000AW-0081.000). The objective of this audit is to determine whether the Military Departments are processing exemption requests for the COVID-19 vaccination and taking disciplinary actions for active duty Service members in accordance with Federal and DoD guidance.

- If you have any questions, please contact me at 703-604-8300 or Marguerite Garrison, Deputy Inspector General for Administrative Investigations at 703-604-8500, or marguerite.garrison@dodig.mil. If you wish to discuss the specifics of the ongoing audit, please contact Brett Mansfield, Deputy Inspector General for Audit at 703-604-8900, or brett.mansfield@dodig.mil.

cc:
General Counsel of the Department of Defense

2

 Gmail

alaric stone ███████████████

EXHIBIT 27

## FW: C19 Vaccination & Personnel Admin mini FAQs

**Stone, Alaric B LTJG USCG (USA)** ████████████████
To: alaric stone ████████████████

Sun, Jun 5, 2022 at 8:49 AM

**From** Gilliland, Jame  W CPO USCG (USA) ███████████████
**Sent:** Wednesday, June 1, 2022 11:37 AM
**To:** Stone, Alaric B LTJG USCG (USA) ████████████
**Subject:** FW: C19 Vaccination & Personnel Admin mini FAQs

**From** Spencer, Devin R MCPO USCG (USA) ████████████
**Sent:** Wednesday, June 1, 2022 8:28 AM
**To:** D05-DG-LANT-AFLOAT-CC ███████████  D05-DG-LANT-ASHORE-CC ████████
████████
**Cc** Demello, Jeremy P MCPO USCG (USA) █████████████; Nile , Daryl Peter MCPO USCG BASE
PORTSMOUTH (USA) ██████████
**Subject:** FW: C19 Vaccination & Personnel Admin mini FAQs

**From** Pulkkinen, Aly  on J MCPO USCG PSC (USA) ████████████
**Sent:** Tuesday, May 31, 2022 3:14 PM
**To:** HQS-DG-lst-GoldCMC████████████  HQS-DG-lst-SilverCMCs ████████████
**Subject:** C19 Vaccination & Personnel Admin mini FAQs

Good afternoon, All!

Below are some of the common questions we're fielding and wanted to push the general answers for broader awareness.
Thi  info i  current a  of today  Thank you all for your  upport and patience with thi   No, it i  really not 'all COVID, all the
time' around here…

1.   Should members who refused vaccination be removed from the advancement/promotion list?  One of our members
who refused to get vaccinated is on the EPAA advancement list for 1JUN.  Since he is in violation of Article 90 ("Willfully
Disobeying a Superior Commissioned Officer") and Article 92(2) ("Failure to Obey other Lawful Order"), we will contact
EPM and a  k that the member be pulled from the advancement li  t

A. This pulls below is cut and pasted from the pending email to commands of the 22 unvaccinated members on the June EPAA. In future months, we aim to have this email sent to applicable commands prior to the EPAA relea e

Effective 24 May 2022, enli ted Coa t Guard member  who are not in compliance with the COVID 19 vaccine mandate established in ALCOAST 305/21 and 315/21 are ineligible to advance. This policy only applies to unvaccinated enlisted Coast Guard members issued P&D-41D or P&D-41E, as applicable. These members are considered "non-compliant." Commanders, Commanding Officers, and Officers-In-Charge  hall withhold the advancement of non compliant enli ted member  in accordance with the provisions of Article 3.A.21.b of Enlistments, Evaluations, and Advancements, COMDTINST M1000.2C. Non-compliant members will be allowed to compete for advancement, but their advancement shall be withheld until they become compliant with the COVID-19 vaccine mandate. Non-compliant members who fail to gain compliance prior to the e piration of the applicable advancement eligibility li t will have to re-compete for advancement in the next advancement cycle. If _____Member XX___  is non-compliant, you are directed to withhold their advancement in accordance with the provisions of Article 3.A.21.b of Enlistments, Evaluations, and Advancements, COMDTINST M1000.2C. This withholding applie  to frocking authorization  or ceremonial advancement  Command  having already frocked or ceremoniously advanced members who are now non-compliant may rescind those frockings or ceremonial advancements at their discretion, but are directed to do so no later than the expiration of the applicable advancement eligibility list.

2. Do we need to do a disciplinary EER/OER on the member? Unless told otherwise, we intend to initiate disciplinary evaluation  on all member  who refu ed order  to get vaccinated

A  No  Current policy applie   The i uing of a 3307 without NJP, even one documenting a COSO, i not included in Article 4.C.2 of Enlistments, Evaluations, and Advancements, COMDTINST M1000.2C, as a reason to initiate an unscheduled (or discipline) EER. However, commands are authorized per Article 4.D.3.i of Enlistments, Evaluations, and Advancements, COMDTINST M1000.2C, to initiate a Change of Commanding Officer' Recommendation EER "for any good and  ufficient rea on " With respect to NJP, the ability to NJP members solely for failing to comply with the COVID-19 mandate is specifically withheld by para. 7 of ALCOAST 305/21 ("Commanding Officers and leaders shall not commence administrative or disciplinary action based solely on a Service member's decision to decline vaccination until  uch implementing guidance i  promulgated")  Para  5 of ALCOAST 446/21 unwind this, just a little. ("Military members whose religious accommodation request has been denied with a final action decision, and who refuse to become fully vaccinated against COVID-19, are subject to their command accounting for vaccine refusal in the execution of routine administrative functions (e.g., evaluation , advancement and re enli tment recommendation , and other  imilar action  undertaken in the regular course of business")). However, NJP is not a routine administrative function undertaken in the regular course of business; therefore, we are advising commands not to NJP members based solely on failing to comply with the COVID-19 mandate.

3. How should we handle future EERs/OERs going forward? Will enlisted members receive an Unsat in conduct on all future EER , and for officer , hould thi  be noted in Block 5 comment  until they comply with order  to be vaccinated or otherwise received a medical exemption? Please provide guidance.

A. Current PSC guidance for EERs is that commands may use all performance, including failing to obey a lawful order for the COVID-19 vaccine, as long as that performance (including action and inaction) occurred in the marking period. The rating chain retains the authority to mark the member as appropriate, to include mark  of 1, 2, 3, U,  and N  Any comment  for the e mark  mu t be ju tified per policy and must NOT include prohibited comments which in this case would be for personal medical information. To that end, EER comments should address the "failure to obey a lawful order" or "failure to maintain military medical readiness requirements" but should refrain from specifically commenting on refu ing a vaccine e plicitly or implicitly

Before awarding a mark, con ider the following, all mu t have been completed on or before the end of the marking period:

    a.  Has all medical exemption and religious accommodation requests been exhausted (i.e. Did not seek it out, Did not follow through, or Denied)?

    b.  Was the member ordered via CG-3307 to be at a time and place to receive the vaccine?

    c.  Did the member not receive the vaccine as ordered and receive a CG-3307 documenting that fact?

    1  Did the refu al/no  how that wa  documented in the CG 3307 occur within the marking period;

    or

      2.  Did the member continue to refuse vaccination through the marking period if already in receipt of a CG-3307 from a previous marking period?

**If a, b, and c are "Yes" and either c1 or c2 is "Yes", please re-submit removing the prohibited comments.

**If a, b, or c are "No" or both c1 and c2 are "No", then command engagement will be required and that performance will need to be pu hed until the ne t marking period

4  Will member  e ecute PCS order ?  EPM ha  advi ed u  that member  who refu ed to get vaccinated after denial of their religious accommodation appeal are not being discharged.  Members will be retained until the expiration of their enlistment at which time they will be ineligible to re-enlist.  Until discharge, are these members eligible to execute PCS orders?

    A.  Certain unvaccinated members will execute PCS orders based on the needs of the service.  All enli ted member  eligible for a  ignment in AY22 were notified whether they will e ecute PCS order  in AY22.  These members received one of two different orders notes:

    a.  "In accordance with ALCGPSC 016/22 and subject to service need, service members who refuse to become fully compliant with the COVID-19 vaccine mandate established in ALCOAST 305/21 and 315/21 are ineligible to execute PCS orders.  <u>The execution of these orders was determined not to be for the good of the  ervice and may not be marked READY to e ecute until the  ervice member gain  full compliance with COVID-19 mandate.</u>  Service members must be compliant with the COVID-19 vaccine mandate before reenlisting or extending to meet the obligated service requirements contained in these orders.  Additionally, service members issued CG-3307 PD-41D/E are ineligible to reenlist or extend by operation due to the Commi  ion of a Seriou  Offence IAW the provi ion  of Article 1 E 2 e 1 of the Enlistments, Evaluations, and Advancements, COMDTINST M1000.2C.  These orders will be canceled on 01 July 2022 if service members remain non-compliant with the COVID-19 vaccine mandate.  Failure to comply with the direction in ALCOAST 305/21 or 315/21, may lead to further administrative or di ciplinary action, to include involuntary admini trative  eparation for the good of the  ervice "

    b  <u>"In accordance with ALCGPSC 016/22, you are authorized to e ecute the e PCS order  ba ed on the needs of the service regardless of your current vaccination status.</u>  There are no obligated service requirements for the execution of these orders.  This authorization does not exempt you from becoming compliant with the COVID-19 vaccination mandate established in ALCOASTs 305/21 and 315/21, or the ri k mitigation and leader hip mea ure  e tabli hed in ALCOAST 352/21  Failure to comply with the direction in ALCOAST 305/21 or 315/21, may lead to further administrative or disciplinary action, to include involuntary administrative separation from the Coast Guard.  Members issued CG-3307 PD-41D/E are ineligible to reenlist or extend by operation due to the Commission of a Serious Offense IAW the provi ion  of Article 1 E 2 e 1 of the Enli tment , Evaluation , and Advancement , COMDTINST M1000.2C.  This includes reenlistments and Expiration of Enlistment extensions to meet obligated service requirements for the execution of PCS orders."

    Further, some now non-compliant members are in receipt of PCS orders as a result of a pending advancement which they are no longer eligible to accept. As there is likely another member and it is June eve, tho e order  tand

159

Very respectfully,

CMC AJ Pulkkinen

Personnel Service Center

████████████

ShopCGX.com

EXHIBIT 28

R 021850Z MAY 22 MID600051770801U
FM COMDT COGARD WASHINGTON DC
TO ALCOAST
BT
UNCLAS
ALCOAST 157/22
SSIC 6230
SUBJ:   COVID 19: UPDATE TO COVID-19 ADMINISTRATIVE RISK MITIGATION
AND LEADERSHIP MEASURES
A. COMDT COGARD WASHINGTON DC 262212Z AUG 21/ALCOAST 305/21
B. COMDT COGARD WASHINGTON DC 072247Z SEP 21/ALCOAST 315/21
C. COMDT COGARD WASHINGTON DC 261519Z JAN 22/ALCGPSC 016/22
D. COMDT COGARD WASHINGTON DC 271530Z SEP 21/ALCOAST 352/21
E. COMDT COGARD WASHINGTON DC 080148Z OCT 21/ALCGPSC 104/21
1. This ALCOAST authorizes unvaccinated members to attend Coast
Guard facilitated training required for their assignments. The
Coast Guard continues to take actions with respect to unvaccinated
members, with due regard for the health and safety of our entire
workforce and the need to preserve mission readiness.
2. For the purpose of this message, "unvaccinated members" refers to
personnel who have not completed a COVID-19 vaccination regimen.
Per REF (A), members are considered fully vaccinated two weeks after
the last required dose of an FDA approved COVID-19 vaccine, a
COVID-19 vaccine administered under the FDA's Emergency Use
Authorization, or a COVID-19 vaccine on the World Health
Organization Emergency Use Listing.
3. Paragraph 5.A(2) of REF (D) and Paragraph 4.A. of REF (E) are
cancelled. The following requirements apply to all unvaccinated
members, regardless of their assignment year status:
    a. Unvaccinated members are authorized to attend "C" Schools
specifically required for their assignment, as necessary to meet
mission readiness requirements. No other "C" School training is
authorized for unvaccinated members. FORCECOM, in consultation
with the appropriate Program, will determine which schools are
required to meet mission readiness requirements. Unvaccinated
members may not be able to attend some required "C" schools if the
entity providing the training prohibits unvaccinated member
attendance.
    b. Unvaccinated members must not obligate additional service,
except as a result of executing PCS orders.
4. The current status of all FORCECOM Readiness Activities (AIA
Activities, Exercise Support Activities, and Class "A" and "C"
schools) are regularly updated, and can be found on the ETQC Portal
site at:
(Copy and Paste URL Below into Browser)

https://cg.portal.uscg.mil/units/forcecom/ETQC/SitePages/Home.aspx

5. All other portions of REF (C), (D), and (E) not previously
addressed remain in effect.
6. This message will be cancelled on 02 May 2023, if not rescinded
sooner by me, my successor, or a superior officer.
7: FC POC is CAPT Adrian West, Chief of Staff, email:
███████████████████ .
8. RADM Eric C. Jones, Deputy for Personnel Readiness (DCMS-DPR),
sends.
9. Internet release is not authorized.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ALARIC STONE**, **ERIC JACKSON**, and | ) | |
| **MICHAEL MARCANELLE**, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| **ALEJANDRO N. MAYORKAS**, in his official | ) | |
| capacity as Secretary of Homeland Security, | ) | |
| **LLOYD J. AUSTIN, III**, in his | ) | |
| official capacity as Secretary of Defense, | ) | |
| **LINDA L. FAGAN**, in her official | ) | |
| capacity as Commandant of the Coast Guard, and | ) | |
| **BRIAN K. PENOYER**, in his official capacity | ) | |
| as Assistant Commandant for Human | ) | |
| Resources of the Coast Guard, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF BOATSWAIN'S MATE 1ST CLASS PETTY OFFICER ERIC JACKSON

Pursuant to 28 U.S.C. § 1746, I, Eric Jackson, under penalty of perjury declare as follows:

1.     I am over the age of eighteen and am competent to make this declaration.

2.     I am a non-commissioned officer, a Boatswain's Mate 1st Class Petty Officer, in the United States Coast Guard.

3.     In my current position, I supervise real-time Coast Guard operations for Coast Guard Station South Padre Island. My duties include coordinating building security and directing live maritime operations (including interdictions, rescues, and other safety events). I am also completing my local qualifications to resume performing maritime operations, such as boardings, interdictions, inspections, live fire training, and piloting boats. My responsibilities will further

1

162

include law enforcement and boarding operations.  Additionally, among other duties, I help train new Coast Guard service members in interdiction operations by piloting "Target of Interest" boats. In this role, I use my years of experience in often hostile interdictions to simulate evasive maneuvers I have seen throughout my career, and pass down that vital knowledge to the next generation of Coast Guard service members.

4.      I have served in active service with the Coast Guard for more than 18 years.

5.      The military has rewarded me with numerous medals for my service, including the Coast Guard Special Operations Service Ribbon just this year. I earned this award by serving with a rapid-response interdiction team uniquely trained to intercept human smugglers off the coast of California. My team and I halted many smuggling boats, often loaded with over twenty migrants. We apprehended the captains and transferred migrants to Customs and Border Patrol. Should I be allowed to complete my local qualifications, I would likely resume using my many years of experience in performing similar operations.

6.      Before I joined the Coast Guard, my home was in the Northern District of District of Texas (Arlington, Texas).

7.      I joined the Coast Guard in 2004. From approximately 2004 to 2006, the Coast Guard assigned me to a duty station in Hawaii. From approximately 2006 to 2010, the Coast Guard assigned me to a duty station in New Jersey. From approximately 2010 to 2018, the Coast Guard assigned me to a duty station in Louisiana. From approximately 2018 to June 2022, the Coast Guard assigned me to a duty station in California. In July 2022, the Coast Guard assigned me to a duty station on South Padre Island, Texas. I have never considered any of those duty stations to be my permanent home.

8.      My last move, to South Padre Island in July 2022, occurred despite a Coast Guard policy that I understand prohibits such transfers for unvaccinated personnel. I did not expect a transfer due to this policy. However, I was told that the policy was waived for my case due to the needs of the Coast Guard. I was forced to move my family from California to Texas on short notice.

9.      Since my transfer required a waiver and only occurred due to the Coast Guard's needs, and since a transfer typically incurs a service commitment, I was led to believe that I could continue serving with the Coast Guard until my current enlistment expired.

10.      My Coast Guard "home of record" is, and always has been, in the Northern District of Texas.

11.      When I have voted in the past, I have voted as a resident of the Northern District of Texas. I have never voted as a resident of anywhere else. I intend to vote as a resident of the Northern District of Texas in the future.

12.      Throughout my career in the Coast Guard, I have always considered myself a Texas resident for purposes of any state income tax requirements, because Texas does not have an income tax I have not paid state income tax, and I have never filed a state income tax return for any other state or paid state income tax to any other state.

13.      I plan to reside in the Northern District of Texas when I retire or am separated from the Coast Guard. I have close family in the Northern District of Texas (and close family has lived there all my life), my mother told me that I am her sole intended heir, she owns a house and acreage in the Northern District of Texas (Weatherford, Texas), and I plan to reside at that property with my family upon retirement or separation whenever that may occur.

3

164

14.    When I have been on leave from Coast Guard service, I have often stayed with my family at that property in the Northern District of Texas. I have some personal property at that location.

15.    I consider my residence to be in the Northern District of Texas.

16.    I have lived in other places during my Coast Guard career as stated above but I did so as part of my duty assignment. I have never considered my residence to be anywhere but in the Northern District of Texas.

17.    In approximately April of 2020, I experienced some COVID-19-type symptoms and believed and continue to believe I had COVID-19 at that time. Having fully recovered from what I believe was COVID-19 and thus having natural immunity, I believe I am at less risk of becoming infected again than my fellow vaccinated coworkers and pose less risk to mission accomplishment no matter where I am assigned.

18.    I base this belief on my experiences remaining free from COVID-19 over the past two and a half years since acquiring natural immunity, despite many very close contacts with people who were actively sick with COVID-19.

19.    For instance, during my time performing the mission for which I earned a Coast Guard Special Operations Ribbon, I was frequently in close contact with many ill and unvaccinated migrants, and never became ill myself.

20.    As another example, while aboard the BENJAMIN BOTTOMS, I slept in close quarters with three fully vaccinated personnel. During one tour, all three became ill; however, I remained completely healthy with no COVID-19 symptoms and negative tests throughout the duration of their illness.

4

21.     As yet another example, my unit held a morale event at a San Diego Padres game this past summer. After the game, and after a full day working closely alongside my fully vaccinated and boosted commander, I learned that my commander was sick with COVID-19, and believed he caught it while out in the public during our unit morale event. Due to his illness, our mission was delayed. Despite this very close contact, I did not become ill, and had three negative tests during the delay.

22.     Based on publicly available information presented by the Coast Guard, I understand that the Coast Guard has granted at least eight permanent medical accommodation and 45 temporary medical accommodations.

23.     Based on publicly available information presented by the Coast Guard, I understand that at least approximately 98% of active-duty Coast Guard service members have received COVID-19 vaccinations.

24.     I do not understand how temporary continued mitigation efforts for approximately 2% of the Coast Guard would significantly impact mission readiness, especially because, for example: the Coast Guard readily accommodates those granted medical accommodations when 100% of the Coast Guard has been operating under the same parameters for many months; the CDC's COVID-19 prevention recommendations do not distinguish between vaccinated and unvaccinated persons; the physical fitness of military service members as a group is well above average; and I understand the court injunctions against enforcement of the COVID-19 mandate in other branches (including the Navy, Air Force, and Marines) have not negatively impacted mission readiness and in fact have positively impacted mission readiness because religious service members in those branches can serve.

25.      I am a member of the Christian faith. I understand that vaccinations are a condition of military service and am not opposed to vaccines in principle. However, in accordance with my faith, it is my sincerely held religious belief that abortion is a grave evil and that use of vaccines that cooperate in that evil by incorporating the cell lines of aborted children in their development or testing is not morally justified except in extraordinary circumstances not present here.

26.      I understand that all COVID-19 vaccines currently authorized for use in the United States utilized fetal cell lines in their production or testing. I understand that those fetal cell lines are descended from fetal tissue taken from elective abortions of unborn children.

27.      Because all COVID-19 vaccines authorized for use in the United States utilized fetal cell lines in their production or testing, and the fetal cell lines are descended from fetal tissue taken from elective abortions of unborn children, use of the vaccines would constitute cooperation in the evil of abortion. Such cooperation with evil would violate my sincere religious beliefs.

28.      On November 7, 2021, I submitted a request for religious accommodation to the requirement that I take the COVID-19 vaccination. (**Exhibit 1**, attached). My request for religious accommodation was accompanied by an endorsement, dated the same day, from my commander, Lieutenant Commander David Zwirblis, who stated that our ship "will be able to maintain mission readiness with no hindrance to operations if BM1 Jackson is granted a religious accommodation." (**Ex. 2**, attached.)

29.      I received a denial dated December 14, 2021 (**Ex. 3**, attached) of my November 7, 2021, request for religious accommodation.

6

167