30.     On December 27, 2021, I timely appealed the denial of my request for religious accommodation. (**Ex. 4**, attached.)

31.     In May 2022, I received a purported final denial dated May 3, 2022 (**Ex. 5**, attached) of the appeal of my religious accommodation request.

32.     On May 11, 2022, my commander, Lieutenant Commander David Zwirblis, ordered me to receive the first dose of a fully FDA-approved COVID-19 vaccine by May 24, 2022. (**Ex. 6**, attached.)

33.     Against my religious beliefs and under duress, I attempted to comply with the May 11 order, but upon arrival at the vaccination clinic, I discovered that the only available vaccines were labeled for Emergency Use. I declined vaccination with an Emergency Use drug.

34.     On June 30, 2022, my commander reprimanded me for "Willfully Disobeying a Superior Commissioned Officer" and "Failure to Obey other Lawful Order" under the Uniform Code of Military Justice. (**Ex. 7**, attached.) My commander also stated that I "had the opportunity and means to follow the order [to receive the first dose of the COVID-19 vaccine] and failed to do so."

35.     I acknowledged receipt of the reprimand, but informed my commander that the clinic did not have FDA-approved COVID-19 doses available for me to comply with his commander's order to receive "the first dose of a fully FDA-approved COVID-19 vaccine." (**Ex. 7**, attached.)

36.     On or about August 24, 2022, another of my commanders, Lieutenant (LT) S. D. Gunderson, initiated action to discharge me from the Coast Guard. (**Ex. 8**, attached.)

37.     LT Gunderson informed me of the initiated action to discharge me from the Coast Guard on August 24, 2022—just one month after my transfer to my new duty station due to the "needs of the Coast Guard."

38.     LT Gunderson stated that he was initiating discharge proceedings because I was not available for worldwide assignment.

39.     LT Gunderson informed me that I may expect to encounter prejudice in civilian life due to the discharge.

40.     The Coast Guard has forced me to choose between being involuntarily discharged and requesting retirement, despite my desire to continue serving the United States in the Coast Guard using my nearly two decades of specialized training and experience.

41.     On September 9, 2022, I timely responded to the August 24 notice of intent to discharge. (**Ex. 9**, attached.) In this response I stated in part: "I believe I am not required to receive the COVID-19 vaccine under U.S. Law and Code and should not be subject to discipline for not receiving it, as I've set forth in my request for a religious accommodation and in my appeal of the denial of that request. I want to remain in the Coast Guard and do not want to be discharged or to retire at this time, but, faced with very limited options given in the Coast Guard's denial of my religious accommodation request, its denial of my appeal, and the notice of its intent to discharge me, I would choose, under protest and duress, retirement."

42.     In my September 9, 2022, response, I further stated in part: "The zip code of my intended home of selection is 76088." The zip code for Weatherford, Texas, is 76088.

43.     By refusing to take the COVID-19 vaccine and losing my Coast Guard position, I stand to lose hundreds of thousands of dollars in pay, not counting the value of lost benefits including medical benefits. I planned to rely on this compensation in retirement in due course.

8

44.    Especially given the operational tempo of my unit, I believe forcing competent and capable unvaccinated service members such as myself to separate would exacerbate the dire recruitment and retention shortfalls that I understand the Coast Guard is experiencing.

45.    I have been willing and able and remain willing and able to work remotely, wear a mask, and test periodically, as appropriate and as required.

46.    I am aware of the following military orders purportedly requiring me to take the vaccine:

- Department of Defense August 24, 2021, COVID-19 vaccine mandate.

- Coast Guard ALCOAST 305/21 COVID-19 vaccine mandate.

- Coast Guard ALCOAST 315/21 COVID-19 vaccine mandate

47.    I am aware of Commandant Instruction (COMDTINST) M6230.4G, *Immunizations and Chemoprophylaxis for the Prevention of Infectious Disease* (**Ex. 10**, attached), a Coast Guard instruction.

48.    I am not aware of any military branch (including the Air Force, Navy, Army, Marines, and Coast Guard) granting any religious accommodation requests to service members not already slated for separation or retirement.

49.    I am aware that the Pentagon's Inspector General investigated whether the military's process for considering and denying religious accommodation requests to COVID-19 vaccination complies with its own protocols. (https://www.military.com/daily-news/2022/03/02/pentagon-watchdog-investigate-militarys-covid-19-exemption-process.html) I'm also aware of a copy of the Inspector General's concluding memo attached to a letter of supplemental authority filed in *U.S. Navy SEALs 1-26  v. Biden*, Case Nos. 22-10077/22-10534.

50.    Some of the attached exhibits are redacted to remove some personal identifiers.

51.     My request for a religious exemption would not seriously impact my ability to perform my duties. As shown above, I have recovered from COVID-19 and have natural immunity.

52.     I have maintained and continue to maintain protocols for health and safety. I have no known comorbidities, I am physically fit, and to my knowledge I have not transmitted COVID-19 to others.

53.     My Coast Guard career has been entirely in the interest of military readiness, unit cohesion, good order, discipline, health, and safety.

54.     I cannot in good conscience take the vaccine; it is more important to me to remain faithful to my Christian faith than to violate my religiously formed conscience for the sake of work and compensation.

55.     I have not voluntarily chosen to separate from the Coast Guard. I understand that the Coast Guard is in the process of separating me for not taking the vaccine.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September _15_, 2022.

Eric Jackson

10

171

| U.S. Department of Homeland Security<br><br>United States Coast Guard | Commanding Officer<br>CGC BENJAMIN BOTTOMS (WPC 1132) | 1001 S. Seaside Ave<br>San Pedro, CA 90731 |
|---|---|---|

6320
07 Nov 2021

# MEMORANDUM

From:   E. B. Jackson, BM1
        CGC BENJAMIN BOTTOMS

To:     Office of Military Personnel (CG-133)
Thru:   (1) D. J. Zwirblis, LCDR
        (2) Office of Health Services (CG-112)

Subj:   REQUEST FOR A RELIGIOUS ACCOMMODATION FOR THE MANDATORY
        COVID-19 VACCINATION

Ref:    (a) Military Religious Accommodations, COMDINST 1000.15
        (b) Privileged and Confidential Communications to Chaplains, SECNAVINST 1730.9
        (c) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
            COMDTINST M6230.4G

1.  Respectfully request a waiver of policy to accommodate a religious practice based on a sincerely-held religious belief in accordance with Reference (a). I request a waiver to the mandatory vaccination for COVID-19, specifically the Pfizer BioNTech, Pfizer Comirnaty, Johnson & Johnson, AstraZeneca, and Moderna type vaccines.

2.  My accommodation request is for religious accommodation from all COVID-19 type of vaccines that have used mRNA and aborted fetal stem cell lines as a basis of being developed in any part. I have not previously requested religious exemption for any vaccines.

3.  Basis. I am a devout Christian. I was baptized and have participated in religious worship and study since I was a child. One of my strongest feelings against the injection is from the precious unborn child that were taken from their mother's womb and dissected in order to be part of the development and testing of these types of vaccines. I believe that life starts in the womb as Jeremiah 1:5 states, "before I formed you in the womb I knew you." I also believe unborn children should be protected and cherished. As the Bible states in Psalm 139:13, "you cover me in my mother's womb." Also, in Psalm 139:16, "your eyes saw my substance, being yet unformed. And in your book they all were written, the days fashioned for me, when as yet there were none of them." I believe that all unborn children have souls and are in heaven as stated in 2 Samuel 12:22-23. As in John 14:16-17, the Holy Spirit is here to help guide me and trust in the Word of the Lord. In the past I have taken vaccines that used aborted fetal stem cell lines without having the knowledge of how they were created. I have been praying on that and asked God´s forgiveness. My other strong feelings against the mRNA are due to the fact that it works by manipulating the outside of cell lining. Additionally, these vaccine companies have published

Subj: REQUEST FOR A RELIGIOUS ACCOMMODATION          6230
      FOR THE MANDATORY COVID-19 VACCINATION          07 Nov 2021

statements declaring the use of ingredients which are harmful to the body such as carcinogens, neurotoxins, animal viruses, animal blood, allergens, and heavy metals. My body is a Holy Temple of God and the Spirit of God dwells in me. As stated in 1 Corinthians 3:16-17, 1 Corinthians 6:19-20, 2 Corinthians 5:10. Putting something in my body that was created in such a way would be sinful and go against my religious practice and views. My religious beliefs are sincere and because of these finding I am choosing to exercise my rights to request a religious accommodation and my rights under Title VII of the Civil Rights Act of 1964.

4.   Alternate Means. I am open to alternate homeopathic medicine or vaccines if they become available. For now I am willing to follow the other CDC guidelines to keep my shipmates and myself safe from COVID. These include wearing a mask indoor public spaces, staying six feet away from others, and avoiding crowds in poorly ventilated spaces. Additionally, washing my hands often, carrying 60 percent alcohol hand sanitizer, cleaning and disinfecting my work areas before and after use, weekly COVID testing, and monitoring my health daily for possible exposure to COVID. I am 39 years of age in great health and my survivability rate is 99.98% if I contract COVID.  On 07 OCT 2021 I had my consultation with medical officer M. D. Doepking, LT, ▉▉▉▉▉▉▉▉

5.   My contact information is ▉▉▉▉▉▉▉▉ and my email is ▉▉▉▉▉▉▉▉▉▉.

#
PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.

AUTHORITY: 14 U.S.C. § 505

PURPOSE: To obtain information from a person seeking a military religious accommodation in order to identify the free exercise of religion asserted by the member and make a determination that balances the free exercise of religion with military readiness, unit cohesion, and good order and discipline. A Religious Accommodation Interview Checklist will be used by the Chaplain to record information provided by the member during an interview

ROUTINE USES: Authorized USCG officials will use this information to determine if a religious accommodation can be approved pursuant to Section 533(a)(1) of Public Law 112-239 (2013), as amended. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).

EXHIBIT 2

U.S. Department of
Homeland Security

**United States
Coast Guard**

CGC BENJAMIN BOTTOMS
(WPC 1132)

1001 S. Seaside Ave
San Pedro, CA 90731
█████████████████

6230
07 Nov 2021

# MEMORANDUM

████████ ████

From:   D. J. Zwirblis, LCDR
        CGC BENJAMIN BOTTOMS (WPC 1132)

To:     Office of Military Personnel (CG-133)
Thru:   Office of Health Services (CG-112)

Subj:   RELIGIOUS ACCOMMODATION TO COVID-19 VACCINATION: IMPACT TO
        OPERATIONS FOR ███ █████████████████

Ref:    (a) Military Religious Accommodations, COMDINST 1000.15
        (b) BM1 Jackson's memo dated 07NOV2021

1. BENJAMIN BOTTOMS will be able to maintain mission readiness with no hindrance to
operations if BM1 Jackson is granted a religious accommodation for the COVID-19 vaccine.
The BENJAMIN BOTTOMS crew currently has a 92% vaccination rate so the risk BM1 poses
to his shipmates is minimal.  In the event that BM1 Jackson contracts COVID-19 and/or is
placed in a quarantine status, the ship plans to fill his vacancy with a TDY member from a
surrounding unit or through the critical fill solicitation process.  In order to mitigate risk for the
member, the command will ensure that BM1 Jackson continues to adhere to all required safety
protocols for unvaccinated members including the wearing of a face mask, travel restrictions,
and pre-patrol restriction of movement when necessary.

#

| U.S. Department of Homeland Security **United States Coast Guard** | Commandant United States Coast Guard | 2703 Martin Luther King Jr. Ave. S.E. Washington, DC 20593-7907 Staff Symbol: CG-133 |
|---|---|---|

6230
**DEC 1 4 2021**

# MEMORANDUM

From: A. W. Williams, CAPT
COMDT (CG-133)

Reply to
Attn of:

To: E. B. Jackson, BM1
CGC BENJAMIN BOTTOMS (WPC 1132)

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST GUARD'S COVID-19 VACCINATION MANDATE

Ref: (a) Your memo 6320 of 07 NOV 21
(b) ALCOAST 305/21 R 262212Z AUG 21
(c) ALCOAST 315/21 R 072247Z SEP 21
(d) Military Religious Accommodations, COMDTINST M1000.15 (series)
(e) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases, COMDTINST M6230.4 (series)
(f) 42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
(g) U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1. Reference (a) is your request that the Coast Guard accommodate a religious practice so that you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c). I am the adjudication authority for religious accommodation requests pursuant to reference (d). I have carefully reviewed your request in accordance with references (d)-(f). **Your request is denied.**

2. I made this decision after considering your right to free exercise of your religion or religious beliefs and the government's compelling interest in mission accomplishment, to include military readiness; unit cohesion; good order and discipline; and the health and safety of you, the members assigned to your unit and within the Coast Guard, and the public with whom the Coast Guard regularly interacts. I then considered whether requiring you to receive the COVID-19 vaccine is the least restrictive means available to achieve this compelling interest. It was your burden to establish the religious nature and sincerity of your beliefs and that receiving the vaccine would substantially burden your religious belief or practice. For the purpose of this administrative decision, I do not question the sincerity of your religious belief or whether vaccine requirements substantially burden your religious practice. The Coast Guard reserves the opportunity to make these determinations, but I do not need to address them here to resolve your request. Moreover, your concerns regarding potential health complications resulting from medical interventions are not addressed in this response.

3. I have concluded that there are no lesser restrictive means available other than vaccination to achieve the compelling government interest here. In assessing your request, I considered that the Coast Guard is a military service that must be ready at all times to perform its military and other missions. The military nature of the Coast Guard and the readiness obligations of military

175

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE      6230
COVID-19 VACCINATION MANDATE

service would likely suffice to require vaccination. In addition, the Coast Guard is unique amongst the military services because of the nature of its missions that include support of the Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law. The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here. In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies. Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard. The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit. Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs. Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts. The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4.  I also considered that you are assigned to an operational billet. In your current assignment to CGC BENJAMIN BOTTOMS, your duties as a small-boat coxswain, Boarding Officer, and Deck Watch Officer place you in operationally critical positions within close-proximity to your shipmates and in enclosed spaces that do not afford the opportunity to consistently social distance in accordance with the Center for Disease Control's recommended guidelines. In addition, you and your shipmates are required to continuously cohabitate the cutter for extended periods of time with limited berthing, dining, and work space options available. The diverse nature of your unit's underway operations include the possibilities of interactions with commercial and recreational mariners, detainees, foreign and domestic port visits, and limited access to advanced medical care while at-sea, which increases the health risks for yourself and your shipmates.

    a.  Social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public because of the operational nature of your billet. As a member assigned to an operational unit, you are unable to accomplish your daily missions while in isolation, in quarantine, or at home. Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible. The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates. Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day.

    b.  Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination. Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public. The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

    c.  Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19

2

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE      6230
COVID-19 VACCINATION MANDATE

test. By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

5. Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public. Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19. This in turn decreases the military readiness of the unit and the Coast Guard as a whole. You must be medically ready and able to perform your duties for your unit to function effectively.

6. I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution. **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7. You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8. If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

9. You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of Reference (g).

10. If you do not begin the COVID-19 regime or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

#

Copy:  CGC BENJAMIN BOTTOMS (WPC 1132)
       COMDT (CG-00A)
       COMDT (CG-00H)
       COMDT (CG-112)

EXHIBIT 4



U.S. Department of
Homeland Security

**United States
Coast Guard**

Commanding Officer
CGC BENJAMIN BOTTOMS
(WPC1132)

1001 S. Seaside Ave.
San Pedro, CA 90731

1530
27 Dec 2021

# MEMORANDUM

From:   E. B. Jackson, BM1
        CGC BENJAMIN BOTTOMS

To:     COMDT (CG-1)
Thru:   (1) D. J. Zwirblis, LCDR
        (2) COMDT (CG-133)

Subj:   REQUEST TO APPEAL DECISION REGARDING DETERMINATION FOR
        RELIGIOUS ACCOMMODATION FOR THE MANDATORY COVID-19
        VACCINATION

Ref:    (a) My memo 6230 of 07 NOV 2021
        (b) Military Religious Accommodations, COMDINST 1000.15
        (c) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
            COMDTINST M6230.4 (series)
        (d) A.W. Williams, CAPT memo 6230 of 14 DEC 2021
        (e) D. J. Zwirblis, LCDR memo 6230 of 07 NOV 2021

1.  Accordance with References (b). I respectfully request to appeal CG-133's denial of my
    waiver request of the policy to accommodate a religious practice based on a sincerely-held
    religious belief. That the ability to perform my duties would not be impacted. I requested a
    waiver to the mandatory vaccination for COVID-19, specifically the Pfizer BioNTech, Pfizer
    Comirnarty, Johnson & Johnson, AstraZeneca, and Moderna mRNA/viral vector type
    vaccines.

    a.  The generalized assertion in reference (d) the denial letter is not tailored to my specific
        request. The Coast Guard response is not addressing my right to exercise for a religious
        accommodation request. A.W. Williams, CAPT did not take in account the memos from
        my command, pastor, and chaplain, which was sent with my initial memo. The timeline
        in which to receive the first dose of the vaccine is unrealistic. The FDA approval of new
        COVID-19 antivirals was not considered. I am appealing for discrepancies in reference
        (d) and an individualized inquiry based off my request and not a blanket response.

2.  Discrepancy in reference (d) - "I have concluded that there are no lesser restrictive means
    available other than the vaccination."

    a.  On October 22, 2020 the FDA approved the antiviral drug remdesivir for use in adults
        which is affective against COVID-19. Antibodies, natural immunity are a viable option.
        Testing for that would further help not only show the level of immunity but also if the

Subj: REQUEST TO APPEAL DECISION REGARDING          1530
DETERMINATION FOR  RELIGIOUS ACCOMMODATION          27 Dec 2021
FOR THE MANDATORY COVID-19 VACCINATION

natural immunity is present. The Merck's Molnupiravir antiviral pill has been approved by the FDA 23 DEC 2021. Pfizer's pill Paxlovid was approved 22 DEC 2021. Both are available with a prescription and have not been tested on human aborted fetal tissue.

    b.  Reference (b) section 11c.3 - when available, alternative immunization or treatment that does not violate the member's religious objection must be used.

3.  Discrepancy in reference (d) - "Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen test and the window of time necessary to receive the results."

    a.  As per the FDA the PCR testing is very accurate and as fast as 60 minutes for the results. President Joe Biden announced 21 DEC 2021 the purchase of a half-billion at home-test starting in January 2022. The President is adding more testing sites to the already 20,000. I have 11 testing sites within 4 miles of my house with one being 0.6 miles away. With the at home-testing and very close COVID-19 testing sites that would allow me to test myself prior to work if I was showing symptoms.

4.  Discrepancy in reference (d) - "Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible."

    a.  Citing from Ref. (e) "Benjamin Bottoms will be able to maintain mission readiness with no hindrance to operations if BM1 Jackson is granted a religious accommodation for the COVID-19 vaccine."

5.  Discrepancy in reference (d) - "Limited access to advanced medical care while at-sea, which increases the health risk for yourself and your shipmates."

    a.  The normal operating AOR (Area of Responsibility) for CGC Benjamin Bottoms is 30 to 60 miles offshore of San Diego/Los Angles California. It is no more that 1 to 2 hours from medical care. Air Station San Diego is also an option which would greatly reduce the time for medical care. Benjamin Bottoms is not scheduled to conduct missions outside the U.S. this year.

6.  Discrepancy in reference (d) - "unvaccinated Coast Guard members place not only themselves at risk, but also hold the risk every other member in the unit and public."

    a.  Cited from the CDC's website updated on 17 DEC 2021 under possibility of COVID-19 illness after vaccination. An infection of a fully vaccinated person is referred to as a "vaccine breakthrough infection". And that people with vaccine breakthrough infections may spread COVID-19 to others. Also people who get vaccine breakthrough infections can be contagious. Then goes on to say, a community will be better protected if you wear a mask when you are in indoor public places.

Subj: REQUEST TO APPEAL DECISION REGARDING          1530
DETERMINATION FOR RELIGIOUS ACCOMMODATION          27 Dec 2021
FOR THE MANDATORY COVID-19 VACCINATION

7. Discrepancy in reference (d) –"the military readiness demands confronting the DOD military service."

   a. During a House Armed Services Hearing on COVID-19 Response on 17 FEB 2021 between minutes 34:34 to 35:10. Major General Jeffrey Taliaferro the Vice Director, Operations, Joints Chiefs of Staff was asked, if members that do not receive the vaccine still be deployable. The Major General stated "yes sir."

8. Discrepancy in reference (d) – "You have 10 business days after receipt of this decision to receive your first dose of a two dose vaccine or the single dose of a single-dose vaccine."

   a. The Coast Guard at this time does not offer a FDA approved dose of the vaccine. All current vaccines are under EUA (Emergency Use Authorization). The only FDA approved vaccine is the Pfizer COMIRNATY but is not available for distribution until 2023. The Pfizer-BioNTech is similar to the Pfizer Comirnarty but the Pfizer-BioNTech is under EUA. As verified by U.S. District Court Federal Judge Allen Winsor on 30 NOV 2021, "The products are legally distinct with certain differences." The federal Judge went on to say "the DOD cannot mandate vaccines that only have an EUA" By the timeline that was given I would be forced to participate in a medical experiment considering the Coast Guard does not have the FDA approved vaccine. And that would be a violation of the Nuremberg Code, as well as federal law.

   b. Reference (c) 8–3. Refusal options the FDA may decide that potential recipients of a drug under EUA should have the option to refuse it. The President may waive this option for military personnel.

   c. Under 10 USC 1107 only the President has the authority to grant a waiver of the requirement that a military member provide consent to receive an IND or a drug unapproved for its applied use in connection with the member's participation in a particular military operation. A Presidential wavier for a military member to take the IND or EUA vaccine does not exist.

9. I am a devout Christian. I was baptized and have participated in religious worship and study since I was a child. Being subjected to these types of vaccines would go against my deeply held religious beliefs as stated in reference (a).

10. My contact information is ▮▮▮▮▮▮▮ and my email is ▮▮▮▮▮▮▮▮▮▮

#

PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.

3

Subj: REQUEST TO APPEAL DECISION REGARDING          1530
DETERMINATION FOR  RELIGIOUS ACCOMMODATION          27 Dec 2021
FOR THE MANDATORY COVID-19 VACCINATION


AUTHORITY: 14 U.S.C. § 505


PURPOSE: To obtain information from a person seeking a military religious accommodation in order to identify the free exercise of religion asserted by the member and make a determination that balances the free exercise of religion with military readiness, unit cohesion, and good order and discipline. A Religious Accommodation Interview Checklist will be used by the Chaplain to record information provided by the member during an interview


ROUTINE USES: Authorized USCG officials will use this information to determine if a religious accommodation can be approved pursuant to Section 533(a)(1) of Public Law 112-239 (2013), as amended. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).

EXHIBIT 5

**United States**
**Coast Guard**

6230

03 May 2022

# MEMORANDUM

From:   M. L. Lafferty, RDML
        Appellate Authority

To:     E. B. Jackson, BM1

Subj:   DECISION ON APPEAL OF RELIGIOUS ACCOMMODATION DENIAL

Ref:    (a) Your memo 6230 of 27 Dec 2021
        (b) CG-133 memo 6230 of 14 Dec 2021
        (c) Military Religious Accommodations, COMDTINST 1000.15 (series)

1. I have personally reviewed and fully considered your appeal (reference (a)) of the decision to deny your request for a religious accommodation (reference (b)). I find no error occurred in reaching the decision to deny your religious accommodation request. As such, and in accordance with reference (c), your appeal is denied.

2. My decision in your case came only after extensive consideration. I personally reviewed your appeals package and consulted with a Judge Advocate to ensure I accurately applied the law and policy to your specific circumstances. My actions in denying your request are intended to meet Coast Guard requirements as a ready military workforce and national first responder in which you play a valuable role.

3. I realize my denial of your appeal is not welcome news. It takes courage to submit an accommodation request that requires sharing your closely held beliefs, as well as to trust others to treat those beliefs thoughtfully. I also understand that you may have experienced additional stress during this process and, if so, strongly encourage you to take advantage of the many resources the Coast Guard provides to help you best manage that stress. Contact your command if you have questions about how to access these resources.

4. I have no doubt that you have made significant sacrifices along your journey, investing yourself in our Coast Guard and the Nation. I hope you will decide to comply with the Coast Guard's vaccine requirement and continue your service well into the future.

\#

DEPARTMENT OF HOMELAND SECURITY
U.S. COAST GUARD

## ADMINISTRATIVE REMARKS

### PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.
**AUTHORITY**: 14 U.S.C. § 505
**PURPOSE**: To document a USCG service member's achievements, accomplishments, Uniform Code of Military Justice (UCMJ) infraction(s), or any other USCG military pay or personnel activity.
**ROUTINE USES**: Authorized USCG officials will use this information to validate a USCG service member's achievements, accomplishments, UCMJ infraction(s) or any other USCG military pay or personnel activity. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).
**CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION:** Providing this information is voluntary. However, failure to provide this information may result in a delay in administrating this form.

Entry Type: Performance and Discipline (P&D-41C)
Reference:  (a) COMDT COGARD WASHINGTON DC 262122Z AUG 21/ALCOAST 305/21
  (b) DoD Instruction 6205.02, DoD Immunization Program (23 Jul 19)
  (c) Immunizations and Chemoprophylaxis, COMDTINST M6230.4 (series)
  (d) Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 801– 946 (as amended)

Responsible Level: Unit
Entry:

As required by reference (a), and consistent with the processes outlined in references (b) and (c), you are required to receive a COVID-19 vaccine in accordance with Food and Drug Administration-approved labeling and guidance.

Your request for a medical exemption or religious accommodation was denied.

You are hereby ordered to report to Base Los Angeles-Long Beach Clinic at 1330 on 24 May 2022 and to receive the first dose of a fully FDA-approved COVID-19 vaccine. A violation of this order may subject you to administrative and disciplinary consequences and is punishable under the Uniform Code of Military Justice (ref (d)), including under Article 90 (willfully disobeying superior commissioned officer) and Article 92(2) (failure to obey a lawful order).

11MAY2022:

David J. Zwirblis

Commanding Officer

*16 may 22* : I acknowledge the above order.

Eric B. Jackson

| 1. NAME OF PERMANENT UNIT | 2. NAME OF UNIT PREPARING THIS FORM | |
|---|---|---|
| CGC BENJAMIN BOTTOMS | CGC BENJAMIN BOTTOMS | |
| 3. NAME OF MEMBER (Last, First, MI) | 4. EMPLOYEE D NUMBER | 5. GRADE/RATE |
| Jackson, Eric, B. | | E-6/BM |

File original in SPO PDR, Email copy to CG PSC-BOPS-C-MR

CG-3307 (05/20)
PREVIOUS EDITIONS ARE OBSOLETE

Page 1 of 1

EXHIBIT 7

DEPARTMENT OF HOMELAND SECURITY
U.S. COAST GUARD

## ADMINISTRATIVE REMARKS

### PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.
**AUTHORITY**: 14 U.S.C. § 505
**PURPOSE**: To document a USCG service member's achievements, accomplishments, Uniform Code of Military Justice (UCMJ) infraction(s), or any other USCG military pay or personnel activity.
**ROUTINE USES**: Authorized USCG officials will use this information to validate a USCG service member's achievements, accomplishments, UCMJ infraction(s) or any other USCG military pay or personnel activity. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).
**CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION:** Providing this information is voluntary. However, failure to provide this information may result in a delay in administrating this form.

Entry Type: Performance and Discipline (P&D-41D)

Responsible Level: Unit
Entry: Negative

On 11 May 2022 you were ordered to report to Base Los Angeles-Long Beach Clinic at 1330 on 24 May 2022 to receive the first dose of the COVID-19 vaccine. You acknowledged receiving the order on 16 May 2022. You reported to the location as ordered but you did not receive a dose of the vaccine as ordered when it was offered by clinic staff. You did not have an approved or pending religious or medical exemption on the date that you were ordered to report to receive the vaccine. You had the opportunity and means to follow the order and failed to do so.

You are in violation of Article 90 ("Willfully Disobeying a Superior Commissioned Officer") and Article 92(2) ("Failure to Obey other Lawful Order") of the Uniform Code of Military Justice.

30JUN2022:

David J. Zwirblis

Commanding Officer

_(signature)_ : I acknowledge receipt of this CG-3307.

Eric B. Jackson

I acknowledge this receipt of this order but do not agree, my religious convictions acknowledged by the Const Guard have no effect. I showed up to the clinic and was given a EUA labeled drug to take, a federal judge said that a EUA drug was legally different from an FDA approved drug, under 10 USC1107 only the president can waive my right not to receive a EUA drug.

| 1. NAME OF PERMANENT UNIT | 2. NAME OF UNIT PREPARING THIS FORM | |
|---|---|---|
| CGC BENJAMIN BOTTOMS | CGC BENJAMIN BOTTOMS | |
| 3. NAME OF MEMBER (Last, First, MI) | 4. EMPLOYEE ID NUMBER | 5. GRADE/RATE |
| Jackson, Eric, B. | | E-6/BM |

File original in SPO PDR, Email copy to CG PSC-BOPS-C-MR

CG-3307 (05/20)
PREVIOUS EDITIONS ARE OBSOLETE

Page 1 of 1

EXHIBIT 8



**U.S. Department of Homeland Security**

**United States Coast Guard**

Commanding Officer
United States Coast Guard
Station South Padre Island

1 Wallace Reed Rd
South Padre Island, TX 78597

████████████

1910
24 Aug 2022

# MEMORANDUM

From:   S. D. Gunderson, LT
        CG STA South Padre Island

Reply to   CWO C. Rantuccio
Attn of:   ████████████

To:     E. B. Jackson, BM1

Subj:   NOTIFICATION OF INTENT TO DISCHARGE

Ref:    (a) Military Separations, COMDTINST M1000.4 (series), Art. 1.B.12.a.(7)
        (b) Military Separations, COMDTINST M1000.4 (series), Art. 1.B.39

1. This is to inform you that I have initiated action to discharge you from the U. S. Coast Guard by reason of convenience of the government pursuant to the provisions of reference (a). The basis for this discharge recommendation is your non-availability of worldwide assignment.

2. The decision on your discharge and type of discharge you will receive rest with Commander (CG PSC-EPM-1). As you may be considered for a general discharge, you have the right to consult with a lawyer as defined by Article 27(b)(1) of the Uniform Code of Military Justice. If you are awarded a general discharge, you may expect to encounter prejudice in civilian life.

3. The Second Chance Program set forth in reference (b) does not apply.

4. You may submit a statement on your own behalf within (5) working days of today's date.

5. You may disagree with my recommendation; if so, your rebuttal will be forwarded with my recommendation.

#

1910
25 Aug 2022

FIRST ENDORSEMENT on Station South Padre Island's memo 1910 of 24 Aug 2022

From:   E. B. Jackson, BM1

To:     CG STA South Padre Island

Subj:   NOTIFICATION OF INTENT TO DISCHARGE

1.  I hereby acknowledge notification of my proposed discharge.

2.  I [waive my right to submit / have attached] a statement on my behalf.
         *(Circle One)*

3.  I understand if I receive a general discharge under honorable conditions I may expect to encounter prejudice in civilian life.

4.  I [object / do not object] to being discharged.
         *(Circle One)*

5.  I hereby acknowledge I have been provided the opportunity to consult with a military lawyer.

#

5

186

EXHIBIT 9

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commanding Officer
United States Coast Guard
Station South Padre Island

1 Wallace Reed Road
South Padre Island, Texas 78597

1910
09 SEP 2022

# MEMORANDUM

From:   E. B. Jackson, BM1
        CG STA South Padre Island

To:     CG PSC-EPM-1

Thru:   S. D. Gunderson, LT
        CG STA South Padre Island

Subj:   NOTIFICATION OF INENT TO DISCHARGE RESPONSE BM1 JACKSON

Ref:    (a) Military Separations, COMDTINST M1000.4 (series), Article 1.B.12a.(7)
        (b) (a) Military Separations, COMDTINST M1000.4 (series), Article 1.B.39
        (c) ALCOAST 270/22 mandating Covid-19 vaccination for military members update
        (d) BM1 Jackson Request for Religious Accommodation
        (e) Request For a Waiver of Policy to Accommodate Practice Based on Religious Belief
        (f) https://www.covid19treatmentguidelines.nih.gov/therapies/antiviral-therapy
        (g) CG-133 Religious Accommodation Decision

1. I respectfully request an extension until the end of my enlistment August 10th 2024 or full reconsideration of intent to discharge based on the following:

   a) The Boatswain Mate (BM) rating strength is at a total gap of 263 from the latest numbers published August 2022. I bring a lot of qualifications to the rating force being in over 18 years. The loss of knowledge that I have obtained over almost 2 decades from law enforcement missions/training, small boat tactics/training, deck watch officer, and hurricane response. I believe to discharge me from service will be a loss to the overall Coast Guard mission readiness.

   b) Based on the recent guidance from the Center Disease Control dated August 11th 2022, "unvaccinated" personnel now have the same guidance as those that are "vaccinated". The new information there should no longer be any loss of mission readiness between those that are "vaccinated" and "unvaccinated". Findings from the NIH now list Ivermectin as an antiviral treatment for COVID-19 as per reference (f) and doesn't conflict with my religious values. My new duty station changed is a land billet and the argument that I would not have access to medical help is irrelevant. A study from John Hopkins Medicine shows that natural immunity antibody levels against COVID-19 are higher and stay in the body longer than those that received a COVID-19 vaccine. Presented with all the new medicines, VERS data, and independent studies all arguments that the COVID-19 Vaccine is the only option from reference (g) "no lesser means available other than vaccination" are irrelevant. It needs be taken into consideration that I have missed zero days of active duty because of COVID. My current unit within the last 3 weeks had 3 people that where vaccinated missed operational days due to COVID. At my last unit a total of 8 people vaccinated missed operational days causing the cutter to miss 2 operational underway days.

Subj: NOTIFICATION OF INENT TO DISCHARGE                    1910
RESPONSE BM1 JACKSON                                              09SEP2022

c) The Coast Guard has acknowledged the legitimacy of my religious concerns and accommodation request as per references (d), (e), and (g) but still denied it citing all pervious arbitrary guidelines that have since been scientifically dismantled and are now concerted out of date with current medical guidelines and advice from the Center for Disease Control and Prevention (CDC) and National Institutes of Health (NIH).

d) My religious convictions have and will stand the test throughout this ordeal of discrimination and coercion, although the reasons for denying my fundamental right by U.S. Law and Code to religious freedoms have not. "Out of my distress I called on the Lord; the Lord answered and set me free" Psalm 118:5.

2.  I understand with this request I may not request a date to retire.  If my request is approved, CG PSC-EPM-1 will select the date for retirement.

3.  I understand if this request is approved, I will no longer be eligible for advancement and Servicewide competition, or my name will be removed from present eligibility lists, as appropriate.

4.  I understand if I request to cancel this retirement, Commander (PSC-EPM) will consider this request based solely on Service needs.  If such cancellation is approved, it will not entitle me to reinstatement in the current Servicewide competition or on the existing eligibility list.  Further advancement would require re-competition.

5.  I further understand that if I am being processed under the Physical Disability Evaluation System, my request for retirement could be terminated.

#

2



**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commanding Officer
United States Coast Guard
Station South Padre Island

1 Wallace Reed Road
South Padre Island, Texas 78597

1812
09 SEP 2022

# MEMORANDUM

From: E. B. Jackson, BM1
CG STA South Padre Island

To:   CG PSC-EPM-1

Thru: S. D. Gunderson, LT
CG STA South Padre Island

Subj: SERVICE RETIREMENT REQUEST IN LIEU OF ADMINISTRATIVE
DISCHARGE (RILD)

Ref:  (a) Military Separations, COMDTINST M1000.4 (series), Article 1.C.11

1.   I request voluntary 20-year retirement in lieu of administrative discharge.

2.   I believe I am not required to receive the COVID-19 vaccine under U.S. Law and Code and
should not be subject to discipline for not receiving it, as I've set forth in my request for a
religious accommodation and in my appeal of the denial of that request. I want to remain in the
Coast Guard and do not want to be discharged or to retire at this time, but, faced with very
limited options given in the Coast Guard's denial of my religious accommodation request, its
denial of my appeal, and the notice of its intent to discharge me, I would choose, under protest
and duress, retirement.

3.   I understand with this request I may not request a date to retire. If my request is approved,
CG PSC-EPM-1 will select the date for retirement.

4.   I understand if this request is approved, I will no longer be eligible for advancement and
Servicewide competition, or my name will be removed from present eligibility lists, as
appropriate.

5.   I understand if I request to cancel this retirement, Commander (PSC-EPM) will consider this
request based solely on Service needs. If such cancellation is approved, it will not entitle me to
reinstatement in the current Servicewide competition or on the existing eligibility list. Further
advancement would require re-competition.

6.   I further understand that if I am being processed under the Physical Disability Evaluation
System, my request for retirement could be terminated.

7.   The zip code of my intended home of selection is 76088.

\#

189

EXHIBIT 10

**Army Regulation 40–562**
**BUMEDINST 6230.15B**
**AFI 48–110_IP**
**CG COMDTINST M6230.4G**

**Medical Services**

# Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases

**Headquarters**
**Departments of the Army,**
**the Navy,**
**the Air Force,**
**and the Coast Guard**
**Washington, DC**
**7 October 2013**

## UNCLASSIFIED

# *SUMMARY of CHANGE*

AR 40–562/BUMEDINST 6230.15B/AFI 48–110_IP/CG COMDTINST M6230.4G
Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases

This major revision, dated 7 October 2013--

o  Changes the regulation title to "Immunizations and Chemoprophylaxis for the
   Prevention of Infectious Diseases" (cover).

o  Describes the responsibilities of the privileged physician with medical
   oversight of any clinic or activity that administers immunizations (para 1-
   4*c*(2)).

o  Describes the responsibilities of the privileged health care provider, who is
   under the direction of the privileged physician of any clinic or activity that
   administers immunizations (para 1-4*c*(3)).

o  Changes a reference to five-injection thresholds to reflect current evidence-
   based practices (para 2-1*e*(1)).

o  Adds a description of procedures for vaccine storage and handling (para 2-3).

o  Adds a description of military indications for required and recommended
   vaccines (paras 4-2 through 4-19).

o  Makes changes to chemoprophylaxis recommendations (chap 5).

o  Adds a description of procedures for documenting immunizations and
   immunization recordkeeping (para B-5).

o  Establishes and recommends immunization personnel training (para B-6 and
   table B-1).

o  Establishes criteria for determining required immunizations for military
   personnel (app D).

o  Makes administrative revisions (throughout).

Headquarters
Departments of the Army,
the Navy,
the Air Force,
and the Coast Guard
Washington, DC
7 October 2013

*Army Regulation 40–562
*BUMEDINST 6230.15B
*AFI 48–110_IP
*CG COMDTINST M6230.4G

Medical Services

Effective 7 November 2013

# Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases

By Order of the Secretary of the Army, Navy, Air Force, and Coast Guard:

RAYMOND T. ODIERNO
*General, United States Army
Chief of Staff*

Official:

GERALD B. O'KEEFE
*Administrative Assistant to the
Secretary of the Army*

M. L. NATHAN
*Vice Admiral, Medical Corps
United States Navy
Surgeon General of the Navy*

THOMAS TRAVIS
*Lieutenant General, U.S. Air Force
Surgeon General*

MAURA K. DOLLYMORE
*Rear Admiral, U.S. Coast Guard
Director, Health, Safety and Work-Life*

**History.** This publication is a major revision.

**Summary.** This regulation for immunization and chemoprophylaxis updates quality standards for immunization delivery; establishes electronic immunization tracking systems as the preferred immunization record; provides guidance for lost immunization records, immunization credit for pre-existing immunity, and complying with regulations for vaccines and other products administered in investigational, new drug status or in accordance with emergency use authorization; describes dividing initial entry immunization into two clusters; and describes the role of the Military Vaccine Office.

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to the following: uniformed Departments of the Navy, Air Force, and Coast Guard (including the active and reserve components of each Service); nonmilitary persons under military jurisdiction; selected Federal employees; selected employees of Department of Defense contractors; and Family members and other health care beneficiaries eligible for care within the military health care system. This regulation is applicable during mobilization.

**Proponent and exception authority.** The proponent of this regulation is The Surgeon General. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions and identifies key internal controls that must be evaluated (see appendix E).

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from The Surgeon General (DASG–ZA), 7700 Arlington Blvd., Falls Church, VA 22041–5143.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to The Surgeon General (DASG–ZA), 7700 Arlington Blvd., Falls Church, VA 22041–5143. Air Force users are invited to send comments and suggested improvements on AF Form 847 (Recommendations for Change of Publication) through channels to Headquarters, AFMSA/SGOP, 7700 Arlington Blvd., Falls Church, VA 22041–5143.

**Distribution.** This publication is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve. Navy/Marine Corps: Ships, units, and stations having medical department personnel. Air Force: Active Air Force, the Air National Guard, and Air Force Reserve. Coast Guard: Active Coast Guard and Coast Reserves.

---

*This regulation supercedes AR 40–562/BUMEDINST 6230.15A/AFJI 48–110/CG COMDTINST M6230.4F, dated 29 September 2006.

AR 40–562/BUMEDINST 6230.15B/AFI 48–110_IP/CG COMDTINST M6230.4G • 7 October 2013          i

## UNCLASSIFIED

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*

**Chapter 2**
**Program Elements and Clinical Considerations,** *page 2*
Standards • 2–1, *page 2*
Logistics • 2–2, *page 3*
Storage and handling • 2–3, *page 3*
Hypersensitivity or allergy • 2–4, *page 5*
Immunizing women of childbearing potential • 2–5, *page 5*
Exemptions • 2–6, *page 6*
Immunization and chemoprophylaxis records • 2–7, *page 7*
Jet-injection immunization devices • 2–8, *page 8*
Emergency response requirements • 2–9, *page 8*
Adverse events • 2–10, *page 9*
Program evaluation • 2–11, *page 9*
Blood donation • 2–12, *page 10*

**Chapter 3**
**Personnel Subject to Immunization,** *page 10*
Military accessions • 3–1, *page 10*
Military personnel • 3–2, *page 11*
Certain civilian employees • 3–3, *page 11*
Contracted workers • 3–4, *page 12*
Department of Defense, U.S. Coast Guard schools, childcare centers and youth programs • 3–5, *page 12*
Other populations • 3–6, *page 13*

**Chapter 4**
**Specific Immunization Requirements for Department of Defense and U.S. Coast Guard Personnel,**
 *page 13*
Civilian applicability • 4–1, *page 13*
Adenovirus types 4 and 7 • 4–2, *page 13*
Anthrax • 4–3, *page 13*
Haemophilus influenzae serotype b, commonly called Hib • 4–4, *page 14*
Hepatitis A • 4–5, *page 14*
Hepatitis B • 4–6, *page 14*
Influenza • 4–7, *page 14*
Japanese encephalitis • 4–8, *page 14*
Measles, mumps, and rubella (MMR) • 4–9, *page 15*
Meningococcal • 4–10, *page 15*
Pertussis • 4–11, *page 15*
Pneumococcal • 4–12, *page 15*
Poliomyelitis • 4–13, *page 15*
Rabies • 4–14, *page 16*
Smallpox • 4–15, *page 16*
Tetanus, diphtheria, and pertussis • 4–16, *page 16*
Typhoid fever • 4–17, *page 17*
Varicella • 4–18, *page 17*

**Contents—Continued**

Yellow fever • 4–19, *page 17*

**Chapter 5**
**Chemoprophylaxis,** *page 18*
General • 5–1, *page 18*
Anthrax • 5–2, *page 18*
Group A streptococcus • 5–3, *page 18*
Influenza • 5–4, *page 18*
Leptospirosis • 5–5, *page 19*
Malaria • 5–6, *page 19*
Meningococcal disease • 5–7, *page 19*
Plague • 5–8, *page 19*
Scrub typhus • 5–9, *page 19*
Smallpox • 5–10, *page 19*
Traveler's diarrhea • 5–11, *page 19*

**Chapter 6**
**Biological Warfare Defense,** *page 20*
Responsibilities • 6–1, *page 20*
Procedures • 6–2, *page 20*

**Chapter 7**
**Vaccines and Other Products in Investigational New Drug Status,** *page 20*
Purpose • 7–1, *page 20*
General guidance on investigational new drug products • 7–2, *page 20*
Health recordkeeping requirements for investigational new drug products • 7–3, *page 20*
Information requirements for investigational new drug products • 7–4, *page 21*
Coordination • 7–5, *page 21*

**Chapter 8**
**Vaccines and Other Products Used Under Emergency Use Authorization,** *page 21*
General • 8–1, *page 21*
Criteria • 8–2, *page 21*
Refusal options • 8–3, *page 21*
Health recordkeeping requirements for emergency use authorization products • 8–4, *page 21*
Information requirements for emergency use authorization products • 8–5, *page 21*
Department of Defense requests for emergency use authorizations • 8–6, *page 21*
Coordination • 8–7, *page 21*

**Appendixes**

**A.**   References, *page 22*

**B.**   Standards for Military Immunization, *page 25*

**C.**   Medical and Administrative Exemption Codes, *page 28*

**D.**   Immunizations for Military Personnel, *page 29*

**E.**   Internal Control Evaluation Process, *page 30*

**Table List**

Table B–1: Training standards, *page 26*
Table C–1: Medical exemption codes, *page 28*
Table C–2: Administrative exemption codes, *page 28*
Table D–1: Immunizations for military personnel, *page 29*

**Glossary**

## Chapter 1
## Introduction

### 1–1. Purpose
This publication provides directive requirements for the Military Vaccination Program; establishes general principles, procedures, policies, and responsibilities for the immunization program; and implements military and international health regulations and requirements.

### 1–2. References
Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms
Abbreviations and special terms used in this regulation are explained in the glossary.

### 1–4. Responsibilities
*a. Command medical authority.* The command medical authority will prescribe specific immunization and chemoprophylactic requirements for their units per requirements established by this publication and additional guidance provided by the appropriate surgeon general or the U.S Coast Guard (USCG), Director of Health, Safety, and Work-Life (USCG, CG–11).

*b. Command leaders.* Combatant commanders, major command commanders, unit commanding officers, commanders of special operations and forces, and officers-in-charge will:

(1) Ensure military and nonmilitary personnel under their jurisdiction receive required immunizations and chemoprophylaxis. Ensure immunizations and immunization exemption codes (medical or administrative) are documented in an approved Department of Defense (DOD) or USCG Service Immunization Tracking System (ITS), as described in paragraph 2–7*a*.

(2) Maintain appropriate international, Federal, State, and local records of all immunizations and chemoprophylaxis.

(3) Ensure personnel transferred to another command or unit, including advanced instructional training or technical school, receive proper screening for, and administration of, appropriate immunizations and chemoprophylaxis for the area assigned, and are timed to provide immunity before deployment or exposure or to complete a vaccine series.

(4) Ensure immunization exemptions are documented in the Service ITS.

(5) Ensure vaccine doses or boosters are administered to complete a started series or maintain immunity.

(6) Ensure deviations from specified immunizations are cleared or authorized by the appropriate combatant commander; surgeon general; or USCG, CG–11.

(7) Observe international military standardization agreements (STANAGs).

*c. Medical commanders, commanding officers, and command surgeons.* Medical commanders, commanding officers, and command surgeons will:

(1) Ensure individuals administering immunizations are properly trained in accordance with DOD, Service, and Centers for Disease Control and Prevention (CDC) guidelines and act within their scope of practice as determined by each Service. A training checklist is found in appendix B, paragraph B–6 and table B–1.

(2) Appoint, in writing, a privileged physician with medical oversight over any clinic or activity that administers immunizations. This physician will:

*(a)* Complete appropriate training in immunization science in residence or via distance learning.

*(b)* Be available to address immunization issues, although it is not required that the privileged physician be present for administration of vaccines. The USCG requires a privileged health care provider to administer immunizations to civilians who are eligible for care in a medical treatment facility.

*(c)* Establish and sign vaccine and chemoprophylaxis standing orders for clinics or other locations where immunizations or chemoprophylaxis medications are administered.

*(d)* Ensure standard operating procedures (SOPs) are established that implement current national standards for adult and pediatric immunizations and chemoprophylactic practices and promote appropriate quality improvement mechanisms. Incorporate local practices and requirements of policies contained in references listed at appendix A.

(3) Appoint, in writing, a privileged health care provider, who is under the direction of the privileged physician appointed in paragraph 1–4*c*(2), to have oversight over the daily activities of any clinic or activity that administers immunizations. The privileged physician may serve as the health care provider if no one is available to assume the position of privileged health care provider.

(4) Ensure patients are evaluated for preexisting immunity, screened for administrative and medical exemptions, and/or evaluated for the need for medical exemptions to immunizations or chemoprophylaxis medications. Exemptions are granted per paragraph 2–6; document any exemptions.

(5) Monitor the immunization status of personnel and ensure compliance with policies and procedures for creating and maintaining immunization records in accordance with Title 42, United States Code, Chapter 300aa-25.

(6) Ensure emergency medical response is available and that personnel who administer immunizations receive

training on: basic cardiopulmonary resuscitation, administration of epinephrine, and emergency response to immunization-adverse events, at a minimum.

(7) Ensure health care providers are available to respond to and report adverse events resulting from immunization.

(8) Ensure patients needing evaluation of adverse events after immunization are referred to appropriate health care providers, such as medical subspecialists (including specialists in immunization health care) for evaluation, consultation, or indicated intervention.

*d. The Army, as Executive Agent for the Military Vaccination Program.* The Army, as Executive Agent for the Military Vaccination Program and in cooperation with the Military Services, will:

(1) Operate a Military Vaccine (MILVAX) Office to provide the Military Services with a coordinated source for information and education of vaccine-related activities needed in order to implement Department of Defense Directive (DODD) 6205.3, DODD 6205.02E, and Department of Defense Instruction (DODI) 6205.4.

(2) Synchronize, integrate, and coordinate immunization policies and other immunization-related activities for all DOD components.

(3) Facilitate and promote the quality of immunization policy, implementation, education, distribution, risk communication, administration, clinical services, safety surveillance, research, and program evaluation.

(4) Provide a comprehensive access point to provide information, education resources, safety surveillance, and uniform procedures to identify, report, and evaluate vaccine-associated adverse events.

(5) Maintain historical vaccine usage data as well as identify future vaccine requirements as needed.

(6) Provide primary coordination between DOD and vaccine manufacturers for all applicable post-licensure vaccine studies.

(7) Coordinate with other Secretaries of the Military Departments and the Commandant, USCG to:

*(a)* Establish joint clinical quality standards for immunization delivery and education and training to personnel involved in immunization healthcare. The goals of these standards are to promote clinical excellence and decrease practice variability.

*(b)* Assess the DOD Immunization Program by developing metrics to measure individual medical readiness, vaccine effectiveness and safety, and compliance with overall immunization policies.

*(c)* Regularly update the Joint Regulation on Immunization and Chemoprophylaxis for the Prevention of Infectious Diseases.

(8) Promote scholarly immunization study activities through the Army's Medical Infectious Disease Research Program using funds both from the Defense Health Program and the Research, Development, Test, and Evaluation.

*e. Each of the Military Services.* Each of the Military Services will provide an immunization health care capability to deliver medical specialty consultation, case management, and clinical investigation. The U.S. Navy provides medical services for the U.S. Marine Corps.

## Chapter 2
## Program Elements and Clinical Considerations

### 2–1. Standards

*a. Department of Defense and U.S. Coast Guard policy.* The Military Service policy concerning immunizations follows the recommendations of the CDC and the Advisory Committee on Immunization Practices (ACIP) and the prescribing information on the manufacturer's package inserts, unless there is a military-relevant reason to do otherwise. Any vaccine or drug licensed by the U.S. Food and Drug Administration (FDA) or the U.S. Department of Health and Human Services (DHHS) may be used, as well as vaccines or drugs compliant with applicable DOD investigational new drug (IND) or emergency use authorization (EUA) processes. Privileged health care providers may make clinical decisions for individual beneficiaries to customize medical care or to respond to an individual clinical situation that is compliant with IND or EUA processes.

*b. Standards for delivery of military vaccines.* Standards for delivery of military vaccines are provided in appendix B. Military Services will abide by these standards in routine immunization delivery.

*c. Expiration date.* Vaccines or drugs will not be used beyond the manufacturer's potency expiration date, unless the appropriate surgeon general or USCG, CG–11, authorizes extension in exceptional circumstances.

*d. Screening for contraindications.* Screen all potential vaccines for contraindications, precautions, or warnings per the prescribing information on the manufacturer's package insert.

*e. Immunization schedules and intervals.*

(1) *Initial series.* Once an immunization series has been started, it must be completed, unless a medical or administrative exemption exists. Restarting an immunization series or adding extra doses is not necessary when an initial series of a vaccine or toxoid is interrupted; instead, give delayed doses as soon as feasible.

(2) *Doses.* Vaccine doses in an initial series will not be administered at intervals less than the recommended minimum intervals or earlier than the minimum age unless the doses are part of a CDC catch-up schedule or during an

outbreak. Doses in an initial series administered 5 or more days earlier than the minimum interval should not be counted as valid doses. The next valid dose is calculated after the last invalid dose.

(3) *Booster doses*. After the initial series of a vaccine is complete, a booster dose may be recommended for specific vaccines. For vaccines that do not provide lifetime immunity, the booster dose is usually recommended or required to increase immunity back to protective levels.

*f. Simultaneous immunizations*.

(1) When simultaneous vaccine injections are necessary, administer vaccines in different limbs. The anatomical site may depend on the age of the individual, and the degree of muscle development. If different anatomical sites are not possible, then separate the injections by at least 1 inch. Refer to the ACIP General Recommendations on Immunizations for proper needle lengths.

(2) Priority of immunization is based on the relative likelihood of various microbial threats and the existence of any vaccine-vaccine, vaccine-antibody, or vaccine-drug interactions and is best performed by the health care provider. In military training centers, contagious diseases typically represent the most imminent threats.

(3) Spacing of live and inactivated vaccines.

*(a)* Two or more inactivated vaccines can be administered simultaneously or at the prescribed interval and restrictions indicated in the package insert for each vaccine.

*(b)* Inactivated and live vaccines can be administered simultaneously or at the prescribed interval and restrictions indicated in the package insert for each vaccine.

*(c)* Two or more live virus vaccines must be administered simultaneously or separated by at least 28 days (4 weeks). Refer to ACIP guidelines for exceptions.

*g. Screening for immunity*. For some vaccine-preventable diseases, serologic or other tests can be used to identify pre-existing immunity from prior infections or immunizations that may eliminate unnecessary immunizations.

*h. Live virus vaccines and tuberculosis testing*. Vaccinations with live vaccines may affect tuberculosis (TB) testing. This includes both the Mantoux tuberculin skin test and the Intereferon-Gamma Release Assays test whole-blood test. To avoid interference:

(1) Administer live virus vaccines and TB test on the same day.

(2) Perform TB test 4 to 6 weeks after administration of live virus vaccines, or

(3) Administer live virus vaccines, once the TB test is read.

## 2–2. Logistics

*a. Requisitioning of immunizing and chemoprophylaxis agents*. Immunizing and chemoprophylaxis agents are requisitioned in accordance with medical supply procedures. However, vaccinia immune globulin—also known as VIG-intravenous—is available only by ordering through the MILVAX Office.

*b. Transportation, storage, and handling*. All personnel will maintain the cold chain in vaccine delivery during transportation, storage, and handling. Shipping and storage advice is available from Services medical logistics centers.

*c. Small stations, ships, and cutters*. To minimize the shipment of vaccines that must be stored at frozen temperatures, small stations, ships, and cutters may requisition these items from a nearby military medical activity stocking the items. Requisitioning procedures and reimbursement are prescribed by the supplying activity.

## 2–3. Storage and handling

*a. Safety and efficacy of vaccines*. Failure to adhere to recommended specifications for storage and handling of vaccines may reduce potency, resulting in inadequate immune responses in the recipients and inadequate protection against disease. To maintain the safety and efficacy of vaccines, ensure immunizing and chemoprophylaxis agents are stored, shipped, and handled in accordance with the pharmaceutical manufacturer's instructions as outlined in the product package insert or other guidance.

*b. Policies for maintaining vaccines*. All locations that maintain and administer vaccines will develop and implement policies and procedures for maintaining cold chain management of vaccines.

*c. Shelf-life after opening*.

(1) Administer vaccines shortly after withdrawal from single-dose or multi-dose vials, in accordance with the manufacturer's package insert.

(2) Single dose vials are meant for one-time use only. At the end of the clinic day, discard all single-dose vials without protective caps.

(3) For multi-dose vaccine vials that do not require reconstitution, doses that remain after withdrawal of a dose can be administered until the expiration date printed on the vial or vaccine packaging, so long as the vial has been stored correctly and the vaccine is not visibly contaminated and the manufacturer has not specified otherwise.

(4) Multi-dose vials that require reconstitution must be used within the interval specified by the manufacturer. After reconstitution, the new expiration date should be written on the vial.

*d. Diluents*.

(1) Diluents are not interchangeable, unless specified by the manufacturer.

(2) Transport diluents at room temperature in validated containers, but not in direct contact with shipping gel packs.

(3) Store diluents according to the manufacturer's package insert.

(4) Discard diluents when stored inappropriately or expired.

*e. Filling syringes and attaching needles.*

(1) Never mix individual vaccines in the same syringe. Different vaccines should never be mixed in the same syringe unless specifically licensed for such use. Do not transfer vaccine between syringes.

(2) Use a separate needle and syringe for each injection.

(3) Label filled syringes with the type of vaccine, lot number, and date of filling, unless the vaccine is administered immediately after being drawn into the syringe by the same person administering the vaccine.

(4) Attach needles to manufactured filled syringes just prior to administration. Discard needle and syringe if the vaccine is not administered before the end of the clinic day or vaccination session in accordance with the manufacturer's package insert. If no time line is provided, discard after 8 hours.

*f. Prefilling syringes.*

(1) Prefilling syringes is highly discouraged because of the increased risk of administration errors and possible bacterial growth in vaccines that do not contain preservatives. Syringes other than those filled by the manufacturer are designed for immediate use and not for vaccine storage.

(2) In certain circumstances in which a single vaccine type is being used, such as during an influenza vaccination campaign, filling a small number of syringes may be considered.

(3) Discard unused syringes filled by the end user (that is, not filled by the manufacturer) in accordance with the manufacturer's package insert. If no time line is provided, discard after 8 hours.

*g. Storing vaccine.*

(1) Ensure that only vaccines are stored in the vaccine storage unit (refrigerator or freezer).

(2) Store refrigerated vaccines at temperatures of 35°F to 46°F (2°C to 8°C). Do not expose refrigerated vaccines to freezing temperatures.

(3) Store frozen vaccines at temperatures of 5°F (-15°C) or lower.

(4) Store all reconstituted lyophilized (freeze-dried) vaccines in accordance with the manufacturer's temperature and light condition parameters.

*h. Vaccine storage equipment.* Ensure that vaccine storage units are carefully selected, used properly, and consistently monitored to maintain recommended vaccine storage temperatures.

(1) Stand-alone refrigerators and freezers are recommended for storage of vaccines. A combination refrigerator/frost-free freezer for home use is acceptable if only the refrigerator compartment of the combination unit is used to store refrigerated vaccines. A separate stand-alone freezer should then be used to store frozen vaccine. Dormitory style refrigerators are not authorized for vaccine storage.

(2) Use certified and calibrated thermometers in all vaccine storage units. Uncertified liquid (mercury or alcohol) thermometers and uncertified dial-type household refrigerator/freezer thermometers are not authorized.

(3) Ensure alarm systems are incorporated as part of the vaccine storage unit to alert staff of power failures or indicate whether or not vaccine temperatures have been maintained.

*i. Temperature tracking.*

(1) Ensure temperatures are documented for each vaccine storage unit. Physically confirm the temperature of all vaccine refrigerators and freezers at a minimum of two times per day. Document the date, time, and temperature of the vaccine storage unit on a temperature log. Vaccine outside of a refrigerator or freezer must have the temperature checked and documented every hour.

(2) Keep temperature logs for at least 3 years. State and/or local requirements may require longer recordkeeping.

(3) Record date and time of any mechanical malfunction or power outage on the temperature log or on another equipment-tracking document.

*j. Vaccine storage alarms.*

(1) Ensure alarm systems are capable of monitoring vaccine storage 24 hours a day, 7 days per week. Ensure the system either notifies an accountable person when a failure is detected, or the system is capable of indicating that the vaccine temperature integrity was maintained during the storage period (or notes any deviations).

(2) Ensure current personnel contact information exists on auto-dialers, and that appropriate coverage occurs during periods of leave, holiday weekends, and so forth.

(3) Monitor alarms electronically and physically 24 hours a day, 7 days per week.

(4) Test the entire alarm system, to include refrigerator-freezer-unit sensor to the remote monitoring station and telephone or pager, at least monthly. Maintain test records for at least 3 years.

(5) For vaccine storage units within restricted access areas, ensure the temperature can be checked and a light or audible alarm is installed to indicate when the storage unit temperature is out of range without having to physically enter the restricted area.

*k. Transporting vaccines.*

(1) Always transport vaccines in properly insulated containers to maintain the recommended temperatures.

(2) Ensure containers used for transporting vaccines are capable of maintaining the vaccine at the correct temperatures. Validated storage devices include the Vaxicool, Vaxipac, manufacturer shipping containers, Styrofoam(tm) coolers with at least 2-inch thick walls, or Endurotherm insulating shipping containers.

(3) Pack containers to appropriately maintain the proper temperature while vaccine is transported or shipped. Refrigerated or frozen packs are authorized for use to maintain the cold chain when used according to the U.S. Army Medical and Materiel Agency (USAMMA) Distribution Operations Center instructions.

(4) Include calibrated thermometers to track temperatures in all transportation and off-site storage containers.

(5) Pack vaccines in their original packaging. Do not remove vaccine vials from boxes.

(6) Document vaccine type, quantity, date, time, and originating facility on the outside of the transportation containers.

(7) Ensure temperatures are tracked during transportation and any deviations in temperature are readily identifiable.

*l. Vaccine disposal or disposition.*

(1) Discard syringes or vials that contain live virus vaccines per installation policy.

(2) Contact the pharmacy or logistics office for specific policies regarding the disposition of unopened vials, expired vials, unused doses, and potentially compromised vaccine.

(3) Label potentially compromised vaccines with the words "Do not use" and place in the refrigerator or freezer based on the manufacturer's instructions as if they were not compromised. Report all compromised anthrax, smallpox, and influenza vaccines to USAMMA for validation before destruction. Contact the manufacturer for all other potentially compromised vaccines for disposition or destruction instructions.

(4) Report all confirmed compromised vaccine losses through Service-specific channels to the Military Vaccine Office. The report must include the following: description of the reason for the loss, vaccines compromised, total vials/doses lost, and cost of lost or compromised vaccines.

## 2–4. Hypersensitivity or allergy

*a.* Before administration of any medication, including vaccines, determine if the individual has previously shown any unusual degree of adverse reaction or allergy to it or any specific component of the vaccine or its packaging (for example, eggs, gelatin, preservatives, latex). Review the manufacturers' package inserts and reference materials for product-specific information.

*b.* Defer individuals with reported hypersensitivity to a particular vaccine or its components from immunization.

*c.* Refer individuals with a hypersensitivity to an appropriate medical specialist for evaluation, unless the health record contains documentation of a prior consultation or a specialist's recommendations. Document hypersensitivity and any recommended exemption(s) in the electronic ITS and the appropriate sections of the health record.

## 2–5. Immunizing women of childbearing potential

A pregnancy screening test for women of childbearing potential is not routinely required before administering vaccines, including live virus vaccines. Take the following precautions to avoid unintentional immunization with contraindicated products during pregnancy—

*a.* Display signs asking pregnant women to identify themselves. Discreetly ask her if she is, or might be, pregnant. Document responses in the health record. If the answer is "yes", and the ACIP does not recommend the vaccine for use in pregnancy, then defer her from immunization or refer to an obstetric healthcare provider to determine whether the benefits of immunization outweigh risks in pregnancy. If the vaccine is recommend for use in pregnancy by ACIP, the vaccine may be administered. If pregnancy status is uncertain, defer immunization until after a negative pregnancy evaluation (for example, urine, or serologic test).

*b.* With regard to smallpox (vaccinia) vaccine, a specific pre-immunization screening form (available at http://www.smallpox.mil/resource/forms.asp) that assesses the date of the last menstrual period is required. For women whose last menstrual period was more than 28 days ago, a pregnancy test is recommended.

*c.* Breastfeeding women may be immunized in accordance with the current ACIP guidelines. At present, no immunization products are medically contraindicated in breastfeeding women. Smallpox vaccine is withheld from breastfeeding women, except in an outbreak, primarily due to the potential for contact transmission of vaccinia virus to the child.

*d.* If a live virus vaccine is administered, counsel her to avoid becoming pregnant for the appropriate interval as recommended by CDC or the vaccine manufacturer. Document the counseling in the health record.

*e.* If she is pregnant and immunization is indicated, immunize in consultation with her obstetric health care provider.

*f.* If a contraindicated vaccine is inadvertently administered to a pregnant woman, report the event upon discovery to the preventive medicine point of contact and obstetric services and complete appropriate quality assurance documents. Report such cases to any applicable registry. For assistance with registry referral procedures, contact the preventive medicine service or MILVAX.

## 2–6. Exemptions

There are two types of exemptions from immunization-medical and administrative. Granting medical exemptions is a medical function. Granting administrative exemptions is a nonmedical function.

*a. Medical exemptions.* A medical exemption includes any medical contraindication relevant to a specific vaccine or other medication. Health care providers will determine a medical exemption based on the health of the vaccine candidate and the nature of the immunization under consideration. Medical exemptions may be temporary (up to 365 days) or permanent. Standard exemption codes appear in appendix C.

(1) General examples of medical exemptions include the following—

*(a)* Underlying health condition of the vaccine candidate (for example, based on immune competence, pharmacologic or radiation therapy, pregnancy and/or previous adverse response to immunization).

*(b)* Evidence of immunity based on serologic tests, documented infection, or similar circumstances.

*(c)* An individual's clinical case is not readily definable. In such cases, consult appropriate medical specialists, including specialists in immunization health care.

(2) Providers who are assessing medical exemptions may seek a second opinion from a provider experienced in vaccine adverse event management, such as specialists in immunization health care at a medical center, or seek additional consultation from MILVAX.

(3) Annotate electronic ITS and paper-based service treatment records with exemption codes denoting evidence of immunity, severe adverse event after immunization (except for the Medical Readiness Reporting System), other temporary or permanent reasons for medical exemption, and other appropriate categories.

(4) Report cases warranting permanent medical exemptions due to a vaccine related adverse event to the Vaccine Adverse Events Reporting System (VAERS) at the Web site at http://www.vaers.hhs.gov and as discussed in paragraph 2–10.

(5) Revoke medical exemptions when they are no longer clinically warranted.

*b. Administrative exemptions.* Standard exemption codes appear in appendix C.

(1) *Separation or retirement.* Within 180 days before separation or retirement, Service personnel may be exempt from deployment (mobility) immunizations, if one of the following conditions are met:

*(a)* They are not currently assigned, deployed, or scheduled to perform duties in a geographical area where an immunization is indicated.

*(b)* The commander has not directed immunization because of overriding mission requirements. Personnel who meet separation or retirement requirements and desire an immunization exemption must identify themselves to their commander. The member must have approved retirement or separation orders. Active duty personnel continuing duty in the reserve component are not exempted on this basis.

(2) *Thirty days or fewer of service remaining.* Applies to civilian employees and contractor personnel who will leave a permanent (other than OCONUS deployments) assignment subject to immunization within 30 days or fewer.

(3) Religious exemptions.

*(a) Servicemembers.* Immunization exemptions for religious reasons may be granted according to Service-specific policies to accommodate religious beliefs of a Service member. This is a command decision made with medical, judge advocate, and chaplain input.

*1.* Requests for religious exemption must comply with the provisions of the applicable policy and/or regulation for the Servicemember requesting religious accommodation. For the Army, religious accommodation policy is provided in AR 600–20. For the Navy and Marine Corps, waivers are granted on a case-by-case basis by the Chief, Bureau of Medicine, and Surgery. For the Air Force, permanent exemptions for religious reasons are not granted; the MAJCOM commander is the designated approval and revocation authority for temporary immunization exemptions. For the Coast Guard, CG–122 is the designated approval and revocation authority for religious immunization exemptions. USCG requests must be forwarded through the appropriate chain to Commandant CG–122 via CG–112.

*2.* A military physician must counsel the applicant. The physician should ensure that the Servicemember is making an informed decision and should address, at a minimum, specific information about the diseases concerned; specific vaccine information including product constituents, benefits, and risks; and potential risks of infection incurred by unimmunized individuals.

*3.* The commander must counsel the individual that noncompliance with immunization requirements may adversely impact deployability, assignment, or international travel.

*4.* Per DODI 1300.17 and applicable service regulations will be provided whether Servicemembers with pending active requests for religious exemption are temporarily deferred from immunizations, pending outcome of their request.

*5.* Religious exemptions may be revoked, in accordance with Service-specific policies and procedures, if the individual and/or unit are at imminent risk of exposure to a disease for which an immunization is available.

*(b) Civilian employees.* Civilian employees submit requests for immunization exemption for religious reasons to their supervisors. Civilian requests are processed in accordance with Part 1605, Title 29, Code of Federal Regulations and component policies.

*(c) Bargaining units.* Civilian personnel affected by this document who are members of bargaining units will be

considered for exemption consistent with applicable personnel management policies and applicable labor relations obligations.

*(d) Other exemption categories.* Administrative or medical personnel will appropriately annotate electronic ITS with exemption codes denoting separation, permanent change of station, emergency leave, missing or prisoner of war, deceased, and other appropriate categories.

## 2–7. Immunization and chemoprophylaxis records

*a. Electronic immunization tracking systems.*

(1) Document all immunizations in a DOD and USCG-approved ITS. Include date, immunization given, dose, anatomical location of administration, lot number, manufacturer, Vaccine Information Sheet (VIS) date, and the identification of the person administering the vaccine.

(2) Electronic ITS must—

*(a)* Comply with the requirements of the National Vaccine Injury Compensation (NVIC) Program as provided in 42 USC 300aa-25, Report and Recording of Information, and 42 USC 300aa-26. NVIC information is outlined in paragraph 2–7*d*.

*(b)* Incorporate DOD-directed levels of security, certification, and redundancy, and the requirements of the Health Insurance Portability and Accountability Act to preclude unauthorized access to personal medical information and to survive hardware or software malfunction.

*(c)* Be capable of generating printed reports of immunization status and exemption information on both an individual and unit basis.

(3) A printed report from the electronic ITS, in CDC Form 731 (International Certificate of Vaccination or Prophylaxis) 731, SF 601 (Health Record-Immunization Record), or DD Form 2766C (Adult Preventive and Chronic Care Flowsheet) (Continuation Sheet) format, accompanied by an official clinic stamp and the authorized signature and printed name of an authenticating official, will qualify as an official paper immunization record.

(4) A printed report as identified in preceding paragraph 2–7*a*(3) will suffice as a valid certificate of vaccination for international travel (except for yellow fever which is documented on the CDC Form 731) for active duty members of the Armed Forces as outlined in Article 36 (Annex 6) of the World Health Organization (WHO) International Health Regulations.

*b. Non-electronic immunization and chemoprophylaxis records.*

(1) *Deployment records.* Transfer information regarding immunizations and chemoprophylaxis including date, product given, dose, and initials of person administering to the deployable health record (DD Form 2766) or comparable approved form, either by computer-generated report or by hand. Upon return from deployment, transfer entries on the deployment record into the appropriate ITS or other electronic record system.

(2) *Abbreviations.* Use abbreviations for vaccines and their manufacturers conforming to the nomenclature adopted by the CDC Vaccine Identification Standards Initiative. When annotating the date a vaccine is administered, the day, month, and year are listed in that order. The day is expressed in Arabic numerals, the month spelled out or abbreviated using the first three letters of the word, and the year expressed in Arabic numerals either by four digits or by the last two digits (for example, 14 June 1994 or 14 Jun 94).

(3) *Transcribed records.* Entries based on prior official records will include the following statement: "Transcribed from official records." Alternately, the statement may cite the specific source (for example, "Transcribed from SF 601"). When entries are transcribed onto paper records, include the initials of the transcriber on each entry.

(4) *SF 601 (Navy, Marine Corps, and U.S. Coast Guard).* Prepare SF 601 in accordance with this directive and chapter 16 of NAVMED P–117.

(5) *DD Form 2766C.* Initiate DD Form 2766C for all personnel at the time of entry into Military Service.

(6) *Paper-based immunization and chemoprophylaxis records.* Individuals preparing paper-based immunization and chemoprophylaxis records will ensure that paper records match the electronic ITS. If paper-based immunization or chemoprophylaxis records are used, electronic ITS will be updated within 24 hours.

(7) *CDC Form 731.* Required for yellow fever documentation and or prepared upon request for each member of the Armed Forces and for nonmilitary personnel receiving immunizations, including date, immunization given, dose, and the initials of the person administering the vaccine. The form contains valid certificates of immunization for international travel and quarantine purposes in accordance with WHO international health regulations. CDC Form 731 remains in the custody of the individual who is responsible for its safekeeping and for keeping it in his or her possession when traveling internationally. Data are entered by hand, rubber stamp, or by typewriter.

*(a) Supply.* CDC Form 731 is obtained through normal publication supply channels.

*(b) Stamps.* Use in accordance with instructions received from the Division of Global Migration and Quarantine; the appropriate surgeon general; Chief, Bureau of Medicine and Surgery; or CG–11.

*1. Army.* USAHRC (AHRC–PDR), 1600 Spear Head Division Avenue, Fort Knox, KY 40122.

*2. Navy.* Bureau of Medicine and Surgery (BUMED), Washington, DC 20372.

*3. Air Force.* HQ AFPC/DPMDB, Randolph AFB, TX 78148.

*4. Marine Corps.* Headquarters, U.S. Marine Corps, Washington, DC 20380.

*5. Coast Guard.* Commandant, CG–11, USCG Headquarters, 2100 Second Street SW, Washington, DC 20593–0001.

*(c) Written signatures.* Written signatures must appear in appropriate spaces on each certificate; signature stamps are not valid.

*c. Lost immunization records.* If an individual's immunization records are lost, assume the individual received standard immunizations administered at entry into Military Service by the individual's accession source (for example, enlisted, Service academy, direct commission) unless there is an objective reason to believe otherwise. Do not repeat such immunizations. Base decisions for future immunizations on assumed date of last immunization (for example, individual assumed to have received tetanus-diphtheria toxoid in July 1995 would next be immunized in July 2005).

*d. National Vaccine Injury Compensation Program.*

(1) The statute 42 USC 300aa-1 to 300aa-34 (The National Childhood Vaccine Injury Act of 1986) and other regulations set standards for certain immunizations. These requirements apply to U.S. vaccines as indicated by the CDC after the DHHS Secretary publishes a notice of coverage. Document the patient's name; identifying number (for example, sponsor's SSN); type of vaccine; date of administration; manufacturer; lot number; and the name, address, and title of person administering the vaccine in a permanent health record or permanent office log or file, in either paper or electronic format. The electronic immunization tracking systems are the primary method of immunization documentation. Other records and management reports may be generated from the electronic immunization database, as described above.

(2) Personnel who administer any vaccine covered under the NVIC program, to either children or adults, will provide a written copy of the VIS to the vaccinee and allow sufficient opportunity to read the most recent VISs provided by the DHHS and an opportunity to ask questions about the vaccine. Copies of VISs are available through the CDC Web site (http://www.cdc.gov/vaccines). The VIS should be supplemented with an oral explanation or video presentation, or in the appropriate language, when the patient or guardian does not appear to be literate in English. Provide printed copies to any individual who requests one. Translations of VISs into languages other than English are available from nongovernmental organizations.

(3) Personnel who administer vaccines are not required to obtain the signature of the military member, patient, or legal representative acknowledging receipt of a VIS. However, to create a record that the materials were provided, health care personnel who administer vaccines will annotate each patient's health record that the VISs were provided at the time of immunization.

(4) The statute 42 USC 300aa-1 to 300aa-34 (The National Childhood Vaccine Injury Act of 1986), requires that the following events be reported to VAERS, a public health activity administered by the FDA and CDC:

*(a)* Any event listed in the NVIC program's vaccine injury table (at http://www.hrsa.gov/vaccinecompensation/table.htm) occurring within the time period specified.

*(b)* Any contraindicating event listed in a vaccine's package insert (product labeling).

(5) The VAERS accepts all reports by any interested party of real or suspected adverse events occurring after the administration of any vaccine.

(6) All DOD and USCG health care beneficiaries are eligible to file claims with the NVIC program, according to the program's procedures.

## 2–8. Jet-injection immunization devices

These devices must be used in accordance with FDA-approved manufacturer's recommendations. Only vaccines with FDA approval for jet injectors use may be used in these devices.

## 2–9. Emergency response requirements

*a. Written plan.* Clinics or activities administering immunizations will develop and maintain a written plan for emergency response, including standing orders for the management of anaphylaxis and fainting.

*b. Training.* Whenever vaccines are administered, at least one person present must be trained and current in basic cardiopulmonary resuscitation, oropharyngeal airway management, and recognition and initial treatment of anaphylaxis with epinephrine.

*c. Anaphylaxis management.* For the medical management of an anaphylaxis event whenever vaccines are administered, the following must be immediately accessible on scene: stethoscope, blood pressure cuff (sphygmomanometer), minimum of three adult doses of epinephrine (1:1000), oral airway, bag valve mask or equipment to administer oxygen by positive pressure, and the equipment and ability to activate an emergency medical system. Other equipment and/or medications (for example, injectable antihistamines, corticosteroids, vasopressors, glucagon, albuterol, and IV fluids with administration sets), depending on the clinical setting and local policy, may be included beyond the minimum requirements listed above.

*d. Observation.* The ACIP general recommendations suggest that persons be observed for 15 to 20 minutes after

being immunized. Manufacturer's guidance must be followed when the manufacturer's package insert exceeds this requirement.

## 2–10. Adverse events

*a*. Describe in the individual's health record a detailed account of adverse events after administering immunizing agents or other medications. Mandatory information consists of identification, lot number, and manufacturer of the vaccine or other medication; date of administration; name and location of the medical facility; the type and severity of the event; treatment provided; and any exemption from additional doses. Consultation through MILVAX's Vaccine Healthcare Centers network is available 24 hours a day, 7 days a week, for providers who require additional support for clinical evaluation of possible vaccine adverse events.

*b*. Health care providers will report adverse events involving vaccines via the VAERS Web site http://www.vaers. hhs.gov or by faxing or mailing a VAERS–1 form. Obtain VAERS forms and information by calling 1–800–822–7967 or by accessing the VAERS Web site.

*c*. Health care providers will report adverse events involving chemoprophylaxis agents to MedWatch via the Web site at http://www.fda.gov/Safety/MedWatch/default.htm or on FDA Form 3500. MedWatch forms and information are available by calling 1–888–463–6332 or on the MedWatch Web site.

*d*. Reporting requirements are as follows:

(1) Report adverse events resulting in hospitalization, a life-threatening event (for example, anaphylaxis), time lost from duty more than one duty shift, or an event related to suspected contamination of a vaccine vial. Reports are also required for all events listed on the VAERS Table of Reportable Events Following Vaccination (available at http:// vaers.hhs.gov/resources/vaersmaterialspublications).

(2) Further, health care providers are encouraged to report other adverse events considered unexpected in nature or severity.

(3) Reports of mild expected reactions are not required (for example, low-grade, self-limited fever of less than 24 hours duration, temporary local soreness, redness, or minor swelling at the site of immunization), but such reports may be submitted if the clinician or patient wishes.

*e*. Patients may also submit a VAERS or MedWatch report directly. If a patient wishes to submit a VAERS report, health care personnel will assist the patient in completing the form, regardless of professional judgment about causal association to immunization.

*f*. Record pertinent information from the recipient's health record on the VAERS or MedWatch report. Submit copies of the report within 7 days of adverse event recognition as follows:

(1) Send the original report form to the VAERS or MedWatch office.

(2) File a copy of the VAERS or MedWatch report in the patient's individual health record or annotate the relevant information on the report within the health record.

*g*. Immediately notify USAMMA or the vaccine manufacturer if contamination or other serious problem with a vaccine vial or lot is suspected. Suspend usage, but quarantine and retain all such opened or unopened vials or lots under appropriate storage conditions pending further investigation and disposition instructions.

*h*. An adverse reaction to a DOD-directed immunization in Service personnel is a line-of-duty condition.

(1) Medical treatment facility (MTF) commanders will provide full access to reserve component (National Guard and Reserve) members for evaluation and treatment of adverse events potentially related to DOD-directed immunizations.

(2) Reserve component (National Guard and Reserve) unit commanders will inform their members that they may seek medical care for such adverse events, with the unit providing assistance and information related to pay status and compensation issues. Any necessary documentation, including line-of-duty determinations, will be completed after the Reserve component Servicemember is evaluated and, if required, treated. In no case will such evaluation or treatment be denied or delayed pending line-of-duty determination. If additional health care is required after the initial visit and a line-of-duty determination has established a Service connection, a notice of eligibility must be completed in accordance with DODD 1241.01.

(3) DOD will provide an immunization health care capability to deliver medical specialty consultation, case management, and clinical investigation.

## 2–11. Program evaluation

MTF facilities and commands storing service treatment records will review immunization and chemoprophylaxis practices at least annually to ensure compliance with current standards of care and documentation and as a measure of medical readiness and health promotion. Program evaluation includes internal and external assessments of the standards for military immunization (see app B). Program evaluation is focused at the clinic level, regardless of Service, to include both fixed facilities and field units. The Continuous Quality Immunization Improvement Process Tool is one of several tools available to assist with program evaluation and is described at http://www.vaccines.mil/cqiip. MILVAX

can assist with guidance and implementation of the Continuous Quality Immunization Improvement Process Tool. Other tools may be available depending on the Service.

## 2–12. Blood donation

For timing of immunization with regard to blood donations, clinicians will consider the policies of the Armed Services Blood Program Office (http://www.militaryblood.DOD.mil) and the specific Service Blood Program Offices. In some situations, such as accession sites where blood donations are scheduled, regularly coordinate the administration of live vaccine immunizations after scheduled blood donation activities, when possible.

# Chapter 3
# Personnel Subject to Immunization

## 3–1. Military accessions

*a. Military accessions.* Accessions include Service personnel in enlisted initial entry training, Reserve Officers Training Corps (ROTC), Officer Candidate School, academy preparatory school, Service academy, Officer Indoctrination School, other officer accession programs, and officers who are directly commissioned.

(1) When determining the immunization needs of accessions, give credit for immunizations appropriately documented earlier in life (for example, data from electronic immunization registries maintained by State health departments).

(2) Immunize if the primary series is incomplete, if a booster immunization is needed, or if the Service personnel has no serologic or documented evidence of immunity. Complete multiple-dose immunization series according to the recommended schedule as soon as possible.

(3) Before immunizing, conduct serologic testing where available. At a minimum, conduct serologic testing for antibodies for measles, rubella, hepatitis A, hepatitis B, and varicella. Document medical exemptions for immunity (MI) in Service ITS. Documented medical exemptions for immunity will be accepted as evidence of immunity in lieu of vaccination.

(4) Except in an outbreak setting or for individual clinical purposes, immunization records will not be screened after completion of initial training with regard to measles, mumps, and rubella (MMR), poliovirus, or varicella vaccines.

(5) Document immunizations and immunization exemption codes (medical or administrative) in a DOD-approved Service ITS.

*b. Enlisted accessions.* Enlisted accessions may be scheduled for immunizations in two or more clusters, as long as all appropriate immunizations are administered or seroimmunity is determined. Pregnancy screening or testing for female accessions must be verified prior to administration of any live virus vaccines.

(1) *First cluster.* The first cluster of immunizations is administered, if susceptible, before or at the beginning of collective training (initial entry training, basic military training) to protect against pathogens that represent an imminent risk of contagious disease in settings of close contact: adenovirus; influenza; meningococcal; MMR; tetanus-diphtheria-pertussis; and varicella. Pneumococcal vaccine may be administered if warranted epidemiologically. Ensure live virus vaccines are given on the same day or at least 28 days apart (see ACIP guidelines for exceptions).

(2) *Second cluster.* The second cluster of immunizations may be administered, if susceptible, in the first or second half of basic military training, during advanced individual training, or upon arriving at the first duty station to protect against travel and other military risks. These immunizations include hepatitis A, hepatitis B, influenza (if not administered in first cluster), and poliovirus. Live virus immunizations follow at least 28 days after earlier live virus immunizations (see ACIP guidelines for exceptions).

*c. Reserve Officers' Training Corps cadets and midshipmen.* ROTC cadets and midshipmen and similar officer candidates who are ordered or called to active duty or active duty for training will require immunizations. Cadets and midshipmen may be scheduled for immunizations in two or more clusters:

(1) *First cluster.* Assess immunization or immunity status and administer immunizations, if susceptible, before or at the beginning of collective training to protect against pathogens that represent an imminent risk of contagious disease in settings of close contact. These immunizations include: influenza; meningococcal; MMR; tetanus-diphtheria-pertussis; and varicella. Ensure live virus vaccines are given on the same day or at least 28 days apart (see ACIP guidelines for exceptions).

(2) *Second cluster.* The second cluster of immunizations may be administered, if susceptible, in the first or second half of collective training to protect against travel and other military risks. These immunizations include hepatitis A, hepatitis B, influenza (if not administered in first cluster), and poliovirus. Live virus immunizations follow at least 28 days after earlier live virus immunizations (see ACIP guidelines for exceptions). ROTC cadets or midshipmen who travel overseas as part of their training will receive immunizations according to geographic risk assessments.

*d. Service academy cadets and midshipmen.* Service academy cadets and midshipmen will require immunizations as follows:

(1) *First cluster*. Assess immunization or immunity status and administer immunizations, if susceptible, before or at the beginning of collective training to protect against pathogens that represent an imminent risk of contagious disease in settings of close contact. These immunizations include: influenza, meningococcal, MMR, tetanus-diphtheria-pertussis, and varicella. Ensure live virus vaccines are given on the same day or at least 28 days apart (see ACIP guidelines for exceptions).

(2) *Second cluster*. The second cluster of immunizations may be administered, if susceptible, in the first or second half of collective training to protect against travel and other military risks. These immunizations include hepatitis A, hepatitis B, influenza (if not administered in first cluster), and poliovirus. Live virus immunizations follow at least 28 days after earlier live virus immunizations (see ACIP guidelines for exceptions). Cadets and midshipmen who travel overseas as part of their training will receive immunizations according to geographic risk assessments.

*e. Entry-level officers*. Upon accession, screen commissioned and warrant officers for immunization or immunity status and vaccinate as required.

## 3–2. Military personnel

*a. Active duty personnel*. Immunize active duty personnel in accordance with appendix D or as supplemented in official notices posted at the Military Vaccine Office Web site, http://www.vaccines.mil. During Military Service, active duty personnel will receive or be up-to-date on adult routine immunizations.

*b. Reserve component (National Guard and Reserve)*. Immunize Reserve component Servicemembers in accordance with appendix D or as supplemented in Service-specific policies and notices posted at http://www.vaccines.mil. Reserve component Servicemembers receive the same immunizations as active duty personnel, but must be in a duty status to receive required immunizations.

*c. Aviation personnel*. Typically, aviation personnel are grounded for 12 hours (Air Force: access to medical care 4 hours post vaccination unless operational needs dictate otherwise; Navy: refer to "Aeromedical Reference and Waiver Guide" (ARWG) for vaccine specific information) after immunization, or as specified by their flight surgeon. No formal grounding documents are required for uncomplicated immunization. Personnel who previously experienced urticaria, hypersensitivity phenomena, or other unusual phenomena after an immunization are restricted from flying duty for an appropriate interval (for example, 72 hours) as determined by the flight surgeon. Additional temporary grounding may be necessary until significant side effects resolve.

*d. Occupational risk*. Military members at occupational risk for specific disease threats will receive appropriate vaccines per appendix D or as supplemented in Service-specific policies posted at http://www.vaccines.mil. Immunize special populations at occupational risk for vaccine-preventable diseases not listed in appendix D per Service, Federal, State, or local occupational medicine guidance.

*e. Geographic travel requirements*.

(1) Each Service's preventive medicine authority maintains current health threat assessments based on disease prevalence in specific geographical regions using Federal, DOD, USCG, and other relevant sources of information. These assessments are disseminated to units within their respective jurisdictions. Special Operations may determine additional area-specific immunization requirements.

(2) Installations and deployed units report disease occurrence through appropriate unit and/or medical lines of communication.

(3) Combatant commanders, in coordination with the appropriate surgeons general or CG–11, establish specific immunization requirements based on a disease threat assessment. These requirements may differ from standard Service immunization policies for personnel entering their area of responsibility to participate in exercises or other operational missions. Immunize personnel on official deployment or travel orders in accordance with the specific guidance established by the combatant commander before departure.

(4) For short notice travel or deployments requiring vaccines given in a multi-dose series, administer the first dose of the basic series. Administer as many of the subsequent doses as time permits. Completion before departure is the goal. If the series cannot be completed before departure, complete it upon arrival. Inform the patient that in order to obtain optimal immunity, the series must be completed by receiving all the required doses at the recommended intervals.

(5) For quarantine, entry, and reentry requirements, follow the provisions of the CDC, Division of Global Migration and Quarantine regulations concerning entry or reentry of military and nonmilitary personnel into the United States or its commonwealths, territories, and possessions.

*f. Other uniformed Service personnel*. Members of other uniformed Services are authorized immunizations according to their occupation, official duties, travel plans, health status, or other relevant factors.

## 3–3. Certain civilian employees

*a. Federal civilian employees*.

(1) *General*. Federal civilian employees will receive country-specific immunizations without charge at military activities upon presentation of official orders or authorization. Area preventive medicine authorities are consulted for recommendations applicable to specific areas. People declining immunizations required for entry into foreign countries

are referred to the appropriate authority for counseling. Document counseling in the health record and note that omission of certain immunizations may have consequences under host country policies, which could include compulsory immunization, detention, quarantine, or denial of entry.

(2) *Civilian employees at occupational risk for vaccine-preventable disease*. Federal civilian employees who are at risk of exposure to an infectious disease associated with their occupation may receive appropriate immunizations, without charge, at military activities. Administer immunizations upon recommendation of the responsible occupational medicine authority.

(3) *Civilian health care employees*. Susceptible or occupationally exposed health care employees (including volunteers) who are at risk of exposure to an infectious disease (for example, influenza) associated with their occupation may receive appropriate immunizations, without charge, at military activities. This policy applies to all health care settings, regardless of age or sex of the health care employee. Employees, including volunteers, who have contact with or potential exposure to human blood or blood products (whether from patient care, laboratory, or other health care settings) are provided hepatitis B virus vaccine in accordance with the local bloodborne pathogen exposure-control plan. Refer to the Occupational Safety and Health Administration standards (29 CFR 1910.1030) for additional information. Immunizations or immune status may be a condition of employment.

(4) *Employees with potential occupational exposure to wastewater or sewage*. Employees at occupational risk of exposure to wastewater or sewage will receive tetanus-diphtheria toxoids (preferably with pertussis vaccine) per ACIP recommendations. Other vaccines are not routinely required based solely on occupational exposure for wastewater treatment system workers, including sewage generated by medical facilities.

(5) *Individuals immunized per categories above*. Individuals immunized per the civilian personnel categories above are authorized treatment and necessary medical care related to adverse events after immunization, consistent with applicable occupational health program requirements.

*b. Civilian Expeditionary Workforce*. Civilian employees and others in the Civilian Expeditionary Workforce may receive, without charge, appropriate immunizations at military activities. In accordance with DODD 1404.10, components should ensure emergency-essential and non-combat essential employees are aware of potential deployment immunizations as a condition of employment. Components should also ensure the employee completes and signs a record of notification with a signed DD Form 2365 (DOD Civilian Employee Overseas Emergency-Essential Position Agreement). Applicable vacancy announcements and position descriptions will note obligations to receive immunizations. Emergency-essential and non-combat essential employees have the same access as military personnel to treatment and necessary medical care related to adverse events after immunization, consistent with applicable occupational health program requirements.

*c. Bargaining units*. For Federal employees in a bargaining unit, local management must meet applicable labor relations obligations before implementing any changes to the bargaining unit employees' conditions of employment. Civilian personnel advisory centers provide guidance on these matters.

*d. Biological warfare defense*. Immunization of civilian employees and contracted workers for biological warfare defense are addressed in DODI 6205.4.

*e. Emergency situations*. In emergency situations, the provisions of DODD 6200.03 apply.

## 3–4. Contracted workers

*a.* Provide immunizations to contracted workers according to the terms of the contract and as stated in the contract agreement. If the contract does not provide for provision of immunizations by the government, contractors are responsible for providing appropriate immunizations to their employees For vaccines with limited distribution (for example, anthrax, smallpox), DOD or USCG may provide the immunizations, regardless of the terms of the contract. The contractor is responsible for work-related illnesses, injuries, or disabilities under worker-compensation programs, supplemented by existing Secretarial designee authority.

*b.* Contracted health care workers are eligible for immunizations required or offered to health care employees and are provided as stated in the contract agreement. Contracts will include specifications describing immunizations required of contracted health care workers.

*c.* Family members of contracted workers in foreign-duty settings under military sponsorship will receive country-specific immunizations without charge at military activities upon presentation of official orders or authorization. People declining immunizations required for entry into foreign countries are referred to the appropriate authority for counseling. Document counseling in the health record and note that omission of certain immunizations may subject them to adverse action according to host country policies, which could include compulsory immunization, detention, quarantine, or denial of entry.

## 3–5. Department of Defense, U.S. Coast Guard schools, childcare centers and youth programs

*a.* As a condition of employment, schoolteachers, childcare center workers, youth program workers, and volunteers are administered appropriate vaccines against communicable diseases in accordance with ACIP adult immunization schedule recommendations, unless already immune, based on seroimmunity, physician diagnosed illness, or documented proof of immunization.

*b.* Children attending DOD and USCG-sponsored primary and secondary schools, childcare centers, or similar facilities are required to be up to date on all age appropriate ACIP-recommended vaccines for children unless there is documentation of previous immunization, religious exemption, or medical contraindication. For foreign-national children outside the United States, observe host country recommendations or requirements.

### 3–6. Other populations

*a. Department of Defense and U.S. Coast Guard beneficiaries.*

(1) *Family members of military personnel.* Family members receive immunizations according to current ACIP recommendations. In addition, Family members may be subject to Service-specific requirements and recommendations for immunizations applicable to the country in which they will reside while accompanying military members under military sponsorship.

(2) Family members or sponsored individuals of other Federal civilian employees in foreign-duty settings under military sponsorship. These Family members will receive country-specific immunizations without charge at military activities upon presentation of official orders or authorization. People declining immunizations required for entry into foreign countries are referred to the appropriate authority for counseling. Document counseling in the health record and note that omission of certain immunizations may have consequences under host country policies, which could include compulsory immunization, detention, quarantine, or denial of entry.

*b. Foreign nationals.* Foreign nationals who come to the United States, its territories, commonwealths, or possessions under Armed Forces sponsorship receive immunizations required for entry into the United States and by local jurisdictions. When returning to their country of origin, foreign nationals receive immunizations required by international health regulations or their country of origin. These immunizations are administered without charge at military activities upon presentation of official orders or authorization.

*c. Detainees.* The installation or activity commander, upon the recommendation of the appropriate medical authority, will provide immunizations against diseases that may be a significant cause of death or illness among detainees. Such immunizations are voluntary and are administered without charge to the detainee. Annotate all immunizations and chemoprophylactic medications in the detainee's health record. Before immunization, inform detainees in their own language about the relative benefits and risks of the specific immunizations offered. Factors to consider in deciding which immunizations to offer detainees include their likely preexisting immunity, the anticipated length of detention, seasonal threat of infection, and other risk factors related to personal health status and living conditions. (Refer to DODI 2310.08E for additional guidance.)

*d. Overseas commander authority.* The overseas commander, commanding officer, or officer-in-charge, upon the recommendation of the appropriate medical authority, will provide immunizations against communicable diseases judged to be a potential hazard to the health of the command; such vaccines are administered without charge.

*e. Other than U.S. Forces.* Immunization of other than U.S. Forces for biological warfare defense are addressed in DODI 6205.4.

*f. Emergency situations.* In emergency situations, the provisions of DODD 6200.03 apply.

## Chapter 4
## Specific Immunization Requirements for Department of Defense and U.S. Coast Guard Personnel

(Also see appendix D for a chart on the required immunizations for military personnel.)

### 4–1. Civilian applicability

Certain civilian employees may be required to receive immunizations as a condition of their employment or participation in a particular assignment. In such cases, failure to voluntarily receive the immunizations may result in a personnel action being taken (see chap 3), but in no case will immunizations be involuntarily administered.

### 4–2. Adenovirus types 4 and 7

*a. Military indication.* To prevent adenovirus infection, an acute febrile respiratory disease caused by adenovirus serotypes 4 and 7. Direct contact and fecal oral transmission of the virus may result in a respiratory disease infection or outbreak of disease among an unvaccinated recruit population.

*b. Basic trainees.* Administer adenovirus vaccine to military enlisted basic trainees before or at the beginning of collective training at the same time the first live virus vaccines are administered. Routine administration in other populations is not generally recommended except when directed by preventive medicine guidance, based on disease incidence and severity.

### 4–3. Anthrax

*a. Military indication.* To prevent anthrax, an acute infectious disease caused by the spore forming bacterium

*Bacillus anthracis*. Direct exposure to anthrax spores may result in cutaneous, gastrointestinal, or inhalational infection. *Bacillus anthracis* has been identified as a potential biological warfare agent.

*b. Military and civilian personnel*. Administer anthrax vaccine to military personnel and applicable civilians according to DOD or USCG policy for the Anthrax Vaccine Immunization Program and Service-specific implementation plans. Immunize personnel based on geographical areas at higher risk for release of anthrax as a weapon or in occupational roles as designated by the Services, Chairman of the Joint Chiefs, or the Office of the Secretary of Defense.

*c. Occupational risk*. Administer anthrax vaccine to at-risk veterinary and laboratory workers and others at occupational risk of exposure.

## 4–4. Haemophilus influenzae serotype b, commonly called Hib

*a. Military indication*. To prevent invasive Haemophilus influenza disease and infection of many organ systems caused by the bacterium *Haemophilus influenzae* serotype b (Hib). The disease is transmitted via respiratory droplets. The most common types of invasive Hib disease are: meningitis, epiglottitis, pneumonia, arthritis, and cellulitis.

*b. Military and civilian personnel*. Administer Hib vaccine to those who are immunocompromised, have sickle cell disease, or do not have a spleen or a functioning spleen.

## 4–5. Hepatitis A

*a. Military indication*. To prevent hepatitis A, an acute infection of the liver that is acquired by consuming food or water contaminated with hepatitis A virus, particularly during deployment or travel to areas with poor food, water, and sewage sanitation. It can range in severity from a mild illness lasting a few weeks to a severe illness lasting several months. Hepatitis A infections occur worldwide.

*b. Basic trainees and other accessions*. Unless seroimmune, administer hepatitis A vaccine to trainees and accessions during initial entry training.

*c. Military and civilian personnel*. Unless seroimmune, or evidence of appropriate complete vaccination, administer hepatitis A vaccine to all military personnel, and civilian personnel when indicated.

*d. Occupational risk*. Hepatitis A vaccine is indicated per ACIP guidelines and locally designated food handlers.

## 4–6. Hepatitis B

*a. Military indication*. To prevent hepatitis B, an acute or potentially chronic infection of the liver that is acquired through percutaneous, sexual, and other mucosal exposure to blood and body fluids from people infected with hepatitis B virus. Chronic infections may result in cirrhosis or cancer of the liver. Hepatitis B infections occur worldwide, and some infected people maintain a chronic carrier state.

*b. Basic trainees and other accessions*. Unless seroimmune, administer hepatitis B vaccine to basic trainees and accessions during initial entry training.

*c. Military and civilian personnel*. Unless seroimmune, or evidence of appropriate complete vaccination, administer hepatitis B vaccine to all military personnel, and civilian personnel, when indicated.

*d. Occupational risk*. Administer hepatitis B vaccine to susceptible personnel who are at risk of potential exposure to bloodborne pathogens per the Occupational Safety and Health Administration standards (29 CFR 1910.1030). For military purposes, this includes occupational specialties involving health care workers, emergency medical technicians, mortuary affairs personnel, search and rescue specialists, correctional facility staff, and designated special operations forces.

*e. Serologic testing*. Conduct serologic testing of health care workers who have direct contact with patients and those who have potential occupational risk for exposure to bloodborne pathogens 1 to 2 months after completion of the hepatitis B vaccine series to determine serologic response according to CDC and ACIP recommendations.

## 4–7. Influenza

*a. Military indication*. To prevent influenza, an acute febrile respiratory viral infection that can cause epidemics within military populations, especially under conditions of crowding, such as initial entry training, aboard ships, extended air transport, or deployment settings. Influenza has the potential for widespread transmission through person-to-person contact and fomites.

*b. Military personnel*. Administer influenza vaccine(s) annually or as indicated to all active duty, Reserve, and National Guard personnel.

*c. Occupational risk*. Administer influenza vaccine(s) annually or as indicated to personnel who work or volunteer in DOD MTFs.

## 4–8. Japanese encephalitis

*a. Military indication*. To prevent Japanese encephalitis, a mosquito-borne viral disease, during deployments and travel to endemic areas in Eastern Asia and certain western Pacific Islands. Japanese encephalitis virus (JEV) can cause

an acute infection of the brain, spinal cord, and meninges with high rates of complications, chronic disability, and death.

*b. Military and civilian personnel.* Administer the JEV vaccine to military personnel and civilian personnel who have a substantial risk of exposure to the virus based on their geographic location.

*c. Temporary flying restrictions.* Impose temporary flying restrictions post-JEV immunization for aircrew personnel per Service-specific policy.

## 4–9. Measles, mumps, and rubella (MMR)

*a. Military indication.* To prevent MMR, primarily by boosting immunity acquired from childhood immunization. These three acute viral infections are spread by the respiratory route or person-to-person contact. In military trainee populations, each can cause disease outbreaks. Rubella usually causes a mild infection, but infection during the first trimester of pregnancy puts the fetus at high risk of congenital rubella syndrome and birth defects. Young adults may experience more severe complications from mumps infection. All three diseases occur worldwide, primarily among children.

*b. Basic trainees and other accessions.* Unless seroimmune to both measles and rubella, administer MMR vaccine to susceptible basic trainees and accessions within the first 2 weeks of training.

*c. Military and civilian personnel.* Presume immunity through infection for persons born in 1957 or earlier. Ensure personnel born after 1957 have received two lifetime doses of MMR vaccine or have positive serologic test results. Immunity against mumps is not necessary as a military requirement, but may be appropriate in exceptional clinical circumstances such as outbreaks.

*d. Occupational risk.* Ensure health care workers have received two documented doses of MMR vaccine or have positive serologic test results.

## 4–10. Meningococcal

*a. Military indication.* To prevent meningococcal disease or meningitis and other systemic infections caused by the bacteria *Neisseria meningitidis* serogroups A, C, W–135, and Y. No vaccine against serogroup B meningococcus, another common pathogen, is currently licensed in the United States. Basic trainees and other military populations living in crowded conditions are at an increased risk for meningococcal infection. Historically, outbreaks have occurred in training populations. Meningococcal vaccine may be indicated for deployment and travel to areas with highly endemic meningococcal disease.

*b. Basic trainees and other accessions.* Administer meningococcal vaccine to basic trainees, cadets, and midshipmen at Service academies within the first 2 weeks of training, if no evidence of vaccination within the last 5 years.

*c. Military and civilian personnel.* Administer meningococcal vaccine to personnel traveling to countries in which *N. meningitidis* is hyperendemic or epidemic and other countries as required by DOD and USCG policy or recommended by the CDC.

*d. Alert personnel.* Administer meningococcal vaccine to personnel who are designated to deploy within 10 days of notification.

*e. Other personnel.* Administer one dose of meningococcal vaccine to persons who do not have spleens or functional spleens.

## 4–11. Pertussis

Tetanus, diphtheria, and pertussis guidance is in paragraph 4–16.

## 4–12. Pneumococcal

*a. Military indication.* To prevent pneumococcal disease due to *Streptococcus pneumoniae* in personnel who fall into a high-risk category due to age or underlying health conditions (for example, persons who smoke, have asthma, or have no spleen) or who are in high-risk situations, such as certain training populations. *Streptococcus pneumoniae* may result in pneumonia, bacteremia, and meningitis.

*b. Basic trainees and other accessions.* Routine administration of vaccine is not generally practiced, but may be directed by preventive medicine guidance, based on disease incidence and severity.

*c. Military personnel.* Administer pneumococcal vaccine to military personnel who are in a high-risk category per ACIP recommendations. Administer a second dose to persons without spleens or severely immunocompromised five years after the initial dose.

## 4–13. Poliomyelitis

*a. Military indication.* To prevent poliomyelitis, a viral infection that affects the central nervous system resulting in paralytic symptoms, primarily by boosting immunity acquired from childhood immunization. Poliomyelitis is acquired by person-to-person transmission through the fecal-oral route. Military and civilian personnel deploying or traveling to areas with poor sanitation are at increased risk, although international immunization efforts have decreased poliomyelitis incidence worldwide. Only inactivated poliovirus vaccine (IPV) is available in the US.

*b. Basic trainees and other accessions.* Administer a single booster dose of IPV to basic trainees and accessions. Personnel who have not received the primary series must complete the series using IPV. Unless there is reason to suspect otherwise (for example, childhood spent in a developing country, childhood immunizations not administered), receipt of the primary series of IPV may be assumed.

*c. Military personnel.* Because of the high level of childhood immunization against this disease, do not screen immunization records with regard to poliovirus immunity after completion of initial entry training except in an outbreak setting or for individual clinical purposes.

## 4–14. Rabies

*a. Military indication.* To prevent rabies, a life threatening viral disease caused by exposure to the saliva of animals or humans infected with the rabies virus, which includes bites.

(1) *Pre-exposure prophylactic immunization.* A pre-exposure immunization series may be indicated for people with potential occupational risk of exposure to rabid animals, or for forces assigned to locations where access to definitive care likely exceeds 24 hours. Pre-exposure prophylaxis should not be considered sufficient for the prevention of rabies; however, it reduces the need for human rabies immune globulin-better known as HRIG-and reduces the number of shots required for post-exposure prophylaxis.

(2) *Post-exposure prophylaxis.* Consult with a preventive medicine physician and veterinarian for guidance and to report the animal exposure. Post-exposure treatment includes immediate wound care, and may include the post-exposure vaccine series, and human rabies immune globulin in an unvaccinated patient. Post-exposure prophylaxis is safe and effective.

*b. Military personnel.* Administer pre-exposure rabies vaccine series to special operations personnel, including designated special operations enablers and the occupational risk groups listed below, in accordance with Service policy.

*c. Occupational risk.* Administer pre-exposure rabies vaccine series to veterinary workers, animal handlers, certain laboratory workers, and personnel who have animal control duties and personnel assigned long-term to regions with endemic rabies. Give booster doses every 2 years or when antibody concentrations indicate.

## 4–15. Smallpox

*a. Military indication.* To prevent smallpox disease due to the deliberate release or spread of the smallpox virus. In 1980, the WHO declared the global eradication of naturally occurring smallpox. Nonetheless, stocks of variola virus, the causative agent of smallpox, could be used as a biological warfare agent.

*b. Military and civilian personnel.* Vaccinate designated military and civilian personnel according to DOD and other designed personnel in accordance with USCG policy and Service-specific implementation plans. These include military personnel and applicable civilians who are smallpox epidemic response team members, assigned to medical teams at hospitals and clinics, or assigned to designated forces that constitute mission-critical capabilities. Immunize personnel based on geographical areas at higher risk for release of smallpox as a weapon or in occupational roles as designated by the Services, Chairman of the Joint Chiefs, or the Office of the Secretary of Defense.

*c. Training and education.* Before administering smallpox vaccine to military or civilian personnel who are eligible to receive smallpox vaccine, provide education on the criteria for exemption from immunization, expected response at the vaccination site, vaccination-site care, risks of spreading vaccinia to close contacts, adverse events following immunizations (AEFI) such as myopericarditis, and other relevant topics per Service implementation plans.

*d. Screening.* Use the DOD-specific screening form posted at http://www.vaccines.mil to identify persons with personal or household contraindications to smallpox vaccination (for example heart conditions, immunosuppressed conditions, pregnancy, skin conditions such as eczema and atopic dermatitis). Screening will include assessing pregnancy status and recency of testing for human immunodeficiency virus infection. In the event of a smallpox outbreak, "permanent" exemptions may be rescinded according to individual risk of exposure to variola virus.

*e. Vaccination.* Internal MTF and command clinical quality management programs will have mechanisms to confirm that vaccinators demonstrate proper vaccination technique.

*f. Post-vaccination site care.* Take appropriate care to prevent the spread of vaccinia virus from a vaccinee's vaccination site. MTFs will monitor the vaccination sites of vaccinated health care workers (for example, operating site-care stations), promote effective bandaging, and encourage scrupulous hand washing.

*g. Post-vaccination evaluation ("take" check).* Assessment and documentation of response (a "take") to vaccination is required for health care workers and members of smallpox response teams who would travel into a smallpox outbreak area. Evaluate and record the vaccination response of individuals receiving smallpox vaccine in a DOD and USCG-approved electronic ITS.

## 4–16. Tetanus, diphtheria, and pertussis

*a. Military indication.* To prevent tetanus, diphtheria, and pertussis, primarily by boosting immunity acquired from childhood immunization.

(1) Tetanus is an acute disease of the nervous system caused by the serotoxin produced by *Clostridium tetani*. The *C. tetani* spores enter the body through breaks in the skin, and the bacterium then grows at the wound site. A tetanus

infection results in generalized rigidity and convulsive spasms of the skeletal muscles. The *C. tetani* spores occur in the environment worldwide.

(2) Diphtheria is an acute disease caused by a cytotoxin of the bacteria *Corynebacterium diphtheriae*. *C. diphtheriae* is transmitted person-to-person via respiratory droplets and direct contact. Diphtheria can lead to airway obstruction, and more severe complications may result from toxin absorption into organs and tissues. Diphtheria occurs worldwide.

(3) Pertussis is a highly communicable acute respiratory illness caused by the bacteria *Bordetella pertussis*. Pertussis is spread via direct contact with respiratory secretions. Pertussis occurs worldwide.

*b. Basic trainees and other accessions*. For those individuals lacking a reliable history of prior immunization, administer one dose of Tetanus-diphtheria and acellular pertussis (Tdap) vaccine according to ACIP guidelines. Unless there is reason to suspect otherwise (for example, childhood spent in a developing country, childhood immunizations not administered), receipt of the basic immunizing series may be assumed.

*c. Military and civilian personnel*. Administer booster doses of Tetanus-diphtheria (Td) to all personnel every 10 years following the completion of the primary three-dose series. A one-time dose of Tdap in place of a Td booster during adulthood is required, regardless of interval.

*d. All personnel*. Following ACIP wound-management guidelines for the treatment of contaminated wounds. Tdap is preferred to Td for adults vaccinated 5 years earlier who require a tetanus toxoid-containing vaccine as part of wound management and who have not previously received Tdap. For adults previously vaccinated with Tdap, Td should be used if a tetanus toxoid-containing vaccine is indicated for wound care.

## 4–17. Typhoid fever

*a. Military indication*. To prevent typhoid fever, a systemic bacterial disease acquired by consuming food or water contaminated with *Salmonella typhi*, particularly during deployment or travel to typhoid-endemic areas and other areas with poor sanitation.

*b. Military and civilian personnel*. Administer typhoid vaccine before overseas deployment to typhoid-endemic areas.

*c. Alert personnel*. Administer typhoid vaccine to alert personnel, per Service policy, who are prepared for deployment to typhoid-endemic areas or who have potential risks of exposure to contaminated local food and drink. Administer booster doses per immunization schedule. For Air Force, only units specifically identified by the MAJCOM surgeon require initial and subsequent immunization against typhoid fever.

## 4–18. Varicella

*a. Military indication*. To prevent varicella (chickenpox), a generally mild and self-limiting viral infection caused by the varicella zoster virus. Although varicella is a common childhood disease, adults may experience more severe illness and have higher complication and case-fatality rates. Adolescents and adults are at higher risk for severe disease complications such as secondary skin infections, neurologic disease, and multi-organ involvement. Varicella zoster virus is transmitted by respiratory secretions, direct contact, and aerosolization of the virus from skin lesions. Military members at higher risk for infection include basic trainees, cadets/midshipmen at Service academies, officer trainees, and special operations personnel, and others living in military environments conducive to person-to-person spread of respiratory diseases (for example, barracks, ships).

*b. Basic trainees and other accessions*. Administer varicella vaccine to susceptible trainees and other accessions within the first 2 weeks of initial entry training. Serologic screening of trainees is the preferred means of determining those susceptible to varicella infection and in need of immunization. Identify those people who do not have a personal history of varicella disease, documentation of two prior varicella immunizations, or documentation of immunity based on serologic testing as susceptible. Document positive results of serologic testing in a DOD-approved electronic ITS. Adults and adolescents require two doses of varicella vaccine given 4 to 8 weeks apart.

*c. Health care workers*. Administer varicella vaccine to susceptible health care workers. Determine susceptibility as noted above for trainees, birth before 1980 should not be considered evidence of immunity for health care workers. Routine post-immunization testing for antibodies to varicella is not recommended.

*d. Other susceptible adults*. Offer varicella vaccine to other susceptible persons, especially nonpregnant women of childbearing age and men living in households with young children.

## 4–19. Yellow fever

*a. Military indication*. To prevent yellow fever disease, a viral infection that may result in severe systemic disease and organ failure. Yellow fever infection is transmitted via the bite of an infected mosquito. Documented vaccination status must be verified to meet international health requirements during deployment or travel to yellow-fever-endemic areas. Areas of greatest risk are sub-Saharan Africa and tropical South America.

*b. Military personnel*. Administer yellow fever vaccine to all Marine Corps accessions and military personnel traveling to or transiting through yellow-fever-endemic areas.

*c. Alert personnel*. Administer yellow fever vaccine to alert personnel prepared for deployment to yellow-fever-endemic areas. Administer booster doses per immunization schedule. For Air Force, only units specifically identified

by the MAJCOM surgeon require initial and subsequent immunization against yellow fever. For Navy, administer to those assigned to units subject to deployment within 10 days of notification into land areas where yellow fever is endemic.

*d. Civilian and other personnel.* Administer yellow fever vaccine to personnel traveling to, or transiting through, endemic areas.

# Chapter 5
# Chemoprophylaxis

## 5–1. General

*a. Chemoprophylaxis.* This section does not relate to the treatment of diseases but provides a brief review of military relevant diseases and associated chemoprophylaxis guidelines. Chemoprophylaxis is defined here as the administration of medication before, during, or after possible exposure to an infectious agent, to prevent either infection or disease. Most agents used for chemoprophylaxis are not FDA-approved for this indication and thus may not be administered to units under a force health protection strategy or policy; rather, these agents must be prescribed to individuals and documented accordingly by an appropriate health care provider. Follow instructions from the relevant combatant command surgeon who will consult with the appropriate preventive medicine authority for the use of chemoprophylactic agents. Command medical officers will review indications for use and potential adverse effects of specific chemoprophylactic medications before use. These recommendations for drugs or agents are current as of the date of this publication. Consult current information and guidance for appropriate drugs and dosing regimens (for example the CDC, the ACIP, the National Center for Medical Intelligence (NCMI), and the American Public Health Association's "Control of Communicable Diseases Manual"). The following classes of chemoprophylaxis are not addressed in this publication:

(1) Chemical warfare-related chemoprophylaxis. Consult the current version of "Medical Management of Chemical Casualties," published by the U.S. Army Medical Research Institute of Chemical Defense.

(2) Medical therapy for tuberculosis infection. Consult publications from CDC, the American Thoracic Society, the Advisory Council for the Elimination of Tuberculosis, and similar authorities.

(3) Radiation-related chemoprophylaxis (for example, potassium iodide, granisetron, or Prussian blue).

(4) Other forms of prevention involving nonbiological medications (for example, calcium, aspirin, or vitamins).

(5) Immunotherapy.

*b. Packaging.* Dispense chemoprophylaxis agents to individuals in child-resistant containers, consistent with 15 USC 1471–1476 (The Poison Prevention Packaging Act), or unit-of-use packaging. Use appropriate packaging to keep the medication clean and dry.

*c. Labeling.* Dispense chemoprophylaxis agents to individuals in packages that contain the name of the product, directions for proper use, and the name of the person to whom the medication was dispensed.

## 5–2. Anthrax

*a. Military indication.* The use of antibiotics and immunoglobulin following a possible exposure to anthrax is locally-directed and is prescribed by preventive medicine based on risk. The use of antibiotics and immunoglobulin have been shown to increase survival when used after exposure to anthrax and before onset of symptoms (post-exposure prophylaxis or empiric treatment).

*b. Chemoprophylaxis.* Recommended drugs include ciprofloxacin and doxycylcine. Refer to Service-specific policies. Anthrax immunoglobulin is available through the CDC's Emergency Operation Center.

## 5–3. Group A streptococcus

*a. Military indication.* Outbreaks of group A streptococci can spread rapidly in groups in settings of close contact, such basic training and contingency operations.

*b. Chemoprophylaxis.* The primary drug used for prophylaxis is penicillin, specifically the long-acting injectable form, penicillin G benzathine. Oral penicillin VK and azithromycin have also been used effectively. Administer penicillin prophylactically, when required, to terminate disease transmission. Routine administration of penicillin for prophylaxis of basic trainees against group A streptococcal infection has been shown to be effective at some installations with historically high incidence of disease. This practice should be directed by local preventive medicine authority.

## 5–4. Influenza

*a. Military indication.* Influenza can be a significant cause of morbidity in a susceptible population and can degrade mission capability.

*b. Chemoprophylaxis.* Consider prophylactic use of antiviral therapy if available vaccine does not antigenically

match circulating strains or if an outbreak occurs early in the season before widespread immunization. For additional guidance, refer to CDC.

## 5–5. Leptospirosis

*a. Military indication*. Leptospirosis can cause morbidity in personnel exposed to contaminated water sources.

*b. Chemoprophylaxis*. Doxycycline is effective in preventing leptospirosis in exposed military personnel during periods of high risk of exposure. Consult an infectious diseases or preventive medicine authority for proper use and dosing.

## 5–6. Malaria

*a. Military indication*. Malaria has caused morbidity and mortality in military populations for centuries. It continues to be one of the most important disease threats to military and civilian personnel deployed to areas where the disease is endemic.

*b. Chemoprophylaxis*. The Services or the combatant command surgeon determine specific chemoprophylactic regimens, typically with guidance from the NCMI, for the area of operations based on degree and length of exposure and the prevalence of drug resistant strains of *plasmodia* in the area(s) of travel. Prescribe anti-malarials per package insert. Health care providers will screen individuals for contraindications to specific malaria chemoprophylaxis (for example G6PD deficiency and primaquine) and determine the appropriate malaria chemoprophylaxis. Health care providers must document malaria chemoprophylaxis prescriptions in the health record when anti-malarial medications are prescribed. Include the member's electronic medication profile (for example, Composite Health Care System II), whenever possible.

## 5–7. Meningococcal disease

*a. Military indication*. Meningococcal disease can result in morbidity and potential mortality in populations experiencing crowded conditions. Chemoprophylaxis has been shown to prevent disease when administered post-exposure to susceptible people.

*b. Chemoprophylaxis*. There are several drugs available for prophylaxis of close contacts of meningococcal disease cases. Consult an infectious diseases or preventive medicine authority for determination of individuals to offer prophylaxis and for assistance with drug selection and dosing.

## 5–8. Plague

*a. Military indication*. Plague has been identified as a potential biological warfare agent, especially if aerosolized to cause pneumonic plague. There is no licensed vaccine that is effective against pneumonic plague. Provide chemoprophylaxis to persons potentially exposed to cases of pneumonic plague.

*b. Chemoprophylaxis*. Consult an infectious diseases or preventive medicine authority for determination of individuals to offer prophylaxis and for assistance with drug selection and dosing.

## 5–9. Scrub typhus

*a. Military indication*. Spread by the bite of infective larval mites. Mite bites may be a source of morbidity in populations encountering field conditions.

*b. Chemoprophylaxis*. Doxycycline has been shown to be effective in preventing scrub typhus in exposed personnel. Consult an infectious diseases or preventive medicine authority for proper use and dosing.

## 5–10. Smallpox

*a. Military indication*. Various forms of vaccinial infections may develop following receipt of the smallpox vaccine. Chemoprophylaxis may be indicated to prevent morbidity in immunized Servicemembers or their contacts.

*b. Chemoprophylaxis*. VIG and vaccinia-specific antivirals are available through the DOD. Contact MILVAX to request and coordinate administration of these chemoprophylactic agents.

## 5–11. Traveler's diarrhea

*a. Military indication*. Diarrhea can cause morbidity in personnel exposed to contaminated food and water sources.

*b. Chemoprophylaxis*. Chemoprophylaxis for traveler's diarrhea is only recommended on rare occasions where diarrhea would compromise a mission. Prophylactic antibiotics may be considered for short-term travelers who are high-risk hosts (such as those who are immunosuppressed) or those taking critical trips during which even a short bout of diarrhea could significantly impact the purpose of the trip. Instead of prophylaxis travelers, should be prescribed appropriate medications and provided instructions for self-treatment of diarrhea. Consult an infectious diseases or preventive medicine authority for assistance.

# Chapter 6
# Biological Warfare Defense

## 6–1. Responsibilities

*a.* The combatant commanders, annually and as required, provide the Chairman of the Joint Chiefs of Staff with their assessment of the biological warfare threats to their theaters.

*b.* The President of the Defense Health Board, in consultation with the Secretaries of the Military Departments, annually and as required, identifies to the Assistant Secretary of Defense (Health Affairs) (ASD (HA)) vaccines available to protect against validated biological warfare threat agents and recommends appropriate immunization protocols and/or chemoprophylaxis.

## 6–2. Procedures

The DOD Immunization Program for Biological Warfare Defense is conducted as follows:

*a.* The combatant commanders, annually and as required, provide the Chairman of the Joint Chiefs of Staff with their assessment of the biological warfare threats to their theater.

*b.* The Chairman of the Joint Chiefs of Staff, in consultation with the combatant commanders; the chiefs of the Military Services; and the Director, Defense Intelligence Agency, annually validates and prioritizes the biological warfare threats to DOD personnel and forwards the threat list to the DOD Executive Agent through the ASD (HA).

*c.* Within 30 days of receiving the validated and prioritized biological warfare threat list from the Chairman of the Joint Chiefs of Staff, the DOD Executive Agent, in consultation with the Secretaries of the military departments and the President of the Defense Health Board, provides recommendations to the ASD (HA) on vaccines and immunization protocols necessary to enhance protection against validated biological warfare threat agents.

*d.* Within 30 days of receiving the coordinated recommendations of the DOD Executive Agent, the ASD (HA) directs the Secretaries of the military departments to begin immunization of the specified DOD and USCG personnel against specific biological warfare threat agents. The ASD (HA) will coordinate with and obtain approval from the Secretary or Deputy Secretary of Defense before issuing the appropriate direction.

*e.* The Secretaries of the military departments will program and budget for required vaccinations, including the costs of the biological warfare defense vaccines.

# Chapter 7
# Vaccines and Other Products in Investigational New Drug Status

## 7–1. Purpose

For infectious disease threats for which the only available vaccine or chemoprophylaxis product is in an IND status, the IND product must be administered in full accordance with FDA regulations at 21 CFR Parts 50 and 312, as well as 10 USC 1107, Executive Order 13139, and DODD 6200.2. DOD may use products that have not been approved or licensed for commercial marketing as force health protection measures in combat settings, other military operations, peacekeeping, or humanitarian missions. DOD will provide comparable access to IND products to military personnel, civilian personnel, contracted workers, and beneficiaries based on the health risk to the people involved.

## 7–2. General guidance on investigational new drug products

Commanders, through the appropriate chain, must request approval from the Secretary of Defense to use INDs for force health protection. If the member's use of an IND product is voluntary, the product must be administered with documented informed consent in accordance with a protocol approved by the FDA for IND product use. A vaccine, antibiotic, or other product in an IND status may be mandatory for military members, if the President of the United States has approved a waiver of the requirement for informed consent. Under 10 USC 1107, only the President has the authority to grant a waiver of the requirement that a military member provide prior consent to receive an IND or a drug unapproved for its applied use in connection with the member's participation in a particular military operation. The President must determine, in writing, that obtaining consent (1) is not feasible, (2) is contrary to the best interests of the member, or (3) is not in the interests of national security. The requirement for informed consent may not be waived for civilian personnel, contracted workers, and beneficiaries.

## 7–3. Health recordkeeping requirements for investigational new drug products

All IND vaccines or chemoprophylaxis products that are administered, whether with the member's informed consent or with an approved waiver of informed consent, must be recorded in the individual's permanent health record or DOD and USCG-approved electronic ITS. For vaccines, the documentation is the same as that required for other vaccines with an annotation "IND" with the vaccine name. This recordkeeping requirement is in addition to any recordkeeping

requirements of the FDA-approved IND protocol. The requirement for recordkeeping applies to IND vaccines, antibiotics, and other medications in IND status.

### 7–4. Information requirements for investigational new drug products

Any recipient of an IND vaccine or chemoprophylaxis product must receive the information (for example, briefing, individual counseling, information statements) required by the FDA-approved IND protocol. Full compliance with this requirement is extremely important whether the IND product is voluntary or mandatory.

### 7–5. Coordination

The Army, as the Executive Agent for the Immunization Program for Biological Warfare Defense, maintains a program office at the U.S. Army Medical Materiel Development Activity (USAMMDA) to execute oversight and coordination of the use of IND products for Force Health Protection.

## Chapter 8
## Vaccines and Other Products Used Under Emergency Use Authorization

### 8–1. General

Under 21 USC 564 (The Food, Drug, and Cosmetic Act), some drugs, vaccines, or devices that have not been approved or licensed by the FDA through the regular drug approval process (or not approved for an intended use) may be used as medical countermeasures to chemical, biological, radiological, and nuclear (CBRN) agents or threats, if the FDA grants an EUA. This EUA authority is an alternative to the otherwise applicable requirement to file an IND application and follow IND rules (see chap. 7) to use such unapproved drugs as CBRN medical countermeasures.

### 8–2. Criteria

In general, the FDA may grant an EUA for up to 12 months, with potential renewal, based on the following:

*a*. The Secretary of Defense or designee has determined that there is a military emergency or significant potential for a military emergency relating to a particular CBRN agent or threat.

*b*. The Secretary of DHHS declares an emergency based on the Secretary of Defense's determination.

*c*. The Secretary of DHHS determines—

(1) The vaccine or drug may be effective in diagnosing, treating, or preventing the disease or condition.

(2) The known and potential benefits of the vaccine or drug outweigh the known and potential risks.

(3) There is no adequate, approved, and available alternative medical countermeasure.

*d*. The duration of authorization corresponds to the duration of the emergency or significant potential for an emergency.

### 8–3. Refusal options

The FDA may decide that potential recipients of a drug under an EUA should have the option to refuse it. The President may waive this option for military personnel.

### 8–4. Health recordkeeping requirements for emergency use authorization products

All EUA vaccines or chemoprophylaxis products that are administered must be recorded in the individual's permanent health record and/or DOD-approved electronic ITS.

### 8–5. Information requirements for emergency use authorization products

Any recipient of an EUA vaccine or chemoprophylaxis product must receive the information (for example, briefing, individual counseling, information statements) required by the FDA-approved EUA. Full compliance with this requirement is critical.

### 8–6. Department of Defense requests for emergency use authorizations

Requests for possible EUAs for military purposes must be submitted to ASD (HA) for consideration.

### 8–7. Coordination

The Army, as the Executive Agent for the Immunization Program for Biological Warfare Defense, maintains a program office at the USAMMDA. This office oversees and coordinates EUA product use for force health protection.

**Appendix A**
**References**

**Section I**
**Required Publications**
Unless otherwise stated, all publications are available at: http://www.apd.army.mil/. Department of Defense regulations are available at: http://www.dtic.mil/.

**DODI 6200.03**
Public Health Emergency Management within the Department of Defense (Cited in paras 3–3*d*, 3–6*f*.)

**DODI 6205.4**
Immunization of Other Than U.S. Forces (OTUSF) for Biological Warfare Defense (Cited in paras 3–3*e*, 3–6*f*.)

**Section II**
**Related Publications**
A related publication is a source of additional information. The user does not have to read a related publication to understand this regulation. Unless otherwise stated, all publications are available at: http://www.apd.army.mil/. Department of Defense regulations are available at: http://www.dtic.mil/. The U.S. Code and the Code of Federal Regulations are available at: http://www.gpoaccess.gov/fdsys/.

**AR 11–2**
Managers' Internal Control Program

**AR 25–30**
The Army Publishing Program

**AR 600–20**
Army Command Policy

**AFI 48–123**
Medical Examination and Standards (Available at http://www.e-publishing.af.mil/.)

**Control of Communicable Diseases Manual**
Communicable disease control and the international health regulations (Available at http://www.apha.org/.)

**COMDTINST M6000.1**
Medical Manual

**DODD 1241.01**
Reserve Component Medical Care and Incapacitation Pay for Line of Duty Conditions

**DODD 1404.10**
DOD Civilian Expeditionary Workforce

**DODI 6200.02**
Application of Food and Drug Administration (FDA) Rules to Department of Defense Force Health Protection Programs

**DODI 6205.02E**
Policy and Program for Immunizations to Protect the Health of Service Members and Military Beneficiaries

**DODD 6205.3**
DOD Immunization Program for Biological Warfare Defense

**DODI 1300.17**
DOD Accommodation of Religious Practices Within the Military Services

**DODI 1400.32**
DOD Civilian Work Force Contingency and Emergency Planning Guidelines and Procedures

**DODI 2310.08E**
Medical Program Support for Detainee Operations

**DODI 5010.40**
Manager's Internal Control (MCIP) Program Procedures

**Executive Order 13139**
Improving Health Protection of Military Personnel Participating in Particular Military Operations (Available at http://www.archives.gov/federal-register/executive-orders/disposition.html/.)

**NATO STANAG 2037**
Vaccination of NATO Forces(Available at http://www.nato.int/docu/standard.htm/.)

**NATO STANAG 2491**
NBC/MED Policy for the Immunization of NATO Personnel Against Biological Warfare Agents(Available at http://www.nato.int/docu/standard.htm/.)

**NATO STANAG 3474**
Temporary Flying Restrictions Due to Exogenous Factors Affecting Aircrew Efficiency (Available at http://www.nato.int/docu/standard.htm/.)

**10 USC 1107**
Notice of use of an investigational new drug or a drug unapproved for its applied use

**15 USC 1471**
Definitions

**15 USC 1472**
Special packaging standards

**15 USC 1473**
Conventional packages, marketing

**15 USC 1474**
Regulations for special packing instructions

**15 USC 1475**
Repealed. Section 1205(c), Act of 13 August 1981, Public Law 97–35, Title XII, Volume 95, U.S. Statute at Large, p. 716.

**15 USC 1476**
Preemption of Federal standards

**21 USC 360**
Registration of producers of drugs or devices

**42 USC 300aa**
Public Health Service

**42 USC 300aa–1 to 300aa–34**
The National Childhood Vaccine Injury Act of 1986

**42 USC 300aa–25**
Recording and Reporting of Information

**21 CFR 312**
Investigational New Drug Application

**29 CFR 1605**
Guidelines on Discrimination Because of Religion

**29 CFR 1910.1030.**
Blood borne pathogens

**Section III**
**Prescribed Forms**
This section contains no entries.

**Section IV**
**Referenced Forms**
Except where otherwise indicated below, the following forms are available as follows: DA forms are available on the APD Web site, at http://www.apd.army.mil; DD forms are available from the OSD Web site, at http://www.dtic.mil/whs/directives/infomgt/forms/index.htm; standard forms (SFs) and optional forms (OFs) are available from the GSA Web site (http://www.gsa.gov).

**DA Form 11–2**
Internal Control Evaluation Certification

**DA Form 2028**
Recommended Changes to Publications and Blank Forms

**DD Form 2365**
DOD Civilian Employee Overseas Emergency-Essential Position Agreement

**DD Form 2766**
Adult Preventive and Chronic Care Flowsheet (Available through normal forms supply channel.)

**DD Form 2766C**
Adult Preventive and Chronic Care Flowsheet (Continuation Sheet) (Available through normal forms supply channel.)

**FDA Form 3500**
MedWatch: The FDA Safety Information and Adverse Event Reporting System (Available at http://www.fda.gov/Safety/MedWatch/default.htm).

**Form VAERS–1**
Vaccine Adverse Event Reporting System (Available at http://vaers.hhs.gov/esub/index)

**CDC Form 731**
International Certificate of Vaccination (Available through normal forms supply channel. Also available at http://bookstore/gpo.gov, or toll free at 1-866-512-1800.) (Marine Corps and Navy - S/ N 0108–LF–400–0706. Available from the Navy Supply System and may be requisitioned per NAVSUP P–2002D.)

**SF 600**
Medical Record - Chronological Record of Medical Care

**SF 601**
Health Record - Immunization Record

## Appendix B
## Standards for Military Immunization

### B–1. Standard #1: immunization availability

*a.* Ensure immunizations are available when required to minimize disruption of deployment or training schedules.

*b.* Ensure immunizations are available at convenient times, without unnecessary barriers and are available on a walk-in basis, as staffing permits. As clinically appropriate, administer any vaccine doses required simultaneously to avoid missed immunization opportunities.

*c.* Ensure immunization services are responsive to the needs of beneficiaries.

*d.* Review the vaccination status of all beneficiaries at every health care visit to determine which vaccines are indicated.

*e.* Implement standing orders if written orders are unavailable. Standing orders must address vaccine dosage and administration, contraindications and precautions, and documentation procedures. Ensure standing orders are signed by the privileged physician who has medical oversight of the clinic.

### B–2. Standard #2: vaccine information and vaccinee education

*a.* Educate beneficiaries about the benefits and risks of vaccination in a culturally appropriate manner and at an appropriate education level.

*b.* Prior to vaccination, provide all parents/guardians and vaccinees the most current Vaccine Information Sheets (VISs) for each vaccine as mandated by Federal law (42 USC 300aa-26). Allow sufficient time to discuss any concerns or questions as noted by the vaccinee. Ensure VISs are accessible and visible in the patient waiting area of the clinic or activity that provides immunizations.

*c.* Prior to each vaccination provide all potential vaccinees the opportunity to read the current DOD and/or FDA mandated vaccine information brochure. Additional education requirements may be required as outlined in vaccination policy.

*d.* Ensure immunization personnel are readily available to accurately answer patients' immunization questions and concerns about vaccines. Ensure personnel have ready access to immunization information resources.

### B–3. Standard #3: vaccine storage and handling

*a.* Ensure staff members adhere to cold-chain management principles during administration, transportation, and storage. Ensure up-to-date, written cold-chain management protocols are accessible at all locations where vaccines are stored.

*b.* Implement temperature monitoring processes at any clinic or activity that administers immunizations. All vaccine storage devices should have a calibrated thermometer and alarm systems that are visually monitored at a minimum of twice a day.

*c.* The CDC's National Center for Immunization and Respiratory Diseases strongly recommends that providers draw vaccine only at the time of administration to ensure that the cold chain is maintained and that vaccine is not inappropriately exposed to light. Do not pre-draw doses; draw them when they are needed.

### B–4. Standard #4: indications and contraindications

*a.* Screen each patient for allergies, health status, recent vaccinations, and previous vaccine adverse events before immunization. Provide each patient an opportunity to ask questions about potential contraindications. Refer patients for appropriate medical evaluation, as needed.

*b.* Screen each patient's immunization record to determine vaccine needs or requirements.

*c.* Ensure staff members document any contraindication to an immunization in the health record and ITS. Screen all women for pregnancy status.

### B–5. Standard #5: immunization recordkeeping

*a.* Record immunizations accurately in a DOD and USCG-approved electronic ITS according to Service-specific policy at the time of immunization, or no later than 24 hours after administration of immunization. Transcribe all historical immunizations into the immunization tracking system.

*b.* Recommend any clinic or activity that administers immunizations has one or more mechanisms for notifying patients when the next dose of an immunization series is needed (a reminder system) or when doses are overdue (recall system). Reminder and recall systems may be automated or manual and may include mailed, emailed, or telephone messages.

*c.* Record all military personnel immunization information in an electronic ITS immunization record. All Services must record military immunization data into an electronic database that communicates with a centralized DOD registry.

## B–6. Standard #6: immunization personnel training

*a.* Ensure all persons who administer vaccines, including immunization augmentees, are appropriately trained and work within their appropriate scope of practice as determined by Service policies.

*b.* Immunization training must meet a standard acceptable to the MTF commander, command surgeon, or other appropriate medical authority. Training will include vaccine storage and handling; vaccine characteristics; recommended vaccine schedules; patient screening; contraindications; vaccine administration techniques; and treatment and reporting of adverse events to include anaphylaxis, vaccine benefit and risk communication, and documentation and management.

*c.* Ensure personnel who administer vaccines complete a comprehensive immunization orientation and annual continuing education that addresses training standards and competency of vaccine related topics based on an individual's role in administering and/or handling vaccines. Individuals who routinely administer vaccines should complete at least 8 hours of training annually. Training resources include resident courses, self-paced online training programs, and video training (see table B–1).

**Table B–1**
**Training standards**

| Medical standard or procedure | Physicians and medical directors | Immunizers | Chapter and appendix paragraph locations |
|---|---|---|---|
| **Quality patient care and delivery of immunizations** | | | |
| Properly trained in accordance with DOD, Service, USCG, and Centers for Disease Control and Prevention (CDC) guidelines and act within their scope of practice as determined by each Service. | B[1], A[2] | B, A | 1–4c(1) |
| Understands standing order procedures for administering immunizations including dose, route, time indication, contraindications, and so forth. | B, A | B, A | 2–1b and B–1 |
| Demonstrates the ability and knowledge to screen individuals for contraindications, hypersensitivities, allergies, and so forth, before administering vaccines. | B | B, A | 2–1d and B–4 |
| Understands and adheres to immunization dosing and interval schedules. | B | B, A | 2–1e and B–6 |
| Understands how to properly document exemptions from further immunization in the ITS (DD Form 2766C), on the DD Form 2766 (Adult Preventive and Chronic Care Flowsheet), and/or in other relevant paper-based immunization records. | B | B, A | 2–6, 2–7, and B–4 |
| **Patient information and education before immunization** | | | |
| Understands the purpose of and legal requirements for making VISs available to vaccine recipients. | B | B, A | 2–7d(2) and B–2 |
| Understands how to document the date of the VIS in the ITS when documenting an immunization given. | B | B, A | 2–7d(3) and B–2 |
| **Vaccine storage and handling** | | | |
| Trained in cold-chain management principles and procedures. | B, A | B, A | 2–3 and B–3 |
| Demonstrates how to read a vaccine package insert for storage and handling requirements. | B | B, A | 2–3 and B–3 |
| Understands proper reporting procedures for vaccine storage and handling losses. | B, A | B, A | 2–3f and B–3 |
| **Emergency care and adverse-event reporting** | | | |
| Basic cardiopulmonary resuscitation and the administration of epinephrine. | B, R[3] | B, R | 2–9b and B–6 |
| Knows how to use the emergency equipment available for treating an anaphylactic reaction. Ensures medications in kit are not expired. | B | B, A | 2–9c and B–6 |
| Demonstrates the ability to initiate anaphylactic reaction treatments per protocol. | B | B, A | 2–9c and B–6 |
| Understands the procedure for documenting an adverse event after an immunization. | B | B, A | 2–10d and B–7 |

**Table B–1**
**Training standards—Continued**

| | | | |
|---|---|---|---|
| Knows how to submit a Vaccine Adverse Event Reporting System (VAERS) Form 1. | B | B, A | 2–10*d* and B–7 |
| Comprehends DOD's Clinical Guidelines for Managing Adverse Events after Immunization. | B, A | B | 2–10 and B–7 |
| **Understands how to handle and administer specific vaccines** | | | |
| Military and civilian personnel eligible to receive smallpox vaccine will be educated before immunization regarding criteria for exemption from immunization, expected response at the vaccination site, vaccination-site care, risks of spreading vaccinia to close contacts, and other relevant topics. | B, A | B, A | 4–15 |
| **Immunization record keeping (documentation)** | | | |
| Trained to accurately document immunizations, historical immunization data, and medical exception codes in ITS. | B | B, A | 2–6*a* and *b*, 2–7, and B–5 |
| **Training** | | | |
| Demonstrates understanding of and ability to follow this multi-Service publication and other pertinent references such as DOD, USCG, and CDC guidance in the performance of duties. | B, A | B, A | 1–5 |

Notes:
[1] B=baseline or initial training
[2] A=annually
[3] R=as required

*d.* Ensure persons who administer vaccines have ready access to information resources regarding current recommendations for childhood, general adult, travel, and military-specific immunizations.

## B–7. Standard #7: adverse events after immunization

*a.* Epinephrine (such as auto-injectable epinephrine) must be properly stored and readily available at all vaccination locations along with other supplies determined locally to manage adverse events (see para 2–9). Ensure all immunization personnel are trained to administer epinephrine.

*b.* Provide easy access to telephones or radios to persons who administer vaccines for summoning emergency medical personnel. Medical providers document adverse events in the health record at the time of the event or as soon as possible thereafter.

*c.* Report all clinically significant adverse events after vaccination to VAERS. Provide staff members with ready access to reporting options for the VAERS.

*d.* Develop a quality improvement process to assure adverse events are reported to VAERS promptly.

## B–8. Standard #8: vaccine advocacy to protect the military Family

*a.* Develop a mechanism at the MTF level to determine the extent of influenza and pneumococcal immunization coverage among its high-risk patients. Develop a plan to optimize vaccination uptake and coverage.

*b.* Implement a plan to optimize immunization rates among cardiac, pulmonary, diabetic, asplenic, and other patient groups at elevated risk of complications from vaccine-preventable infectious diseases.

*c.* Conduct a quality improvement program to optimize the performance in immunizing children, adolescents, and adults against the preventable infections that most threaten them.

*d.* Ensure commanders use immunization databases to identify and resolve the vulnerabilities of their units.

*e.* All health care providers (not just those in any clinic or activity that administers immunizations) should routinely determine the immunization status of their patients, offer vaccines to those for whom they are indicated, and maintain complete immunization records.

# Appendix C
# Medical and Administrative Exemption Codes

This appendix gives details about medical and administrative exemption codes, as well as information on duration.

## C–1. Medical exemption codes

Medical exemption codes appear in table C–1.

**Table C–1**
**Medical exemption codes**

| Code | Meaning | Explanation of example | Duration |
|------|---------|------------------------|----------|
| MD | Medical, declined | Declination of optional vaccines (not applicable to military required vaccinations). | Indefinite |
| MA | Medical, assumed | Prior immunization reasonably inferred from individual's past experiences (for example, basic military training), but documentation missing. Code used to avoid superfluous immunization. Code can be reversed upon further review. | Indefinite |
| MI | Medical, immune | Evidence of immunity (for example, by serologic antibody test ); documented previous infection (for example, chickenpox infection); natural infection presumed (for example, measles, if born before 1957). | Indefinite |
| MP | Medical, permanent | HIV infection, prolonged or permanent immune suppression, upper age limit, other contraindication determined by physician. Can be reversed if the condition changes. For tuberculosis, positive tuberculosis test. | Indefinite |
| MR | Medical, reactive | Permanent restriction from receiving additional doses of a specific vaccine. Use only after severe reaction after vaccination (for example, anaphylaxis). Report such reactions to VAERS. Code can be reversed if an alternate form of prophylaxis is available. Do not code mild, transient reactions as MR. code events referred for medical consultation as MT. | Indefinite |
| MS | Medical, supply | Exempt due to lack of vaccine supply. | Up to 90 days |
| MT | Medical, temporary | Pregnancy, hospitalization, events referred for medical consultation, temporary immune suppression, convalescent leave, pending medical evaluation board, any temporary contraindication to immunization. | Up to 365 days |

## C–2. Administrative exemption codes

Administrative exemption codes appear in table C–2.

**Table C–2**
**Administrative exemption codes**

| Code | Meaning | Explanation of example | Duration |
|------|---------|------------------------|----------|
| AD | Administrative, deceased | Individual is deceased. | Indefinite |
| AL | Administrative, emergency leave | Individual is on emergency leave. | Up to 30 days |
| AM | Administrative, missing | Missing in action, prisoner of war. | Indefinite |
| AP | Administrative, PCS | Permanent change of station. | Up to 90 days |
| AR | Administrative, refusal | Personnel involved in actions under the Uniformed Code of Military Justice, religious waiver. (Indefinite and revocable. May be revoked at any time. See paragraph 2–6b(2. | Until resolution |
| AS | Administrative, separation | Pending discharge, separation (typically within 60 days), and retirement (typically within 180 days). | Until 180 days |
| AT | Administrative, temporary | Absent without leave, legal action pending (other than code AR). | Until 90 days |
| NR | Not required | Individuals who received immunization while eligible, subsequently changed occupational category and now serve as civilian employees or contract workers not otherwise required to be immunized. | Indefinite |

## Appendix D
## Immunizations for Military Personnel

### D–1. Text citations
Paragraphs 4–2 to 4–19 provide additional information on immunizations for military personnel.

### D–2. Required immunizations
This table provides a listing of required immunizations for military personnel.

**Table D–1**
**Immunizations for military personnel**

| Name of vaccine | Army | Navy | Air Force | Marine Corps | Coast Guard |
|---|---|---|---|---|---|
| Adenovirus[1] | Acc[2] | Acc | Acc | Acc | Acc |
| Anthrax | Risk | Risk | Risk | Risk | Risk |
| Haemophilus influenzae type b | Risk | Risk | Risk | Risk | Risk |
| Hepatitis A | Acc, Rou[3] | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Hepatitis B | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Influenza | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Japanese encephalitis | Risk[4] | Risk | Risk | Risk | Risk |
| Measles, mumps, rubella | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Meningococcal | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Pneumococcal | Risk | Risk | Risk | Risk | Risk |
| Poliovirus[5] | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Rabies | Risk | Risk | Risk | Risk | Risk |
| Smallpox (vaccinia) | Risk | Risk | Risk | Risk | Risk |
| Tetanus-diphtheria (preferably with pertussis vaccine) | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Typhoid fever | Risk | Risk | Risk | Risk | Risk |
| Varicella | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou | Acc, Rou |
| Yellow fever | Risk | Risk | Risk | Acc, Risk | Risk |

Notes:
[1] Initial entry and basic training accessions only
[2] Acc=accessions
[3] Rou=adult routine
[4] Risk=special, risk-based, and occupational
[5] Refer to paragraph 4–13.

**Appendix E**
**Internal Control Evaluation Process**

**E–1. Function**
The function covered by this checklist is immunization and chemoprophylaxis.

**E–2. Purpose**
The purpose of this checklist is to assist in evaluating key management controls and is not intended to address all controls. The evaluation is focused at the clinic level, regardless of Service, to include both fixed facilities (MTFs, TDA units) and TOE field units. The checklist serves as a clinical quality improvement tool and is described at http://www.vaccines.mil/cqiip.

**E–3. Instructions**
Answers must be based on the actual testing of key management controls (for example, document analysis, direct observation, interviewing, sampling, or simulation). Answers that indicate deficiencies must be explained and corrective action indicated in supporting documentation. These key management controls must be formally evaluated at least once every 5 years. Certification that this evaluation has been conducted must be accomplished on DA Form 11–2–5 (Internal Control Evaluation Certification Statement).

**E–4. Test questions**
Test questions are available directly via a link at the Web site address in paragraph E–2, above.

**E–5. Supersession**
This evaluation replaces the evaluation for immunization and chemoprophylaxis previously published in AR 40–562, dated 29 September 2006.

**Glossary**

**Section I**
**Abbreviations**

**ACIP**
Advisory Committee on Immunization Practices

**AFI**
Air Force Instruction

**AFJI**
Air Force Joint Instruction

**ASD (HA)**
Assistant Secretary of Defense (Health Affairs)

**CBRN**
chemical, biological, radiological, and nuclear

**CDC**
Centers for Disease Control and Prevention

**CFR**
Code of Federal Regulations

**CG–11**
Coast Guard, Director, Health, Safety, and Work-Life

**COMDTINST**
Commandant Instructions

**DCJI**
disposable-cartridge jet injectors

**DD**
Department of Defense Form

**DHHS**
Department of Health and Human Services

**DODD**
Department of Defense Directive

**DODI**
Department of Defense Instruction

**EUA**
emergency use authorization

**FDA**
Food and Drug Administration

**G6PD**
glucose-6-phosphate dehydrogenase

**Hib**
Haemophilus influenzae type b

**HQ**
headquarters

**HQDA**
Headquarters, Department of the Army

**IND**
investigational new drug

**IPV**
inactivated poliovirus vaccine

**ITS**
immunization tracking systems

**JTF CapMed**
Joint Task Force - National Capital Region/Medical

**JEV**
Japanese-encephalitis vaccine

**MAJCOM**
major command (Air Force)

**MILVAX**
Military Vaccine Office

**MMR**
measles, mumps, rubella

**MTF**
medical treatment facility

**NCVIA**
National Childhood Vaccine Injury Act

**NVIC**
National Vaccine Injury Compensation (Program)

**OTUSF**
other than U.S. Forces

**RC**
reserve component

**ROTC**
Reserve Officers' Training Corps

**SF**
Standard Form

**SOP**
standard operating procedure

**SSN**
social security number

**STANAG**
standardized agreement

**TB**
tuberculosis

**Td**
Tetanus-diphtheria

**Tdap**
Tetanus-diphtheria and acellular pertussis (vaccine)

**USAMMDA**
U.S. Army Medical Materiel Development Activity

**USC**
United States Code

**USCG**
United States Coast Guard

**VAERS**
Vaccine Adverse Events Reporting System

**VIS**
vaccine information statement

**WHO**
World Health Organization

**Section II**
**Terms**
This section contains no entries.

**Section III**
**Special Abbreviations and Terms**

**Accession**
The attainment of rank or dignity.

**Alert personnel**
Specified forces maintained (alert force) in a special degree of readiness.

**Antigen**
A substance that, when introduced into the body, stimulates the production of an antibody.

**Contraindication**
A factor that renders the administration of a drug or the carrying out of a medical procedure inadvisable.

**Hyperendemic**
Equally endemic, at a high level, in all age groups of a population.

**Neisseria meningitides**
The bacteria that is the causative agent of cerebrospinal meningitis.

**Plasmodia**
A genus of apicomplexan protozoa, in the family Plasmodiidae parasitic, in the blood cells of animals and humans; the malarial parasite.

**Primaquine**
An ant malarial agent especially effective against Plasmodium vivax.

**Seroimmunity**
Immunity conferred by administration of an antiserum.

**Serologic**
The scientific study of blood serum and other bodily fluids.

**Toxoid**
A bacterial toxin (usually an exotoxin) whose toxicity has been weakened or suppressed either by chemical (formalin) or heat treatment, while other properties, typically immunogenicity, are maintained.

**Urticaria**
A skin condition characterized by intensely itching welts and caused by allergic reactions.

**Variola virus**
The causative agent of smallpox.

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ALARIC STONE**, **ERIC JACKSON**, and | ) | |
| **MICHAEL MARCENELLE**, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| **ALEJANDRO N. MAYORKAS**, in his official | ) | |
| capacity as Secretary of Homeland Security, | ) | |
| **LLOYD J. AUSTIN, III**, in his | ) | |
| official capacity as Secretary of Defense, | ) | |
| **LINDA L. FAGAN**, in her official | ) | |
| capacity as Commandant of the Coast Guard, and | ) | |
| **BRIAN K. PENOYER**, in his official capacity | ) | |
| as Assistant Commandant for Human | ) | |
| Resources of the Coast Guard, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF LIEUTENANT JUNIOR GRADE MICHAEL MARCENELLE

Pursuant to 28 U.S.C. § 1746, I, Michael Marcenelle, under penalty of perjury declare as follows:

1.      I am over the age of eighteen and am competent to make this declaration.

2.      I am an Officer in the United States Coast Guard.

3.      In my current position with Training Center Yorktown, Virginia, I serve as an Instructor at the International Maritime Officers School where I plan, coordinate, and execute the course curriculum for international officers aboard Training Center Yorktown.

4.      I have been in the Coast Guard since my direct commission in April 2019.  Prior to my assignment in Yorktown, I was assigned to Sector Charleston where I served as a Boarding Officer conducting law enforcement operations and served as a Command Center

1

231

Watchstander overseeing multi-mission operations including search and rescue, law enforcement, and pollution cases.

5.      I initially commissioned as a Second Lieutenant in the United States Marine Corps in 2011.  During my time as a Marine, I served as an Air Intelligence Officer, Weapons and Tactics Intelligence Instructor, and Recruiting Management Officer.  I deployed to Afghanistan in support of Operation Enduring Freedom, Kuwait in support of Operation Inherent Resolve, and throughout the Mediterranean in support of Special Purpose Marine Air Ground Task Force – Crisis Response – Africa.  Following these deployments, I served as the Operations Officer and Executive Officer of Marine Corps Recruiting Station Portland, Oregon.

6.      My transfer into the Coast Guard in 2019 allowed me to continue serving with no break in active duty service.  I therefore have more than a decade on active duty.

7.      Throughout my time as a commissioned officer in two separate military branches, I received numerous personal and unit awards as well as above average Fitness Reports and Officer Evaluation Reports, highlighting a career of dedicated and exemplary service to my country.  For instance, prior to departing the Marine Corps, I received a Marine Corps Commendation Medal for my work supervising day-to-day operations of recruiting efforts dispersed across over 650,000 square miles and three states.  I also received a Marine Corps Achievement Medal for my success deploying to Afghanistan supporting special operations missions, and redeploying on extremely short notice to Kuwait to halt terrorist advances in Iraq.

8.      I have never been the subject of any disciplinary action by the Coast Guard or Marine Corps, nor has there ever been cause to discipline me for any reason.

9.      I became aware of ALCOAST 305/21, indicating that Coast Guard service members would be required to receive the Pfizer-BioNTech COVID-19 vaccine if they had not

2

voluntarily received another FDA Emergency Use Authorization or World Health Organization Emergency Use Listing vaccine, shortly after issuance on August 26, 2021.

10.     Prior to ALCOAST 305/21, I had researched the available COVID-19 vaccines, including the stated health benefits and risks, as well as how the vaccines had been produced and tested.  Based on this research, I learned that all of the available COVID-19 vaccines had been tested or produced using cell lines developed from remains of aborted babies.

11.     As a Roman Catholic, I further sought guidance from authoritative Catholic texts to clearly understand what my moral obligations were based on the knowledge I gained regarding the available COVID-19 vaccines.  These texts included the Bible and the Catechism of the Catholic Church.  I also consulted my priest and statements of Catholic bishops.

12.     Based on my research, both on the science of the COVID-19 vaccines and on the moral philosophy of my Catholic faith, I concluded that compliance with the Coast Guard's vaccine mandate would mean acting contrary to my religious obligation to obey my formed conscience by abstaining from cooperation with evil.

13.     I therefore decided to submit a request for religious accommodation waiving the COVID-19 vaccination requirement for me, in accordance with Commandant Instruction (COMDTINST) 1000.15 (**Ex. 1**, attached).  COMDTINST 1000.15 was issued on August 30, 2021.

14.     The next day, on August 31, 2021, I initiated the process of pursuing a religious accommodation to abstain from the COVID-19 vaccines.  I met with the Sector Charleston Chaplain, LT Joseph A. Seifert (USN), as directed in COMDTINST 1000.15, who confirmed the sincerity of my faith and the substantial burden the vaccine mandate imposed on my faith.  On September 9, 2021, I received a verbal medical counseling by Naval Health Clinic Charleston

3

Primary Care Manager, LT Nicholas Petril (USN).  On September 13, 2021, I compiled all required documents detailed in COMDTINST 1000.15 and submitted my official accommodation request directly to the Sector Charleston Deputy Sector Commander, Captain Heather R. Mattern.

15.     As is directed in COMDTINST 1000.15 and also due to the personal nature of its contents, I specifically requested to submit my request directly to the Sector Charleston Commander, Captain John D. Cole.  However, Captain Mattern refused and stated that all requests were to go through her first and then on to the Sector Commander.

16.     On October 5, 2021 (22 days after submitting my request), I was notified by Captain Mattern that she had taken my request with her while on personal leave and had left my personal documents at her sister's home.  Captain Mattern then asked if I wanted her sister to mail the documents to Sector Charleston, or to destroy the documents.  I asked that she destroy them.  I was distressed that my personal information was revealed without my prior consent and in violation of Coast Guard protocols.  I was also concerned that the delay may reflect negatively on my request, despite my diligence in completing the request as soon as I could.

17.     I recompiled my documents and resubmitted them to Captain Mattern.  My initial request documents are attached as **<u>Exhibit 2</u>**.

18.     While my request was pending, I continued to abide by my commander's COVID-19 mitigation protocols, as I had before filing my initial request.  These protocols variously included masking and social distancing, based on guidance received from higher headquarters.

19.     On December 1, 2021, I experienced symptoms consistent with COVID-19.  I had not experienced COVID-19 symptoms before.  When I noticed these symptoms, I called into a

4

military health hotline and was directed to remain home and monitor my symptoms, followed by reporting to my local military clinic where I was tested for COVID-19. The test confirmed that I contracted COVID-19. The test results were incorporated into my military medical record. I recovered and returned to work immediately following the mandatory 10-day period of quarantine. During that period of time, my colleagues were able to help take on my shifts with no mission loss, just as I had taken on additional shifts for others when they were out sick due to COVID or various other illnesses. My illness in December 2021, occurred more than three months after the Commandant instructed Coast Guard members to receive a Pfizer-BioNTech COVID-19 vaccine on August 26, 2021.

20.     I am aware that the Coast Guard experienced record-high COVID-19 case rates in December 2021 and January 2022. I am aware that cases among vaccinated personnel during this time surpassed cases among unvaccinated personnel, both in raw numbers and per capita rates. I also understand that the Coast Guard's statistics did not differentiate between people like me who had never contracted COVID-19 until the unprecedented surge in cases among vaccinated personnel, and people who had acquired a natural immunity to COVID-19.

21.     Between the beginning of the COVID-19 pandemic until the present day, I have closely abided by my commanders' COVID-19 mitigation protocols, including masking, distancing, and increased attention to hygiene. These protocols have varied over time, based on local community transmission rates and internal unit-specific guidance.

22.     On January 22, 2022, I submitted a leave request to travel from Charleston, South Carolina to Elizabeth City, North Carolina to compete in the inaugural Coast Guard Marathon taking place on March 5, 2022. I had been training for the marathon since November 2021, interrupted only by my brief illness with COVID-19. The leave request was routed through my

supervisor, who recommended disapproval on February 1, 2022, and then I received final disapproval by Captain Mattern on February 3, 2022.  I met with each of them individually to request an explanation for why my leave was denied, as no explanation was provided on the Leave Request Form.  They both stated that they believed that unvaccinated personnel were not permitted to take leave under Coast Guard policy, specifically, guidance they received from the District 7 Admiral, RADM Brendan McPherson in his September 29, 2021, document titled, "COVID-19 Leave, Liberty, and Official Travel Policy."  (**Ex. 3**, attached.)

23.     On February 8, 2022, my initial request for a religious accommodation was denied by Captain Anthony W. Williams (CG-133) (**Ex. 4**, attached).  I received the denial letter from Captain Mattern on February 10, 2022.  The denial letter was a mirror of the many others I had already read from fellow Coast Guardsmen.

24.     I noted that Captain Williams stated that my request was denied at least in part because I interact with Coast Guard Auxiliarists, "some of whom are within high-risk categories."  Coast Guard Auxiliarists are civilians who volunteer to help active duty and reserve Coast Guard service members with certain safety and inspection tasks, while gaining access to certain Coast Guard facilities.  I now understand that Coast Guard Auxiliarists are not required to be vaccinated.  Additionally, working with Auxiliarists was only a collateral duty that I had effectively managed remotely throughout the duration of my assignment.

25.     After receiving the denial letter, I requested a copy of my commander's endorsement letter accompanying my initial request so that I would be better able to respond to the denial letter.  Captain Mattern refused to provide this information, stating in an email that legal counsel advised her the denial letter "provides the complete reasoning and explanation of the decision on [my] request."  (**Ex. 5**, attached.)

26.     On February 25, 2022, I submitted my appeal providing evidence contradicting the statements of Captain Williams in the initial denial.  (**Ex. 6**, attached.)  I also documented that I had contracted COVID-19 and understood that I now benefited from naturally-acquired immunity which I understand protects me at least as well as immunity from vaccination.

27.     On May 16, 2022, Rear Admiral Eric Jones purportedly denied my appeal.  (**Ex. 7**, attached.) Captain Mattern provided the letter to me on May 27, 2022.  The letter was once again a mirror image of the many others I had already seen.

28.     Also on May 27, 2022, Captain Mattern, on behalf of Captain Cole, issued me a CG-3307 Performance and Discipline (P&D-41C) form.  (**Ex. 8**, attached.)  Through the form, Captain Cole ordered me to receive the "first dose of a fully FDA-approved COVID-19 vaccine."

29.     In acknowledging the order by signature, I added the following written statement, "CAPT Heather Mattern, Deputy Sector Commander & I discussed my inability to carry out this order as there are currently no 'fully FDA-approved' vaccines available. Deputy referenced ALCOAST 352/21 as the USCG determination that the vaccines are 'interchangeable', although FDA states they are 'legally distinct.'"

30.     However, against my religious beliefs and under duress, I reported to Naval Health Clinic Charleston on May 31, 2022, and met with the Director of Immunizations, Tanikka R. Evans, RN to request if there were any FDA-approved vaccines available.  She advised me that they did not carry any FDA-approved vaccines.  She then signed a memorandum that I provided her affirming that I reported to the clinic as directed, but no FDA-approved vaccines were available.  (**Ex. 9**, attached.)

7

31.     I also have asked the Coast Guard Health Services liaison to the Naval Health Clinic how vaccinations provided at a civilian clinic were handled, should I locate an FDA-approved vaccine off installation.  I was told that the clinic technicians update a service member's vaccine record upon receipt of an emailed picture of a vaccine card.  I asked whether the technicians verify the information in the pictures, such as by confirming vaccine lot numbers in online databases.  I was told that no verification occurs.

32.     The next day, on June 1, 2022, I provided the memorandum signed by Tanikka Evans to Captain Mattern proving that I reported to the clinic as directed and there were no FDA-approved vaccines available.  Captain Mattern then stated that she still had to issue me a negative CG-3307 Performance and Discipline (P&D-41D) form on behalf of Captain Cole.  (**Ex. 10**, attached.)  The CG-3307 states that I "had the opportunity and the means to follow the order and failed to do so."  On the bottom of the same document, Captain Mattern wrote the following hand-written note, "01 June LTJG Marcenelle provided documentation that he attempted to receive a fully FDA approved COVID-19 vaccination from the Charleston Naval Health Clinic as per the CG-3307 dated 27 May 2022 but that there was no fully FDA approved [sic] as noted in memo dated 31 May 2022. CAPT Heather Mattern, Deputy Sector Commander."  The hand-written note by Captain Mattern directly contradicts the original verbiage typed in the CG-3307.

33.     This CG-3307 is now in my official record, and stands as the only reprimand I have received in my eleven years on active duty.  Although I am slated to promote to Lieutenant soon, this document effectively prevents me from promotion, and therefore long-term retention, in the Coast Guard.

8

34.     On the very same day when Captain Mattern privately presented the CG-3307 to me, her representative publicly presented me a Coast Guard Achievement Medal.  The medal citation praised my superior performance leading missions during the period from April 2019 through June 2022 and also made a special note of my actions using my unique law-enforcement background to de-escalate a dangerous conflict  (**Ex. 11**, attached.)  My commander, Captain Cole, signed the CG-3307 form less than a week after he signed the Coast Guard Achievement Medal.

35.     I departed from my unit on June 1, 2022, carrying, in one hand, an award recognizing my superior performance and unique contributions to the mission, all of which occurred while unvaccinated, and carrying, in the other hand, a formal reprimand gutting my Coast Guard career because the Coast Guard claims my continued service is too great a threat to mission accomplishment.

36.     Shortly after I received my award and reprimand, I moved my large family from Sector Charleston to my current duty station in Virginia.  I was surprised to receive orders to move, as I understand there is a Coast Guard policy prohibiting transfers for unvaccinated personnel.  I understand the policy was waived due to the needs of the Coast Guard that I serve at the Training Center.

37.     After I arrived in Yorktown, a vaccinated and boosted Coast Guardsman officemate contracted COVID-19.  He worked from home and quickly returned without mission impact.  I helped to cover for him with whatever tasks he could not complete from home.  No other officemates were required to quarantine, test, or resume masking.  I remained healthy throughout.

9

38.     A month later, after experiencing allergy-like symptoms following a weekend of outdoor labor, I tested positive for COVID-19.  This is the second positive test I have had since the beginning of the outbreak (December 2021 and September 2022).  I remained extremely healthy throughout the duration of time I tested positive for COVID-19, and my symptoms never progressed beyond those typically associated with allergies.  In fact, during the time I experienced the allergy-like symptoms, I went for a 6 mile run.  The impact to the mission was negligible, at most, as I was able to carry out my work assignments from home.  We rescheduled one field trip so that all of the students could self-monitor following my positive results and prior to testing.  Upon testing the entire class and staff of 32 people, we found that only myself and one fully vaccinated student in the class tested positive for COVID-19.  The student had taken a weekend trip to a popular vacation area in between my contact with him and his positive test.  The student also only had minor allergy-like symptoms and was able to remain engaged in class by attending remotely from his room.

39.     I understand that the Centers for Disease Control and Prevention (CDC) defines immunity as "protection against a disease."

https://www.cdc.gov/vaccines/terms/glossary.html#:~:text=Immunity%3A%20Protection%20against%20a%20disease.

40.     I further understand that according to the CDC, immunity, which is achieved by the production of antibodies against a disease, "can be acquired in two ways, either by contracting the disease or through vaccination."

https://www.cdc.gov/vaccines/terms/glossary.html#:~:text=Active%20immunity%3A%20The%20production%20of,or%20through%20vaccination.

10

240

41.    The CDC's definitions align with my experiences with COVID-19.  My immunity achieved by "contracting the disease" in December 2021, provided "protection against [the] disease" in September 2022.  In September 2022, my symptoms were barely noticeable, and I could work and even run six miles with no constraints.

42.    Additionally, I understand that while my natural immunity provided protection nine months post infection, a study published in the New England Journal of Medicine found that the effectiveness of the Pfizer-BioNtech COVID-19 vaccine (which I was ordered to receive) "was negligible" just six months after vaccination.

https://www.nejm.org/doi/full/10.1056/NEJMoa2203965

43.    I also understand that the Director of the CDC, Dr. Rochelle Walensky, has stated that "what [the COVID- 19 vaccines] can't do anymore is prevent transmission."  Further, after being asked if "you get COVID, you're fully vaccinated, but you are totally asymptomatic, you can still pass on the virus to someone else, is that right?", Dr. Walensky answered, "that is exactly right." https://twitter.com/CNNSitRoom/status/1423422301882748929.

44.    I have been willing and able and remain willing and able to work remotely, wear a mask, and test periodically, as appropriate and as required.

45.    I am aware of the following military orders purportedly requiring me to take the vaccine:

- Department of Defense August 24, 2021, COVID-19 vaccine mandate.
- Coast Guard ALCOAST 305/21 COVID-19 vaccine mandate.
- Coast Guard ALCOAST 315/21 COVID-19 vaccine mandate

46.    I am aware of Commandant Instruction (COMDTINST) M6230.4G, *Immunizations and Chemoprophylaxis for the Prevention of Infectious Disease*, a Coast Guard instruction.

11

47.    I am not aware of any military branch (including the Air Force, Navy, Army, Marine Corps, and Coast Guard) granting any religious accommodation requests to service members not already slated for separation or retirement.

48.    I am aware that the Pentagon's Inspector General investigated whether the military's process for considering and denying religious accommodation requests to COVID-19 vaccination complies with its own protocols. ([https://www.military.com/daily-news/2022/03/02/pentagon-watchdog-investigate-militarys-covid-19-exemption-process.html](https://www.military.com/daily-news/2022/03/02/pentagon-watchdog-investigate-militarys-covid-19-exemption-process.html)) I am also aware of a copy of the Inspector General's concluding memo attached to a letter of supplemental authority filed in *U.S. Navy SEALs 1-26  v. Biden*, Case Nos. 22-10077/22-10534.

49.    I am aware that the Pentagon's Inspector General informed the Secretary of Defense on June 2, 2022, that the Inspector General "found a trend of generalized assessments rather than the individualized assessment that is required by Federal law and DoD and Military Service Policies."

50.    I believe that granting my request for a religious exemption would not seriously impact my ability to perform my duties. As shown above, I have recovered from COVID-19 and have natural immunity (i.e., protection) from COVID-19.

51.    I have maintained and continue to maintain protocols for health and safety, I have no known comorbidities, I am physically fit, and to my knowledge I have not transmitted COVID-19 to anyone in the conduct of my duties.

52.    My Coast Guard career has been entirely in the interest of military readiness, unit cohesion, good order, discipline, health, and safety.

53.    Some of the attached exhibits are redacted to remove some personal identifiers.

12

54.     I cannot in good conscience take the vaccine; it is more important to me to remain dedicated to my Christian faith than to violate my religiously formed conscience for the sake of work and compensation.

55.     I have not voluntarily chosen to separate from the Coast Guard. I understand that the Coast Guard is in the process of separating me for not taking the vaccine.

56.     I want to continue serving my country in the Coast Guard indefinitely.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 15, 2022.

Michael Marcenelle

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

US Coast Guard Stop 7801
2703 Martin Luther King Jr Ave SE
Washington, DC 20593-7801
Staff Symbol: CG-1331
Phone: (202) 475-5382
Fax: (202) 475-5927
Email: HQS-PolicyandStandards@uscg.mil

COMDTINST 1000.15
30 AUG 2021

COMMANDANT INSTRUCTION 1000.15

Subj:   MILITARY RELIGIOUS ACCOMMODATIONS

Ref:   (a)  Coast Guard Medical Manual, COMDTINST M6000.1 (series)
    (b)  Immunizations and Chemoprophylaxis (Joint Publication), COMDTINST M6230.4 (series)
    (c)  Uniform Regulations, COMDTINST M1020.6 (series)
    (d)  Religious Ministries within the Coast Guard, COMDTINST 1730.4 (series)
    (e)  U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)
    (f)  Religious Liberty in the Military Services, Department of Defense Instruction 1300.17

1.  <u>PURPOSE</u>.  To promulgate policy and guidance for the accommodation of religious practices within the United States Coast Guard.

2.  <u>ACTION</u>.  All Coast Guard unit commanders, commanding officers, officers-in-charge, deputy/assistant commandants, and chiefs of Headquarters staff elements must comply with the provisions of this Commandant Instruction. Internet release is authorized.

3.  <u>DIRECTIVES AFFECTED</u>.  None.

4.  <u>DISCUSSION</u>.  The Coast Guard values the rights of its personnel to practice their religion of choice, or none at all, when it does not interfere with the ability to safely and effectively accomplish our missions. This Instruction provides the processes for consideration and resolution of requests for religious accommodation. It strives to strike a balance between consideration for the exercise of religion and ensuring military readiness, unit cohesion, good order, discipline, health and safety. This Instruction applies to all Coast Guard active duty and reserve personnel, Coast Guard Academy cadets, and applicants for accession programs. It also applies to other uniformed service members while serving within the Coast Guard. The policies and procedures in this Instruction apply solely to the accommodation of religious practices within the Coast Guard and no other context. Conscientious objectors are not covered by this Instruction and should refer to Conscientious Objectors and the Requirement to Bear Arms, COMDTINST 1900.8 (series).

DISTRIBUTION – SDL No. 170

|   | a | b | c | d | e | f | g | h | I | j | k | l | m | n | o | p | q | r | s | t | u | v | w | x | y | z |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | X | X | X | X | X | X | X | X | X | X |   | X | X | X | X | X | X |   | X |   | X | X |   |   |   |   |
| B | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| C | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| D | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| E | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |   |   |   |   |   |
| F |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   | X | X | X |   |   |   |   |   |   |   |
| G |   | X | X | X | X |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| H | X | X | X | X | X | X | X |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |

NON-STANDARD DISTRIBUTION:

5. <u>DISCLAIMER</u>.  This guidance is not a substitute for applicable legal requirements, nor is it itself a rule. It is intended to provide operational guidance for Coast Guard personnel and is not intended to nor does it impose legally binding requirements on any party outside the Coast Guard.

6. <u>MAJOR CHANGES</u>.  This is the first issuance of this Instruction. There are no prior versions. This Instruction supersedes Flag Voice 412, Religious Accommodation Policy Revision published by Assistant Commandant for Human Resources (CG-1) on 2 Feb 2014. This Instruction establishes uniform procedures and guidelines for processing requests for religious accommodations within the Coast Guard.

7. <u>ENVIRONMENTAL ASPECT AND IMPACT CONSIDERATIONS</u>.

   a. The development of this Instruction and the general policies contained within it have been thoroughly reviewed by the originating office in conjunction with the Office of Environmental Management, Commandant (CG-47). This Instruction is categorically excluded under current Department of Homeland Security (DHS) categorical exclusion DHS (CATEX) A3 from further environmental analysis in accordance with the U.S. Coast Guard Environmental Planning Policy, COMDTINST 5090.1 and the Environmental Planning (EP) Implementing Procedures (IP).

   b. This Instruction will not have any of the following: significant cumulative impacts on the human environment; substantial controversy or substantial change to existing environmental conditions; or inconsistencies with any Federal, State, or local laws or administrative determinations relating to the environment. All future specific actions resulting from the general policy in this Instruction must be individually evaluated for compliance with the National Environmental Policy Act (NEPA) and Environmental Effects Abroad of Major Federal Actions, Executive Order 12114, Department of Homeland Security (DHS) NEPA policy, Coast Guard Environmental Planning policy, and compliance with all other applicable environmental mandates.

8. <u>DISTRIBUTION</u>.  No paper distribution will be made of this Instruction. An electronic version will be located on the following Commandant (CG-612) web sites:  Internet: https://www.dcms.uscg.mil/Directives/, and CGPortal: https://cg.portal.uscg.mil/library/Directives/SitePages/Home.aspx.

9. <u>RECORDS MANAGEMENT CONSIDERATIONS</u>.  Records created as a result of this Instruction, regardless of format or media, must be managed in accordance with the records retention schedules located on the Records Resource Center CGPortal site: cg.portal.uscg.mil/units/cg61/CG611/SitePages/Home.aspx.

10. <u>DEFINITIONS</u>.

   a. Religious Accommodation. A religious accommodation is any adjustment to the work environment that will allow a member or applicant to exercise his or her religious beliefs. The need for religious accommodation may arise where an individual's sincerely held religious beliefs, observances or practices conflict with a specific task or requirement of their position or an application process. Accommodation requests often relate to work

2

schedules, dress and grooming, or religious expression in the workplace. Requests for religious accommodation from a military policy, practice, or duty that substantially burdens a service member's exercise of religion may be denied only when the military policy, practice, or duty furthers a compelling government interest and it is the least restrictive means of furthering that compelling government interest. The Coast Guard has a compelling government interest in mission accomplishment at the individual, unit, and organizational levels, including such necessary elements of mission accomplishment as military readiness, unit cohesion, good order and discipline, and health and safety.

b. Religious Observance. Religious observances include, but are not limited to participating in worship services, daily prayers or following other doctrinal requirements on holy days.

c. Religious Exercise. Any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

d. Religious Practice. An action, behavior, or course of conduct constituting individual expressions of religious beliefs, whether or not compelled by, or central to, the religion concerned.

e. Religious Dietary Observances. Religious dietary observances include doctrinal or traditional requirements on types of subsistence allowed or the means of food preparation.

f. Religious Medical Practices. Religious medical practices include doctrinal or traditional objections to receiving immunizations and providing Deoxyribonucleic Acid (DNA) specimen samples.

g. Religious Apparel. Articles of clothing, jewelry or other such accoutrements worn as part of the doctrinal or traditional observances of the religious faith practiced by the service member. Hair and grooming practices required or observed by religious groups are not included within the meaning of religious apparel.

(1) Neat and conservative. In the context of the wear of a military uniform, items of religious apparel that:

(a) Are discreet, tidy, and not dissonant or showy in style, size, design, brightness, or color;

(b) Do not replace or interfere with the proper wear of any authorized article of the uniform; and

(c) Are not temporarily or permanently affixed or appended to any authorized article of the uniform.

h. Tradition or Traditional. Recurring practices, ceremonies, customs or obligations that -- whether or not explicitly required by religious doctrine -- have historically been associated with or derived from established religious beliefs and doctrines.

i. Pre-accession. The period of time before a prospective service member's participation in a commissioning program, warrant officer program, enlistment (or entry), reenlistment (or reentry), or enrollment in the Coast Guard Academy or College Student Pre-commissioning initiative (CSPI).

11. <u>POLICY</u>.

    a. General. Pursuant to the Free Exercise Clause of the First Amendment to the U.S. Constitution, service members have the right to observe the tenets of their religion or to observe no religion at all. Under Section 2000bb-1 of Title 42, United States Code, also known as "The Religious Freedom Restoration Act," Section 533(a)(1) of Public Law 112-239 and other laws applicable to the accommodation of religious practices, the Armed Forces must accommodate the beliefs of a member of the armed forces reflecting the conscience, moral principles, or religious beliefs of the member and, in so far as practicable, may not use such beliefs as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training or assignment. Coast Guard policy is to provide reasonable accommodations to the observances of the religious faith practiced by individual members when these doctrines or observances will not have an adverse impact on military readiness, individual or unit readiness, unit cohesion, health, safety, discipline, or mission accomplishment. Accommodation of a member's religious practices cannot be guaranteed and is subject to operational necessity. Unit commanders are encouraged to seek input from the unit's Servicing Legal Office and Chaplain to ensure compliance with Section 533(a)(1) of Public Law 112-239, as amended.

        (1) Requests for accommodation based on sincerely held beliefs must not be denied without consultation with the unit's Servicing Legal Office, Civil Rights Service Provider, and Chaplain.

        (2) All requests for accommodation must be reviewed and acted upon by the appropriate approval authority and during the timelines outlined in Enclosure (1), insofar as practicable and as operations allow.

        (3) Pre-accession members must be given the opportunity to route a religious accommodation request prior to departure for a Military Entrance Processing Station.

        (4) All approved requests must be forwarded to the appropriate accession point and Indoctrinating Training Center (Officer Candidate School or Training Center Cape May) before the member executes his or her orders.

    b. Standards of Review for Religious Accommodation Requests.

        (1) The Coast Guard has a compelling government interest in mission accomplishment at the individual, unit, and organizational levels, including such necessary elements of mission accomplishment as military readiness, unit cohesion, good order and discipline, and health and safety. In accordance with the Religious Freedom Restoration Act (RFRA), and Reference (f), the Coast Guard will normally accommodate practices of a service member based on a sincerely held religious belief.

4

(2) Accommodation includes excluding a service member from an otherwise applicable military policy, practice or duty. In accordance with RFRA, if a military policy, practice or duty substantially burdens a service member's exercise of religion, accommodation can only be denied if:

    (a) The military policy, practice, or duty is in furtherance of a compelling governmental interest; and

    (b) The policy, practice, or duty is the least restrictive means of furthering that compelling government interest.

    Note: In applying the standard of (a) and (b) above, the burden of proof is placed upon the Coast Guard, not the individual requesting the exemption.

(3) A request for the accommodation of religious practices may be granted in whole or in part. The requestor will be informed in writing of the decision to grant or deny the request, and of any conditions or limitations placed on the grant.

c.  Types of Accommodation Requests.

(1) Observances of Worship and Holy Days. CO/OICs will accommodate Worship practices, Holy Days, Sabbath or similar religious observance requests except by necessity, consistent with mission accomplishment. These requests can be approved at the local unit level in accordance with operational demands.

(2) Dietary Practices. CO/OICs should support religious dietary observances to the fullest extent possible, consistent with mission accomplishment.

(3) Immunizations. While the Coast Guard has a compelling interest in requiring that all members receive immunizations, individual immunization requirements may be waived when requested by the member based on religious objection. The religious objection of the service member must be balanced against the medical risk to the member and the unit, and Coast Guard requirements such as alert status, deployment potential, and availability of the member for reassignment to units requiring full medical readiness, as described in Reference (a). When available, alternative immunization or treatment that does not violate the member's religious objection must be used. This accommodation may be terminated by the CO/OIC, if the individual and/or unit are at imminent risk of exposure to a disease for which an immunization is available. All requirements set forth in References (a) and (b) must be met. Commandant (CG-133) is the approval authority for all requests to be exempt from immunizations, although COs/OICs may give approval for the member to receive an alternate immunization approved by Commandant (CG-112).

(4) Grooming. A key element of unit cohesion is establishing and maintaining uniform military grooming and appearance standards. Waivers of grooming policy for male members on all duty types to wear unshorn/long hair or beards may be submitted to through CO/OIC to PSC-PSD-mu. Approved beards must be worn in a neat and conservative manner. When a member is authorized to wear a beard of greater than

5

two inches in length, the beard must be rolled, tied and/or otherwise groomed to achieve a length not to exceed two inches when measured from the bottom of the chin.

(5) Deoxyribonucleic Acid (DNA) Specimen Sampling. DNA analysis fulfills the military requirement of quickly and accurately identifying the remains of Coast Guard members under "Using the Armed Forces Repository of Specimen Samples for the Identification of Remains, COMDTINST 6510.1 (series)". DNA sampling is performed on every accession upon arrival at the member's accession point. Analysis of these samples are only conducted when necessary for identification of remains. Therefore, religious accommodations for DNA analysis can only be processed prior to the prospective accession's arrival at his or her respective accession point. The cumulative impact of repeated accommodations of a similar nature and previous treatment of similar requests may set a precedent that could adversely impact other Coast Guard medical policies and programs, including mandatory pre-deployment processing, medical screening activities, Human Immunodeficiency Virus testing and medical surveillance program serum collection. The specimen sample will be destroyed at the request of the member upon completion of service.

(6) Uniforms. When approved, such apparel will be authorized to be worn with the military uniform as long as it does not interfere with the performance of the member's military duties or is otherwise specifically prohibited in this Section. All uniform accommodations must maintain compliance with Reference (c), including maintaining a neat and conservative appearance.

(a) Whether an item of religious apparel interferes with the performance of the service member's military duties depends on the characteristics of the item, the circumstances of its intended wear, and the particular nature of the member's current duties. Factors in determining if an item of religious apparel interferes with the military duties include, but are not limited to, whether the item:

[1] Impairs the safe and effective operation of weapons, military equipment, or machinery;

[2] Poses a health or safety hazard to the service member wearing the religious apparel or to others;

[3] Interferes with the wear or proper function of special or protective clothing or equipment (e.g., helmets, flak jackets, flight suits, camouflage uniforms, gas masks, wet suits, and crash and rescue equipment); and

[4] Otherwise impairs mission accomplishment.

(b) Head Coverings. Religious accommodations for members to wear neat and conservative religious head coverings (including, but not limited to a hijab, turban, kufi, kippah, or yarmulke) may be authorized in accordance with Enclosure (1) and Reference (c). Except in the case of safety or protective headgear required by the member's duties, position or assignment, a member

6

249

granted a religious accommodation for head coverings is not required to wear military headgear in addition to his or her religious head covering if such military headgear would violate his or her sincerely-held religious beliefs.

(c) Jewelry bearing religious inscriptions or otherwise indicating affiliation or belief may be worn subject to the same uniform regulations prescribed for jewelry that is not of a religious nature. The Coast Guard will consider religious accommodation requests to wear jewelry that is not in compliance with uniform regulations in accordance with this policy.

(d) Chaplains may wear any religious apparel required by their religious organizations with the uniform while conducting public worship services and during the performance of rites and rituals distinct to their faith groups.

(e) Service members may wear any required religious apparel distinct to their faith group with the uniform while in attendance at public worship services.

(7) Requests for any other types of religious accommodations can be submitted to the member's command for approval.

(8) Accommodation Duration and Rescission of an Accommodation. An approved request for accommodation will remain in effect during follow-on duties, assignments, or locations, and for the duration of the service member's military career, including after promotions, reenlistment or commissioning, unless and until rescinded in accordance with requirements of this issuance.

(a) An approved accommodation may be subject to review and rescission, in whole or in part, at any time, based upon a determination that the circumstances under which the grant of accommodation was approved have changed (e.g., deployment, new duties, or other material change in circumstances). The Coast Guard, and not the individual member, bears the burden of initiating a proposal to review and rescind an accommodation previously granted.

(b) When a command initiates a proposal to review and rescind an accommodation previously granted, the CO/OIC will forward a written summary of the nature of the materially changed circumstances that require such review and repeal to the member concerned for comment.

[1] The service member will be:

[a] Allotted no fewer than 10 business days to review and comment on the proposed rescission of the accommodation;

[b] Afforded the opportunity to review and comment on any endorsements of this proposal from the chain of command; and

[c] Afforded, subject to security classification requirements, the opportunity to review and comment on any documents or attachments to the proposal or subsequent endorsements.

[2] Any comments submitted by the service member will be forwarded for consideration by the appropriate official authorized to act on the matter. For example, if a religious accommodation was approved by a commanding officer at a previous unit, the comments must be considered by the commanding officer of the service member's current unit. If a religious accommodation was previously approved by the Office of Military Personnel (CG-133), comments must be considered by Commandant (CG-133).

[3] A proposal to review and rescind a previously approved accommodation must be acted on at the level of authority no lower than that at which the accommodation was granted.

[4] The standard for repealing a previously granted accommodation, in whole or in part, is the same as the standard for denying an initial request for the accommodation of religious practices, and the same factors must be considered, as appropriate.

(9) Accommodation Modification or Suspense Under Exigent Circumstances. Under exigent circumstances and in furtherance of a compelling governmental interest due to operational necessity, when time is of the essence and no less restrictive means of religious accommodation are available, a commander may temporarily modify or suspend accommodations granted, upon notice to the service member concerned and without benefit of appeal. The level of this commander must be no lower than the CO/OIC for a service member who has previously been granted an accommodation of religious practices.

(a) The service member concerned may be required to immediately comply with the modification or suspension of an accommodation, if circumstances so warrant.

(b) The modification or suspension of the accommodation will apply for only the minimum period required by the circumstances.

12. ROLES AND RESPONSIBILITIES. The following roles and responsibilities apply to current Coast Guard members. New recruits waiting to be accessed must make their requests through their recruiter.

a. Members seeking religious accommodation must submit their request in writing to the proper approval authority in accordance with Enclosure (1). Prior to submitting their request, members are required to consult with their unit's Chaplain. The request must include a notation that the member met with the chaplain, and include the date of the meeting and the name/contact information of the chaplain. Prospective accessions should submit their request through their recruiter, who is required to arrange a consultation with a Coast Guard Chaplain. A sample of a religious accommodation request memorandum can be found in Enclosure (2).

8