RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

HUNTER DOSTER; JASON ANDERSON; MCKENNA
COLANTANIO; PAUL CLEMENT; JOE DILLS; BENJAMIN
LEIBY; BRETT MARTIN; CONNOR MCCORMICK; HEIDI
MOSHER; PETER NORRIS; PATRICK POTTINGER; ALEX
RAMSPERGER; BENJAMIN RINALDI; DOUGLAS RUYLE;
CHRISTOPHER SCHULDES; EDWARD STAPANON, III;
ADAM THERIAULT; DANIEL REINEKE, on behalf of
themselves and others similarly situated,

�construction⎤ Nos. 22-3497/3702

                              *Plaintiffs-Appellees*,

      *v.*

HON. FRANK KENDALL, in his official capacity as
Secretary of the Air Force; LT. GENERAL ROBERT I.
MILLER, in his official capacity as Surgeon General of
the Air Force; LT. GENERAL MARSHALL B. WEBB, in
his official capacity as Commander, Air Education
and Training Command; LT. GENERAL RICHARD W.
SCOBEE, in his official capacity as Commander, Air
Force Reserve Command; LT. GENERAL JAMES C.
SLIFE, in his official capacity as Commander, Air
Force Special Operations Command; UNITED STATES
OF AMERICA,

                              *Defendants-Appellants*.

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:22-cv-00084—Matthew W. McFarland, District Judge.

Argued: October 19, 2022

Decided and Filed: November 29, 2022

Before: KETHLEDGE, BUSH, and MURPHY, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:**  Casen B. Ross, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, for Appellees.  **ON BRIEF:**  Casen B. Ross, Charles W. Scarborough, Lowell V. Sturgill Jr., Sarah J. Clark, Anna O. Mohan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, Aaron Siri, Elizabeth A. Brehm, Wendy Cox, SIRI AND GLIMSTAD LLP, New York, New York, Thomas B. Bruns, BRUNS CONNELL VOLLMAR & ARMSTRONG, Cincinnati, Ohio, for Appellees. Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Frederick R. Yarger, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, Ilya Shapiro, New York, New York, Gene C. Schaerr, Kenneth A. Klukowski, SCHAERR | JAFFE LLP, Washington, D.C., John Eidsmoe, FOUNDATION FOR MORAL LAW, Montgomery, Alabama, for Amici Curiae.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  The Department of the Air Force has ordered all of its over 500,000 service members to get vaccinated against COVID-19.  Some 10,000 members with a wide array of duties have requested religious exemptions from this mandate.  The Air Force has granted only about 135 of these requests and only to those already planning to leave the service.  Yet it has granted thousands of other exemptions for medical reasons (such as a pregnancy or allergy) or administrative reasons (such as a looming retirement).  The 18 Plaintiffs who filed this suit allege that the vaccine mandate substantially burdens their religious exercise in violation of the First Amendment and the Religious Freedom Restoration Act of 1993 (RFRA).  Finding that these claims would likely succeed, the district court granted a preliminary injunction that barred the Air Force from disciplining the Plaintiffs for failing to take a vaccine.  But its injunction did not interfere with the Air Force's operational decisions over the Plaintiffs' duties.  The court then certified a class of thousands of similar service members and extended this injunction to the class.

The Air Force appeals the individual and class injunctions.  Its briefs across the two appeals work at cross-purposes.  In its challenge to the class-action certification, the Air Force

(correctly) states that RFRA adopts an individual-by-individual approach: the Air Force must show that it has a compelling interest in requiring a "specific" service member to get vaccinated based on that person's specific duties and working conditions. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006). In its challenge to the Plaintiffs' injunction, however, the Air Force fails to identify the specific duties or working conditions of a single Plaintiff. It instead seeks to satisfy RFRA with the "general interests" underlying its vaccine mandate. *Id.* at 438. We are thus asked to deny that common questions exist for purposes of certifying a class but to accept that common answers exist for purposes of rejecting all 18 Plaintiffs' claims on their merits.

We decline this inconsistent invitation. Under RFRA, the Air Force wrongly relied on its "broadly formulated" reasons for the vaccine mandate to deny specific exemptions to the Plaintiffs, especially since it has granted secular exemptions to their colleagues. *Id.* at 431. We thus may uphold the Plaintiffs' injunction based on RFRA alone. The Air Force's treatment of their exemption requests also reveals common questions for the class: Does the Air Force have a uniform policy of relying on its generalized interests in the vaccine mandate to deny religious exemptions regardless of a service member's individual circumstances? And does it have a discriminatory policy of broadly denying religious exemptions but broadly granting secular ones? A district court can answer these questions in a "yes" or "no" fashion for the entire class. It can answer whether these alleged policies violate RFRA and the First Amendment in the same way. A ruling for the class also would permit uniform injunctive relief against the allegedly illegal policies. We affirm.

# I

## A

The Air Force lists its mission as: "Fly, fight, and win—airpower anytime, anywhere." R.34-2, PageID 2236. It seeks to ensure that the United States can maintain "air superiority" for all offensive operations overseas and defensive operations at home. R.34-3, PageID 2247. It also conducts aerial missions worldwide to gather intelligence, transfer personnel and cargo, and strike targets. *Id.* The Air Force completes its critical duties through a structure that consists

primarily of nine Major Commands and three Field Commands.  R.34-2, PageID 2236.  The Commands include over 3,000 squadrons that perform varied functions, ranging from fighter and bomber squadrons to medical and maintenance squadrons.  *Id.*, PageID 2235–36.  To fill its squadrons, the Air Force relies on 501,000 service members spread across those on active duty (about 326,000), in the reserves (about 68,000), and in the Air National Guard (about 107,000).  R.34-3, PageID 2248.

The "roles" of these individuals "differ vastly."  R.34-2, PageID 2235.  The duties of the Plaintiffs exemplify this diversity.  Some perform tasks readily associated with the Air Force.  Lieutenant Colonel Edward Stapanon trains fighter pilots; Major Daniel Reineke trains pilots for remotely piloted aircraft.  R.45, PageID 3078–79; R.42-5, PageID 2964.  Others plan for the future.  Second Lieutenant Hunter Doster recently graduated from the Air Force Institute of Technology and develops new technology at the Air Force Research Lab.  R.48, PageID 3211–15.  Still others undertake the service functions required for a global air operation.  Airman First Class McKenna Colantonio maintains fuel systems.  R.42-1, PageID 2776.  Senior Airman Joseph Dills helps passengers on and off planes.  R.48, PageID 3254, 3270–71.  While the Plaintiffs serve in varied roles, they all share an objection rooted in their faiths to taking any currently available COVID-19 vaccine.

The military has long imposed vaccine mandates.  R.27-4, PageID 1564.  Before the COVID-19 pandemic, the Department of Defense required personnel to take some vaccines upon entering the service (including for the flu and polio) and others upon taking specific duty assignments (including for anthrax and yellow fever).  *Id.*; R.27-6, PageID 1624.

After the FDA approved the first COVID-19 vaccine for regular use in August 2021, the Secretary of Defense added that vaccine to the list of required vaccinations.  R.27-3, PageID 1561.  The Secretary ordered all Armed Forces to receive an FDA-approved vaccine, but he also permitted them to satisfy this mandate by taking other vaccines approved for emergency use by the FDA or the World Health Organization.  *Id.*  The Secretary of the Air Force, Frank Kendall, directed active-duty members to get vaccinated by November 2 and reservists by December 2.  R.27-7, PageID 1632.  Within months, 97% of those on active duty and 92% of those in the reserves had willingly done so.  R.27-17, PageID 1970.

Recognizing that some might object to the vaccine, Secretary Kendall permitted medical, administrative, and religious exemptions.  R.27-7, PageID 1646, 1649.  He also paused the mandate for those seeking exemptions while the Air Force processed their requests.  R.27-8, PageID 1656.

Service members may seek medical exemptions for health reasons like a vaccine allergy.  R.27-7, PageID 1646; R.27-12, PageID 1922–23.  Pregnant service members may also obtain this exemption despite CDC guidance that they may safely get vaccinated.  R.27-7, PageID 1645.  To obtain exemptions, service members must notify their unit commanders and visit military medical providers.  *Id.*, PageID 1654.  A provider decides whether to grant an exemption.  *Id.*  During any period of exemption, a unit commander may alter a service member's duties.  *Id.*, PageID 1647.

Service members may seek administrative exemptions if they are near retirement.  Secretary Kendall initially limited this exemption to those on "terminal leave."  *Id.*, PageID 1649.  These members stop working at the start of leave and retire at its end.  R.27-16, PageID 1954.  He later expanded the exemption to cover all personnel who planned to retire in five months, even those who planned to remain on active duty during this time.  R.27-8, PageID 1656.  Unit commanders decide whether to approve these exemptions.  R.27-16, PageID 1954.

Service members may lastly seek religious exemptions.  R.27-7, PageID 1649.  Secretary Kendall relied on existing guidance from a Department of the Air Force Instruction (DAFI 52-201) for this exemption.  *Id.*  The guidance notes that the Air Force has a compelling interest in "mission accomplishment," including in "military readiness, unit cohesion, good order and discipline, and health and safety for both the member and the unit."  DAFI 52-201, § 2.1, at 2 (June 23, 2021).  Rather than give unit commanders discretion to decide whether these interests trump exemption requests, the guidance centralizes the process.  A commander at a Major or Field Command makes the decision, and the Surgeon General of the Air Force resolves all appeals.  R.27-7, PageID 1652–53.

The Air Force follows an 11-step religious-exemption process.  *Id.*, PageID 1651–53.  At step one, service members must submit a written request that describes why a COVID-19

vaccine burdens their religion.  *Id.*, PageID 1651.  Most Plaintiffs have objected to the available COVID-19 vaccines because of their ties to aborted fetal tissue during development or testing.  Lieutenant Doster, for example, listed this concern when explaining why these vaccines would violate his religious beliefs "as a Born-Again Christian."  R.11-4, PageID 331, 334.  But not all requesters have raised this religious objection.  Lieutenant Colonel Jason Anderson wrote that his Buddhist faith prohibited him from presently taking a vaccine.  R.11-6, PageID 392–96.

At steps two and three, service members receive counseling.  They must meet with their unit commanders to discuss how the failure to get vaccinated might limit their ability to deploy and alter their duty assignments.  R.27-7, PageID 1651.  And they must meet with medical providers to discuss the risks from COVID-19 and information about vaccines.  *Id.*

At step four, military chaplains conduct in-depth interviews to evaluate, and opine on, the sincerity of a service member's beliefs based on such factors as the member's demeanor and past conduct.  *Id.*; DAFI 52-201, at 29.  A chaplain, for example, recommended granting Doster an exemption because of "overwhelming" evidence that his objection was sincere, including his statements that he had led a "men's group in worship and study" at the Air Force Academy and that his wife works "at a pro-life, non-profit organization."  R.11-4, PageID 339.

At step five, a "Religious Resolution Team" (made up of a lower-level commander, chaplain, public affairs officer, staff judge advocate, and medical provider) recommends whether to grant or deny an exemption.  R.27-7, PageID 1651.  Teams have reached differing results.  The team that reviewed Doster's request recommended a denial (over a dissent) in a short statement.  R.42-3, PageID 2839.  It agreed that Doster's beliefs were sincere but noted that, as set forth in DAFI 52-201, it considered "whether a compelling governmental interest[] exists and whether the [vaccine mandate] uses the least restrictive means necessary to achieve" it.  *Id.*  The team did not expressly identify any compelling interest or alternative means.  In contrast, the team that reviewed the request of Major Andrea Corvi, a class member, voted to approve it (over two dissents) because she could continue in her duty assignment as an information-operations officer while unvaccinated.  R.53-1, PageID 3769–70.

At step six, a staff judge advocate offers legal analysis. R.27-7, PageID 1651. The Air Force has largely redacted the parts of these opinions that do more than describe background law. *E.g.*, R.42-1, PageID 2789–92. But Major Corvi obtained an unredacted opinion. There, a judge advocate recommended granting her an exemption. R.53-1, PageID 3774–77. He reasoned, among other things, that the exemption would minimally affect military readiness because of her duties as an information-operations officer. *Id.*, PageID 3775. He noted that it also would not affect "unit cohesion" because of the "extremely low likelihood" that her unit would ever deploy. *Id.*, PageID 3776. He added that service members "compose a healthier and younger demographic" and so face a greater risk of dying in a car accident than from COVID-19. *Id.*

At step seven, each officer in a service member's chain of command recommends approval or disapproval. R.27-7, PageID 1652. Officers have performed this review with varying degrees of diligence. Some consider a service member's duties. Airman Colantonio's squadron commander recommended granting her an exemption because her work as a fuel-systems technician required her to wear gear that protected against COVID-19. R.42-1, PageID 2776. Others state in a conclusory fashion: "A compelling government interest exists to vaccinate all Airmen against COVID-19," and there are no "less restrictive means available to achieve that compelling interest." R.42-4, PageID 2934.

At step eight, the commander of the relevant Major or Field Command must decide on the exemption and identify the reasons for all denials. R.27-7, PageID 1652. Despite thousands of requests, commanders have denied exemptions with limited individual-specific analysis. One commander appears to deny requests (including those of Airman Colantonio and Staff Sergeant Adam Theriault) with a standard-form memo that merely changes whether he "approve[s]" or "disapprove[s]" the exemption. R.42-1, PageID 2780; R.11, PageID 563. These denial memos summarily state that a "compelling governmental interest in mission accomplishment (military readiness, unit cohesion, good order and discipline, and health and safety for both the member and the unit) exists." R.42-1, PageID 2780. Although another commander issued lengthier memos, their substance did not change significantly across denials. *See* R.11-4, PageID 344–45 (Doster); R.38-3, PageID 2635–36 (Stapanon); R.42-5, PageID 2980–81 (Reineke).

At steps nine and ten, the Air Force completes procedural tasks.  It places a copy of the decision in a service member's file, provides notice of the decision, and informs the service member of the right to appeal the denial.  R.27-7, PageID 1652.

At step eleven, the Surgeon General of the Air Force, Lieutenant General Robert Miller, decides any appeal.  R.27-7, PageID 1653.  His standard denial memo contains a paragraph's worth of analysis following the same format.  *E.g.*, R.11-7, PageID 417 (Colantonio); R.19-1, PageID 944 (Doster); R.42-2, PageID 2817 (Dills); R.42-5, PageID 2999 (Reineke); R.60-1, PageID 4359 (Stapanon).  It first states that "preventing the spread of disease among the force is vital to mission accomplishment."  R.19-1, PageID 944.  It next spends a sentence or two on a service member's individual "circumstances," typically highlighting that the service member interacts with others.  *Id.*  It then notes that the service member may someday need to deploy "on short notice[.]"  *Id.*

After a denial, commanders order service members to get vaccinated in five days.  R.11-21, PageID 569.  Some warn that a refusal could result in a wide array of punishments: "Failure to comply with this lawful order may result in administrative and/or punitive action for Failing to Obey an Order under Article 92, Uniform Code of Military Justice."  R.19-1, PageID 946.  But Secretary Kendall listed "administrative discharge" as the standard (mandatory) sanction.  R. 27-8, PageID 1656.  By July 2022, the Air Force had "administratively separated" 834 members.  DAF COVID-19 Statistics—July 2022, https://perma.cc/J3GG-B59M.

As of that month, 9,754 service members had requested religious exemptions.  *Id.*  The Air Force had granted only 135 requests.  *Id.*  Even this number overstates things.  It actually granted the "religious" exemptions only to those who qualified (or nearly qualified) for an "administrative" exemption because they would soon retire.  *See* R.30-2, PageID 2084–85, 2088, R.46-1, PageID 3121–23.  At argument, the Air Force agreed that it has granted zero religious exemptions to anyone who does not plan to leave the service within a year.  Arg., No. 22-3497, at 51:33–52:07.

The Air Force, by comparison, has provided no statistics on the total number of medical or administrative exemptions that personnel have requested or that it has granted since the

inception of the vaccine mandate. In December 2021, there were a total of 2,047 service members currently with medical exemptions and 2,247 service members currently with administrative exemptions. *See* DAF COVID-19 Statistics—December 2021, https://perma.cc/C6ZZ-BGB4. The total number of members with these exemptions in any given month appears to have steadily declined since then. *See* DAF COVID-19 Statistics—July 2022.

B

In February 2022, the 18 Plaintiffs, some on active duty and others in the reserves, sued Secretary Kendall, Surgeon General Miller, and the commanders of three Major Commands. R.1, PageID 3–6. Asserting RFRA and First Amendment claims, they alleged that the exemption process is a sham because the Air Force followed a discriminatory policy that denied nearly all religious exemptions but broadly granted medical and administrative exemptions. *Id.*, PageID 13.

The district court issued four decisions that matter now. The court granted the Plaintiffs a preliminary injunction on the ground that the Air Force's blanket denial of religious exemptions likely violated RFRA and the Free Exercise Clause. *Doster v. Kendall*, __ F. Supp. 3d __, 2022 WL 982299, at *11–15 (S.D. Ohio Mar. 31, 2022). This injunction barred the Air Force from disciplining the Plaintiffs for failing to take COVID-19 vaccines. *Id.* at *17. But it did not interfere with the Air Force's "operational decisions" about the Plaintiffs' duties or deployability. *Id.*

The district court next certified a class of members of the Air Force. *See Doster v. Kendall*, 342 F.R.D. 117, 121 (S.D. Ohio 2022). It defined the class to include those whom a military chaplain has found to have sincerely held religious beliefs that are substantially burdened by the vaccine mandate. *See Doster v. Kendall*, 2022 WL 3576245, at *3 (S.D. Ohio Aug. 19, 2022). The district court subsequently extended its preliminary injunction to the class. *See Doster v. Kendall*, 2022 WL 2974733, at *1–2 (S.D. Ohio July 27, 2022). It then denied a stay of this class-wide injunction pending appeal. *See Doster*, 2022 WL 3576245, at *1.

The Air Force appealed both the district court's individual injunction and the court's class injunction. It immediately sought a stay of the latter from us. We denied the stay but

consolidated and expedited these two appeals. *Doster v. Kendall*, 48 F.4th 608, 617 (6th Cir. 2022).

## II.  Injunction for the Named Plaintiffs

We start with the injunction awarded to the Plaintiffs.  Courts ask four questions when deciding whether to grant a preliminary injunction: Will the plaintiffs likely succeed on their claims?  Will they suffer an irreparable injury without relief?  Which side does the balance of the equities favor?  And where does the public interest lie?  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Air Force raises three arguments under this framework.  It asserts that the Plaintiffs' claims will likely fail because the claims are not judicially reviewable. It asserts that the claims will likely fail because they do not satisfy the governing standards under RFRA and the Free Exercise Clause.  And it asserts that the remaining factors tilt in its favor. We can reject all three arguments based solely on the Plaintiffs' RFRA claims, which alone justified the injunction.  Under traditional principles of constitutional avoidance, then, we need not address the Plaintiffs' free-exercise claims.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

### A.  Justiciability of the RFRA Claims

According to the Air Force, two hurdles to our review—an abstention doctrine tailored to the military and the general ripeness doctrine—bar the Plaintiffs' RFRA claims.  Yet the Plaintiffs have satisfied their burden at this stage by showing that we likely can review these claims.  *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018).

#### 1.  Abstention

The Air Force asks us to decline to hear these RFRA claims under an abstention test that the Fifth Circuit created in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), to govern claims by service members against the military.  *See Harkness v. Sec'y of Navy*, 858 F.3d 437, 444–45 (6th Cir. 2017).  This test has two parts, each with its own subparts.  To obtain review, a service

member must allege that the military violated the law and that the service member has exhausted any internal military processes to obtain relief. *Mindes*, 453 F.2d at 201. The service member next must show that a court should resolve the claim despite the "policy reasons" against judicial review of military decisions. *Id.* This part requires a court to consider a claim's strength, the harm from denying review, the degree of military interference, and the extent to which a court must second guess "military expertise or discretion[.]" *Id.* at 201–02. The Air Force argues that we may expand *Mindes*'s test "in common-law fashion" to cover *any* potential claim against the military. *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746 (6th Cir. 2019).

a. The Air Force "overstates" our abstention power, so we must clarify the circumstances in which a court may decline to hear a properly filed case. *Id.* Courts start with the presumption of a "virtually unflagging" duty to resolve all cases that fall within their jurisdiction. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989) (citation omitted). As Chief Justice Marshall said long ago, a court would commit "treason to the constitution" if it refused to resolve an Article III "case" because the case's legal issues touched sensitive matters. *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). More recently, the Court has reaffirmed that the judiciary lacks a common-law power to create policy-rooted "exceptions" to its jurisdiction. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–28 (2014).

Two recent clarifications illustrate this point. The first concerns "prudential" standing. Courts once held that they could adopt "self-imposed limits" on deciding cases for prudential reasons. *Allen v. Wright*, 468 U.S. 737, 751 (1984). But the Supreme Court has since clarified that courts may not create prudential-standing common law. *Lexmark*, 572 U.S. at 128. Rather, they may dismiss a suit based on a prudential limitation on review only if the relevant law is best read to adopt this limit as a matter of statutory interpretation (not judicial policy). *Id.* The second concerns "prudential" exhaustion. Courts once suggested that they could create exhaustion mandates (or exceptions) in common-law fashion. *See United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 35–38 (1952). But the Supreme Court has now clarified that exhaustion likewise raises an interpretive question about whether a law contains an exhaustion

mandate (or exception).  *See Ross v. Blake*, 578 U.S. 632, 639 (2016); *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992).

These clarifications shed light on the judiciary's power to "abstain" from reviewing claims against the military.  True, the Supreme Court has "been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Austin v. U.S. Navy Seals 1–26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring) (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)).  But it has never adopted a general abstention test grounded in judicial "policy" and applicable to all claims against the military.  Rather, the Court has implemented its reluctance to interfere in military affairs in three more precise (and legally rooted) ways—in the way that it resolves statutory questions, in the way that it oversees judge-made claims, and in the way that it grants discretionary remedies.

When resolving statutory questions, the Court presumes that laws do not intrude into military affairs when they are ambiguous on the point.  Do the civil-service laws give the Merit Systems Protection Board the power to review the Navy's denial of a security clearance?  Do the habeas laws give courts the power to review the Army's duty assignments?  The Court answered "no" to these questions by interpreting the laws to retain military independence.  *See Egan*, 484 U.S. at 527–32; *Orloff v. Willoughby*, 345 U.S. 83, 92–93 (1953).  But courts should not overread this canon of construction.  Just because "congressionally uninvited intrusion into military affairs by the judiciary is inappropriate," *United States v. Stanley*, 483 U.S. 669, 683 (1987), does not mean that courts may "decline" an invitation that Congress has sent.  They should review a claim against the military if Congress has "provided" for that review.  *Egan*, 484 U.S. at 530; *e.g.*, *Parisi v. Davidson*, 405 U.S. 34, 39, 44–46 (1972).

When overseeing judge-made claims, the Court has also refused to apply novel causes of action against the military.  Take *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which adopted a claim for damages against federal officers for constitutional violations.  *Id.* at 397.  The Court chose not to extend this *Bivens* remedy to the military because of its hesitancy to disrupt military functions.  *See Chappell v. Wallace*, 462 U.S. 296, 300–04 (1983).  This principle makes sense.  Whatever source of authority gave the Court the power to create *Bivens* also gave it the power to limit *Bivens*.  Yet a court should also not

take this principle too far. Courts have long permitted "judge-made" claims seeking an injunction (not damages). *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). And they have long permitted those claims against the military. *See Stanley*, 483 U.S. at 683 (citing cases).

When considering discretionary relief, the Court has again accounted for the military context. A court may deny an equitable remedy like an injunction even if a plaintiff has a valid claim. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982); *Younger v. Harris*, 401 U.S. 37, 43–49 (1971). The Court thus considers the effects on military operations when engaging in the balancing over whether to grant an injunction. *See Winter*, 555 U.S. at 24; *Schlesinger v. Councilman*, 420 U.S. 738, 757–58 (1975). This remedial discretion played a big role in the sole military case that the Court dismissed on "political question" grounds. *Gilligan v. Morgan*, 413 U.S. 1, 5–12 (1973). In *Gilligan*, students at Kent State University sued the Ohio Governor and Ohio National Guard following the shooting by guard members that left several students dead. *Id.* at 3. They sought an amorphous injunction that would have compelled the judiciary to oversee the Ohio National Guard's training and orders. *Id.* at 5–6. The Court relied on the remedy's sweeping scope to find the claim nonjusticiable. *Id.* at 4–12. But it disavowed any broad abstention test. *Id.* at 11–12. So when students later sought more traditional relief for the same incident, the Court permitted their claims. *See Scheuer v. Rhodes*, 416 U.S. 232, 249–50 (1974).

As its caselaw demonstrates, the Supreme Court has never adopted anything like the abstention test that the Air Force asks us to apply here. To justify this test, therefore, the Air Force relies on *Harkness*, our only decision to follow the Fifth Circuit's *Mindes* decision. But *Harkness* did not create a broad abstention test either. It applied *Mindes* to only one of the claims that a military chaplain had brought against the Secretary of the Navy. 858 F.3d at 443–51. We abstained from hearing the claim that the Secretary had violated the First Amendment by denying the chaplain assignments in retaliation for his prior litigation. *Id.* at 443–45. The chaplain cited no statute that allowed him to pursue this claim. *Id.* He also did not seek damages and could not seek an injunction because he had retired, so our review could "obviate[]" no injury. *Id.* at 444. Further, we did not abstain from resolving the chaplain's *other* claim (that the

Secretary had wrongly failed to convene a "special selection board") because this claim had a clear statutory source. *Id.* at 441, 445 (citing 10 U.S.C. § 14502(h)(1)). We have thus invoked *Mindes* only once for an unusual claim unconnected to any cause of action or remediable injury.

b. This precedent shows the proper way to approach the Air Force's request that we abstain from deciding the Plaintiffs' RFRA claims because the claims concern military decisions. We must ask an ordinary question of statutory interpretation: Is RFRA best read to adopt an abstention test that allows courts to dismiss claims for "policy reasons" or to require exhaustion within the military? *Mindes*, 453 F.2d at 201. RFRA's text, structure, and context provide the answer: No.

Start with the text. RFRA contains a right to sue: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). Because the Plaintiffs' claims arise from this *statutory* source, we may not adopt common-law abstention rules as if we were regulating a *court-created* claim. *See Lexmark*, 572 U.S. at 128; *cf. Chappell*, 462 U.S. at 298–304. The Plaintiffs' claims here thus resemble the claim that we found justiciable in *Harkness* more than the one that we found nonjusticiable. *See* 858 F.3d at 443–51.

RFRA also applies to the Air Force and its vaccine mandate. The law broadly defines the covered entities: "the term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States[.]" 42 U.S.C. § 2000bb-2(a). It thus reaches the Air Force officers ("officials" of the "United States") sued here. The law also broadly defines the covered conduct: "[t]his chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993[.]" 42 U.S.C. § 2000bb-3(a). It thus reaches the vaccine mandate, which "implements" federal law. *See* U.S. Dep't of Def. Instruction 6205.02, Dep't of Def. Immunization Program (July 23, 2019) (authorized by 10 U.S.C. § 136(b)). While the Supreme Court has told us not to interpret ambiguous laws to permit judicial review of military decisions, we must engage in that review where, as here, Congress "specifically has provided" for it. *Egan*, 484 U.S. at 530.

Two broader structural points reinforce that RFRA does not allow us to accept the Air Force's common-law abstention request. For one thing, Congress identified the justiciability rules to follow: "Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution." 42 U.S.C. § 2000bb-1(c). Since courts must follow Article III's rules whether or not RFRA cited them, this text suggests that courts should not adopt other judge-made limits to "govern" a RFRA claim. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1155 (10th Cir. 2013) (en banc) (Gorsuch, J., concurring), *affirmed sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). To be sure, one of our vacated decisions did not read RFRA to reject prudential standing. *See Autocam Corp. v. Sebelius*, 730 F.3d 618, 623–24 (6th Cir. 2013), *vacated by* 573 U.S. 956 (2014). But that pre-*Lexmark* decision lacks precedential force. *See CIC Servs., LLC v. Internal Revenue Servs.*, 925 F.3d 247, 256–57 (6th Cir. 2019), *rev'd on other grounds by* 141 S. Ct. 1582 (2021). And we have since noted that RFRA allows parties to sue "to the full extent permitted by Article III." *New Doe Child #1 v. Congress of United States*, 891 F.3d 578, 586 (6th Cir. 2018).

For another thing, when Congress imposed procedural limits on RFRA or related statutes, it did so expressly. The Prison Litigation Reform Act of 1995 requires prisoners to exhaust remedies at their prison before suing under any "Federal law[.]" 42 U.S.C. § 1997e(a). When passing RFRA's sister statute, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), Congress noted that this prisoner-exhaustion rule applied to that prison-focused statute. 42 U.S.C. § 2000cc–2(e). Other courts have recognized that § 1997e(a) applies to prisoner-filed RFRA claims too. *See Jackson v. District of Columbia*, 254 F.3d 262, 266–67 (D.C. Cir. 2001). Basic interpretive rules suggest that we should not add an implied military-exhaustion requirement on top of this express prisoner-exhaustion requirement. *See Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 509–12 (1982).

RFRA's historical context confirms this result. Congress enacted RFRA after the Supreme Court changed its reading of the Free Exercise Clause. In *Sherbert v. Verner*, 374 U.S. 398 (1963), the Court had held that state and federal laws that substantially burden religion (including neutral and generally applicable laws) must satisfy strict scrutiny. *See id.* at 406–08;

*Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). A plaintiff thus could use 42 U.S.C. § 1983—the cause of action that permits suits against state actors for constitutional violations—to challenge a neutral state law that flunked this scrutiny. Yet, in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Court departed from *Sherbert* by holding that neutral and generally applicable laws categorically comport with the Free Exercise Clause. *Id.* at 878–80. In RFRA, Congress sought "to restore" *Sherbert*'s strict-scrutiny test for these types of laws. 42 U.S.C. § 2000bb(a)(4), (b)(1).

This backdrop shows that a pre-*Smith* free-exercise claim under § 1983 represents the most analogous cause of action to RFRA. The Supreme Court has already said as much. When holding that RFRA allows damages suits against federal officials, it reasoned that § 1983 allowed similar suits before RFRA. *Tanzin v. Tanvir*, 141 S. Ct. 486, 490–92 (2020). The same reasoning applies here. Before RFRA, § 1983 did not require a plaintiff to exhaust a free-exercise claim with a state actor in order to sue that actor. *Patsy*, 457 U.S. at 516. The lack of an exhaustion requirement in § 1983 shows that we should not read *Mindes*'s exhaustion requirement into RFRA.

In sum, we may adopt only those abstention rules that comport with the law under which a plaintiff sues. And RFRA does not contain *Mindes*'s test. So we are left with our "virtually unflagging" duty to resolve the Plaintiffs' RFRA claims. *Lexmark*, 572 U.S. at 126 (citation omitted).

### 2. Ripeness

The Air Force alternatively argues that we should dismiss the Plaintiffs' claims under the "ripeness" doctrine. This doctrine bars a plaintiff from suing too early. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). It has a constitutional element drawn from Article III's limits on judicial review. *See Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). And it has a prudential element drawn from the judiciary's discretion over equitable relief. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). The Air Force invokes both elements.

*Constitutional Ripeness*. Article III permits us to resolve only "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. A plaintiff has filed a constitutionally "unripe" case if the plaintiff seeks relief for a speculative injury that will occur only if certain contingencies come to pass. *See Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). This element largely duplicates Article III's separate "standing" test. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014). In their constitutional senses, both doctrines require a "certainly impending" injury. *Compare Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), *with Thomas*, 473 U.S. at 581.

At this stage, the Plaintiffs need only show a "substantial likelihood" of that injury. *See Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021). Because an Article III case must have existed when the Plaintiffs sued, we must consider the facts as they were then. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992). Chaplains had confirmed that the vaccine mandate substantially burdened the Plaintiffs' sincerely held religious beliefs. But different Plaintiffs had reached different steps of the Air Force's 11-step process. Some had received final denials from the Surgeon General. Others had appeals of initial denials pending with him. Still others had not yet received an initial denial from the commander of the relevant Major or Field Command.

Did all the Plaintiffs face a certainly impending injury? We need not engage in this inquiry on a Plaintiff-by-Plaintiff basis because even the Plaintiffs who had yet to receive an initial denial showed a significant likelihood of such an injury (and thus the Plaintiffs further along in the process necessarily did too). The Plaintiffs' claims implicate two common paths to proving future injuries.

Path One: Parties often allege that they plan to engage in an activity (for example, speech protected by the First Amendment), but that a law bars that activity. *See Driehaus*, 573 U.S. at 158–61. In that situation, parties need not first undertake the activity and risk punishment for violating the law before seeking review over whether they have a right to do so. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). The government's future enforcement of the law counts as an "impending" injury if a court can answer "yes" to two questions: Does a plaintiff seek to engage in conduct that the law "arguably" prohibits? *Driehaus*, 573 U.S. at

161–62 (citation omitted). And has the plaintiff shown a "credible threat" that the government will enforce it against the plaintiff? *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

Here, all the Plaintiffs likely proved an imminent injury from the Air Force's future enforcement of its mandate to take a COVID-19 vaccine. *Driehaus*, 573 U.S. at 161. For starters, they proved their "intention" to undertake conduct "arguably" protected by RFRA because they had all filed written requests for religious exemptions. *Babbitt*, 442 U.S. at 298.

The Plaintiffs have also shown that their refusal to take a vaccine would "arguably" violate the mandate even though—in theory, at least—some could still get an exemption at the time that they sued. *Driehaus*, 573 U.S. at 162 (citation omitted). Even then, a near certainty existed that the Air Force would deny the exemption requests of those Plaintiffs who had yet to receive an initial decision. *Cf. id.* at 158 (quoting *Clapper*, 568 U.S. at 414 n.5). The Air Force had approved just 25 of the over 7,500 then-existing requests. DAF COVID-19 Statistics—March 2022, https://perma.cc/N47B-UB29. It had also granted the few exemptions only to individuals who had agreed to leave the Air Force within a year. Arg., No. 22-3497, at 51:33–52:07. The Air Force points to no evidence suggesting that the Plaintiffs meet this criterion.

The Plaintiffs have lastly shown a "substantial" "threat" that the Air Force would enforce the mandate. *Driehaus*, 573 U.S. at 164. Secretary Kendall issued a memorandum "warning" service members of the sanctions for not complying. *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam). He noted that those who refused to get vaccinated after the Air Force had denied an exemption "*will* be subject to initiation of administrative discharge." R.27-8, PageID 1657 (emphasis added). The Air Force also had a "history" of enforcing this mandate against "others" who refused to comply. *Fischer*, 52 F.4th at 307. It had "administratively separated 236 active duty Airmen" near the time of this suit. DAF COVID-19 Statistics—March 2022.

Path Two: Parties often allege that they seek a government benefit but that the government has forced them to proceed through an unlawful process to obtain it. A plaintiff might allege that the government has adopted a policy that gives permit-issuing officials too

much discretion over whether to grant a permit for speech on public property.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988).  A speaker who desires a permit does not need to proceed through this allegedly invalid process to challenge the policy in court.  *See id.*; *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406–08 (6th Cir. 1999).  Similarly, a plaintiff might allege that the government has adopted a policy that discriminates on the basis of race in the awarding of public contracts.  *See Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  A contractor who is "able and ready" to apply for a contract need not proceed through the discriminatory process (and have the application denied) before challenging the policy.  *Id.*; *Vitolo*, 999 F.3d at 358–59.

Here, the Plaintiffs were "able and ready" to apply for exemptions since they had already done so when they sued.  *Ne. Fla. Chapter*, 508 U.S. at 666.  And the Plaintiffs do not only complain about the final denials.  They also complain about the Air Force's *policies* for deciding whether to grant exemptions.  The Plaintiffs assert that the Air Force has followed a "de facto policy" to reject all religious exemptions "regardless of their individual circumstances" and a "discriminatory policy" to deny religious exemptions in favor of other exemptions.  *Doster*, 48 F.4th at 613.  Just as someone may challenge a racially discriminatory policy for awarding contracts without receiving a formal denial, *Ne. Fla. Chapter*, 508 U.S. at 666, so too the Plaintiffs likely can challenge a religiously discriminatory policy without receiving a formal denial.

In response, the Air Force asserts that Plaintiffs may not raise their RFRA claims until it initiates termination proceedings against them for failing to take a vaccine, at which point they can invoke RFRA as a defense.  This argument conflicts with century-old law.  The Supreme Court has long held that parties may raise pre-enforcement challenges to a legal mandate before engaging in the act that will trigger it.  *See MedImmune*, 549 U.S. at 128–29.  This rule also extends to threatened "administrative action[.]"  *Driehaus*, 573 U.S. at 165.  The Plaintiffs thus need not wait until the Air Force has kicked them out for exercising their religion before their claims are ripe.

*Prudential Ripeness.* The Supreme Court measures a case's "prudential" ripeness using two metrics, asking whether it raises legal issues "fit[]" for review and whether the plaintiff would suffer "hardship" from delay. *Abbott Laboratories*, 387 U.S. at 149. Recently, the Court questioned whether it may impose these "prudential" limits on cases over which it has jurisdiction. *Driehaus*, 573 U.S. at 167. This concern has special resonance for RFRA given that it refers only to Article III standing. 42 U.S.C. § 2000bb-1(c). Yet prudential ripeness might have stronger legal footing than the Air Force's requested abstention test because it arises from the judiciary's traditional discretion over equitable relief. *See Miller v. City of Wickliffe*, 852 F.3d 497, 507–08 (6th Cir. 2017) (Rogers, J., concurring). And RFRA gives courts the power to grant "appropriate relief," a phrase that likely incorporates that discretion. 42 U.S.C. § 2000bb-1(c). Yet we need not "resolve" this debate now because the Plaintiffs "easily" meet the two prudential factors. *Driehaus*, 573 U.S. at 167.

Courts commonly find a case "fit" for review if the government has issued a "final decision" on a matter. *See Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226, 2228 (2021) (per curiam). Under this "relatively modest" requirement, the government need only have reached a non-tentative finding. *Id.* at 2230. So, for example, an agency makes a final decision when it issues a "jurisdictional determination" that certain lands contain "waters of the United States" triggering the Clean Water Act's requirements. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 593, 597–600 (2016). The landowner may sue immediately to challenge that non-tentative determination and does not need to wait and see whether the agency will enforce the Act against it. *Id.* at 600–02.

The Air Force has reached the same type of "final" decision for most of the Plaintiffs. We evaluate prudential ripeness (unlike Article III jurisdiction) based on the facts that exist now, not at the time of the complaint. *See Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974); *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 219–20 (5th Cir. 2021). The Plaintiffs tell us that 14 of them have now had their appeals denied by the Surgeon General. Appellees' Br., No. 22-3497, at 26. (We could find only 10 final denials in the record, but the Air Force does not dispute this fact.) The Air Force thus has reached a "definitive" position that

these Plaintiffs do not qualify for exemptions.  *Hawkes*, 578 U.S. at 598.  That is enough.  *Pakdel*, 141 S. Ct. at 2230.

Even the four Plaintiffs who have yet to have their appeals rejected meet this "fitness" element given the nature of their claims.  The Supreme Court has held that a party can raise a "fit" challenge to a government process before the party finishes the process—as when the party challenges the authority of a non-Article III tribunal to adjudicate a claim.  *See Thomas*, 473 U.S. at 580–81.  And the Plaintiffs allege that the Air Force has adopted an exemption process plagued by illegal policies of discrimination and of denying all exemptions for generalized reasons.

Courts commonly find "hardship" from delayed review when a government decision has "adverse effects of a strictly legal kind"—namely, when it compels a party to undertake activity on threat of sanction.  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).  The Air Force's vaccine mandate shares this trait.  Because the Surgeon General has denied the appeals of most Plaintiffs, they face a choice between violating their religious beliefs by taking the vaccine or "risking" a sanction by failing to follow an order.  *Driehaus*, 573 U.S. at 167–68.

Even the Plaintiffs who have yet to have their appeals denied have shown hardship from delayed review.  After the Surgeon General denies an appeal, the Air Force gives service members a mere five days to take a vaccine or face sanctions.  R.42-5, PageID 2998; R.11-21, PageID 569.  Sergeant Theriault, for example, received notice of his denial on January 25, 2022, was ordered to take a vaccine by January 30, and had been "reprimanded" by February 8.  R.11-21, PageID 569–71.  When the government pressures parties to give up intangible rights like those protected by RFRA, courts should not delay review until the time that the parties must rush into court seeking a temporary restraining order to protect these rights.  *See Carey v. Wolnitzek*, 614 F.3d 189, 196 (6th Cir. 2010); *cf. Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984).

The case on which the Air Force relies says nothing to the contrary.  *See Miles Christi Religious Ord. v. Township of Northville*, 629 F.3d 533, 537–41 (6th Cir. 2010).  In *Miles Christi*, a religious order used a home for religious services, and zoning officials decided that the

order must build a parking lot or get a variance.  *Id.* at 535.  We found the religious order's RLUIPA suit unripe.  *Id.*  Unlike the Plaintiffs who have obtained final denials from the Surgeon General, the religious order could obtain a variance.  *See id.* at 538.  And unlike the other Plaintiffs, the religious order did not attack the variance process itself.  *See id.*  That process also stayed enforcement proceedings.  *See id.* at 542.  So the possibility of a variance eliminated the need for the religious order to choose between exercising its religion or risking those proceedings.  Most Plaintiffs now face that "Hobson's choice."  *Id.* at 540.  And because the others would face this choice within five days of the Surgeon General's denial, they should not have to wait.  All Plaintiffs thus likely filed ripe claims.

## B. RFRA Merits

The Air Force next turns to the merits.  Yet the Plaintiffs also likely will prove that the Air Force violated RFRA when it denied their requests for religious exemptions from its COVID-19 vaccine mandate.  *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

### 1

We start with the RFRA ground rules.  The law grants "very broad" legislative "protection for religious liberty."  *Hobby Lobby*, 573 U.S. at 693.  It adopts a blanket prohibition: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability[.]"  42 U.S.C. § 2000bb-1(a).  It then carves out a narrow exception: "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  *Id.* § 2000bb-1(b).

This text adopts a burden-shifting approach.  RFRA plaintiffs must initially prove that a government action violates the law's general ban on burdening religion.  *See Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015).  (*Holt* considered a RLUIPA claim, but the Supreme Court relies on its precedent for the two laws interchangeably.  *See Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022) (relying on *O Centro*, 546 U.S. at 429–30).)  To meet their burden, plaintiffs must prove that they hold the religious belief that they espouse and do not seek to use religion as a pretext to

avoid a government-imposed duty. *Hobby Lobby*, 573 U.S. at 717 n.28. They also must prove that the government has substantially burdened their religion by, for example, punishing religiously motivated conduct. *See Holt*, 574 U.S. at 361.

Once plaintiffs satisfy this step, the burden switches to the government to "demonstrate"—in other words, satisfy the "burdens" of production and "persuasion"—that the challenged government action falls within RFRA's narrow exception to its ban on burdening religion. 42 U.S.C. §§ 2000bb-1(b), 2000bb-2(3); *see O Centro*, 546 U.S. at 429. This exception codifies as statutory law what the Supreme Court has called the "most demanding test known to constitutional law": strict scrutiny. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

The government will successfully run this strict-scrutiny gauntlet only in "rare cases." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). It must first identify a "compelling" interest for its action. 42 U.S.C. § 2000bb-1(b)(1). Before RFRA, the Supreme Court had made clear that this word "means what it says[.]" *Smith*, 494 U.S. at 888. The government must rely on interests that serve the "highest order," *Yoder*, 406 U.S. at 215, or seek to stop "the gravest abuses," *Sherbert*, 374 U.S. at 406. The interests that the government cites in court also must be the "true" reasons for its action; it may not rely on made-for-litigation interests. *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014) (citation omitted).

The government next must prove that its action qualifies as the "least restrictive means" to further its interest. 42 U.S.C. § 2000bb-1(b)(2). This test represents the most rigorous type of "means-ends" scrutiny. *See Hobby Lobby*, 573 U.S. at 728. It requires the government to show more than that its proposed action is "narrowly tailored" to the interest that it seeks to serve. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477–78 (1989). Rather, the government must show that every other possible "alternative will be ineffective to achieve its goals"; if any less-restrictive alternative exists, the government "must use it." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815–16 (2000); *see also Holt*, 574 U.S. at 364–65.

RFRA prohibits the government from relying on *generalities* to meet either part of this test. The government instead must show that its "marginal interest" in enforcing a mandate against a *specific* "person" is compelling and that it cannot further its interest in another way that

imposes less of a burden on that person's religious exercise.  42 U.S.C. § 2000bb-1(b); *Hobby Lobby*, 573 U.S. at 726–27.  When considering compelling interests and alternative means, the government has often lost sight of this individualized focus.  For example, it may well have critical safety interests in the ban on the "exceptionally dangerous" drugs in Schedule I of the Controlled Substances Act.  *O Centro*, 546 U.S. at 430–32.  But the Attorney General wrongly relied on that general interest when seeking to bar a religious sect's specific use of a tea listed in Schedule I.  *Id.* at 432–37.  Similarly, when considering alternatives to a mandate that all employers (including those with religious objections) provide employees with insurance for contraception, the government should consider paying for this coverage itself.  *See Hobby Lobby*, 573 U.S. at 728–30.  And it cannot rebut that option with a generalized showing that it would cost too much to insure *all* women; the alternative means must be unfeasible even for the *smaller subset* whose employers have religious objections.  *See id.*

Of particular relevance, RFRA provides greater protection to religion in this military context than the Supreme Court's current view of the Free Exercise Clause.  As noted, *Smith* read that clause not to trigger *Sherbert*'s strict-scrutiny test as long as a government action is neutral and generally applicable.  494 U.S. at 878–80.  Even before *Smith*, though, the Court had refused to apply strict scrutiny to military regulations that burdened a service member's religious exercise.  *Id.* at 884 (discussing *Goldman v. Weinberger*, 475 U.S. 503 (1986)).  *Goldman* upheld an Air Force regulation requiring "standardized uniforms" that had the effect of barring a Jewish service member from wearing a yarmulke.  475 U.S. at 504–05, 508–09.  The Court held that the Constitution required courts to review "military regulations" with a "far more deferential" eye than the scrutiny that governs "similar laws or regulations designed for civilian society."  *Id.* at 507.  It added that it must give "great deference" to military judgments about the "relative importance of a particular military interest."  *Id.*  RFRA's text, by contrast, prohibits this rational-basis-style deference.  Although *Goldman* rejected *Sherbert*'s strict-scrutiny test in the military context (at least for a military regulation that was arguably neutral and generally applicable), RFRA requires the government to meet that test for *all* actions that substantially burden religious exercise, including actions by a military "branch."  42 U.S.C. § 2000bb-2(1); *see id.* § 2000bb-1(b).

2

The Air Force likely cannot satisfy these standards.  The burdens of proof at this preliminary-injunction stage "track the burdens" of proof at trial.  *O Centro*, 546 U.S. at 429. The Plaintiffs met their duty to prove that the vaccine mandate imposed a substantial burden on their sincerely held religious beliefs.  *See Ramirez*, 142 S. Ct. at 1277.  The Air Force required them to participate in deposition-style inquiries into their beliefs, and its own chaplains found them sincere.  A refusal to take a vaccine also triggers "serious disciplinary" sanctions.  *Holt*, 574 U.S. at 361.

The "burdens of going forward with the evidence and of persuasion" thus shifted to the Air Force to show that it could satisfy strict scrutiny.  42 U.S.C. § 2000bb-2(3).  At the outset, the Air Force does not attempt to meet these burdens by citing any "extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment" of its personnel.  *Austin*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring).  The Supreme Court seemingly relied on that interest when it stayed an injunction to the extent it barred the Navy from considering a Navy Seal's vaccination status in its operational decisions.  *Id.* at 1301 (order).  Here, by contrast, the district court's injunction allows the Air Force to consider the Plaintiffs' vaccination status when making such decisions.  *Doster*, 2022 WL 982299, at *17. The injunction bars the Air Force only from taking "adverse or punitive action against" them.  *Id.* And the Air Force has failed to show that it has a compelling interest in forcing the Plaintiffs to get vaccinated on threat of punishment or that this action is the least restrictive means to serve such an interest.

a. *Compelling Interests.*  The Air Force asserts that it can punish the Plaintiffs for failing to get vaccinated because this mandate serves two compelling interests: those in "military readiness" and in the "health of its troops."  Appellants' Br., No. 22-3497, at 31.  It highlights the need for all of its personnel to be immediately deployable, *id.* at 33; the potential harms to a mission from a COVID-19 outbreak in a deployed setting, *id.*; the vaccine mandates in other countries, *id.* at 34; the need for members to be in close contact at home, *id.*; and the reduced health risks for vaccinated personnel, *id.* at 35–36.  These arguments conflict with two well-established rules.

*First*, "invocation of such general interests, standing alone, is not enough." *O Centro*, 546 U.S. at 438. Just as the Attorney General could not rely on the generally dangerous nature of the drugs barred by the drug laws to stop a specific religious sect from using a prohibited tea, *id.* at 432–33, the Air Force cannot rely on its general readiness or health concerns to refuse specific exemptions. In the abstract, the Air Force may well have a compelling interest in requiring its 501,000 members to get vaccinated. It has also largely achieved this general interest, as evidenced by its ability to vaccinate over 97% of its force. DAF COVID-19 Statistics—July 2022. Under RFRA, however, the Air Force must show that it has a compelling interest in refusing a "specific" exemption to, say, Lieutenant Doster or Airman Colantonio. *Hobby Lobby*, 573 U.S. at 726–27; *O Centro*, 546 U.S. at 431. And just because it might have a compelling interest in the abstract does not mean that it has one "in each marginal percentage point by which" it achieves this abstract interest. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011).

To succeed under RFRA's "'more focused' inquiry," the Air Force must identify the duties of each Plaintiff and offer evidence as to why it has a compelling interest in forcing someone with those duties to take the vaccine or face a sanction. *Hobby Lobby*, 573 U.S. at 726 (quoting *O Centro*, 546 U.S. at 430). The Air Force itself concedes the need for this Plaintiff-by-Plaintiff inquiry. It opposed the certification of a class action because "differences in occupational duties, deployment tempo, and work environment all factor into" the RFRA analysis, R.34, PageID 2213, and because "the roles and responsibilities of individual Airmen and Guardians may differ vastly," R.34-2, PageID 2235. But the Air Force did not even *undertake* this individualized inquiry during this litigation, let alone *prove* a compelling "marginal" interest for any specific Plaintiff. *Hobby Lobby*, 573 U.S. at 727.

Most glaringly, the Air Force's opening brief did not describe the duties of a single Plaintiff. From a review of that brief, we would have no idea that Lieutenant Doster was a student at the Air Force Institute of Technology at the start of this suit and later became a developmental engineer at the Air Force Research Lab. R.48, PageID 3211, 3215. Nor would we know that Airman Colantonio serves as a fuel-systems technician, R.42-1, PageID 2776, or that Airman Dills serves as a passenger representative helping passengers on and off flights,

R.48, PageID 3254, 3270–71.  Even after the district court identified this legal error, *Doster*, 2022 WL 982299, at *13, the Air Force has doubled down on appeal by mistakenly relying on generalized interests.

An example shows why the Air Force cannot do so.  It asserts that the COVID-19 vaccine mandate furthers its readiness interest by ensuring that service members can quickly deploy.  It is "hard to swallow" the claim that this interest was compelling for Lieutenant Doster when he attended the Air Force Institute of Technology.  *Holt*, 574 U.S. at 364.  Personnel in training "are not immediately ready for deployment," R.34-5, PageID 2281–82, so the Air Force treated Doster as "non-deployable," R.42-3, PageID 2846.  To accept the Air Force's generalized "readiness" argument, we would have to find that it has a compelling interest in ensuring the immediate deployability of someone who is not immediately deployable.  Only "unquestioning deference" could uphold such a claim.  *Holt*, 574 U.S. at 364.

The Air Force responds that the district court failed to cite its "detailed declarations and record materials" allegedly explaining why each Plaintiff's duties required that Plaintiff to take a vaccine.  Appellants' Br., No. 22-3497, at 40.  But, as far as we can tell, the Air Force introduced Plaintiff-specific declarations for only 5 of the 18 Plaintiffs.  R.27-19 to R.27-23, PageID 1981–2026.  And besides, "'[j]udges are not like pigs, hunting for truffles' that might be buried in the record."  *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1163 (6th Cir. 2021) (citation omitted).  The Air Force failed to engage in the properly focused inquiry where it belonged—in its briefing.

The Air Force's declarations also raise red flags that it seeks to rely on after-the-fact "rationalizations" made for this suit.  *Haight*, 763 F.3d at 562.  For example, in one post-litigation declaration, Airman Colantonio's group commander (Colonel Deedrick Reese) testified that Colantonio needed the vaccine partly because she must work "in close settings with other service members" as a fuel-systems technician.  R.27-22, PageID 2014.  During the earlier exemption process, however, her squadron commander recommended granting an exemption because of her work's inherent COVID-19 protections: "Much of the fuels maintenance is done wearing protective respirators due to the fuel vapors, so safety protection is big priority on a daily basis[.]"  R.42-1, PageID 2776.  During that process, Colonel Reese did not cite work-related concerns to recommend a denial; he noted only that Colantonio (like all Air Force

personnel) may need to deploy quickly.  *Id.*, PageID 2778.  This generalized analysis fails to pass muster under RFRA.  And the Air Force cannot come up with other more specific interests merely "in response to litigation."  *Haight*, 763 F.3d at 562 (citation omitted).

*Second*, the Supreme Court has told us to ask an objective question to uncover whether the Air Force considers its interests compelling: Does it discriminate against religious conduct by permitting other conduct that undercuts its interests in the same way?  The Court held, for example, that an exemption in the drug laws for the use of peyote undercut the claim that the Attorney General had a compelling safety interest in stopping the religious sect's use of tea.  *See O Centro*, 546 U.S. at 433.  And here, the Air Force appears to freely grant medical and administrative exemptions from its vaccine mandate.  These exemptions "produc[e] substantial harm" to the health and readiness interests that the Air Force claims to be compelling.  *Lukumi*, 508 U.S. at 547.

As for its health interest, the Air Force says that it must reject religious exemptions because those working in "close physical contact" can spread COVID-19.  Appellants' Br., No. 22-3497, at 34.  But the Air Force has allowed medical or administrative exemptions even when these exemptions undercut that interest.  The Surgeon General, for example, denied Lieutenant Doster a religious exemption because his work as a student "require[d] intermittent to frequent contact with others[.]"  R.19-1, PageID 944.  But the Air Force granted multiple medical exemptions to pregnant women who worked with him and performed "identical assignments[.]"  R.46-1, PageID 3123; R.48, PageID 3215–16.  Likewise, the Surgeon General denied Airman Dills a religious exemption because he had "frequent contact with others" as a passenger representative.  R.42-2, PageID 2817.  Yet Dills worked with "[s]everal" colleagues who obtained other exemptions.  R.48, PageID 3261.  The Air Force allowed these members to continue "interacting with people" and "working in close quarters" without change.  *Id.*, PageID 3262.  Perhaps most striking, the Surgeon General denied a religious exemption for Major Corvi (a class member) because her assignment "require[d] intermittent to frequent contact with others."  R.53-1, PageID 3788.  In the same month, she received a medical exemption for her pregnancy.  *Id.*, PageID 3789; R.52-1, PageID 3461, 3502, 3508.  The Air Force does not explain why service members who remain unvaccinated because of their pending retirement or

pregnancy pose less of a risk of spreading COVID-19 than those who remain unvaccinated because of their religion.

As for its readiness interest, the Air Force says that it must ensure that all service members remain immediately deployable. But service members who obtain medical or administrative exemptions generally cannot deploy because the Air Force treats anyone who has not taken a COVID-19 vaccine as nondeployable. Appellants' Br., No. 22-3702, at 8. (Commanders may grant exceptions and permit unvaccinated members to deploy on a case-by-case basis. R.34-3, PageID 2251–52.) So even though the Surgeon General denies religious exemptions on the ground that the Air Force "must be able to leverage our forces on short notice," R.19-1 PageID 944, the Air Force does not believe that this "immediately deployable" concern also requires it to compel the vaccination of a service member who has an allergy or plans to retire in the near future.

The Air Force responds that the other exemptions do less harm to this deployability interest because they last for shorter periods. The Air Force treats religious exemptions as permanent. It treats medical exemptions as temporary because factual changes (like a new vaccine to which a member is not allergic) would allow a medically exempt service member to take a vaccine later. R.27-12, PageID 1922–23, 1925. According to military guidance, a medical exemption also may last only a year, at which point the Air Force must assess whether to discharge the service member. R.34-5, PageID 2276, 2282–83. But religious and medical exemptions can be "temporary" in an *identical* way. An allergic service member is permitted to wait for a new vaccine that does not contain the allergy-triggering ingredient. R.27-17, PageID 1959 & n.14. Most Plaintiffs would likewise take a new vaccine made in a manner consistent with their beliefs. *See, e.g.*, R.11-17, PageID 533; R.11-19, PageID 548. So a single new vaccine (one that contains a different ingredient and that is made in a different way) could simultaneously alleviate the physical and spiritual obstacles. Yet the Air Force gives the medical objector at least a year-long exemption and the religious objector an immediate denial.

Regardless, the Air Force does not automatically discharge service members with medical exemptions after a year. The guidance on which the Air Force relies notes that it may retain nondeployable personnel for longer "on a case-by-case basis" if it is in the military's

interest.  R.34-5, PageID 2279, 2290.  Top-notch fighter pilots thus may receive indefinite allergy exemptions.  But Lieutenant Colonel Stapanon, who earned two air medals during Operation Iraqi Freedom, cannot obtain an indefinite religious exemption.  R.45, PageID 3068, 3078–79.  This "system" of case-by-case "exceptions" to deployability further undermines the Air Force's claimed interest that all service members must be immediately deployable.  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021).  This same guidance, moreover, treats several types of service members as *permanently* nondeployable, including conscientious objectors.  R.34-5, PageID 2285–86.  If the Air Force can permanently retain those who cannot deploy because of their religious objections to a war, it must explain why it cannot permanently retain those who cannot deploy because of their religious objections to a vaccine.

b. *Least Restrictive Means*.  The Air Force next says that its requirement that the Plaintiffs take a COVID-19 vaccine or get sanctioned is the "least restrictive means" to achieve its interests.  It explains that regular testing may catch an infection too late, Appellants' Br., No. 22-3497, at 41, that the science remains unclear over the protection from "natural immunity," *id.* at 42, that "masking" depends on the "wearer's behavior" and does not reduce the risk of bad health outcomes, *id.* at 43, and that those who must deploy or work in close contact cannot isolate, *id.*

These arguments suffer from the same two legal flaws.  *First*, the Air Force lists generic reasons why no other means will achieve its interests; it does not undertake a "'more focused' inquiry" into whether alternative means exist for each Plaintiff.  *Hobby Lobby*, 573 U.S. at 726 (quoting *O Centro*, 546 U.S. at 430).  But RFRA requires it to explain why a Plaintiff's specific duties prevented all other options, such as masking, social distancing, or reassignment.  The Air Force's general "conjecture" that mask wearers behave irresponsibly, for instance, does nothing to establish that a specific Plaintiff will.  *Ramirez*, 142 S. Ct at 1280.  *Second*, the Air Force does not justify its discrimination.  Because it accommodates other personnel for secular reasons, it must explain why it could not extend the identical accommodation to those who requested it for religious reasons.  *See Hobby Lobby*, 573 U.S. at 730–31; *see also Fulton*, 141 S. Ct. at 1882; *Holt*, 574 U.S. at 367–68.  It did not do so.

Again consider the Air Force's asserted health interest in stopping the spread of COVID-19. It bears the burden of showing that no alternative means exist for each Plaintiff. *See Ramirez*, 142 S. Ct. at 1281. It attempted to satisfy this burden by stating that all Plaintiffs "work in close contact with others[.]" Appellants' Br., No. 22-3497, at 43. But it cites evidence for only half of the Plaintiffs. *Id.* And it engages in no individual analysis. When Lieutenant Doster attended the Air Force Institute of Technology, for example, his commander noted that he could "telework." R.42-3, PageID 2846. Even if teleworking will not suffice for future roles, the Air Force must explain why it would not have sufficed for that role. Likewise, the Air Force must explain why it cannot provide the same accommodation to Airman Dills in his role as a passenger representative that it provided to his colleagues who received other exemptions. R.48, PageID 3261–62. Similarly, Major Reineke works in a squadron that "train[s] undergraduate remotely piloted aircraft pilots and sensor operators." R.42-5, PageID 2964. His squadron commander found that the squadron could accommodate his request because he spent "most of his time on administrative tasks at his desk" in a "large ventilated room" "where transmission can be mitigated via a facial covering and social distancing." *Id.* While others up the chain disagreed, *e.g.*, R.42-5, PageID 2968, the Air Force cannot rebut his squadron commander's precise factual claims with vague generalities.

In addition, the Air Force ignores an obvious alternative: It may reassign any Plaintiff who works in too close of contact with others. The Air Force's general religious-accommodation instruction lists "reassignment" as an option it should consider. DAFI 52-201, § 2.7, at 4. Nothing in the injunction prohibited that option, *Doster*, 2022 WL 982299, at *17, and the Air Force makes no claim that reassignment would be administratively unfeasible, *cf. Holt*, 574 U.S. at 368. But the Air Force never even considered whether reassigning the Plaintiffs to positions capable of teleworking (or that allowed other preventative measures) could serve as a less-restrictive means of advancing its interests.

Or consider the Air Force's general interest in ensuring that every member be immediately deployable. A developmental engineer like Doster "rarely deploys," and only "1%" of those engineers work outside the country. R.42-3, PageID 2847. Why couldn't the Air Force equally serve this interest by waiting to compel Doster and others with a low likelihood of

deployment to take a one-dose vaccine only if in fact they receive orders to quickly deploy? Secretary Kendall's guidance raised this possibility, noting that "changes in circumstances," like a "deployment," could lead the Air Force to reassess a religious exemption.  R.27-7, PageID 1652.  In addition, the Air Force does not require all personnel to take *other* vaccines on the speculation that they might need these vaccines someday if they must quickly deploy to certain places.  It instead requires some vaccines (such as for yellow fever) only for certain duty assignments.  R.27-6, PageID 1624.

Lastly, the Air Force fails to explain why it could not help willing Plaintiffs obtain alternative vaccines that do not burden their faiths.  For unidentified reasons, it permits service members to meet its mandate by traveling overseas to take a COVID-19 vaccine approved by the World Health Organization (but not the FDA).  R.27, PageID 1561.  Two Plaintiffs (Connor McCormick and Alex Ramsperger) felt compelled to travel to Mexico at personal expense to take one such FDA-unapproved vaccine (Covaxin) because the Air Force threatened to cancel their pilot training.  R.66-1, PageID 4402.  Yet the Air Force did not "meaningfully facilitate" their trip.  *Id.* at 4404.  If this mandate truly serves an "interest of the highest order," it is "hard to understand" why the Air Force believes that it need not "pay *anything* in order to achieve this important goal."  *Hobby Lobby*, 573 U.S. at 729.  (The Air Force now alleges that these two Plaintiffs' claims are moot.  We will leave that issue for the district court because other Plaintiffs have live claims for injunctive relief, *see T.M. ex rel. H.C. v. DeWine*, 49 F.4th 1082, 1087 n.3 (6th Cir. 2022), and because RFRA permits damages suits, *see Tanzin*, 141 S. Ct. at 491.)

\*   \*   \*

At day's end, the Air Force all but acknowledges that it cannot succeed under traditional strict-scrutiny review.  It instead asks us to read RFRA as if it simply codified the "great deference" that the Supreme Court had previously given to the military under the Free Exercise Clause.  Appellants' Br., No. 22-3497, at 32 (quoting *Goldman*, 475 U.S. at 507).  We see no textual path to that result.  Indeed, the Air Force does not ground this claim in RFRA's text.  Rather, it points to a statement in a Senate Report noting that courts have "always extended to military authorities significant deference in effectuating" their compelling interests and that the

committee "intends and expects that such deference will continue under" RFRA.  S. Rep. No. 103-111, at 12 (1993).

This statement resembles the type of "strategic manipulation[]" that the Supreme Court has warned against.  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). Perhaps these Senators (or their staffers) made the statement because they could not get a military "exception" into the law.  But the Senators failed to reconcile their unenacted intent with the law's enacted text.  *Goldman* deferred to the military in a particular way: by reading the Free Exercise Clause to *depart* from *Sherbert*'s strict-scrutiny test.  475 U.S. at 507.  In sharp contrast, RFRA unambiguously *codified* that test.  The Senate Report itself elsewhere recognized that *Goldman* rejected strict scrutiny but that RFRA required it.  *Id.* at 11–12.  A separate House Report likewise recognized that "[s]eemingly reasonable" military "regulations based upon speculation" would not survive RFRA.  H.R. Rep. 103-88, at 8 (1993).  In all events, RFRA's text—not its legislative history—is the law that binds.  And its text requires us to apply the "most demanding test known to constitutional law," not some watered-down knockoff.  *City of Boerne*, 521 U.S. at 534.

To be sure, strict scrutiny permits courts to recognize that military officers are "experts" in overseeing a lethal military force, just as it permits them to recognize that prison administrators are "experts" in running a secure prison.  *Holt*, 574 U.S. at 364; *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).  But that fact does not allow us to accept the Air Force's legal reasoning here.  Its arguments are both overinclusive (because it relies on general interests divorced from specific Plaintiffs) and underinclusive (because it fails to justify exemptions for other service members that undercut its interests in similar ways).  That type of imprecision may suffice under the rational-basis review that *Goldman* envisioned, but it does not under the law that Congress enacted.

### 3

The Air Force ends its merits discussion by pointing to RFRA's remedies.  The law gives a party the right to seek "appropriate relief" for a violation.  42 U.S.C. §2000bb-1(c).  The Air Force asserts that an injunction against the military can never be "appropriate."  It is wrong.

When a person says that something is "appropriate," the person conveys that it is "suitable" or "proper" for the given situation. *Tanzin*, 141 S. Ct. at 491 (quoting 1 *Oxford English Dictionary* 586 (2d ed. 1989)). Under this "open-ended" definition, the word's meaning turns on the "context" in which it is used. *Id.* (quoting *Sossamon v. Texas*, 563 U.S. 277, 286 (2011)). RFRA and RLUIPA authorize suits to challenge the illegal conduct of governments or their officials, so the Supreme Court has looked to the remedies traditionally available in that context to decide on the "suitable" relief available under these laws. *See id.* at 491–92. Because courts have long barred damages claims against a sovereign, the Court held that RLUIPA did not permit that relief against a state. *Sossamon*, 536 U.S. at 286–93. Because courts have long allowed damages claims against officers in their personal capacities, by contrast, the Court held that RFRA permitted that remedy against federal officials. *Tanzin*, 141 S. Ct. at 491–93.

This reasoning allows courts to issue injunctions against military officials under RFRA. As a general matter, an injunction qualifies as the most "suitable" relief against illegal government conduct. Dating "back to England," courts of equity have had the power to enjoin that conduct. *Armstrong*, 575 U.S. at 327; *Ex parte Young*, 209 U.S. 123, 155–56 (1908). As a specific matter, this power has long extended to the military. When refusing to create a *Bivens* remedy against the military for damages, the Supreme Court noted that service members could seek the "traditional" remedy "designed to halt" illegal conduct: an injunction. *Stanley*, 483 U.S. at 683. Both before and after RFRA, then, courts have authorized such injunctions. *See Hartmann v. Stone*, 68 F.3d 973, 978, 986 (6th Cir. 1995); *Townsend v. Zimmerman*, 237 F.2d 376, 377–78 (6th Cir. 1956).

## C. Other Injunction Factors

Turning to the remaining injunction factors, the Air Force argues that the Plaintiffs have not shown an irreparable injury and that the district court failed to properly assess its interests. These types of arguments face an uphill battle in constitutional cases because courts typically treat a showing that the government likely violated the Free Exercise Clause (or some other right) as outcome dispositive. *See Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam). The Supreme Court, for example, has held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" that cannot be

adequately remedied after the fact. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Because RFRA protects the same bedrock free-exercise rights, the same rule necessarily applies to it. *See Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013); *Hobby Lobby*, 723 F.3d at 1146.

The Air Force responds that the Plaintiffs lack an irreparable injury because a court could repair any employment-related harms through remedies like reinstatement at this lawsuit's end. *See Sampson v. Murray*, 415 U.S. 61, 88–92 (1974). The Air Force's reliance on a case about a captain's discharge for "drunk and disorderly conduct," *Hartikka v. United States*, 754 F.2d 1516, 1517 (9th Cir. 1985), reveals a lack of sensitivity to the foundational rights at stake. The Plaintiffs do not complain just about the tangible loss of pay. They complain about a direct military order commanding them to act against their faiths. This intangible injury (the coerced violation of religious beliefs) is irreparable even when the coercion comes from such lesser forms of pressure as the threatened loss of a civilian job or the loss of the ability to play a college sport. *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 730, 736 (6th Cir. 2021) (per curiam); *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021); *Elrod*, 427 U.S. at 373 (plurality opinion). It is irreparable here too.

In cases concerning constitutional rights, similar logic generally makes it unnecessary to "dwell" on the discretionary balancing of harms or the public interest. *Roberts*, 958 F.3d at 416. The government usually cannot rely on the harm from stopping its likely unconstitutional conduct. *See Bays*, 668 F.3d at 825. And the people have an interest in ensuring that it follows the Free Exercise Clause. *See Dahl*, 15 F.4th at 736. This analysis would again seem to extend to RFRA, a law that the people's representatives passed to protect against the violation of free-exercise rights. *See Korte*, 735 F.3d at 666; *Hobby Lobby*, 723 F.3d at 1145–46 (plurality opinion).

That said, because courts have long considered the effects on the military when engaging in this balancing, *see Winter*, 555 U.S. at 24–33, RFRA likely allows us to consider these effects when deciding whether an injunction is "appropriate," 42 U.S.C. §2000bb-1(c); *cf. Ramirez*, 142 S. Ct. at 1281–83. Yet the district court properly accounted for this military interest. Unlike an injunction that regulates the Navy's "sonar-training program," *Winter*, 555 U.S. at 12, alters a

soldier's "duty orders," *Orloff*, 345 U.S. at 94, or takes over a national guard, *Gilligan*, 413 U.S. at 5, the district court did not interfere with the Air Force's operations, *Doster*, 2022 WL 982299, at *17. It merely barred the Air Force from disciplining the Plaintiffs. *Id.* Because the Air Force has not shown how its inability to punish them interferes with any operational concerns, the court did not abuse its discretion in granting this narrow injunction. *See O Centro*, 546 U.S. at 428.

### III. Injunction for the Class

This conclusion leaves the Air Force's appeal of the class-wide injunction. The Air Force primarily argues that the district court should not have certified a class action under Federal Rule of Civil Procedure 23. It asserts that the class does not satisfy Rule 23(a)'s prerequisites and that the class members' varied interests prohibit the court from maintaining the action under Rule 23(b)(2). Alternatively, the Air Force argues that the court again misapplied the preliminary-injunction factors. Yet the court's class-action certification adheres to longstanding caselaw that permits this type of class action in civil-rights cases. And the court did not abuse its discretion in extending its narrow-in-scope injunction to the broader class.

### A. Jurisdiction

At the outset, the Plaintiffs argue that we lack jurisdiction over the district court's class-certification order because the Air Force did not follow the proper procedure to appeal it. Rule 23 gives us discretion to hear an interlocutory appeal of "an order granting or denying class-action certification[.]" Fed. R. Civ. P. 23(f). But the rule required the Air Force to file a petition seeking our permission to appeal within 45 days. *Id.* It did not. Although Rule 23(f)'s time limits do not restrict our jurisdiction, we must rigorously enforce them. *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 714–15 (2019). The Air Force thus does not rely on Rule 23(f) here. It instead says that we may review its certification arguments based on our separate appellate jurisdiction over the district court's class-wide injunction order.

As the Air Force notes, we have "jurisdiction of appeals from" "[i]nterlocutory orders" "granting, continuing, modifying, refusing or dissolving injunctions[.]" 28 U.S.C. § 1292(a)(1). One might read this text as limiting our review to the four corners of the injunction order.

Courts, though, have never read it that way. Before Congress put this provision at its current location, the Supreme Court had interpreted its predecessor to permit appellate review of any issue that would create an "insuperable objection" to an injunction, such as the issue of whether the complaint even stated a claim. *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 287 (1940) (citation omitted). This reasoning comports with the usual preliminary-injunction factors because a plaintiff could not show the "probability of success on the merits" required to obtain an injunction if the plaintiff would lose on a predicate issue that would prohibit a court from issuing it. *Cf. Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 698 F.2d 150, 152–53 (2d Cir. 1983).

When the propriety of an injunction depends on this type of predicate issue, then, courts have regularly reviewed that issue under § 1292(a)(1). We, for example, reviewed a district court's order that it had personal jurisdiction over a defendant in an appeal under § 1292(a)(1) because the court's power to issue the injunction turned on that jurisdiction. *See Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 & n.2 (6th Cir. 2006). Likewise, we reviewed a district court's order refusing to remand a case to state court in an appeal under § 1292(a)(1) because the remand order implicated the court's subject-matter jurisdiction to issue the injunction. *See Kysor Indus. Corp. v. Pet, Inc.*, 459 F.2d 1010, 1011 (6th Cir. 1972) (per curiam); *see also, e.g.*, *Doe v. Sundquist*, 106 F.3d 702, 707–08 (6th Cir. 1997). Other courts have reviewed a "wide variety" of similar matters. 16 Charles A. Wright et al., *Federal Practice and Procedure* § 3921.1, at 32–43 (3d ed. 2012).

Notably, many courts have relied on this principle to review "class action determinations" under § 1292(a)(1). *Id.* § 3921.1, at 37 & n.23. A class-certification order, by itself, does not fall within that provision. *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 480–82 (1978). Even before the Supreme Court adopted Rule 23(f), however, courts had recognized that they could review the propriety of a class-action certification when such an issue mattered to a class-wide injunction. *See, e.g.*, *Paige v. California*, 102 F.3d 1035, 1038–40 (9th Cir. 1996); *Wagner v. Taylor*, 836 F.2d 578, 584–86 (D.C. Cir. 1987); *Port Auth.*, 698 F.2d at 152–53; *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 522 F.2d 1235, 1237–38 (7th Cir. 1975). And courts have continued to follow the same approach after Rule 23(f)'s enactment. *See, e.g.*,

*Melendres v. Arpaio*, 695 F.3d 990, 996–97 (9th Cir. 2012); *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 492 (7th Cir. 2012).

This logic covers this case. Just as a plaintiff could not receive an injunction if it could not obtain personal jurisdiction, *Kroger*, 437 F.3d at 510, so too the Plaintiffs could not receive a class-wide injunction if they could not obtain class certification. The one hinges on the other. We thus have jurisdiction under § 1292(a)(1) to review the Air Force's certification arguments.

## B.  Rule 23(a)

To certify a class action, a plaintiff must initially establish Rule 23(a)'s four prerequisites. The Air Force raises only Rule 23(a)'s "commonality" and "typicality" prerequisites here.

### 1.  Commonality

A court certifying a class action must find that "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). To explain what this factor demands, we must distinguish a legal question (what elements make a question "common"?) from an evidentiary one (what must a plaintiff do to prove these elements?).

*What elements make a question "common"?* Although written in the plural, Rule 23(a)(2) requires that the class identify only one common question. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). But not just any "common" question will do. Here, for example, it is not enough to ask: Do all of the class members raise RFRA claims? *Id.* at 349. Parties instead must identify only a certain type of question that has only a certain type of answer. *Id.* at 350.

Begin with the "right" type of question: It must be "central" to the class's claims. *Id.* The question typically will affect at least one element of the claims. 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:20, at 400 (6th ed. 2022). So when a party alleged that Ford had made a car with a defective part, the party needed to tie this "defect" issue to the class's claims. *See Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). And since the class asserted breach-of-warranty claims alleging that Ford had agreed to repair

defective parts, the issue implicated the key "breach" element. *See id.* In this way, the certification stage "overlaps" with the merits stage because the question must *matter* to the merits. *Wal-Mart*, 564 U.S. at 352.

Turn to the "right" type of answer: The question must allow a decisionmaker to reach a yes-or-no answer for the class in "one stroke." *Id.* at 350. It will fall short if the decisionmaker could answer "yes" for some members and "no" for others. *See id.* at 355–56. A famous example shows how a suit can meet this all-or-nothing test. A "class" of children alleged that the racial segregation in their school district was "inherently unequal." *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954). The segregation either did or did not violate equal protection; the answer would not change for each child. 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions*, § 4:26, at 116–17 (6th ed. 2022); *cf. Gratz v. Bollinger*, 539 U.S. 244, 267 (2003).

The typical Title VII claim, by contrast, will not meet this test. *Gen. Tele. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–59 (1982). Suppose an employee alleges that his company failed to promote him because of his race and uses this claim to certify a class alleging that the company discriminated against all employees of the same race. *Id.* at 149–51. Although the question of whether the company engaged in intentional discrimination is central to the claims, a factfinder typically cannot decide that question for all class members at once. *Id.* at 157–58. One employee may not have received a promotion because of her supervisor's animus, but another might not have received it because of his lack of qualifications, and so on. *Id.* An allegation that one employee suffered one discriminatory act does not provide the "glue" that permits a single answer "to the crucial question" of why each employee did not get promoted. *Wal-Mart*, 564 U.S. at 351.

What can provide the glue? An employee might allege that the company engaged in a "common course of conduct" or had a "common unlawful policy" that affected the class. 7A Charles A. Wright et al., *Federal Practice and Procedure* § 1763.1, at 290 (4th ed. 2021). Just as the board of education in *Brown* had an explicit segregation policy, the company might have an explicit "testing procedure" alleged to be discriminatory. *Falcon*, 457 U.S. at 159 n.15. Or it might follow a "pattern or practice" of discrimination as its "standard operating procedure." *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876 (1984) (citation omitted).

A factfinder could decide whether the employer has this illegal procedure or practice with a yes-or-no answer for the class.  Indeed, pattern-or-practice class actions have a long history for Title VII claims.  *See id.*; *see also Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 441–42 (7th Cir. 2015); *Brown v. Nucor Corp.*, 785 F.3d 895, 902–17 (4th Cir. 2015).

Courts have applied the same rules beyond Title VII cases.  To list a few examples, the Supreme Court found that a common question existed when applicants alleged that a university had a policy of considering race in college admissions in violation of the Equal Protection Clause.  *Gratz*, 539 U.S. at 263–68.  Similarly, the Eighth Circuit held that a common question existed when prisoners with Hepatitis C alleged that officials had a policy of denying them medications in violation of the Eighth Amendment.  *Postawko v. Mo. Dep't of Corrs.*, 910 F.3d 1030, 1038 (8th Cir. 2018); *cf. Ross v. Gossett*, 33 F.4th 433, 437–39 (7th Cir. 2022); *Parsons v. Ryan*, 754 F.3d 657, 674–84 (9th Cir. 2014).  Likewise, the Seventh Circuit held that a common question existed when employees alleged that a company had an "unofficial policy" of requiring off-the-clock work.  *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374–75 (7th Cir. 2015); *cf. Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165–66 (9th Cir. 2014).

*How must plaintiffs prove the commonality elements?*  Plaintiffs must show that they meet Rule 23's requirements, *Wal-Mart*, 564 U.S. at 350, and a court must engage in "rigorous analysis" to ensure that they do, *Falcon*, 457 U.S. at 161.  In obvious cases, plaintiffs may rely on allegations in the "pleadings" alone.  *Id.* at 160.  If the parties disagree over a fact critical to a Rule 23 requirement, though, plaintiffs cannot rest on their complaint.  They must provide evidence.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  *Wal-Mart* suggested that a plaintiff must offer "[s]ignificant proof" of a critical fact.  564 U.S. at 353 (citation omitted).  It is not clear what this phrase means.  Was it invoking the preponderance-of-the-evidence test?  Something lower?  *See* 3 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 7:21, at 117 (6th ed. 2022).  We have left the question open (and can do so here too because the issue does not affect the outcome).  *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 418 n.8 (6th Cir. 2012).

Two examples show how factual disputes can matter to Rule 23.  Rule 23(a)(1) requires a class to be sufficiently "numerous."  What if a plaintiff alleges that the class consists of 10,000

members, but a defendant claims it includes 10?  *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (Easterbrook, J.).  The plaintiff must offer proof.  *Id.*  Likewise, Rule 23(b)(3) requires common questions to "predominate" over individual ones.  Securities-fraud plaintiffs often cannot satisfy this rule because the fraud claim's "reliance" element requires buyer-by-buyer proof.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461–63 (2013).  To show reliance on a class-wide basis, Plaintiffs regularly try to use the fraud-on-the-market theory: that public misrepresentations are baked into the price of a stock traded on an efficient market.  *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958–59 (2021).  But they must prove (not plead) most of the elements of this factual theory to satisfy Rule 23(b)(3).  *Id.*

The same evidentiary rules govern commonality.  If a disputed fact is critical to whether a common question can be answered yes or no for the class, the plaintiff must offer proof.  *Wal-Mart*, 564 U.S. at 351.  This requirement often may not pose much of a commonality obstacle.  An insured, for example, might bring a contract class action claiming that an insurer breached a "standard-form" contract.  *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 458–59 (6th Cir. 2020).  Although commonality turns on a key fact (that the insurer *used* a standard-form contract), the insurer might not even dispute the point.  *See id.*; 1 Rubenstein, *supra*, § 3:24, at 423 & n.21.

Yet *Wal-Mart* shows that this proof requirement can matter to commonality.  There, three plaintiffs asserted that Wal-Mart denied them equal pay and promotions because of their sex in violation of Title VII.  564 U.S. at 343.  The plaintiffs sought to certify a class of 1.5 million.  *Id.*  But they did not allege that Wal-Mart had a uniform policy of discrimination; they alleged that it had a nonuniform policy of "*allowing discretion* by local supervisors over employment matters."  *Id.* at 355.  This theory presented a commonality problem.  "The whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard."  *Id.* at 353.  To prove that a common question could be resolved for the entire class, the plaintiffs needed to show that the policy of giving thousands of managers discretion had led them to exercise that discretion in a uniformly discriminatory way.  *Id.* at 355–56.  The plaintiffs attempted to do so with statistical regression analyses suggesting a nationwide disparate impact

on female employees and anecdotal evidence from 120 employees. *Id.* at 356–59. Yet this proof did not show the existence of a common question that, if answered, would resolve any element in one stroke. *Id.*

Although *Wal-Mart* considered merits-related evidence of sex discrimination, a court should not overread its use of this evidence. At the certification stage, courts may not conduct a "free-ranging" review of the merits. *Amgen*, 568 U.S. at 466. They may peek at evidence on the merits only when required to resolve a Rule 23 issue. *Id.* For commonality purposes, this limit means that we may look at merits evidence only if needed to decide whether a question will *have a common answer* central to each of the class member's claims—not whether the common answer will *favor the class. See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505–06 & n.3 (6th Cir. 2015); *see also, e.g., Bell*, 800 F.3d at 374, 376–79; *Jimenez*, 765 F.3d at 1166 n.5.

*

Under these standards, the district court did not abuse its discretion by finding that common questions existed. *See Hicks*, 965 F.3d at 457, 459. Our reasoning begins with a description of the class and its claims. The court defined the class to include all Air Force members (including those on active duty, in the reserves, in the Air National Guard, and in the Space Force) who:

> (i) submitted a religious accommodation request to the Air Force from the Air Force's COVID-19 vaccination requirement, where the request was submitted or was pending, from September 1, 2021 to July 27, 2022; (ii) were confirmed as having had a sincerely held religious belief substantially burdened by the Air Force's COVID-19 vaccination requirement by or through Air Force Chaplains; and (iii) either had their requested accommodation denied or have not had action on that request.

*Doster*, 2022 WL 3576245, at *3. The Plaintiffs' RFRA and free-exercise claims on behalf of this class differ from their individual claims. The individual claims challenge the Air Force's specific denials of exemptions for the Plaintiffs and seek an injunction to compel the Air Force to grant those specific exemptions. R.1, PageID 19. The class claims challenge the Air Force's "systematic" denial of religious exemptions and seek an injunction to compel the proper "processing" of all exemption requests. *Id.*, PageID 2, 19. The class has also identified at least

two questions: Has the Air Force followed a "de facto policy" of rejecting religious exemptions based on its generalized health and readiness interests in the vaccine mandate?  *Doster*, 48 F.4th at 613.   And has the Air Force followed a "discriminatory policy" of treating religious exemptions less favorably than other exemptions?  *Id.*

These questions satisfy the commonality elements.  They raise the "right" type of questions because they implicate "issue[s]" "central to" the class's RFRA and free-exercise claims.  *Wal-Mart*, 564 U.S. at 350.  As for RFRA, it requires the Air Force to prove that it has a "compelling" interest in enforcing its vaccine mandate against each class member and that the mandate "is the least restrictive means" to achieve that interest.  42 U.S.C. § 2000bb-1(b).  The common questions implicate whether the Air Force has met this test.  Assume that the Air Force has followed a policy of denying all religious exemptions because of, say, its "broadly formulated interest[]" in ensuring that all service members can deploy on short notice.  *O Centro*, 546 U.S. at 431.  This policy would show that the Air Force has been uniformly violating RFRA because it has been failing to undertake the "'more focused' inquiry" that RFRA demands.  *Hobby Lobby*, 573 U.S. at 726 (quoting *O Centro*, 546 U.S. at 430).  Similarly, assume that the Air Force has followed a policy of discriminating against religious objectors by granting far fewer religious exemptions than other exemptions without justification.  This policy would show that the Air Force lacks a compelling interest to enforce the mandate against religious objectors, *see O Centro*, 546 U.S. at 433–34, and that it actually does have the capacity to accommodate them, *see Hobby Lobby*, 573 U.S. at 730–32.

As for the Free Exercise Clause, it requires the government to meet a similar strict-scrutiny test for actions that are not "neutral and generally applicable."  *Fulton*, 141 S. Ct. at 1876–77, 1881.  The question of whether the Air Force has followed a discriminatory policy implicates the preliminary free-exercise inquiry: Is its vaccine mandate a "neutral and generally applicable" regulation?  *Id.* at 1876.  If not, both of the class's common questions would then matter to the Free Exercise Clause's strict-scrutiny test for the same reasons that they matter to RFRA's.  *See id.* at 1881–82; *Lukumi*, 508 U.S. at 546–47.  Admittedly, the Court's decision in *Goldman* (upholding the Air Force's refusal to allow a service member to wear a yarmulke) leaves unclear how these usual free-exercise principles apply in this military context.  Yet the

regulation in *Goldman* arguably was neutral and generally applicable because the military required "standardized uniforms" for everyone. 475 U.S. at 508–09. So this uncertainty only results in another common legal question for the class: Does *Goldman*'s deferential test apply even when the military "proceeds in a manner intolerant of religious beliefs" rather than in a neutral and generally applicable way? *Fulton*, 141 S. Ct. at 1877.

Next, the Plaintiffs have met their burden to establish that these common questions have the "right" kind of yes-or-no answers for the entire class. To be sure, just like Title VII, RFRA and the Free Exercise Clause generally necessitate an individual inquiry into the "crucial question" of "why" the government denied a specific exemption to a specific person. *Wal-Mart*, 564 U.S. at 352. Here, then, a mere allegation that one service member did not receive a religious exemption would not suffice to certify a class of all service members who did not receive one. *See Falcon*, 457 U.S. at 157–59. Like Title VII, however, RFRA and the Free Exercise Clause permit the Plaintiffs to assert a general "pattern or practice" of illegal conduct. *Cooper*, 467 U.S. at 876. After all, this pattern-or-practice approach arises from Rule 23, not anything in Title VII. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 147–50 (2d Cir. 2012). And the Plaintiffs' class claims look similar to other constitutional or statutory claims that courts have certified outside Title VII. *See Gratz*, 539 U.S. at 263–68; *Postawko*, 910 F.3d at 1038; *Ross*, 33 F.4th at 438–39.

Like the plaintiffs in those cases, the Plaintiffs here have adequately proved that each question will "yield a common answer" for the class. *Rikos*, 799 F.3d at 506 n.3. A decisionmaker can answer "yes" or "no" to the question of whether the Air Force has followed a policy of denying religious exemptions based on its generic health and readiness justifications regardless of a service member's circumstances. The Plaintiffs have offered "[s]ignificant proof"—indeed, the evidence is undisputed—that the Air Force has a "uniform" practice of denying religious exemptions to anyone who wants to remain in the service. *Wal-Mart*, 564 U.S. at 355; *Ross*, 33 F.4th at 438. As of July 2022, about 9,754 service members had requested exemptions. The Air Force had granted only 135 of the requests. And it granted these limited requests only to personnel who fit within (or nearly fit within) the administrative exemption because they planned to leave the service within a year. Arg., No. 22-3497, at 51:33–52:07. The

parties "dispute" only the *reason* for the uniform denials.  *Ross*, 33 F.4th at 438.  According to the Plaintiffs, the Air Force has a "standard operating procedure" of violating the law by denying exemptions based on its general health and readiness interests.  *Cooper*, 467 U.S. at 876 (quoting *Teamsters v. United States*, 431 U.S. 324, 336 (1984)).  According to the Air Force, it has examined each member's unique circumstances and reached the conclusion that its compelling health and readiness interests in requiring vaccination win out over every conceivable mix of specific duties and alternative means.  Either way—whether this practice stems from an illegal broad-brush approach or from a legal individualized analysis—the answer will be the same for the whole class.

Likewise, a decisionmaker can answer "yes" or "no" to the question of whether the Air Force has followed a discriminatory policy of denying virtually all religious exemptions but broadly granting other exemptions.  The Plaintiffs have offered "[s]ignificant proof"—again, the evidence is undisputed—that the Air Force treats those requesting religious exemptions differently from those requesting other exemptions.  *Wal-Mart*, 564 U.S. at 355.  Although it has granted no religious exemptions to service members who would like to remain, it has granted well over 4,000 medical and administrative exemptions.  The parties dispute only whether the other exemptions are "comparable" to religious exemptions.  *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *see Ross*, 33 F.4th at 438–39.  According to the Plaintiffs, these exemptions undermine the Air Force's general interests in the same way that religious exemptions do, so this disparate treatment represents unlawful discrimination.  *Cf. Holt*, 574 U.S. at 367–68.  According to the Air Force, religious exemptions are not comparable to the other exemptions because, for example, the former are permanent whereas the latter are temporary.  Either way—whether these exemptions are generally comparable or incomparable—the answer will be the same for the whole class.

\*

The Air Force responds that no common questions exist because: (1) the Plaintiffs did not provide the "significant proof" required for class certification and (2) the alleged policies would not matter for the class's RFRA claims even if the policies existed.  It is twice mistaken.

Response One: The Air Force argues that the Plaintiffs lack "significant proof" of the existence of a general policy. Appellants' Br., No. 22-3702, at 21–27. Yet the Air Force's argument again "confuses the certification stage with the merits stage." *Doster*, 48 F.4th at 613. At this stage, we must ask only if a decisionmaker can answer the Plaintiffs' questions all at once "through evidence common to the class." *Amgen*, 568 U.S. at 467; *Rikos*, 799 F.3d at 506 n.3. The Air Force does not argue that the Plaintiffs' questions flunk that test by requiring member-by-member answers. As with similar pattern-or-practice claims, the evidence will focus not on "individual [exemption] decisions, but on a pattern of [improper] decisionmaking." *Cooper*, 467 U.S. at 876 (quoting *Teamsters*, 431 U.S. at 360 n.46). The Air Force instead argues that the decisionmaker will categorically answer these questions *in its favor* for all class members. But this full-throated "merits" inquiry does not belong at this stage; if anything, it displays the Air Force's own concession that common answers exist. *Ross*, 33 F.4th at 438.

Consider the Air Force's arguments why it does not have a "de facto policy" of denying religious exemptions based on the general interests underlying its mandate. *Doster*, 48 F.4th at 613. It concedes the basic "fact that [it] has overwhelmingly denied religious exemption requests[.]" Appellants' Br., No. 22-3702, at 22. But it says that it has an "overwhelming interest" that uniformly justifies all these denials. *Id.* at 23. What does it offer? It asserts that it must ensure that all personnel "can deploy worldwide on very short notice" and that personnel who do not take the vaccine are nondeployable. *Id.* at 22–23. The Air Force thus relies on its "general interest" in immediate deployability to justify its across-the-board denials. *O Centro*, 546 U.S. at 438. Perhaps the Air Force could prove that this general interest is so compelling that it suffices no matter the many differences in its members' duties. And perhaps it could prove that it has no alternative means to serve this interest other than to fire all unvaccinated personnel. But it is hard to see how its own logic does not prove the Plaintiffs' point: a decisionmaker can answer "yes" or "no" on a class-wide basis whether its general justification can authorize uniform denials.

Or consider the Air Force's arguments why it has not followed a "discriminatory policy" that denies religious exemptions more frequently than other exemptions. *Doster*, 48 F.4th at 613. The Air Force concedes the basic "fact that [it] has granted medical and administrative

exemptions more frequently than religious exemptions[.]"  Appellants' Br., No. 22-3702, at 23.
But it justifies this disparate treatment on the grounds that we have described: religious
exemptions are supposedly permanent; the other exemptions are supposedly temporary.  *Id.* at
23–25, 29–30.  If it can prove that these exemptions are not "comparable," perhaps it could
justify the disparate treatment under RFRA and the Free Exercise Clause.  *Cf. Tandon*, 141 S. Ct.
at 1296; *Holt*, 574 U.S. at 367–68; *O Centro*, 546 U.S. at 433–34.  Yet its reliance on a "common
answer" to justify the disparate treatment of all class members again confirms that the Plaintiffs
raise a common question.  *Rikos*, 799 F.3d at 506; *see Gratz*, 539 U.S. at 267–68.

As these arguments show, the Air Force misreads *Wal-Mart*.  *See Rikos*, 799 F.3d at 505–
06.  *Wal-Mart* did not require the plaintiffs to present significant proof of a policy of sex
discrimination for its own sake.  It instead required the plaintiffs to present this evidence to
ensure that their theory of sex discrimination could "be proved on a classwide basis."  564 U.S.
at 356.  They alleged that Wal-Mart's nonuniform policy of delegating employment decisions to
"thousands of managers" somehow led all the managers to act in a "common way."  *Id.* at 345,
356.  But the plaintiffs failed to identify any "specific employment practice" that these managers
all engaged in.  *Id.* at 357.  So, apart from an inquiry framed at a sky-high level of abstraction
("did Wal-Mart violate Title VII?"), the plaintiffs did not even ask a common *question*, let alone
show that it could be *answered* in the same way for the entire class of 1.5 million employees.

The Plaintiffs, by contrast, do not rely on an oxymoronic theory of uniform
nonuniformity.  Unlike Walmart's delegated decisionmaking, the Air Force centralizes its
decisionmaking.  *Cf. Bell*, 800 F.3d at 375.  The Plaintiffs also do not raise an abstract question
like "did the Air Force violate RFRA?"  They raise concrete questions about whether the Air
Force has a policy of relying on generalized interests to deny religious exemptions and of
treating those exemptions less favorably than others.  And to the extent *Wal-Mart* looked to
significant proof that the alleged policies do in fact exist, the Plaintiffs here have provided it.
Again, the basic facts are undisputed: the Air Force has denied all religious-exemption requests
unless a service member has agreed to leave within a certain time, and it has granted far more
medical and administrative exemptions.  Either the Air Force can justify these policies or it

cannot.  But the Plaintiffs have pointed to specific questions that matter for the class's claims and that a decisionmaker can resolve "in one stroke."  *Wal-Mart*, 564 U.S. at 350.

Response Two: Even if the Air Force followed the policies that the Plaintiffs identify, it next argues, these policies do not violate RFRA.  Appellants' Br., No. 22-3702, at 27–30.  According to the Air Force, RFRA allows it to freely burden a service member's religious beliefs (even for irrational reasons) in its day-to-day operations.  The Air Force says that the statute gets triggered only in judicial proceedings, at which point it must come up with sufficient justifications for its actions under strict scrutiny.  Lest there be any doubt, counsel responded "more or less yes" when asked at argument whether the executive branch took the "position that [it does] not have to worry about RFRA until somebody sues."  Arg., No. 22-3497, at 18:37–:46.  Under this view, even if the Air Force had patently misread RFRA when denying religious exemptions (say, by rejecting all requests on the ground that RFRA does not apply to the military), that universal error provides no basis for class certification.  Instead, the Air Force could correct all such systematic errors by later engaging in the proper case-by-case inquiry in court.

We see nothing in RFRA's text that makes the law a second-class civil-rights statute in the way that the Air Force claims.  That text imposes a categorical limit on government: it "*shall not* substantially burden a person's exercise of religion" unless it can satisfy strict scrutiny.  42 U.S.C. § 2000bb-1(a) (emphasis added).  The law does not say that the government may freely burden a person's religion unless and until the person sues to stop it.

Perhaps the Air Force adopted this view of RFRA because the law's exception to its general ban notes that the government may burden religion if it "demonstrates" that it can satisfy strict scrutiny.  *Id.* § 2000bb-1(b).  RFRA defines "demonstrates" with court-sounding language: to meet the "burdens" of production and "persuasion."  *Id.* § 2000bb-2(3).  Does this definition signal Congress's choice that the government need only come up with reasons for burdening religion in court?  Not at all.  As we explained when applying RLUIPA, the compelling-interest test bars the government from invoking "after-the-fact explanations" to justify actions that have burdened religion.  *Haight*, 763 F.3d at 562.  The reasons that the government recites in court must be the "true" reasons for its actions.  *Id.*; *Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir.

2014) (Gorsuch, J.).   Or, as the Supreme Court explained in the free-exercise context, "[g]overnment 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented post hoc in response to litigation.'"   *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2432 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).   RFRA thus forecloses the Air Force's "burden first, ask questions later" approach.   If it has been systematically denying exemptions based on the policies that the Plaintiffs assert, it has been violating RFRA.   And the Plaintiffs could seek injunctive relief to put a stop to those policies.

## 2.  Typicality

A court certifying a class action must also find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). The district court could reasonably find this factor met largely for the reasons that it found the commonality factor met.   The two factors "tend to merge" in a case like this one.   *Doster*, 48 F.4th at 612 (quoting *Falcon*, 457 U.S. at 147 n.13); *Rikos*, 799 F.3d at 509.   A plaintiff's claims generally will be "typical" of the class's when all of them arise from the same "course of conduct" and assert the "same legal theory."  1 Rubenstein, *supra*, § 3:29, at 444–47; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996).   Here, the Plaintiffs and the class rely on the same pattern of conduct: the Air Force's serial denial of religious exemptions.   And they assert the same theories: that the denials violated the law because of the Air Force's reliance on generic interests and its religious discrimination.

The Air Force responds with two distinct typicality arguments.  It first suggests that it has "unique defenses" against the Plaintiffs because they failed to exhaust their claims and because the claims are not "ripe."   These exhaustion and ripeness defenses are "insignificant" for the reasons that we have explained.  1 Rubenstein, *supra*, § 3:45, at 45, at 505–06.  They thus pose no typicality problem.  *Id.*; *cf. Duncan v. Governor of Virgin Islands*, 48 F.4th 195, 209 (3d Cir. 2022).

The Air Force next suggests that the Plaintiffs (those on active duty or in the reserves) may not represent other categories of service members, such as those in the Air National Guard. At the stay stage, we thought it sufficed to respond that "the Supreme Court's decision in *Gratz* likely refutes that assertion." *Doster*, 48 F.4th at 615. It still suffices. *Gratz* held that a transfer student seeking admission to a university could represent applicants seeking freshman admission because both claims raised the same "set of concerns" against the university's race-based admission policies. 539 U.S. at 265–67. The Air Force's general practice of denying religious exemptions to service members falls within this reasoning. *See* 1 Rubenstein, *supra*, § 3:47, at 524–25.

## C. Rule 23(b)(2)

A court certifying a class action next must find that the class fits within one of Rule 23(b)'s three categories. *See Comcast*, 569 U.S. at 33. Although the district court here relied on both Rule 23(b)(1)(A) and (b)(2), we may uphold its decision based on Rule 23(b)(2) alone. That provision allows a court to certify a class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

This language contains two parts. The class must sue over a uniform action or inaction by the defendant, and it must request a uniform injunction or declaratory judgment from the court. 2 Rubenstein, *supra*, § 4:26, at 113–14; *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (Gorsuch, J.). These requirements are tailor-made for civil-rights cases seeking to stop a general policy or practice. *See Wal-Mart*, 564 U.S. at 361; *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58–59 (3d Cir. 1994); 7AA Charles A. Wright et al., *Federal Practice & Procedure* § 1776, at 83–93 (3d ed. 2005). Indeed, this rule grew out of precedent (like *Brown*) that had used the class-action device to attack "racial segregation" through a "single classwide order." *Wal-Mart*, 564 U.S. at 361; 2 Rubenstein, *supra*, § 4:26, at 116–18.

In this way, Rule 23(b)(2) serves a purpose that is both important and narrow. Importantly, it permits plaintiffs to seek "a *single* injunction or declaratory judgment" that enjoins the challenged policy (or declares it invalid) for the whole class. *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016). Narrowly, it does not permit plaintiffs to seek relief that would require a court to issue "*different* injunction[s] or declaratory judgment[s]" on a member-by-member basis. *Wal-Mart*, 564 U.S. at 360; *Shook*, 543 F.3d at 604. The rule thus merely eliminates the need for each class member to sue for an injunction with the same content. In recent years, courts may have lost sight of this rule because of the growth of "nationwide injunctions or universal remedies" that bar defendants from enforcing laws or regulations against nonparties even *outside* the class-action setting. *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). If, as the rising chorus would seem to suggest, courts eventually scrap these universal remedies, Rule 23(b)(2)'s importance will reemerge. *Cf. id.* at 395 (citing cases); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 475–76 (2017).

That said, Rule 23(b)(2)'s narrow purpose does not foreclose using it as a springboard for additional proceedings. A class action might end with a final "award of prospective relief to the class" that enjoins the challenged practice but permits separate suits by class members seeking individual relief. *Cf. Cooper*, 467 U.S. at 876, 880–81. We, for example, have held that plaintiffs could use Rule 23(b)(2) to obtain a declaratory judgment about the meaning of a standard-form contract, and that class members could later use that judgment "as a predicate for monetary damages" in individual suits. *Gooch*, 672 F.3d at 427–29, 433; *see Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 279–80 (6th Cir. 2018); *see also* 18A Charles A. Wright et al., *Federal Practice and Procedure* § 4455.2, at 444–45 & n.5 (3d ed. 2017).

The Air Force does not seem to dispute that the Plaintiffs here would meet Rule 23(b)(2)'s remedial requirements if they sought an injunction against the illegal policies that they allege. As we noted at the stay stage, such an injunction could enjoin the allegedly illegal policies, "root and branch," and bar the Air Force from taking "adverse action" against class members based on its prior illegal denials of religious exemptions. *Doster*, 48 F.4th at 615. The Air Force instead argues that Rule 23(b)(2) could not apply "[t]o the extent" that the

Plaintiffs ask to litigate individual "RFRA or First Amendment claims that are not based on the purported existence of a systematic policy of denying religious exemption requests[.]" Appellants' Br., No. 22-3702, at 35. Perhaps these individual claims would entail a "different injunction" for each class member in the way that *Wal-Mart* prohibits. 564 U.S. at 360. But this argument is beside the point. The Plaintiffs' *class* claims do rest on a "systematic" policy of violating the law, and only their *individual* claims ask the court to compel the Air Force to grant them exemptions outright. R.1, PageID 2, 19.

Even if the Plaintiffs seek the proper uniform remedy, the Air Force next argues that the district court still abused its discretion by certifying the class action under Rule 23(b)(2). Most significantly, it asserts that class certification of even the narrow class claims would unfairly harm absent class members. Because claim preclusion would bind these members if the class lost, the Air Force reasons, the absent class members might lose the right to litigate "meritorious" RFRA or free-exercise claims tied to their "individual" duties and working conditions. Appellants' Br., No. 22-3702, at 37. The Air Force identifies a legitimate concern. Unlike when a court rejects a request for a universal injunction outside the class-action context (which has no preclusion effects on nonparties), a failed class claim binds all class members. *See Cooper*, 467 U.S. at 874; Michael T. Morley, *De Facto Class Actions?*, 39 Harv. J. L. & Pub. Pol'y 487, 531–33, 541 (2016). But the Supreme Court has already rejected this precise preclusion concern in an analogous context involving a Title VII pattern-or-practice claim. *Cooper*, 467 U.S. at 875–81. Yes, a judgment for the Air Force would prohibit the absent class members from raising the same *pattern-or-practice* claims that the Plaintiffs seek to litigate on behalf of the class. *Id.* at 881. But no, this judgment would not affect the class members' ability to assert their distinct *individual* claims under RFRA or the Free Exercise Clause (like the claims that the Plaintiffs separately raise here). *Id.* Just because a general pattern-or-practice claim fails on its merits does not mean that all fact-specific individual claims fail. *Id.* at 878. So class members "remain free" to litigate those claims elsewhere. 18A Wright, *supra*, § 4455.2, at 444.

The Air Force relatedly argues that the district court lacked the power to alleviate this purported preclusion problem in the way that it did: by allowing class members to opt out of the class. The Air Force is correct that we (like the Supreme Court) have noted in passing that class

members have no *automatic* right to opt out of a Rule 23(b)(2) class action. *See Wal-Mart*, 564 U.S. at 362; *Gooch*, 672 F.3d at 433. But many courts have also held that a district court retains *discretion* to allow class members to opt out of such an action. *See* 2 Rubenstein, *supra*, § 4:36, at 179 & n.8 (citing cases); *see, e.g.*, *Eubanks v. Billington*, 110 F.3d 87, 94–95 (D.C. Cir. 1997). Regardless, we need not conclusively resolve whether we agree with these courts. The Air Force identifies this alleged opt-out problem only to reiterate its preclusion concerns. As we have explained, those concerns are illusory given the nature of the Plaintiffs' class claims.

The Air Force next suggests that the district court failed to properly account for other pending cases brought by other Air Force members when certifying a class action. *See, e.g.*, *Knick v. Austin*, 2022 WL 2157066, at *4–6 (D.D.C. June 15, 2022); *Roth v. Austin*, 2022 WL 1568830, at *13–31 (D. Neb. May 18, 2022). This argument, too, misunderstands the nature of the certified class claims. Because the Plaintiffs seek to litigate pattern-or-practice claims, these general claims will not "improperly interfere" with other claims seeking individual relief and requesting the Air Force to grant an exemption outright. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Cooper*, 467 U.S. at 880; *Fortner v. Thomas*, 983 F.2d 1024, 1031 (11th Cir. 1993). The district court thus did not abuse its discretion by certifying this class action under Rule 23(b)(2).

### D.  Class-Wide Injunction Factors

Even if the district court properly certified a class action, the Air Force lastly contends that the court's class-wide injunction cannot stand. The Air Force criticizes the court for incorporating the reasoning from its narrower order granting the Plaintiffs an injunction into its broader order granting the class an injunction. Yet, when evaluating the preliminary injunction for the class, we must ask the same four questions that we did before. *See NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir. 1989). The analysis thus largely overlaps—a fact that the Air Force recognizes by, for example, relying on identical arguments across its two appellate briefs to suggest that neither the Plaintiffs nor the class members have suffered an irreparable injury. Contrary to its claims, however, the coerced violation of religious beliefs irreparably harms a class member in the same way that it irreparably harms a Plaintiff. *See Roman Cath. Diocese*, 141 S. Ct. at 67; *Korte*, 735 F.3d at 666. We thus need not linger on the Air Force's

duplicative arguments because they fail for the reasons we already explained.  The Air Force does, however, add two distinct class-wide contentions.  It says that the scope of the class-wide injunction exceeds the scope of the RFRA violation.  And it says that the district court's equitable balancing ignored the broader harms that a class-wide injunction would cause.

*Injunction's Scope*.  The Air Force notably does not argue that the Plaintiffs have failed to show a likelihood of success on the merits of their class-wide claims that its broad denial of religious exemptions has arisen from RFRA-violating policies.  It instead offers the conclusory assertion that the district court abused its discretion by issuing a preliminary injunction (barring the Air Force from temporarily disciplining class members) that exceeds the potential scope of final relief (enjoining the Air Force's policies but allowing it to discipline individual class members under an individualized, nondiscriminatory approach).  Appellants' Br., No. 22-3702, at 38–39.

The Air Force does not cite a single case in support of this argument, which confuses the role of a preliminary injunction with that of a permanent one.  As a matter of historical practice, preliminary injunctions have typically sought merely to preserve the "status quo" by stopping a defendant's threatened conduct from causing (irreparable) harm until the court has a meaningful chance to resolve the case on the merits.  *See Burniac v. Wells Fargo Bank, N.A.*, 810 F.3d 429, 435 (6th Cir. 2016); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022); *O Centro Espírita Beneficente União Do Vegetal v. Ashcroft*, 389 F.3d 973, 1012–13 (10th Cir. 2004) (McConnell, J., concurring), *affirmed sub nom.*, *O Centro*, 546 U.S. 418; 11A Charles A. Wright et al., *Federal Practice and Procedure* §§ 2947–48, at 112–13, 124–27 (3d ed. 2013).  A district court enjoys wide latitude when crafting the scope of such temporary relief to fit the equities of a case, *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam), and we review its choices for an abuse of discretion, *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 599 (6th Cir. 2012) (per curiam).

In various situations, courts have recognized that this status-quo relief might look broader than the ultimate relief.  We, for example, preliminarily stopped a school from eliminating a women's sports team for an alleged Title IX violation, while conceding that the university would have discretion to choose how to comply with Title IX at the case's end.  *See Balow v. Mich.*

*State Univ.*, 24 F.4th 1051, 1061 (6th Cir. 2022).  Similarly, another court preliminarily stopped the military from discharging certain service members under a categorical rule treating them as unfit, even though final relief might allow it to discharge them under an "individualized determination" of unfitness.  *Roe v. Dep't of Defense,* 947 F.3d 207, 217, 232–34 (4th Cir. 2020); *see also, e.g.*, *Coal. for Basic Human Needs v. King*, 654 F.2d 838, 842–43 (1st Cir. 1981) (per curiam).

Under these standards, the Air Force's bare-bones argument does nothing to show that the district court abused its discretion by temporarily prohibiting it from engaging in "any disciplinary or separation measures against the members of the Class for their refusal to receive the COVID-19 vaccine[.]"  *Doster*, 2022 WL 3576245, at *3.  The Air Force itself opted to provide the same "temporary exemptions to service members during the pendency of their requests for religious exemptions."  *Doster*, 48 F.4th at 616.  The district court's injunction thus merely retained "*that* status quo" during the pendency of this suit.  *Huisha-Huisha*, 27 F.4th at 733.  And we fully expect that the district court will usher the suit to a swift completion.

*Class-Wide Equities*.  The Air Force ends by pointing out that a preliminary injunction for thousands of class members will cause it to suffer greater harm than a preliminary injunction for the 18 Plaintiffs.  It raises a fair point.  Here again, however, the district court's injunction did not interfere in any operational matters within the Air Force's "professional military judgments." *Winter*, 555 U.S. at 24 (citation omitted).  The injunction broadly permits the Air Force to exercise complete control over how a class member's "vaccination status" should affect its "deployment, assignment, and other operational decisions."  *Doster*, 2022 WL 3576245, at *4; *cf. Austin*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring).

The Air Force also fails to explain how temporarily retaining class members—rather than immediately discharging them—will harm any operational concerns.  *Doster*, 48 F.4th at 616. Its own willingness to exempt these thousands of class members from its mandate while it processed their exemption requests over many months undercuts any such urgent need.  *Id.*  And while the Air Force criticizes the district court's rhetoric, that court did respond to its concerns. At the Air Force's urging, it narrowed the scope of its injunction to permit the Air Force to refuse to enlist or commission new service members who refuse to take a COVID-19 vaccine.

*Doster*, 2022 WL 3576245, at *4.  All told, the district court did not abuse its discretion in extending its narrowly written injunction to the broader class.  *See O Centro*, 546 U.S. at 428.

* * *

We affirm.