# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 29, 2022      Decided December 23, 2022

No. 22-5234

JASKIRAT SINGH, ET AL.,
APPELLANTS

v.

DAVID H. BERGER, IN HIS OFFICIAL CAPACITY AS THE
COMMANDANT OF THE MARINE CORPS, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-01004)

———

*Eric S. Baxter* argued the cause for appellants. With him on the briefs were *Amandeep S. Sidhu*, *Amrith Kaur Aakre*, *Giselle Klapper*, *Daniel H. Blomberg*, *Diana Verm Thomson*, *Daniel D. Benson*, and *Laura Wolk*.

*Joshua C. McDaniel*, *Kelsey M. Flores*, and *Parker W. Knight III* were on the brief for *amici curiae* The Muslim Public Affairs Council and American Islamic Congress in support of appellants.

2

*Jacob T. Spencer*, *Andrew D. Ferguson*, *Joshua R. Zuckerman*, and *John N. Reed* were on the brief for *amicus curiae* Chaplain Jacob Goldstein (ret.) in support of appellants.

*David S. Petron* and *Gordon D. Todd* were on the brief for *amici curiae* Jewish Coalition for Religious Liberty, *et al.* in support of appellants.

*Richard D. Salgado* was on the brief for *amici curiae* The Sikh American Veterans Alliance, *et al.* in support of appellants.

*Sarah M. Harris*, *Mark S. Storslee*, and *Jesse T. Clay* were on the brief for *amici curiae* Former Military Officials Eric Fanning, *et al.* in support of appellants.

*Brian J. Springer*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Michael S. Raab*, Attorney.

Before: MILLETT, RAO, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Jaskirat Singh, Milaap Singh Chahal, and Aekash Singh wish to serve their Nation by enlisting in the United States Marine Corps. They are each fully qualified to enlist, having satisfied the Corps' pre-enlistment criteria. There is just one barrier to their entry. Jaskirat, Milaap, and Aekash are members of the Sikh faith, which requires them, as relevant here, to maintain unshorn hair and beards and to wear certain articles of faith. Those religious practices conflict with the Marine Corps' standard grooming policy for the initial training of newly enlisted recruits,

3

commonly known as boot camp. The Corps has agreed to accommodate Plaintiffs' religious commitments (with some limitations not relevant here) *after* each of them finishes basic training. But it will brook no exception for the Sikh faith during those initial thirteen weeks of boot camp.

The district court denied Plaintiffs' request for a preliminary injunction based solely on an analysis of the public interest. We reverse in part and remand for the prompt issuance of a preliminary injunction in favor of Jaskirat Singh and Milaap Chahal, and for reconsideration of Aekash Singh's request for a preliminary injunction in light of this opinion.

**I**

**A**

This case arises at the intersection of weighty competing interests. On the one hand, "no military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting." *Chappell v. Wallace*, 462 U.S. 296, 300 (1983). Plus the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments" that courts generally are ill-equipped to second guess. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To inculcate the importance to service members of sacrificing "personal preferences and identities in favor of the overall group mission[,]" the military has long had an interest in "the strict enforcement of its uniform dress requirements." *Goldman v. Weinberger*, 475 U.S. 503, 504, 508 (1986).

4

On the other hand, the cost of military service has never entailed the complete surrender of all "basic rights[.]" *Chappell*, 462 U.S. at 304 (internal quotation marks and citation omitted); *see also Rostker v. Goldberg*, 453 U.S. 57, 67 (1981) ("[W]hen it acts in the area of military affairs," "Congress remains subject to the limitations of the Due Process Clause[.]"); *Parker v. Levy*, 417 U.S. 733, 758 (1974) ("[M]embers of the military are not excluded from the protection granted by the First Amendment[.]").

Of particular relevance here, in exercising their "plenary constitutional authority over the military," *see Chappell*, 462 U.S. at 302, the Political Branches have repeatedly required the military to carefully balance its need for disciplined uniformity with the religious needs of service members.

For example, Congress responded promptly and directly to the Supreme Court's decision in *Goldman v. Weinberger*, 475 U.S. 503 (1986), which rejected a service member's First Amendment claim to wear a yarmulke while in uniform, *id.* at 509–510.  A statute passed the following year instructed the military not to ban religious apparel in uniform unless it would "interfere with the performance of the member's military duties" or disrupt a "neat and conservative" appearance.  *See* Pub. L. No. 100–180 § 508, 101 Stat. 1019, 1086–1087 (1987) (codified at 10 U.S.C. § 774).

Then, in 1993, Congress enacted the Religious Freedom Restoration Act ("RFRA"), Pub. L. No. 103–141 (codified at 42 U.S.C. § 2000bb *et seq.*).  RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless the Government "demonstrates that application of the burden to the person" is the "least restrictive means" of furthering a "compelling" interest.  *See* 42 U.S.C. § 2000bb–1(b)(1)–(2).  As the Government has recognized,

5

RFRA, with its demanding compelling-interest and least-restrictive-means test, "undoubtedly 'applies in the military context.'" *United States Navy Seals 1–26 v. Biden*, 27 F.4th 336, 346 (5th Cir. 2022) (quoting *United States v. Sterling*, 75 M.J. 407, 410 (C.A.A.F. 2016), *cert. denied*, 137 S. Ct. 2212 (2017)); *see also* Application for Partial Stay at 22–24, *Austin v. United States Navy Seals 1–26*, No. 21A477, 142 S. Ct. 1301 (March 7, 2022) (government acknowledging that RFRA applies to military decisionmaking); Religious Liberty in the Military Services, Department of Defense Instruction 1300.17 at 1–3 (Jan. 22, 2014) (applying 42 U.S.C. § 2000bb–1 to religious accommodations); Religious Liberty in the Military Services, Department of Defense Instruction 1300.17 at 1–2 (Sept. 1, 2020), J.A. 548–549 (describing its purpose as, in part, to "[i]mplement[] requirements" of RFRA and "to provide, in accordance with the RFRA, that DoD Components will normally accommodate practices of a Service member based on a sincerely held religious belief").

As the Supreme Court has explained, "Congress's express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test, including at the preliminary injunction stage." *Gonzales v. O Centro Espirita Beneficiente União do Vegetal*, 546 U.S. 418, 429–430 (2006) ("*O Centro*"). As under the First Amendment, RFRA's "compelling interest test" is an "affirmative defense" for which the Government bears the burden of persuasion, and it subjects governmental action to strict scrutiny. *See O Centro*, 546 U.S. at 424, 429–430. Strict scrutiny is an "exceptionally demanding" test. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)). If the Government can achieve its interests without burdening religion, "it must do so." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021); *see also Hobby*

6

*Lobby*, 573 U.S. at 728. By subjecting military decisions to RFRA scrutiny, the Political Branches determined, in their expert judgment, that Americans need not surrender their faith to fight for their Nation absent demonstrated necessity.

Since RFRA, Congress and multiple Presidents have doubled down on their commitment to accommodating religion within military life. In the National Defense Authorization Act for Fiscal Year 2013, Congress specifically instructed the military to accommodate the "conscience, moral principles, or religious beliefs" of service members and forbade any disciplinary action based on such beliefs to the extent "practicable." *See* Pub. L. No. 112–239 § 533(a)(1) (codified at note preceding 10 U.S.C. § 1030). Congress expanded that protection the following year by narrowing the grounds on which the military could justify disciplinary action and by requiring an Inspector General report on freedom of religion and conscience in the military. *See* National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113–66 §§ 532–533, 127 Stat. 672, 759–760.

Most recently, in 2015, the Political Branches expressly acknowledged the "numerous religious traditions" represented among service members, including "Christian, Hindu, Jewish, Muslim, [and] Sikh," and determined that this diversity "contributes to the strength" of the armed forces and should be "promote[d]." National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114–92 § 528, 129 Stat. 726, 814; *see also* JOSEPH R. BIDEN, NATIONAL SECURITY STRATEGY 21 (Oct. 2022) ("We will strengthen the effectiveness of the force by promoting diversity and inclusion[.]").

Citing RFRA, and in line with those directives, the Army, Navy, Air Force, and Coast Guard, as well as their training Academies, each accommodate the Sikh religious practices at

7

issue here during both initial recruit training and military service.   Department of the Navy Bureau of Personnel Instruction (BUPERSINST) 1730.11A at 4, 9 (March 16, 2020); Army Directive 2017–03 at 1, 3–5 & Enclosure at 2–4 (Jan. 3, 2017); Department of the Air Force Instruction 36–2903 at 148 (Feb. 7, 2020); Coast Guard Commandant Instruction (COMDTINST) 1000.15 at 4–6 (Aug. 30, 2021).

The Marine Corps, though, has refused in this case to make a religious exception to its uniform and grooming requirements for Plaintiffs during boot camp.   The Corps' Uniform Regulations require men ordinarily to keep "clean-shaven" faces and prohibit wearing religious articles absent authorization.  *See* Marine Corps Order 1020.34H §§ 1001 ¶ 6, 1004  ¶ 4  (May  1,  2018)  ("Marine  Corps  Uniform Regulations").  Also, during boot camp, a male recruit must weekly "have his entire hair length clipped to the scalp[.]"  *Id.* § 1004 ¶ 7a(1)(a)(2); Jeppe Decl. ¶ 17, J.A. 721.

**B**

Sikhism is a monotheistic faith with over 25 million adherents worldwide, making it the fifth-largest religion in the world.   *Religious Accommodations in the Armed Forces: Hearing Before the H. Comm. on Armed Services*, 113th Cong. 107 (2014) (statement for the record of the Sikh Coalition) ("Sikh Coalition Testimony").   Plaintiffs, like many Sikhs, view their faith as one of "courageous warriors against injustice," Compl. ¶ 184, J.A. 39, and Sikhs have served with distinction in the United States military since at least World War I, Sikh Coalition Testimony at 108.

As relevant here, Sikhism forbids its adherents to cut the hair on their head or to shave the hair on their face (*kesh*) and requires men to wear a turban or a *patka* (a smaller covering)

8

over their heads.  *See* Compl. ¶¶ 78–79, 82, J.A. 25–26; Sikh Coalition Testimony at 107.  Adherents also must wear a specific metal bracelet (*kara*).  Compl. ¶ 79, J.A. 25–26. Additionally, those who have gone through an initiation ceremony must carry a small ceremonial dagger under their clothes (*kirpan*), wear specific undershorts (*kacchera*), and insert a small ceremonial comb in their hair (*kanga*).  Compl. ¶ 79, J.A. 25–26; Pl. Opening Br. 10 n.4; *see also Tagore v. United States*, 735 F.3d 324, 328–329 (5th Cir. 2013) (discussing the *kirpan*); *Cheema v. Thompson*, 67 F.3d 883, 884 (9th Cir. 1995) (discussing Sikh articles of faith), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997).  All three plaintiffs may not shave their hair and must wear a *patka* or turban over their heads and a bracelet. Milaap Chahal, having gone through the initiation ceremony, also must wear the dagger, undershorts, and comb.  Pl. Opening Br. 10–11 n.4.

Plaintiffs are lifelong Sikhs for whom the failure to comply with those faith obligations would be intolerable. Cutting one's hair, for example, is "as reprehensible as adultery," as Milaap Chahal attested in his administrative appeal. J.A. 170.  Throughout history, Sikhs have chosen death over cutting their hair.  Compl. ¶ 85, J.A. 27; *see also* Sikh Coalition Testimony at 107 ("[D]enying a Sikh the right to wear a turban and maintain unshorn hair * * * is perceived by followers as the most humiliating and hurtful physical injury that can be inflicted upon a Sikh.").

Between March and November of 2021, Jaskirat Singh, Milaap Chahal, and Aekash Singh sought to enlist in the Marine Corps.  They each passed the Armed Services Vocational Battery test, and were otherwise "found to be mentally, morally, and physically qualified for accession in to the Marine Corps."  Marine Corps Instruction 1730.9 § 4.3

9

(July 12, 2021) (defining a "qualified applicant"); Defs.'
Answer ¶ 27, J.A. 748 (agreeing that Plaintiffs "have been
determined to be 'qualified applicants' for accession pursuant
to Marine Corps Order 1730.9"); *id.* ¶¶ 62–63, 138, 205, J.A.
752, 760, 767.  Each then submitted a pre-accession request for
a waiver of the requirement that they shave their heads and
faces, and permission to cover their heads with a turban or
*patka* and wear a bracelet.  Milaap Chahal also asked to be
allowed to carry the additional articles of faith under his
uniform.

The Marine Corps granted each request in part on
substantially identical terms.  Citing its "compelling interest"
in "instilling in each Marine an identity as part of a team" and
in "break[ing] down recruits' individuality," the Corps
withheld all accommodations during the thirteen-week basic
training program.  J.A. 59; J.A. 165–166; J.A. 236.  But the
Corps committed to allowing Plaintiffs to wear unshorn hair,
neatly tied beards, turbans or *patkas*, and a steel bracelet after
basic training, except "when receiving hostile fire pay or
imminent danger pay," or when a battalion or squadron
commander determines that "operational necessity" requires a
suspension.  J.A. 59; J.A. 164; J.A. 236.  Chahal's request to
wear religious undershorts, a comb, and a ceremonial dagger
also was only granted for after basic training, and subject to
similar conditions.  J.A. 165.

Each Plaintiff timely filed an administrative appeal that
has remained pending for ten to fourteen months.

After receiving no further response on their administrative
appeals, Plaintiffs filed suit in April 2022 against the
Commandant of the Marine Corps and other senior Department
of Defense officials.  As relevant here, the complaint alleges
that the Marine Corps' denial of their requested

10

accommodations during recruit training violates RFRA and the First Amendment. Two days after filing their complaint, Plaintiffs filed a motion for a preliminary injunction "allowing them to maintain their hair, beards, and religious articles (including the turban) during recruit training and for the pendency of this case." Mot. Prelim. Inj. at 19, ECF No. 16, *Toor v. Berger*, No. 22–1004 (D.D.C. April 13, 2022).

The district court denied preliminary relief. While recognizing that the Government faced a strict-scrutiny burden under RFRA, the district court found it "unnecessary" to address the Plaintiffs' likelihood of success on the merits or their irreparable injury because the Government "credibly alleged" that granting the preliminary injunction would "pose a serious threat to national security" by disrupting training methods. Mem. Op. 10–12, J.A. 822–824.

Plaintiffs filed an interlocutory appeal and subsequently moved for an injunction pending appeal or, in the alternative, an expedited appeal. We granted expedition. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## II

A preliminary injunction is an extraordinary remedy that requires a moving party to make a "clear showing" that (1) it has a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) it will likely suffer irreparable harm before the district court can resolve the merits of the case. *See Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016)); *see also Winter*, 555 U.S. at 22.

11

Preliminary injunctions are generally a "stopgap measure" meant only to "preserve the relative positions of the parties" until trial. *Sherley v. Sebelius*, 689 F.3d 776, 781–782 (D.C. Cir. 2012) (quotation omitted). After all, "deciding whether to grant a preliminary injunction is normally to make a choice under conditions of grave uncertainty." *O Centro Espirita Beneficiente União do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (en banc) (McConnell, J., concurring). Bearing in mind that a grant of preliminary relief could prove to be "mistaken" once the merits are finally decided, *id.* at 1017, courts are institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the non-movant ultimately wins on the merits. *Id.* at 1014–1015; *see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 & n.13 (D.C. Cir. 1969). When the injunction addresses military affairs, courts "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 24 (quoting *Goldman*, 475 U.S. at 507).

Each of these weighty circumstances is at play in this case. The proposed injunction would alter "the last uncontested status" before this suit: the Corps' longstanding policy of refusing to accommodate religious objections to shaving during boot camp. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (emphasis and quotation omitted). And Plaintiffs could start and finish their thirteen-week training before the district court can render a final determination on the merits, making the relief granted potentially conclusive on that claim in their complaint.

Although the Government did not ask the district court or this court at the motion stage to apply a heightened standard for preliminary relief, many of our sister circuits have adopted more stringent criteria for injunctions that alter the status quo

12

or grant irreversible relief. *See Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 218 n.1 (3d Cir. 2019) (A "heightened mandatory injunction standard" applies if the injunction "request[s] * * * substantially all of its relief in a way that the relief could not later be undone" or does not "maintain the status quo."); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019) ("Because mandatory preliminary injunctions go well beyond the status quo *pendente lite*, they are particularly disfavored and are not issued in doubtful cases.") (formatting modified and quotation omitted); *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) ("Mandatory preliminary injunctions [generally] do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.") (quoting *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)), *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246–1250 (10th Cir. 2001) (noting that a heightened standard applies if "the effect of the order, once complied with, cannot be undone") (quotation omitted); *Boucher v. Greenfield Sch. Bd.*, 134 F.3d 821, 826 n.6 (7th Cir. 1998) ("A preliminary injunction that would give the movant substantially all the relief he seeks is disfavored, and courts have imposed a higher burden on a movant in such cases."); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 35 (2d Cir. 1995) ("[I]f a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief.").

While we believe that, on the record before us, Plaintiffs would prevail under any of those heightened tests for a preliminary injunction, we decline to reformulate the

13

traditional test set out by the Supreme Court in *Winter*, which considered preliminary injunctive relief aimed at the military. 555 U.S. at 12, 20.  Instead, *Winter* shows that the established test for preliminary relief is sufficiently flexible to take account of all the concerns implicated by the nature of the relief sought here.  After all, "[f]lexibility rather than rigidity has [long] distinguished" equity jurisdiction.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quotation omitted). *Winter*, for its part, already obligates courts to carefully "balance the competing claims of injury[,]" and to weigh the "effect on each party of the granting or withholding of the requested relief."  555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  Properly understood, the "public consequences [of] employing the extraordinary remedy of injunction[,]" *Romero-Barcelo*, 456 U.S. at 312, necessarily include the risk that the relief requested will cause unusual disruption if granted in error, for example by disturbing the status quo in a way that cannot readily be undone.

**III**

Applying *Winter*'s test and taking full account of the additional headwinds the Plaintiffs' request for status-quo-altering and potentially claim-concluding relief faces, we hold that Jaskirat Singh and Milaap Chahal have clearly demonstrated the appropriateness of preliminary injunctive relief.  They have shown not just a likelihood of success, but an overwhelming one, on the merits of their RFRA claim.  The balance of equities and the public interest weigh strongly in favor of issuing the injunction.  And they are now suffering and will continue to suffer grave, immediate, and ongoing injuries to the exercise of their faith.  As for Aekash Singh, he shares that same likelihood of success and balance of interests, but it

14

is unclear on the current record whether he needs injunctive relief before the district court can rule on the merits.

**A**

Plaintiffs "not only have a substantial likelihood of success on the merits—it is difficult to imagine them losing." *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 141 S. Ct. 2485, 2488 (2021).

RFRA forbids the federal government—including the Marine Corps—from "substantially burden[ing] a person's exercise of religion" unless it shows that burden is "in furtherance of a compelling governmental interest" and is the "least restrictive means" of doing so. 42 U.S.C. §§ 2000bb–1(a), (b); *O Centro*, 546 U.S. at 431. In meeting that standard, the Marine Corps cannot rely on "broadly formulated interests." *Hobby Lobby*, 573 U.S. at 726 (quoting *O Centro*, 546 U.S. at 431). Instead, the Corps must demonstrate the specific harm that "would"—not could—result from "granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972)); *see also United States v. Alvarez*, 567 U.S. 709, 725 (2012) (requiring a causal relationship between the restriction imposed and the interest served).

The Marine Corps does not dispute either the sincerity of the Plaintiffs' faith or the Complaint's explanation of why maintaining unshorn hair and carrying religious articles is an inviolable aspect of their religious exercise.

The Marine Corps also acknowledges that refusing the Plaintiffs any religious accommodation during boot camp—which is their only route into service in the Corps—imposes a substantial burden on the exercise of their faith. *See* Gov't

15

Opp. Prelim. Inj. at 2, ECF No. 35, *Toor v. Berger*, No. 22–1004 (D.D.C. May 25, 2022) ("[T]he Government does not contest for purposes of this motion that Plaintiffs' request is rooted in sincerely held religious beliefs and that conforming to the discipline of uniformity during recruit training will burden those beliefs."); *see id.* at 8–9 (arguing only that the denial was "the least restrictive means" of furthering "the compelling interests of mission accomplishment, unit cohesion, and good order and discipline"). The Plaintiffs are, in effect, penalized through the outright denial of their desired military careers solely for practicing their faith.

So the Plaintiffs' likelihood of success comes down to whether the Marine Corps has demonstrated a compelling interest accomplished by the least restrictive means in refusing to accommodate their faith for the thirteen weeks of boot camp. The Marine Corps has failed to meet its burden on both fronts.

**1**

We note at the outset that the Marine Corps does not assert a compelling interest grounded in any safety concerns for Plaintiffs or their fellow recruits arising from the requested accommodations. Neither does it argue that the presence of unshorn hair or faith articles will interfere physically with the boot camp training regimen. Nor does it contend that unshorn hair, groomed in compliance with Marine Corps standards and covered with a turban or *patka*, is incompatible with being a Marine after boot camp. Quite the opposite: The Marine Corps stands ready to accommodate Plaintiffs' unshorn hair and religious articles after boot camp and throughout their careers, with limited exceptions not relevant here. J.A. 59 (memorandum from David A. Ottignon, Deputy Commandant for Manpower and Reserve Affairs, to Jaskirat Singh); J.A. 165–166 (memorandum from Ottignon to Milaap Chahal); J.A.

16

236–237 (memorandum from Ottignon to Aekash Singh); *see also* J.A. 735 (recommendation from Religious Accommodation Review Board that the Corps "approve [Aekash Singh's] request following successful completion of Recruit Training"); J.A. 739 (same for Jaskirat Singh); J.A. 743 (same for Milaap Chahal).

Instead, relying solely on a declaration from Colonel Adam Jeppe, a Marine Corps officer involved in denying Plaintiffs' accommodation requests, the Marine Corps argues that excepting the Plaintiffs from the repeated ritual of shaving their faces and heads alongside fellow recruits, and permitting them to wear a head covering, will impede its compelling interest in forging unit cohesion and a uniform mindset during boot camp. Colonel Jeppe explains that uniformity is crucial to the "psychological transformation" by which civilians acquire the "team mentality," "willingness to sacrifice," and "*esprit de corps*" that are "the hallmark of the Marine Corps." Jeppe Decl. ¶¶ 18–19, J.A. 721. This transformation does not require that "every [M]arine look[] the same." Prelim. Inj. Hr'g Tr. at 17:24–18:1, J.A. 791–792; *see also* Inj. Pending App. Oral Arg. Tr. 33:14–19. Rather, it requires that recruits (1) follow "the same set of regimented practices," Gov't Br. 33, and (2) be "stripped of their individuality," Gov't Br. 20 (quoting Jeppe Decl. ¶ 17 , J.A. 720). Just as all recruits suspend "individual expression, freedom of movement, and freedom of dietary choices," so too, Colonel Jeppe reasons, must Plaintiffs shed religious practices that symbolize their individual beliefs. Jeppe Decl. ¶ 24, J.A. 723.[1]

---

[1] *But see* Oral Arg. Tr. 57:23–58:3 (When asked at oral argument whether the Marine Corps accommodates dietary restrictions at boot camp, counsel for the Corps responded: "My understanding, in general, is that * * * the food that is provided generally accommodates people's dietary restrictions.").

17

We fully credit the vital importance of training Marines "ready to make the sacrifices necessary" to defend the Nation. Jeppe Decl. ¶ 23, J.A. 722.  And we tread with great care knowing that the "complex, subtle, and professional decisions as to the composition[ and] training" of "military force[s]" are matters of expert "military judgment[]" assigned to the Political Branches rather than to the judiciary.  *Gilligan*, 413 U.S. at 10; *see Austin v. United States Navy Seals 1–26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring)*.*  For that reason, we "indulge the widest latitude" in considering the Marine Corps' interest in fostering cohesion and unity among its members, which surely qualifies as compelling. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring).

But even giving the widest berth to the Corps' compelling interest in enforcing its grooming and appearance policies generally, RFRA requires us to ask the more particularized question of whether the Corps "has such an interest in denying an exemption" to these specific plaintiffs. *Fulton*, 141 S. Ct. at 1881; *see also O Centro*, 546 U.S. at 431 (requiring courts to examine "the asserted harm of granting specific exemptions to particular religious claimants").  "Once properly narrowed," *Fulton*, 141 S. Ct. at 1881, the Marine Corps' explanation founders.  More specifically, Colonel Jeppe's claimed compelling need for inflexible grooming uniformity does not stand up against the "system of exceptions" to boot camp grooming rules that the Corps has already created and that seriously "undermine[]" the Corps' contention that it "can brook no departures" for Plaintiffs. *Id.* at 1882.

*First*, the Marine Corps makes medical exemptions from the required shaving of facial hair during boot camp.  As the Navy Surgeon General's "senior dermatology medical advisor" attests, recruits with *pseudofolliculitis barbae*

18

("PFB") develop painful pustules and lesions when shaving. Decl. Capt. Josephine Nguyen, MC, USN ("Nguyen Decl."), J.A. 730–732. PFB is a "common" condition "that occurs mainly in men of African descent." *Id.* ¶ 2, J.A. 730. One study by a Navy surgeon suggests that "approximately 45 to 83% of the African American male population" may suffer from PFB. *See* Jorge Garcia-Zuazaga, *Pseudofolliculitis barbae: Review and Update on New Treatment Modalities*, 168 MILITARY MED. 561, 561 (2003).

The Corps has a detailed protocol for excepting recruits with PFB from the shaving regimen. Recruits in boot camp experiencing a flare-up "typically" receive a "no-shave" waiver for four to eight weeks—that is, for one-third to more than one-half of their basic training. Nguyen Decl. ¶ 5, J.A. 732. "[O]nce shaving bumps subside and after clearance by medical," recruits with mild forms of the condition are allowed to maintain a beard as long as it is "neatly trimmed[.]" Marine Corps Order 6310.1C ("PFB Treatment Protocol") att. 1 ¶ 1h (Oct. 9, 2012), J.A. 260. Recruits with "moderate" cases may forgo shaving or clipping altogether and instead use chemical products to remove the hair if able. *Id.* att. 1 ¶ 2, J.A. 261–262. If the PFB flare-ups continue with clipping or chemicals, an additional four-week exemption from hair removal is available—which would then exempt the recruit from removing facial hair for virtually the entire boot-camp training period. *Id.* att. 1 ¶ 3a, J.A. 263.

These medical exemptions directly undermine the Corps' claimed compelling interest in subjecting Plaintiffs to "the same set of regimented practices" as their peers. *Cf.* Gov't Br. 33. Recruits with PFB routinely will go days or weeks—or almost all of boot camp in some cases—without shaving alongside fellow recruits. That is because skin has to heal and beards have to grow in before clippers or chemicals can even

19

be attempted.  *See* PFB Treatment Protocol ¶ 5d, J.A. 258.  Yet
the Marine Corps nowhere argues or even suggests that
Marines who endure the rigors of recruit training while also
managing painful PFB come out of boot camp with any less
commitment to unit cohesion, self-sacrifice, or discipline than
those who shave daily.

To be sure, regimentation remains for the recruits in that
each one must adhere to the Marine Corps' prescribed
grooming protocol.  But shaving, it turns out, is not an
indispensable component of that regimen.  Instead, the daily
facial grooming ritual to which Colonel Jeppe refers already
involves recruits undertaking varied methods to contain their
facial hair.  Most will shave, some will clip, some will apply
chemicals, and some will do nothing for days or weeks.

Plaintiffs too would be subject to a regimented daily
grooming ritual that would obligate them to neatly groom and
tie their beards on the terms prescribed by the Corps—
presumably the same terms that would govern their post-boot
camp grooming obligations.  *See* J.A. 59 (providing that, for
Jaskirat Singh, when authorized, his "beard must be maintained
in a neat and conservative manner, as determined by [his]
squadron or battalion commander[,]" and that it must be no
more than two inches in length, rolled or tied); J.A. 234 (same
for Aekash Singh); J.A. 166 (same for Milaap Chahal, except
that the beard length with tying is limited to ¼ of an inch); *see
also* U.S. Navy Bureau of Personnel Instruction
(BUPERSINST) 1730.11A ¶ 5(d)(4)(c) (March 16, 2020), J.A.
84 (requiring beards to be "rolled, tied[,] and/or otherwise
groomed to achieve a length not to exceed 2 inches when
measured from the bottom of the chin"); Army Directive 2017-
03, Enclosure at 2–3 (Jan. 3, 2017), J.A. 125–126 (same);
Department of the Air Force Instruction 52–201 att. 7 (June 23,

20

2021) (same); Coast Guard Commandant Instruction (COMDTINST) 1000.15 ¶ 11c(4) (Aug. 30, 2021) (same).

Yet Colonel Jeppe's declaration fails to explain why allowing these three recruits to tightly tie up their beards would interfere with the necessary development of a Marine mindset during boot camp in a way that growing or clipping beards does not.

Instead, the Corps says that medical exemptions are different because recruits with skin conditions are required to shave before arriving at recruit training. But that statement fails to explain how having a clean-shaven face *before* "ship[ping] to Boot Camp," Jeppe Decl. ¶ 30a, J.A. 726, is indispensable to the formation of a Marine over the course of boot camp. Colonel Jeppe's declaration, in other words, fails to connect recruits' initial appearance upon arrival with those day-in and day-out training rituals and regimens for thirteen weeks that he says are so crucial to unit cohesion and stripping away individuality. *See* Jeppe Decl. ¶ 20, J.A. 721. After all, the central purpose of recruit training is to change that individual who shows up on the first day into a fully committed, fit, and able Marine ready for the distinct rigors of service in the Corps.

So the Corps' proffered rationale fails to establish the "direct causal link between the restriction imposed and the [compelling-interest] injury to be prevented" required by RFRA's strict scrutiny test. *Alvarez*, 567 U.S. at 725.

Of course, the reason for exemption would differ between medically exempt and religiously exempt recruits. But that is RFRA's point: Government must, if able, afford religious exercise equal stature with other interests that it accommodates. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1297

21

(2021) (per curiam) (rejecting regulations that "treat[ed] some comparable secular activities more favorably than at-home religious exercise," without "conclud[ing] that those activities pose a lesser risk" of harm); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.") (internal quotation marks and citation omitted; formatting modified).

*Second*, the Marine Corps exempts female recruits from shaving and from cutting their hair altogether. Marine Corps Uniform Regulations § 1004 ¶ 7b(1)(a), J.A. 303 (prescribing short, medium, and long hairstyles for women). Women are allowed instead to wear their hair in several styles. It may be short, medium, or long in length; styled with bangs or layers; and worn in braids, twists, or locs. *Id.* § 1004 ¶ 7b(1)(b), J.A. 303–305. ("Locs" appears as "locks" in the Marine Corps Uniform Regulations.) Women Marines may dye their hair if it "result[s] in natural colors" that "complement the person's complexion," and they may wear a natural-looking wig that otherwise complies with regulations. *Id.* § 1004 ¶¶ 7b(1)(b)(3), (7), J.A. 305.

As the Government notes, women's hairstyles within these categories are regulated in various ways. *See* Gov't Br. 31–32. For instance, bangs cannot be so long that they fall into a Marine's line of sight, and there are limitations on the bulk of tied-up hair of two to three inches. Marine Corps Uniform Regulations § 1004 ¶¶ 7b(1)(a)(2)–(3), J.A. 303.

But what matters here is that female recruits plainly do not engage in the same daily or weekly grooming rituals as one another—let alone as male recruits do. At the same time, they

22

still undergo the regimen of daily conforming their hair to
dictated and detailed standards. *See, e.g.*, Marine Corps
Uniform Regulations § 1004 ¶ 7b(1)(a)(3), J.A. 303 ("Long
hair will be neatly and inconspicuously fastened or pinned,
except that bangs may be worn."); *id.* § 1004 ¶ 7b(1)(b), J.A.
303–304 (requiring hair to "be styled so as not to interfere with
the proper wear of all uniform headgear" and listing hairstyles
"not authorized for wear in uniform"); *id.* § 1004
¶ 7b(1)(b)(1)(e), J.A. 304 ("When worn secured, individual
braids and twists will be small in diameter (no more than 3/8
inch), and will be tightly interlaced/twisted to present a neat,
professional military appearance.").

Women, in other words, do not engage in a daily facial
shaving ritual or even a common-among-females hair styling
regimen.  Nonetheless, they emerge from boot camp as full-
fledged Marines who are as committed to unit cohesion,
stripped of individuality, and ready to defend the Nation as are
male recruits.

Notably, the Marine Corps has been mandated by law to
integrate its male and female recruit training, and that process
has already begun. *See* National Defense Authorization Act of
2020, Pub. L. No. 116–92 § 565, 113 Stat. 1198, 1395–1396
(2019) (codified at note preceding 10 U.S.C. § 8431); *see also*
Oral Arg. Tr. 59.  Yet Colonel Jeppe's declaration nowhere
addressed how denying Plaintiffs an exemption to shaving and
haircut rituals can be a compelling necessity for developing
Marines when male recruits either already do or soon will train
alongside recruits that neither shave nor conform to a single
buzzcut hair style.

*Third*, Colonel Jeppe explains that the Corps has a
compelling interest in minimizing exemptions to its grooming
policies because the "most important element in the Marine

23

Corps' conduct of expeditionary operations is * * * a team-oriented state of mind" at a "whole-of-force level." Jeppe Decl. ¶¶ 25, 31, J.A. 724, 726–727.

While, as a court, we take as given the Corps' judgment about the need for a singular whole-of-force mindset, that claimed interest is troublingly disconnected from the Corps' own leadership recruitment process. Specifically, the Marine Corps is part of the Navy. 10 U.S.C. § 8063(a). So many of its officers are educated and train at the Naval Academy. Yet the Naval Academy accommodates beards, unshorn hair, and the wearing of the same Sikh religious articles at issue here. Gov't Br. 27 ("[T]he Navy has adopted more permissive accommodations policies at the Academy[.]"); Defs.' Answer at ¶ 218, J.A. 769 (admitting that "midshipmen at the U.S. Naval Academy may maintain beards and religious head coverings in certain circumstances"). Notably, those accommodations make no apparent exception for the arduous initial months of the Naval Academy's plebe summer. Likewise, the other military Academies' accommodation policies do not change during the Army's and Air Force's basic training for cadets, or the Coast Guard's swab summer. Memorandum from Steven W. Gilland, Brigadier General, Commandant of Cadets to Brigade Tactical Officer, U.S. Corps of Cadets ¶¶ 2–4, ECF No. 13 Ex. A, *Chahal v. Seamands*, No. 17–12656 (E.D. Mich. Aug. 24, 2017) (permitting cadets at "the United States Military Academy" to wear "a turban/under-turban in a matching camouflage pattern," among other accommodations for cadets with accommodations for "uncut beard and uncut hair"); Air Force Cadet Wing Instruction 36–3501  ¶ 6.2.1.2.1 (Aug. 12, 2020) ("Cadets may * * * grow/wear * * * beards * * * with an approved religious accommodation request using the process outlined in [Air Force Instruction] 36–2903."); Coast Guard Commandant Instruction (COMDTINST) 1000.15 ¶¶ 4, 11c (Aug. 30, 2021)

24

(applying religious accommodation policy to "Coast Guard Academy cadets").

The Government advises that, after graduating from the Naval Academy, cadets who wish to enter the Marine Corps must go through a four-week Leatherneck training program and then six months at The Basic School. Gov't Br. 27–28. Yet in denying Plaintiffs their accommodations, the Marine Corps never addressed the fact that those expeditionary officers might be accommodated through their training. *See* Oral Arg. Tr. 42:21–25 (Q: "You're not aware that [religious accommodations] are stripped away, having been granted for four years, including summers working with the Marines?" A: "Not aware of that, Your Honor."); *see also* Gov't Br. 26 ("[R]eligious apparel that is not visible or apparent in uniform"—like the comb, ceremonial knife, and undershorts sought to be worn by Milaap Chahal—"is permitted in some instances" during Officer Candidates School.).

*Fourth*, the Marine Corps has chosen to moderate its grooming requirements when doing so advances recruitment interests. Specifically, the Corps permits tattoos anywhere on a recruit's body except for their head, neck, or hands—and even that latter restriction is subject to exceptions. Marine Corps Bulletin 1020 at 3 (Oct. 29, 2021), J.A. 64 ("Marines or applicants with tattoos or brands outside of the authorized areas * * * may request an exception to policy to the appropriate adjudicating authority," although they are "not likely to be approved.").

Yet tattoos are a quintessential expression of individual identity. Still, the Corps permits them during boot camp not because tattoos comport with the Corps' interest in stripping recruits of individuality, but because "their prevalence in

25

society creates a potential problem for recruitment," and they "cannot be readily removed[.]" Jeppe Decl. ¶ 32(a), J.A. 727.

If the need to develop unit cohesion during recruit training can accommodate some external indicia of individuality, then whatever line is drawn cannot turn on whether those indicia are prevalent in society or instead reflect the faith practice of a minority. *See Larson v. Valente*, 456 U.S. 228, 245 (1982) ("Free exercise thus can be guaranteed only when legislators * * * are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations."); *cf. Railway Exp. Agency v. New York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring) ("The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.").

Nor can the Marine Corps tenably rely on the difficulty of tattoo removal to justify the differential treatment. Sikhs have historically endured persecution, torture, and death rather than surrender their faith indicia. *See, e.g.*, A. Walter Dorn & Stephen Gucciardi, *The Sword & the Turban: Armed Force in Sikh Thought*, 10 J. MILITARY ETHICS 52, 64–66 (2011). So the removal of a religiously commanded article of faith could be far more "difficult" for Plaintiffs than the temporary physical discomfort of a tattoo's excision.

In short, even fully crediting the Marine Corps' overarching compelling interests in developing unit cohesion, stripping individuality, and building a team-oriented state of mind, the Government has not come close to meeting its burden of showing "why it has a particular interest" in denying hair, beard, and religious article exceptions to these Plaintiffs "while

26

making them available to others" in the same or analogous form. *See Fulton*, 141 S. Ct. at 1882. In other words, the Corps has not shown, in light of its preexisting exemptions to the grooming process—which go largely unexamined by Colonel Jeppe—that denying these accommodations would have any impact on its claimed interests. *See Alvarez*, 567 U.S. at 725; *O Centro*, 546 U.S. at 431.

**2**

Plaintiffs' prospects of success are even greater because the Marine Corps has failed to demonstrate that denying Plaintiffs the same accommodations during boot camp that they would be given during later service in the Corps is the "least restrictive means" of advancing its interest in developing unit cohesion and a team-oriented mindset. *Hobby Lobby*, 573 U.S. at 691.

Specifically, the Marine Corps has not shown that its approach is "narrowly tailored" in pursuit of those interests. *Hobby Lobby*, 573 U.S at 719 n.30; *see Church of the Lukumi Babalu Aye*, 508 U.S. at 546. A government policy is not narrowly tailored when it is either overinclusive or underinclusive—and on this record, the Corps' policy is both. *See Holt*, 574 U.S. at 367; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 546. The Corps likewise has wholly failed to explain how its asserted national security harms "would" result just from accommodating these Plaintiffs in a manner similar to exemptions already made on a daily basis. *See O Centro*, 546 U.S. at 431 (quoting *Yoder*, 406 U.S. at 236).

At the outset, the Corps' claimed inability to depart from uniform shaving and haircuts is materially undermined by the already noted exemptions for medical beards, women's hairstyles, at least some aspects of officer training, and tattoos. That itself is powerful evidence that the Corps' policy is not

27

narrowly tailored. *See Holt*, 574 U.S. at 367–368 (finding that the Government failed to explain "why its grooming policy is substantially underinclusive" when it rejected petitioner's request to grow a ½-inch beard as part of his religious observance while it permitted ¼-inch beards for medical reasons and hair of ½-inch length on heads); *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 547 ("[T]he ordinances are underinclusive to a substantial extent with respect to each of the interests that respondent has asserted, and it is only conduct motivated by religious conviction that bears the weight of the governmental restrictions."); *Hobby Lobby*, 573 U.S. at 728.

In addition, the Marine Corps has provided no evidence that it even considered less restrictive alternatives. While the Corps need not refute every conceivable option to show its policy is the least restrictive means of advancing a compelling interest, it must at minimum explain why obvious and available alternatives are not workable. *Holt*, 574 U.S. at 365–367. Even when RFRA requires great deference, as it surely does here, the Government still must provide "persuasive reasons" for rejecting readily at hand alternatives, especially those that have been proven to work in analogous circumstances. *See id.* at 368–369.

The Plaintiffs have convincingly shown that the Marine Corps has failed to grapple with that aspect of the least-restrictive-means requirement. For example, nowhere do the Marine Corps' accommodation denials, Colonel Jeppe's declaration, or the Government's briefs in this court explain why the Corps cannot apply the same or similar accommodations that the Army, Navy, Air Force, and Coast Guard provide in recruit training, both at boot camp and in the Academies.

28

The Navy, for example, allows members to seek an accommodation to wear unshorn hair and a beard for religious reasons, provided that the beard is neatly groomed or tied, and it permits Sikhs to retain their other articles of faith. Its standards and procedures governing religious accommodations provide that sailors may apply to wear a turban, among other religious head coverings, and that unless safety requires otherwise, a sailor granted such an accommodation is not required to wear military headgear on top of their religious head covering. A sailor can seek permission to wear unshorn hair in a *patka* or turban and a beard, provided that beards are "worn in a neat and conservative manner" and do not exceed two inches in length or may be groomed to not exceed two inches. Bureau of Navy Personnel Instruction (BUPERSINST) 1730.11A ¶ 5(d)(4) (March 16, 2020), J.A. 84.[2]

Given that the Marine Corps is part of the Department of the Navy and designed for "service with the fleet," 10 U.S.C.

---

[2] The Army, Air Force, and Coast Guard have similar policies. The Army maintains the same guidelines for beard length and appearance. Army Directive 2017–03 Enclosure at 2–3 (Jan. 3, 2017), J.A. 125–126. In addition, "[a]n accommodated Soldier may wear a turban (or under-turban or *patka*, as appropriate) made of a subdued material in a color that closely resembles the headgear for an assigned uniform[,]" so long as the head covering is "worn in a neat and conservative manner that presents a professional and well-groomed appearance." *Id.* at 3, J.A. 126. The Air Force may also approve accommodations for turbans, beards, and unshorn hair with the same guidelines as the other branches. *See* Religious Freedom in the Department of the Air Force, Department of the Air Force Instruction (DAFI) 52–201 at 32–33 (June 23, 2021) (template for "turban, uncut beard and hair approval memorandum"). The Coast Guard also allows waivers of its grooming policy for turbans, unshorn hair, and beards if neatly groomed. Military Religious Accommodations, Coast Guard Commandant Instruction (COMDTINST) 1000.15 §§ 11(c)(4), (6) (Aug. 30, 2021).

29

§ 8063(a), the Marine Corps' failure to consider the accommodations made by the Navy takes much air out of its least-restrictive-means claim. We are left with no explanation why accommodations work for sailors but not Marines serving on the same ships or at the same bases. Perhaps there is a reason. But the Marine Corps has not voiced it at any point over the last nearly two years of litigation and has no apparent plans to do so. *See* Defs. Objs. & Resps. Pls.' 1st Set Interrogs. at 2, ECF No. 66–1, *Toor v. Berger*, No. 22–1004 (D.D.C. Dec. 12, 2022) (opposing discovery on religious accommodation practices "outside of the Marine Corps" because they are "of tangential, if any, relevance to the claims at issue in this case[.]").

That void leaves this court no basis to conclude that similar accommodations would be inimical to developing excellent and team-oriented Marines. *See Holt*, 574 U.S. at 368–369 ("'While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction.' That so many other prisons allow inmates to grow beards while ensuring prison safety and security suggests that the Department could satisfy its security concerns through a means less restrictive than denying petitioner the exemption he seeks.") (quoting *Procunier v. Martinez*, 416 U.S. 396, 414 n.14 (1974)).

The Marine Corps instead relies on its status as the only fully "expeditionary" unit within the military. Jeppe Decl. ¶¶ 25, 31, J.A. 723–724, 726–727. Such expeditionary service, Colonel Jeppe explains, may require quick responses "to a broad variety of crises and conflicts across the full spectrum of military operations anywhere in the world." Jeppe Decl. ¶ 25, J.A. 723–724.

30

That may well be true.  But the expeditionary function of Marines after they complete boot camp or the Academy is orthogonal to the only issue in this case, which is whether accommodations will be provided to recruits in Marine boot camp.  No one in boot camp is deploying on a military expedition.

To the extent Colonel Jeppe means that rigid grooming requirements are required to develop an "expeditionary mindset," Jeppe Decl. ¶¶ 25, 26, 28, J.A. 724–725, that claim cannot be reconciled with the exemptions already made for other Marine recruits' beards, hair, and other individual physical indicia.  More specifically, Colonel Jeppe offers no word of explanation as to why accommodating Sikh beards that are neatly groomed and tied, or unshorn hair neatly wrapped in a *patka* or turban, would impair the development of the Marine expeditionary mindset in a way that beards grown by individuals with PFB or unshorn hair worn by women recruits or officers has not.

Colonel Jeppe likewise offers no support for his concern that accommodating these Plaintiffs could have a "cumulative impact" on the Corps' "whole-of-force" expeditionary mindset, *see* Jeppe Decl. ¶¶ 10c, 31, J.A. 717, 726, that would outstrip the effects of the exemptions already allowed.  *See O Centro*, 546 U.S. at 435–436 (rejecting "the classic rejoinder of bureaucrats throughout history:  If I make an exception for you, I'll have to make one for everybody, so no exceptions"); *Yellowbear v. Lampert*, 741 F.3d 48, 62 (10th Cir. 2014) (Gorsuch, J.) ("It can't be the case that the speculative possibility that one exception conceivably might lead to others is always reason enough to reject a request for the first exception.") (emphasis omitted).

31

On top of that, the Corps nowhere wrestles with its own history of flexible grooming and uniform requirements. The Marine Corps has been an "expeditionary" force since its creation in 1775. *See* 3 JOURNALS OF THE CONTINENTAL CONGRESS, 1774–1789 at 348 (1904–1937); An Act for the establishing and organizing a Marine Corps § 6, 1 Stat. 594, 596 (1798) ("[T]he [M]arine [C]orps established by this act, shall, at any time, be liable to do duty in the forts and garrisons of the United States, on the sea coast, or any other duty on shore, as the President, at his discretion, shall direct."); Oral Arg. Tr. 61:15–19, 61:25–62:07.

Yet the Corps' current policy forbidding facial hair has been in place only since 1976. MARINE CORPS UNIFORM REGULATIONS (1976) §§ 1101.1(a), (b). For at least the first 150 years of the Corps' history, including through the Revolutionary War and two World Wars, beards were fully compatible with the Marine Corps' mission success and expeditionary mindset. *General Order*, *in* REGULATIONS FOR THE UNIFORM AND DRESS OF THE NAVY AND MARINE CORPS OF THE UNITED STATES (1852) (permitting beards if not "worn long"); UNIFORM REGULATIONS, U.S. MARINE CORPS § 32 (1917) ("[A] mustache, or beard and mustache, may be worn at discretion."); UNIFORM REGULATIONS, U.S. MARINE CORPS § 32 (1912) (same); *see also* ROBERT H. RANKIN, UNIFORMS OF THE SEA SERVICES 129 (1962) (describing changes in the Corps' uniform hair styles over time, including a "queued" ponytail during the early Republic); *see generally* UNIFORM REGULATIONS, U.S. MARINE CORPS (1937) (making no mention of facial hair).

That is not to say that military practices cannot evolve over time. They certainly can. But RFRA requires that a claim of inflexible necessity not completely ignore past practice. Said another way, the Marine Corps' admission that the grooming

32

policy being enforced against Plaintiffs has only been part of developing Marine recruits for "decades," Jeppe Decl. ¶ 27, J.A. 724–725, raises least-restrictive-means question marks that the Corps, on this record, has left unaddressed and seemingly unconsidered.

Finally, the Plaintiffs have shown that the Corps' flat refusal to permit Plaintiffs' other articles of faith, even those that are invisible to the eye because they are worn under clothing or head wear (the comb, ceremonial knife, and undershorts), similarly fails narrow tailoring.  The Marine Corps has not offered a single word of defense for that aspect of the decision denying accommodations either in its appellate brief or in its earlier opposition to Plaintiffs' request for an injunction pending appeal.  Gov't Br. 14–45; Gov't Resp. in Opp. to Pl. Mot. For Inj. Pending App. 8–22.  In addition, the other military branches and the Corps' own regulations have long permitted the wearing of discreet religious wristbands and other articles of faith during military service.  *See* Marine Corps Uniform Regulations § 1101.4 (1983) (allowing "inconspicuous wristwatches, watchbands and rings" while in uniform).  Such silence does nothing to meet RFRA's demanding burden of least-restrictive-means justification for substantial burdens on religious exercise.

\* \* \* \* \*

To sum up, Plaintiffs have demonstrated not just a likely, but an overwhelming, prospect of success on the merits of their RFRA claim.  At a general level, the Government has certainly articulated a compelling national security interest in training Marine Corps recruits to strip away their individuality and adopt a team-oriented mindset committed to the military mission and defense of the Nation.  But RFRA requires more than pointing to interests at such a broad level.  *Holt*, 574 U.S.

33

at 363. The Marine Corps has to show that its substantial burdening of these Plaintiffs' religion furthers that compelling interest by the least restrictive means. That is where the Marine Corps has come up very short given (1) the series of exemptions for unshorn head and facial hair already allowed; (2) the absence of any particularized explanation as to why regulating Plaintiffs' maintenance and grooming of their beards and hair would interfere with the development of Marines' fitness in a way that other analogous exemptions have not; and (3) the failure of the Corps to even consider, let alone refute, that less restrictive alternatives would serve the Corps' recruit-training interests.

There may well be ways in which the recruit training needs of the Marine Corps differ from those of the other military branches, and there no doubt are aspects of the training regimen that cannot safely be compromised. But Plaintiffs have persuasively shown that, after almost two years of administrative and legal proceedings, the Marine Corps has not come forward with any justification for denying these requested accommodations during boot camp that could meet RFRA's stringent burden. While the Government remains free to offer further justifications before the district court, it has offered this court no reason to believe that any such representations will change the record in a relevant way. *See* Oral Arg. Tr. at 31:14–17 ("The * * * Government won't change its reasons[.]"); Defs. Objs. & Resps. Pls.' 1st Set Interrogs. at 2, ECF No. 66–1, *Toor v. Berger*, No. 22–1004 (D.D.C. Dec. 12, 2022) ("[T]he parties agree that the 'core factual issues are not in dispute at this stage of the litigation.'") (quoting Joint R. 26(f) Report & Disc. Plan at 1, ECF No. 54, *Toor v. Berger*, No. 22–1004 (D.D.C. Sept. 21, 2022)).

Because RFRA claims "should be adjudicated in the same manner as constitutionally mandated applications" of the strict

34

scrutiny test, we need not address the Plaintiffs' likelihood of success on their First Amendment claim, which would at most require the application of the standard that RFRA already imposes on the Corps' denial of accommodations. *O Centro*, 546 U.S. at 430; *see Jarkesy v. S.E.C.*, 803 F.3d 9, 25 (D.C. Cir. 2015) ("Out of respect for the political branches, courts generally avoid ruling on constitutional grounds when possible.") (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring)).

**B**

On this record, the public interest and the balance of equitable considerations weigh strongly in favor of granting an injunction. The balance of the equities and the public interest "merge when, as here, the Government is the opposing party," so we address them together. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)) (formatting modified).

On the Plaintiffs' side of the balance is the weighty public interest in the free exercise of religion that RFRA protects. Though we do not address the Plaintiffs' likelihood of success on their First Amendment claim, when it comes to the balance of interests, we can fairly take note of the parallelism between RFRA and the First Amendment, which imposes the same strict scrutiny test as RFRA on governmental actions that selectively exclude religious exercise from exemptions afforded to others for secular reasons. *See, e.g.*, *O Centro*, 546 U.S. at 429–430; *Church of the Lukumi Babalu Aye*, 508 U.S. at 546–547; *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008). Indeed, the Marine Corps' defense against the Plaintiffs' First Amendment–based request for a preliminary injunction simply incorporates in one paragraph its insufficient defense under RFRA. Gov't Br. 34–35.

35

So when viewed through the lens of RFRA, much like under the First Amendment, the Plaintiffs have demonstrated a weighty public interest in vindicating their claim to fair treatment in the Marine Corps' exemption process. *Cf., e.g.*, *Karem*, 960 F.3d at 668 ("[E]nforcement of an unconstitutional law is always contrary to the public interest.") (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

On the Government's side of the balance, we accord relevant weight to the nature of the requested injunction as one that will change the status quo in military training during litigation and could grant potentially dispositive relief on a central claim in the case because of boot camp's relatively short duration.

We conclude those interests are outweighed in this case by the Plaintiffs' convincing showing of the Marine Corps' broad failure to demonstrate, at this preliminary stage, a rational connection between its asserted training interests and the failure to extend to Plaintiffs the same type of accommodations it already affords others for secular reasons. The declaration from Colonel Jeppe also fails entirely to address whether less restrictive means could accommodate both the Corps' own needs and those of Plaintiffs.

To be sure, Colonel Jeppe's declaration asserts that accommodating the Plaintiffs would imperil the national security by interfering with the training of Marines for their expeditionary role and the rigors of service in the Corps. Jeppe Decl. ¶ 27, J.A. 724–725. Needless to say, protecting the national security is an interest of paramount concern. *See Winter*, 555 U.S. at 24–25. And courts are loath to second-guess the judgments of the Political Branches in that regard. *See id.* at 24.

36

But unlike *Winter*, the "most senior officer[]" in the military, 555 U.S. at 24, to speak on this issue—the Commander in Chief—has voiced a profound national interest in diversity within the military.  *See* JOSEPH R. BIDEN, NATIONAL SECURITY STRATEGY 21 (Oct. 2022); Jim Garamone, *Biden Showcases the Strength, Excellence of American Military Diversity*, U.S. DEP'T OF DEFENSE (March 8, 2021), https://www.defense.gov/News/News-Stories/ Article/Article/2529262/biden-showcases-the-strength-excelle nce-of-american-military-diversity/ (last visited Dec. 16, 2022).  Even more, three different Presidents have joined with four different Congresses over the last 35 years to codify into law the imperative that military commanders make military service compatible with diverse religious traditions, "including Christian, Hindu, Jewish, Muslim, [and] Sikh" faiths.  Pub. L. No. 114–92 § 528; *see* 42 U.S.C. § 2000bb–1(b); 10 U.S.C. § 774; Pub. L. No. 113–66 §§ 532–533; *see also* Remarks at a Joint Reserve Officer Training Corps Commissioning Ceremony, 1 PUB. PAPERS 596 (May 17, 2007) (statement of President George W. Bush praising "the great diversity of the American people" represented in the Armed Forces).

In addition, Colonel Jeppe's superiors within the Marine Corps have themselves stressed that "the readiness and mission success of our * * * Marine Corps" is "inextricably linked" to its diversity.  Memorandum for Assistant Secretaries of the Navy, General Counsel, Commandant of the Marine Corps, and Chief of Naval Operations, *Department of the Navy Diversity, Equity, and Inclusion Going Forward* 1 (Nov. 15, 2021), J.A. 543; *see also* JOSEPH R. BIDEN, NATIONAL SECURITY STRATEGY 21 (Oct. 2022) ("[P]romoting diversity and inclusion" will "strengthen the effectiveness of the military.").

37

Importantly, Plaintiffs have shown at this preliminary stage that the accommodations they seek will both increase religious diversity in the Marine Corps and fully comport with military training needs. Colonel Jeppe's lone declaration does not demonstrate otherwise or even address those instructions from Presidents and Congresses. Under these unusual circumstances, and given the courts' respect for the Political Branches' expertise in handling military matters, the public interest and the balance of equities in this case weigh decisively in favor of preliminary relief.

Finally, while the record establishes that preliminary relief is warranted, this decision in no way prejudges the Government's ability going forward to defend its policy on the merits before the district court. *Sherley*, 689 F.3d at 782 ("To the extent an appellate court predicts, without making a definitive legal conclusion, that the plaintiffs *probably* or *likely* will or will not succeed on the merits, it cannot be said that the court 'affirmatively decided' the issue such that it would bind an appellate court at a later stage of the litigation.") (quoting *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995)).

## C

Two of the plaintiffs—Jaskirat Singh and Milaap Chahal—also have demonstrated that they are currently suffering continuing irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)). At least when, as here, the Government has not argued that there is any relevant daylight between the RFRA and First Amendment analyses, then a comparably irreparable injury

38

applies to violations of RFRA. *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (en banc), *aff'd*, 573 U.S. 682 (2014); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

Still, preliminary relief is the rare exception, and even in claims of constitutional or RFRA violations, a preliminary injunction will issue only if the asserted harm will certainly accrue "in the absence of preliminary relief"—that is, before the district court can resolve the case on the merits. *Winter*, 555 U.S. at 20. The asserted irreparable injury, in other words, must be ongoing or "imminen[t]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)) (emphasis omitted).

Milaap Chahal and Jaskirat Singh have made that showing. The Corps recognizes that they are otherwise fully qualified to enlist in the Marine Corps, and they would join the Corps immediately but for the Corps' refusal to extend existing hair and shaving exemptions to their exercise of faith or to accommodate their religious articles. Notice of Supp., att. 1 ¶ 9, ECF No. 60, *Toor v. Berger*, No. 22–1004 (D.D.C. Nov. 29, 2022); *id.* att. 3 ¶ 6. Each day that the Marine Corps refuses to let them take the oath of enlistment unless they surrender their faith inflicts an irreversible and irreparable harm. They are forced daily to choose between their religion and "the performance of [the] supreme and noble duty of contributing to the defense of the rights and honor of the nation," *Arver v. United States*, 245 U.S. 366, 390 (1918), and are subjected to the "indignity" of being unable to serve for reasons that, on this record, "bear[] no relationship to their ability to perform," *Roe v. Shanahan*, 359 F. Supp. 3d 382, 419–420 (E.D. Va. 2019) (quoting *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993)).

39

The appropriateness of injunctive relief at this time is less clear for Aekash Singh.  To be sure, he has the same likelihood of success on the merits and the balance of interests equally favors him.  He also persuasively alleges that the Marine Corps already inflicted irreparable harm when he attempted to swear into the Corps and was told he could not unless he promised to cut his hair and remove his turban.  Compl. ¶ 188, J.A. 40.  But redress for that past injury does not depend on obtaining preliminary relief now.  As for his present or future intention to join the Corps, counsel has advised this court that Aekash Singh may have postponed his plans to enlist until at least 2024. *See* Pl. Opening Br. 24; Notice of Supp., att. 2 ¶ 4, ECF No. 60, *Toor v. Berger*, No. 22–1004 (D.D.C. Nov. 29, 2022).  Because this factual issue bearing on when Aekash Singh now plans to enlist was not raised before the district court, we leave it to that court on remand to determine whether his injury is currently or will be imminently sufficient to warrant the issuance of preliminary relief.

**IV**

Plaintiffs have shown both an overwhelming likelihood of success on the merits and that the balance of the equities and public interest weigh in their favor.  Jaskirat Singh and Milaap Chahal have also shown ongoing irreparable injury.  For those reasons, we reverse the district court's denial of preliminary injunctive relief for Jaskirat Singh and Milaap Chahal and remand to the district court for the prompt entry of a preliminary injunction requiring the Marine Corps to allow them to enlist without shaving their heads or beards and while bearing those articles of faith that the Government failed to argue against on appeal.

We remand for further consideration of Aekash Singh's request for a preliminary injunction in light of this opinion and

40

the declaration recently filed in district court addressing the
timing of his desired accession into the Marine Corps.

*So ordered.*